# EXHIBIT B



# FRANCHISE AGREEMENT

FRANCHISEE: _Lousianna_

DATE: _11/6/15_

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | GRANT OF FRANCHISE | 1 |
| 3. | TERRITORIAL RIGHTS AND LIMITATIONS | 1 |
| 4. | TERM AND RENEWAL | 1 |
| 5. | TRAINING AND CONFERENCES | 2 |
| 6. | OTHER FRANCHISOR ASSISTANCE. | 2 |
| 7. | ESTABLISHING YOUR VIDA-FLO CLINIC | 3 |
| 8. | MANAGEMENT AND STAFFING. | 4 |
| 9. | FRANCHISEE AS ENTITY | 5 |
| 10. | GUARANTY | 6 |
| 11. | ADVERTISING & MARKETING. | 6 |
| 12. | OPERATING STANDARDS. | 7 |
| 13. | FEES | 9 |
| 14. | RESTRICTIVE COVENANTS. | 10 |
| 15. | YOUR OTHER RESPONSIBILITIES | 12 |
| 16. | INSPECTION AND AUDIT | 13 |
| 17. | INTELLECTUAL PROPERTY | 14 |
| 18. | INDEMNITY | 15 |
| 19. | TRANSFERS | 15 |
| 20. | TERMINATION | 17 |
| 21. | POST-TERM OBLIGATIONS. | 18 |
| 22. | DISPUTE RESOLUTION. | 20 |
| 23. | YOUR REPRESENTATIONS | 20 |
| 24. | GENERAL PROVISIONS | 21 |

<u>ATTACHMENTS</u>

| | |
|---|---|
| ATTACHMENT "A" | Definitions |
| ATTACHMENT "B" | Franchise Area |
| ATTACHMENT "C" | Form of Site Approval Letter |
| ATTACHMENT "D" | Lease Addendum |
| ATTACHMENT "E" | Personal Guaranty |
| ATTACHMENT "F" | ACH Authorization Form |
| ATTACHMENT "G" | Nondisclosure, Nonsolicitation and Noncompetition Agreement |
| ATTACHMENT "H" | Confidentiality Agreement |
| ATTACHMENT "I" | State Addendum |

## VIDA-FLO FRANCHISE AGREEMENT

This Vida-Flo Franchise Agreement (this "Agreement") is entered into as of *November 6*, 20*15* (the "Effective Date") between Hydration Station USA Franchise System, LLC, a Georgia limited liability company ("we" or "us") and *Vida-Flo Louisiana, LLC*, a(n) *Louisiana LLC* ("you").

1.      **DEFINITIONS.** Capitalized terms used in this Agreement are defined either in the body of this Agreement or in ATTACHMENT "A". For capitalized terms that are defined in the body of this Agreement, ATTACHMENT "A" lists the Sections of this Agreement in which such terms are defined.

2.      **GRANT OF FRANCHISE.** We hereby grant you a license to own and operate a Vida-Flo clinic (your "Business" or your "Clinic") using our Intellectual Property from a single location that we approve. As a franchisee, you will establish and operate a specialized medical clinic that offers rehydration treatments and related services to individuals for a variety of purposes, including treatment and/or recovery from illnesses and hangovers as well as enhancing athletic performance and/or recovery from intense athletic activities. You will provide Vida-Flo services and related products from your Clinic. You may also provide "on-site" Vida-Flo treatments at homes and business establishments that are located within your Territory (defined below). With our prior written permission, you may also set up and provide "on-site" treatments at Vida-Flo sponsored events that are conducted within your Territory. We reserve all rights not expressly granted to you.

3.      **TERRITORIAL RIGHTS AND LIMITATIONS.** We will grant you an exclusive territory consisting of the geographic area within a three (3) mile radius from your Clinic (your "Territory"). By exclusive, we mean that: (i) we will not operate, or grant a franchise or license to a third party to operate, a Vida-Flo clinic that is physically located within your Territory during the Term; and (ii) we will not provide, or authorize a third party to provide, "on-site" Vida-Flo treatments at homes and/or business establishments that are located within your territory. We reserve the right to sell, or grant franchises or licenses to third parties to sell, competitive or identical goods or services (including under the Marks) through Alternative Channels of Distribution, irrespective of whether the sales take place in your Territory.

4.      **TERM AND RENEWAL.**

4.1.    **Generally.** The term of this Agreement will begin on the Effective Date and expire ten (10) years thereafter (the "Term"). If this Agreement is the initial franchise agreement for your Business, you may enter into a maximum of two (2) successor franchise agreements (each, a "Successor Agreement") as long as you meet the conditions for renewal specified below. The Successor Agreement shall be the current form of franchise agreement that we use in granting Vida-Flo franchises as of the expiration of the Term or renewal term, as applicable. The terms and conditions of the Successor Agreement may vary materially and substantially from the terms and conditions of this Agreement. Each renewal term will be five (5) years, for a maximum total term of 20 years. You will have no further right to operate your Clinic following the expiration of the final renewal term unless we grant you another franchise in our sole discretion.  If this Agreement is a Successor Agreement, the renewal provisions in your original franchise agreement will dictate the length of the Term of this Agreement as well as your remaining renewal rights, if any.

4.2.    **Renewal Requirements.** In order to enter into a Successor Agreement, you and the Owners (as applicable) must: (i) notify us in writing of your desire to enter into a Successor Agreement not less than 180 days nor more than 360 days before the expiration of the Term or renewal term, as applicable; (ii) not be in default under this Agreement or any other agreement with us or any affiliate of ours at the time you send the renewal notice or the time you sign the Successor Agreement; (iii) sign the Successor Agreement and all ancillary documents that we require franchisees to sign; (iv) sign a General Release; (v) pay us a $2,500 renewal fee; (vi) remodel your Clinic to comply with our then-current standards and specifications; (vii) have the right under your lease to maintain possession of your premises for the duration of the renewal term; and (viii) take any additional action that we reasonably require.

**4.3.**    **Interim Term.** If you do not sign a Successor Agreement after the expiration of the Term and you continue to accept the benefits of this Agreement, then at our option, this Agreement may be treated either as: (i) expired as of the date of the expiration with you then operating without a franchise to do so and in violation of our rights; or (ii) continued on a month-to-month basis (the "Interim Term") until either party provides the other party with 30 days' prior written notice of the party's intention to terminate the Interim Term. In the latter case, all of your obligations will remain in full force and effect during the Interim Term as if this Agreement had not expired, and all obligations and restrictions imposed on you upon the expiration or termination of this Agreement will be deemed to take effect upon the termination of the Interim Term.

Except as otherwise permitted by this Section 4, you have no right to continue to operate your Business following the expiration of the Term.

## 5.    TRAINING AND CONFERENCES

**5.1.**    **Initial Training Program.** The Managing Owner and all of your initial managers must attend and successfully complete the classroom portion of our initial training program before you open your Clinic. Unless we agree to the contrary, training must be completed approximately 60 to 90 days prior to your expected opening date. We will also provide up to five (5) days of onsite training and assistance relating to the opening of your Clinic.

**5.2.**    **Initial Training For New Owners/Managers.** If you hire a new manager or appoint a new Managing Owner after we conduct our pre-opening initial training program, the new manager or Managing Owner, as applicable, must attend and successfully complete our then-current initial training program.

**5.3.**    **Periodic Training.** We may offer periodic refresher or additional training courses for your Owners and employees. Attendance at these training programs may be optional or mandatory, at our option, depending on the specific training program. We may require that your caregivers attend and complete additional training as a condition to offering new products or services.

**5.4.**    **Additional Training Upon Request.** Upon your written request, we may provide additional assistance or training to you at a mutually convenient time.

**5.5.**    **Remedial Training.** If we conduct an inspection of your Clinic and determine that you are not operating in compliance with this Agreement and/or the Manual, we may, at our option, require that your Managing Owner and management personnel attend remedial training that is relevant to your operational deficiencies.

**5.6.**    **Conferences.** We may hold periodic national or regional conferences to discuss various business issues and operational and general business concerns affecting Vida-Flo franchisees. Attendance at these conferences is mandatory. We may charge you up to $750 for each person that attends, or is required to attend, a conference. This fee is due 10 days after invoicing.

**5.7.**    **Training Fees and Expenses.** You are responsible for all food, lodging and travel costs that your Owners and employees incur while attending any training program or conference. We may charge you a training fee of $500 per day for all training specified in this Agreement other than the pre-opening initial training program specified in Section 5.1 (unless you require more than five (5) days of initial onsite training and assistance). In addition, if we agree to provide any on-site training at your Clinic (other than the on-site training specified in Section 5.1), you must also reimburse us for all costs that we incur for food, lodging and travel. The fee and expense reimbursements, if applicable, are due 10 days after invoicing.

## 6.    OTHER FRANCHISOR ASSISTANCE.

**6.1.**    **Manual.** During the Term, we will lend you our confidential Operating Manual (the "Manual") in text or electronic form. The Manual will help you establish and operate your Business. The information in the

Manual is confidential and proprietary and may not be disclosed to third parties without our prior approval.

6.2.   **Startup Package**. Before opening, we will deliver to you the following items (collectively, your "Startup Package"): your interior decorating package;, reception desk; certain of your Clinic electronics; integrated software platform: Vida-Flo Central Office; initial inventory of medications and vitamins; initial inventory of recurring medical supplies; initial inventory of retail and promotional items; office supplies; and miscellaneous Clinic supplies. You will purchase the Startup Package from our affiliate. You agree to pay our affiliate's current pricing for the Startup Package. Upon request, we will provide you with an itemized breakdown of the components of the Startup Package together with the associated cost. The purchase price is nonrefundable. The contents and pricing of our Startup Package may change at any time.

6.3.   **Online Store**.  We will provide you with access to our affiliate's online store for purposes of purchasing certain inventory items, marketing materials, merchandise, operating equipment and supplies.

6.4.   **General Guidance**. Based upon our periodic inspections of your Clinic or reports that you submit to us, we will provide our guidance and recommendations on ways to improve the marketing and/or operation of your Clinic. From time to time, we will also conduct periodic telephonic meetings or conference calls, which may consist of group calls with other franchisees or one-on-one calls with you. You must participate in all telephonic meetings and conference calls that we designate as mandatory.

6.5.   **Marketing Assistance.** As further described in Section 11.2, we will provide you with certain marketing assistance during the Term.

6.6.   **Website.** We will maintain a website for Vida-Flo franchisees that will include the information about your Clinic that we deem appropriate. We may modify the content of and/or discontinue the website at any time in our sole discretion. Throughout the Term, we will also provide you with your own local webpage that will be linked to our main website. Your webpage will include localized information about your Clinic, such as address, hours of operation, contact information, staff bios, etc. We must approve all content on your webpage, but we will consider all information that you suggest in good faith. We will own the website (including your webpage) and domain name at all times.

6.7.   **Purchase Agreements.** We may, but need not, negotiate purchase agreements with suppliers to obtain discounted prices for us and our franchisees. If we succeed in negotiating a purchase agreement, we will arrange for you to be able to purchase the goods directly from the supplier at the discounted prices that we negotiate (subject to any rebates the supplier pays to us). We (or our affiliate) may also purchase certain items from suppliers in bulk and resell them to you at cost plus shipping fees and a reasonable markup.

6.8.   **Research and Development.**  We may, but need not, create branded merchandise and other retail items for resale at your Clinic. If we develop any of these products, you agree to maintain a reasonable inventory of these items at your Clinic at all times. From time to time, we may also research and develop new treatments, formulations or services that may be offered at Vida-Flo clinics. We will advise you of all new authorized products and services that you may offer.

7.   **ESTABLISHING YOUR VIDA-FLO CLINIC**

7.1.   **Site Selection**.  You agree to locate and obtain our approval of the premises from which you will operate your Clinic within 90 days after the Effective Date. The premises must be located within the geographic area identified in ATTACHMENT "B" (the "Franchise Area") and must conform to our minimum site selection criteria. You must send us a complete site report (containing the demographic, commercial and other information, photographs and video tapes that we may reasonably require) for your proposed site. You must also contract with our designated site selection company to review your proposed sites to confirm whether they meet our minimum requirements. You must use our designated real estate brokerage company (or another broker that you propose and we approve) to assist you in finding potential sites and negotiating your lease. We

have the right to accept or reject all proposed sites in our commercially reasonable judgment. We will use our best efforts to approve or disapprove a proposed site within 30 days after we receive all of the requisite materials. Your site is deemed disapproved if we fail to issue our written approval within the 30-day period. Our approval shall be evidenced by the execution of a Site Approval Letter in the form attached to this Agreement as ATTACHMENT "C". You understand that our approval of a site does not constitute a representation or warranty of any kind, express or implied, of the suitability of the site for a Vida-Flo clinic. Our approval of the site indicates only that we believe the site meets our minimum criteria.

7.2.   **Lease**.  If you will lease the premises for your Vida-Flo clinic, you must use your best efforts to ensure your landlord signs the Lease Addendum that is attached to this Agreement as ATTACHMENT "D". If your landlord refuses to sign the Lease Addendum in substantially the form attached to this Agreement, we have the right to disapprove of your lease in our commercially reasonable judgment, in which case you must find a new site for your Vida-Flo clinic. You must obtain our approval of your lease within 45 days after we approve your site. You must promptly send us a copy of your fully executed lease and Lease Addendum for our records.

7.3.   **Construction**.  You must hire an architect to prepare the plans for your Clinic. The plans must comply with all of the standards and specifications set forth in the Manual. Your architect must also ensure that your plans comply with all local ordinances, building codes, permits requirements, and lease requirements and restrictions applicable to the premises. You must submit the final plans to us for approval. Once approved, you must, at your sole expense, construct and equip the premises to the specifications contained in the Manual and purchase (or lease) and install the equipment, fixtures, signs and other items that we require. You acknowledge these requirements are necessary and reasonable to preserve the identity, reputation and goodwill we developed and the value of the franchise. Before you open, we must approve the layout of your Clinic.

7.4.   **Opening**.  You must open your Business to the public within 180 days after the Effective Date. You may not open your Business before: (i) successful completion of the initial training program by your Managing Owner and initial managers; (ii) you purchase all required insurance; (iii) you obtain all required licenses, permits and other governmental approvals; (iv) a state medical board licensed Medical Director who has been approved by us has been on your staff for a minimum of 2 weeks and (v) we provide our written approval of the construction, build-out and layout of your Clinic. You must send us a written notice identifying your proposed opening date at least 30 days before opening. We may conduct a pre-opening inspection of your Clinic and you agree to make any changes we require before opening. BY VIRTUE OF OPENING YOUR BUSINESS, YOU ACKNOWLEDGE THAT WE HAVE FULFILLED ALL OF OUR PRE-OPENING OBLIGATIONS TO YOU.

7.5.   **Relocation**.  You may relocate your Clinic with our prior written approval, which we will not unreasonably withhold. If we allow you to relocate, you must: (i) locate your new Clinic within the Franchise Area; (ii) comply with Sections 7.1 through Section 7.4 of this Agreement with respect to your new Clinic (excluding the 180-day opening period); and (iii) open your new Clinic and resume operations within 30 days after closing your prior Clinic. The radius of your territory may be adjusted based on the classification of the area in which your new Clinic is located.

## 8.   MANAGEMENT AND STAFFING.

8.1.   **Owner Participation**.  You acknowledge that a major requirement for the success of your Business is the active, continuing, and substantial personal involvement and hands-on supervision by your Managing Owner. The Managing Owner must at all times be actively involved in the operation of the Business on a full time basis and provide on-site management and supervision unless you delegate management functions to a manager. Any new Managing Owner that we approve must successfully complete the initial training program.

8.2.   **Managers**.  You may hire a manager to assume responsibility for the daily on-site management and supervision of your Clinic, but only if: (i) the manager successfully completes the initial training program;

4

(ii) the manager signs a Noncompetition Agreement; and (iii) the Managing Owner agrees to assume responsibility for the on-site management and supervision of your Clinic if the manager is unable to perform his or her duties due to death, disability, termination of employment, or for any other reason, until such time that you obtain a suitable replacement manager. Your Managing Owner is responsible for supervising your managers to ensure they manage your Clinic in accordance with the Franchise Agreement and Manual.

**8.3.   Caregivers.** You must employ or contract with licensed medical professionals who are authorized under the laws of your state to administer the medical treatments and perform the medical procedures offered at your Clinic. You represent and warrant that you or your Owners are licensed medical professionals or you have employed or entered into agreements with licensed medical professionals in compliance with applicable law to perform all medical treatments and procedures in connection with your Clinic. You understand that compliance with applicable law may involve entering into a management services agreement, rental agreement or similar agreement and that you may be required to hire a licensed healthcare attorney to assist you in structuring these relationships. We strongly recommend that you engage a healthcare attorney to provide this advice before purchasing the franchise. You, through your personnel, are solely responsible for, and have complete authority, responsibility, supervision and control over, the provision of all medical treatments and procedures performed for patients at your Clinic, including, all diagnoses, treatments, procedures and other professional health care services, as such personnel deem appropriate in their discretion. You will determine the assignments and scheduled hours of work for your caregivers. You must cause such personnel to provide the medical treatments in full compliance with applicable standards, laws, rules and regulations. You shall have sole discretion regarding the method and manner in which you (if licensed to do so) and your caregivers provide the medical treatments and procedures, including, without limitation: (a) determining what diagnostic tests are appropriate; (b) determining the need for referrals to or consultation with another medical professional or specialist; (c) responsibility for the ultimate overall care of the patient, including treatment options available to the patient; and (d) determining how many patients you will see in a given period of time or how many hours you or the licensed medical professionals you employ must work. We shall not in any way control or exert any influence over, nor shall we have the right to control or exert any influence over, either your professional judgment or the professional judgment of any licensed medical professionals that you employ or retain pertaining to provision of medical treatments and procedures. You acknowledge that our franchise training and support programs shall not include any training or support regarding the approved medical treatments or procedures.

**8.4.   Other Employees.** You must hire, train, and supervise honest, reliable, competent and courteous employees for the operation of your Business. You must pay all wages, commissions, fringe benefits, worker's compensation premiums and payroll taxes (and other withholdings required by law) due for your employees. These employees will be employees of yours and not of ours. You must ensure that a sufficient number of trained employees are available to meet the operational standards and requirements of your Business at all times. You must ensure that your employees perform their duties in compliance with the terms of the Manual and any other materials applicable to employees that we communicate to you. You may give your employees only the minimum amount of information and material from the Manual that is necessary to enable them to perform their assigned tasks. You must ensure that your employees do not make or retain any copies of the Manual or any portion of the Manual. We do not control the day to day activities of your employees or the manner in which they perform their assigned tasks. We also do not control the hiring, firing or disciplining of your employees.

**9.   FRANCHISEE AS ENTITY.** If you are an Entity, you agree to provide us with a list of all of your Owners. All Owners of the Entity (whether direct or indirect) are jointly and severally responsible for the Entity's performance of this Agreement and each Owner is bound by all of the terms of this Agreement. Upon our request, you must provide us with a resolution of the Entity authorizing the execution of this Agreement, a copy of the Entity's organizational documents and a current Certificate of Good Standing (or the functional equivalent thereof). You represent that the Entity is duly formed and validly existing under the laws of the state of its formation or incorporation.

**10.     GUARANTY.** If you are an Entity, all Owners (whether direct or indirect) must jointly and severally guarantee the Entity's performance of this Agreement and shall bind themselves to the terms of this Agreement by signing a Personal Guaranty, the current form of which is attached as <u>ATTACHMENT "E"</u>. Depending on the creditworthiness of the Owners and the community property laws of the states in which they reside, we may require that the spouse of each Owner sign a Personal Guaranty (regardless of whether you are an Entity).

**11.     ADVERTISING & MARKETING.**

####     11.1.   <u>Marketing Fund</u>.

            (a)     <u>Administration</u>. Recognizing the value of uniform advertising and promotion to the goodwill and public image of the System and the Marks, we may, but need not establish and maintain a marketing fund. The marketing fund will be used for marketing, advertising, sales promotion and promotional materials, website development and search engine optimization, public and consumer relations, publicity, and any other programs that we deem necessary or appropriate ("Marketing Campaigns"). We have sole discretion in determining the content, concepts, materials, media, endorsements, frequency, placement, location and all other matters pertaining to any Marketing Campaign. We will not use marketing fund fees to defray any of our general operating expenses, except for such reasonable salaries, administrative costs and overhead as we may incur in activities reasonably related to the administration of the marketing fund and the Marketing Campaigns (which may include, without limitation: conducting market research, preparing and conducting television, radio, magazine, billboard, newspaper and other media programs and activities and employing advertising agencies, collecting and accounting for contributions to the marketing fund, and paying for the preparation and distribution of financial accountings and marketing materials). Any surplus of funds in the marketing fund may be invested and we may lend money to the marketing fund if there is a deficit. The marketing fund is not a trust and we have no fiduciary obligations to you with respect to our administration of the marketing fund. A financial accounting of the operations of the marketing fund, including deposits into and disbursements from the marketing fund, will be prepared annually and made available to you upon request.

            (b)     <u>Contributions</u>. If we establish the marketing fund, then you must pay us a weekly marketing fund fee in the amount that we specify from time to time (not to exceed 2% of your Gross Revenues). The marketing fund fee will be payable at the same time and in the same manner as the royalty fee. We will deposit into the marketing fund all: (i) marketing fund fees paid by you and other franchisees; and (ii) fines paid by you and other franchisees. Any company-owned Vida-Flo clinic will contribute to the marketing fund on the same basis as our franchisees. However, if we modify the amount or timing of the contributions that must be made to the marketing fund, any company-owned Vida-Flo clinic that is established or acquired after the modification may contribute to the marketing fund utilizing the modified amount or timing. Except as stated in this Section, we have no obligation to expend our own funds or resources for any Marketing Campaign.

####     11.2.   <u>Marketing Assistance From Us</u>. We will provide you with our recommended marketing plan for your Business. The marketing plan will be included in the Manual. We may create and make available to you advertising and other marketing materials for your purchase through our online store. We may use the marketing fund to pay for the creation and distribution of these materials, in which case there will be no additional charge. We may make these materials available over the Internet (in which case you must arrange for printing the materials and paying all printing costs). Alternatively, we may enter into relationships with third party suppliers who will create the advertising or marketing materials for your purchase. We will provide reasonable marketing consulting, guidance and support throughout the Term on an as-needed basis.

####     11.3.   <u>Your Marketing Activities</u>.

            (a)     <u>Generally</u>. In addition to your required contribution to the marketing fund, you must spend, on a monthly basis, an amount equal to the greater of $500 or 2% of your Gross Revenues on local advertising to promote your Clinic. We must approve all such advertising in accordance with <u>Section 11.3(d)</u>. You agree to participate at your own expense in all advertising, promotional and marketing programs that we require, including any advertising cooperative that we establish pursuant to <u>Section 11.4</u>.  You also agree to

comply with any gift card program that we establish, the specific terms of which may be set forth in the Manuals.

        (b)    <u>Grand Opening</u>. During the period beginning 30 days before opening and ending 90 days after opening, you must spend a total of at least $5,000 on advertising and other marketing activities to promote the grand opening of your Business. We will assist you in developing your grand opening marketing campaign. We must approve your grand opening event and all related promotional activities in accordance with <u>Section 11.3(d)</u>.

        (c)    <u>Standards for Advertising</u>. All advertisements and promotions that you create or use must be completely factual and conform to the highest standards of ethical advertising and comply with all federal, state and local laws. You must ensure that your advertisements and promotional materials do not infringe upon the intellectual property rights of others.

        (d)    <u>Approval of Advertising</u>. Before you use them, we must approve all advertising and promotional materials that we did not prepare or previously approve (including materials that we prepared or approved and you modify). We will be deemed to have approved the materials if we fail to issue our disapproval within 15 days after receipt. You may not use any advertising or promotional materials that we have disapproved (including materials that we previously approved and later disapprove).

        (e)    <u>Internet and Websites</u>. You may market your Clinic through approved social media channels in accordance with our social media policy. We may require that you utilize our designated supplier for social media marketing services. At this time, we do not allow our franchisees to maintain their own websites (other than the localized webpage that we provide) or market their Vida-Flo clinics on the Internet (other than through approved social media outlets). Accordingly, you may not maintain a website, conduct e-commerce, or otherwise maintain a presence or advertise on the Internet or any other public computer network in connection with your Business. If we change our policy at a later date to allow franchisees to maintain their own websites or market on the Internet, you may do so only if you comply with all of the website and Internet requirements that we specify. In that case, we may require that you sign an amendment to this Agreement that will govern your ability to maintain a website and/or market on the Internet.

    **11.4.**    <u>**Advertising Cooperative**</u>. We have the right, but not the obligation, to create one or more advertising cooperatives for the purpose of creating and/or purchasing advertising programs for the benefit of all franchisees operating within a particular region. We have the right to: (i) determine the composition of all geographic territories and market areas for each advertising cooperative; and (ii) require that you participate in any advertising cooperative if and when established by us. If we implement an advertising cooperative, we may establish an advertising council to self-administer the advertising cooperative. You must participate in the council according to the council's rules and procedures and you must abide by the council's decisions. Alternatively, we may administer the advertising cooperative ourselves. We reserve the right to form, change, merge or dissolve advertising cooperatives in our discretion. You must pay the weekly cooperative advertising fee established by us or the council, as applicable, which will be payable at the same time and in the same manner as the royalty fee. The cooperative advertising fee shall not exceed 2% of your Gross Revenues. Upon the majority vote of all franchisees within the advertising cooperative, the amount of the cooperative advertising fee may be adjusted (or temporarily suspended). All cooperative advertising fees that you pay will be credited against your minimum local marketing expenditure requirement set forth in <u>Section 11.3(a)</u>. If we or an affiliate of ours operate a majority of the Vida-Flo clinics within the advertising cooperative, we will increase the cooperative advertising fee only with the consent of a majority of all third-party franchisees within the advertising cooperative. We will collect all cooperative advertising fees and pay them to the applicable advertising cooperative unless we administer the advertising cooperative ourselves.

## 12.    OPERATING STANDARDS.

    **12.1.**    <u>**Generally**</u>. You agree to operate your Business: (i) in a manner that will promote the goodwill

of the Marks; and (ii) in full compliance with our standards and all other terms of this Agreement and the Manual.

**12.2.   Operating Manual.** You agree to establish and operate your Clinic in accordance with the Manual. The Manual may contain, among other things: (i) a description of the authorized goods and services that you may offer at your Clinic; (ii) mandatory and suggested specifications, operating procedures, and quality standards for products, services and procedures that we prescribe from time to time for Vida-Flo franchisees; (iii) mandatory reporting and insurance requirements; (iv) mandatory and suggested specifications for your Clinic; (v) policies and procedures pertaining to the membership program and gift card sales; and (vi) a written list of goods and services (or specifications for goods and services) you must purchase for the construction, development and operation of your Clinic and a list of any designated or approved suppliers for these goods or services. We can modify the Manual at any time. The modifications will become binding 30 days after we send you notice of the modification. All mandatory provisions contained in the Manual (whether they are included now or in the future) become part of this Agreement as if fully set forth herein.

**12.3.   Authorized Goods and Services.** You agree to offer all goods and services that we require from time to time in our commercially reasonable discretion. You may not offer any other goods or services at your Clinic without our prior written permission. You may not use your Clinic or permit your Clinic to be used for any purpose other than offering the goods and services that we authorize. We may, without obligation to do so, add, modify or delete authorized goods and services, and you must do the same upon notice from us. Our addition, modification or deletion of one or more goods or services shall not constitute a termination of the franchise or this Agreement.

**12.4.   Suppliers and Purchasing.** You agree to purchase or lease all products, supplies, equipment, services and other items specified in the Manual from time to time. If required by the Manual, you agree to purchase certain goods and services only from suppliers designated or approved by us (which may include, or be limited exclusively to, us or our affiliate). You acknowledge that our right to specify the suppliers that you may use is necessary and desirable so that we can control the uniformity and quality of goods and services used, sold or distributed in connection with the development and ongoing operation of Vida-Flo clinics, maintain the confidentiality of our trade secrets, obtain discounted prices for our franchisees if we choose to do so, and protect the reputation and goodwill associated with the System and the Marks. If we receive rebates or other financial consideration from these suppliers based upon franchisee purchases, we have no obligation to pass these amounts on to you or to use them for your benefit. If you want us to approve a supplier that you propose, you must send us a written notice specifying the supplier's name and qualifications and provide any additional information that we request. We will approve or reject your request within 30 days after we receive your notice and all additional information (and samples) that we require. We shall be deemed to have rejected your request if we fail to issue our approval within the 30-day period. You must reimburse us for all costs and expenses that we incur in reviewing a proposed supplier within 10 days after invoicing.

**12.5.   Equipment Maintenance and Changes.** You agree to maintain all of your equipment in good condition and promptly replace or repair any equipment that is damaged, worn-out or obsolete. We may require that you change your equipment, which may require you to make additional investments. You acknowledge that our ability to require franchisees to make significant changes to their equipment is critical to our ability to administer and change the System and you agree to comply with any such required change within the time period that we reasonably prescribe.

**12.6.   Software and Technology.** We may change the software or technology that you must use at any time. We may also develop proprietary software or technology that must be used by Vida-Flo franchisees. If this occurs, you agree to enter into a license agreement with us (or an affiliate of ours) and pay us (or our affiliate) commercially reasonable licensing, support and maintenance fees. The terms of the license agreement will govern the terms pursuant to which you may utilize this software or technology. We also reserve the right to enter into a master software or technology license agreement with a third party licensor and then sublicense the software or technology to you, in which case we may charge you initial and ongoing fees based on your use of

the software or technology (including amounts we must pay to the licensor plus a markup that we keep). As of the Effective Date, our affiliate charges you a $1,000 monthly technology fee. All fees referenced in this Section are due 10 days after invoicing (or as otherwise specified by us from time to time).

12.7.   **Remodeling and Maintenance.** You agree to remodel and make all improvements and alterations to your Clinic that we reasonably require from time to time to reflect our then-current image, appearance and clinic specifications. There are no limitations on the cost or frequency of these remodeling obligations. You may not remodel or significantly alter your premises without our prior written approval, which will not be unreasonably withheld. However we will not be required to approve any proposed remodeling or alteration if the same would not conform to our then-current specifications, standards or image requirements. You agree to maintain your Clinic in good order and condition, reasonable wear and tear excepted, and make all necessary repairs, including replacements, renewals and alterations, at your sole expense, to comply with our standards and specifications. Without limiting the generality of the foregoing, you agree to take the following actions at your sole expense: (i) thorough cleaning, repainting, redecorating of the interior and exterior of your facility at the intervals we may prescribe (or at such earlier times that such actions are required or advisable); and (ii) interior and exterior repair of the facility as needed. You agree to comply with any maintenance, cleaning or clinic upkeep schedule that we prescribe from time to time.

12.8.   **Memberships and Package Sales.** All Vida-Flo clinics must honor membership purchases by Vida-Flo customers. A customer who purchases a membership from your Clinic may redeem services or receive discounted pricing at another Vida-Flo clinic. Similarly, a customer who purchases a membership from another Vida-Flo clinic may redeem the services or receive discounted pricing at your Clinic. You agree to comply with all policies and procedures that we specify from time to time relating to customers who services from multiple clinics as part of a membership purchase. We may implement new software to monitor sales and allocate payments to the clinic where services are provided (either in whole or on a percentage basis), in which case we may require that the customer pay us for the membership. We may also adopt policies regarding cooperation between franchisees relating to customers who purchase membership or package services from multiple locations. You agree to comply with all policies and procedures that we specify and we may modify these policies and procedures at any time.

12.9.   **Hours of Operation.** The minimum hours of operation for your Clinic shall be Sunday to Monday from 9am until 5pm. You must establish specific hours of operation and submit those hours to us for approval.

12.10.   **Customer Complaints.** If you receive a complaint from a patient, you must follow the complaint resolution process that we specify to protect the goodwill associated with the Marks. You must send us an incident report of all customer related problems/concerns/complaints within five (5) days of the occurrence of the event.

12.11.   **Failure to Comply with Standards.** You acknowledge the importance of every one of our standards and operating procedures to the reputation and integrity of the System and the goodwill associated with the Marks. If we notify you of a failure to comply with our standards or operating procedures and you fail to correct the non-compliance within the period of time that we require, then, in addition to any other remedies available to us under this Agreement, we may impose a fine of up to $500 per occurrence.

13.   **FEES**

13.1.   **Initial Franchise Fee.** You agree to pay us a $39,000 initial franchise fee in one lump sum at the time you sign this Agreement. The initial franchise fee is fully earned by us and non-refundable once this Agreement has been signed, except that we will refund $10,000 of the initial franchise fee if you and your Owners sign a General Release after we terminate this Agreement pursuant to: (i) Section 20.2(i) for failure to successfully complete the initial training program in a timely manner; (ii) Section 20.2(ii) for failure to obtain our approval of your site in a timely manner; or (iii) Section 20.2(iv) for failure to open your Clinic in a timely

manner despite your diligent and good faith attempts to do so.

**13.2.   Royalty Fee.** On the day of each week that we specify, you agree to pay us a royalty fee equal to 7% of your Gross Revenues from the prior week of operations.

**13.3.   Other Fees and Payments.** You agree to pay all other fees, expense reimbursements and other amounts specified in this Agreement in a timely manner as if fully set forth in this Section 13. You also agree to promptly pay us an amount equal to all taxes levied or assessed against us based upon goods or services that you sell or based upon goods or services that we furnish to you (other than income taxes that we pay based on amounts that you pay us under this Agreement).

**13.4.   Late Fee.** If any sums due under this Agreement have not been received by us when due (or there are insufficient funds in your Account to cover any sums owed to us when due) then, in addition to those sums, you must pay us interest on the amounts past due at the rate equal to the lesser of 18% per annum (pro rated on a daily basis), or the highest rate permitted by your State's law. If no due date has been specified by us, then interest begins to run 10 days after we bill you. We will not impose a late fee for any amounts paid pursuant to Section 13.5 if, but only to the extent that, sufficient funds were available in your Account to be applied towards the payments at the time the payments became due and payable. However, we may impose a late fee for any amounts that we are unable to reasonably determine due to your failure to furnish us with a report required by Section 15.3 within the required period of time or record sales in a timely manner, in which case we may assess a late fee on the entire amount that was due and payable. You acknowledge that this Section 13.4 shall not constitute our agreement to accept the late payments after same are due, or a commitment by us to extend credit to or otherwise finance the operation of your Business.

**13.5.   Method of Payment.** You must complete and send us an ACH Authorization Form allowing us to electronically debit a banking account that you designate (your "Account") for: (i) all fees payable to us pursuant to this Agreement (other than the initial franchise fee); and (ii) any amounts that you owe to us or any of our affiliates for the purchase of goods or services. We will debit your Account for these payments on or after the due date. Our current form of ACH Authorization Form is attached to this Agreement as ATTACHMENT "F". You must sign and deliver to us any other documents that we or your bank may require to authorize us to debit your Account for these amounts. You must deposit into the Account all revenues that you generate from the operation of your Business. You must make sufficient funds available for withdrawal by electronic transfer before each due date. If there are insufficient funds in your Account to cover all amounts that you owe, any excess amounts that you owe will be payable upon demand, together with any late charge imposed pursuant to Section 13.4.

**13.6.   Application of Payments.** We have sole discretion to apply any payments from you to any past due indebtedness of yours or in any other manner we feel appropriate.

**14.   RESTRICTIVE COVENANTS.**

**14.1.   Reason for Covenants.** You acknowledge that the Intellectual Property and the training and assistance that we provide would not be acquired except through implementation of this Agreement. You also acknowledge that competition by you, the Owners or persons associated with you or the Owners (including family members) could seriously jeopardize the entire franchise system because you and the Owners have received an advantage through knowledge of our day-to-day operations and Know-how related to the System. Accordingly, you and the Owners agree to comply with the covenants described in this Section to protect the Intellectual Property and our franchise system.

**14.2.   Our Know-how.** You and the Owners agree: (i) neither you nor any Owner will use the Know-how in any business or capacity other than the operation of your Business pursuant to this Agreement; (ii) you and the Owners will maintain the confidentiality of the Know-how at all times; (iii) neither you nor any Owner will make unauthorized copies of documents containing any Know-how; (iv) you and the Owners will take all

reasonable steps that we require from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you and the Owners will stop using the Know-how immediately upon the expiration, termination or Transfer of this Agreement, and any Owner who ceases to be an Owner before the expiration, termination or Transfer of this Agreement will stop using the Know-how immediately at the time he or she ceases to be an Owner.

    **14.3.**   **Unfair Competition During Term**. You and your Owners agree not to unfairly compete with us during the Term by engaging in any of the following activities ("<u>Prohibited Activities</u>"): (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in any Competitive Business, other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business; (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees), including any attempt to cause a Vida-Flo member to cancel their existing membership with another clinic and sign up as a member at your Clinic; or (iii) inducing (a) any of our employees or managers (or those of our affiliates or franchisees) to leave their position or (b) any customer of ours (or of one of our affiliates or franchisees) to transfer their business to you or to any other person that is not then a franchisee of ours.

    **14.4.**   **Unfair Competition After Term**. During the Post-Term Restricted Period, you and your Owners agree not to engage in any Prohibited Activities. Notwithstanding the foregoing, you and your Owners may have an interest in a Competitive Business during the Post-Term Restricted Period as long as the Competitive Business is not located within, and does not provide competitive goods or services to customers who are located within, the Restricted Territory. If you or an Owner engages in a Prohibited Activity during the Post-Term Restricted Period (other than having an interest in a Competitive Business that is permitted under this Section), then the Post-Term Restricted Period applicable to you or the non-compliant Owner, as applicable, shall be extended by the period of time during which you or the non-compliant Owner, as applicable, engaged in the Prohibited Activity.

    **14.5.**   **Immediate Family Members**. The Owners acknowledge that they could circumvent the purpose of <u>Section 14</u> by disclosing Know-how to an immediate family member (i.e., spouse, parent, sibling, child, or grandchild). The Owners also acknowledge that it would be difficult for us to prove whether the Owners disclosed the Know-how to family members. Therefore, each Owner agrees that he or she will be presumed to have violated the terms of <u>Section 14</u> if any member of his or her immediate family engages in any Prohibited Activities during the Term or Post-Term Restricted Period or uses or discloses the Know-how. However, the Owner may rebut this presumption by furnishing evidence conclusively showing that the Owner did not disclose the Know-how to the family member.

    **14.6.**   **Employees and Others Associated with You**. You must ensure that all of your employees, officers, directors, partners, members, independent contractors and other persons associated with you or your Business who may have access to our Know-how, and who are not required to sign a Noncompetition Agreement, sign and send us a Confidentiality Agreement before having access to our Know-how. You must use your best efforts to ensure that these individuals comply with the terms of the Noncompetition Agreements and Confidentiality Agreements, as applicable, and you must immediately notify us of any breach that comes to your attention. You agree to reimburse us for all reasonable expenses that we incur in enforcing a Noncompetition Agreement or Confidentiality Agreement, as applicable, including reasonable attorneys' fees and court costs.

    **14.7.**   **Covenants Reasonable**. You and the Owners acknowledge and agree that: (i) the terms of this Agreement are reasonable both in time and in scope of geographic area; (ii) our use and enforcement of covenants similar to those described above with respect to other Vida-Flo franchisees benefits you and the Owners in that it prevents others from unfairly competing with your Business; and (iii) you and the Owners have sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms of this Agreement. YOU AND THE OWNERS HEREBY WAIVE ANY RIGHT TO CHALLENGE THE TERMS OF THIS <u>SECTION 14</u> AS BEING OVERLY BROAD, UNREASONABLE OR OTHERWISE UNENFORCEABLE.

**14.8.    Breach of Covenants**. You and the Owners agree that failure to comply with the terms of this Section 14 will cause substantial and irreparable damage to us and/or other Vida-Flo franchisees for which there is no adequate remedy at law. Therefore, you and the Owners agree that any violation of the terms of this Section 14 will entitle us to injunctive relief. We may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, will be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000. None of the remedies available to us under this Agreement are exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages. Any claim, defense or cause of action that you or an Owner may have against us, regardless of cause or origin, cannot be used as a defense against our enforcement of this Section 14.

## 15.    YOUR OTHER RESPONSIBILITIES

**15.1.    Insurance.** For your protection and ours, you agree to maintain the following insurance policies: (i) "all risk" property insurance coverage on all assets, including inventory, furniture, fixtures, equipment, supplies and other property used in the operation of your Business, which must include coverage for fire, vandalism and malicious mischief and have coverage limits of at least full replacement cost; (ii) comprehensive general liability insurance against claims for bodily and personal injury, death and property damage caused by or occurring in conjunction with the operation of your Clinic, containing minimum liability protection of $1,000,000 combined single limit per occurrence, and $3,000,000 in the aggregate; (iii) medical malpractice insurance against claims for bodily and personal injury and death caused by or occurring in conjunction with the operation of your Clinic, containing minimum liability protection of $1,000,000 combined single limit per occurrence, and $3,000,000 in the aggregate; (iv) automobile liability and property damage insurance covering all loss, liability, claim or expense of any kind whatsoever resulting from the use, operation, or maintenance of any automobiles or motor vehicles, owned, leased, or used by you, or your officers, directors, employees, partners or agents, in the operation of your Business, containing minimum liability protection of $1,000,000 combined single limit per occurrence; (v) worker's compensation insurance and employer's liability insurance as required by law; and (vi) any other insurance that we specify in the Manual from time to time. You agree to provide us with proof of coverage prior to opening, within 10 days of any renewal of a policy and at any other time on demand. You agree to obtain these insurance policies from insurance carriers that are rated A or better by Alfred M. Best & Company, Inc. and that are licensed and admitted in the state in which you operate your Clinic. All insurance policies must endorsed to: (i) name us (and our members, officers, directors, and employees) as additional insureds; (ii) contain a waiver by the insurance carrier of all subrogation rights against us; and (iii) provide that we receive 10 days prior written notice of the termination, expiration, cancellation or modification of the policy. If any of your policies fail to meet these criteria, then we may disapprove the policy and you must immediately find additional coverage with an alternative carrier satisfactory to us. Upon 10 days' notice to you, we may increase the minimum protection requirement as of the renewal date of any policy, and require different or additional types of insurance at any time, including excess liability (umbrella) insurance, to reflect inflation, identification of special risks, changes in law or standards or liability, higher damage awards or other relevant changes in circumstances. If you fail to maintain any required insurance coverage, we have the right to obtain the coverage on your behalf (which right shall be at our option and in addition to our other rights and remedies in this Agreement), and you must promptly sign all applications and other forms and instruments required to obtain the insurance and pay to us, within 10 days after invoicing, all costs and premiums that we incur.

**15.2.    Books and Records.** You agree to prepare and maintain at your Clinic for at least five (5) years after their preparation, complete and accurate books, records, accounts and tax returns pertaining to your Business. You must maintain, and upon our request furnish to us by e-mail, mail or facsimile, a written list of all of your patients. You must send us copies of your books and records within seven (7) days of our request.

**15.3.**   **Reports.** On the day of each week that we specify, you must prepare and provide to us weekly statements of: (i) your Gross Revenues and expenses for the prior week's operations; and (ii) your expenditures on local advertising required by Section 11.3 that were incurred during the prior week (which shall be accompanied by copies of receipts for such expenditures). You also agree to prepare all other reports that we require in the form and manner that we require. You agree to send us a copy of any report required by this Section upon request. If we require that you purchase a computer and/or automated cash management system that allows us to electronically retrieve information concerning your sales transactions, you agree that we will have the right to electronically poll your computer and/or automated cash management system to retrieve and compile information regarding the operation of your Business.

**15.4.**   **Financial Statements.** Within 90 days after the end of each calendar year, you must prepare a balance sheet for your Business (as of the end of the calendar year) and an annual statement of profit and loss and source and application of funds. All financial statements must be: (i) verified and signed by you certifying to us that the information is true, complete, and accurate; (ii) prepared on an accrual basis in compliance with Generally Accepted Accounting Principles; and (iii) submitted in any format that we reasonably require. We have the right to require that your financial statements be audited by a certified public accountant if you have previously provided any materially inaccurate financial statements. You agree to send us a copy of any financial statement required by this Section upon request. You authorize us to disclose the financial statements, reports, and operating data to prospective franchisees, regulatory agencies and others at our discretion, provided the disclosure is not prohibited by applicable law.

**15.5.**   **Legal Compliance.** You must secure and maintain in force all required licenses, permits and regulatory approvals for the operation of your Business and operate and manage your Business in full compliance with all applicable laws, ordinances, rules and regulations. You must notify us in writing within two (2) business days of the beginning of any action, suit, investigation or proceeding, or of the issuance of any order, writ, injunction, disciplinary action, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation of your Business or your financial condition. You must immediately deliver to us a copy of any inspection report, warning, certificate or rating by any governmental agency involving any health or safety law, rule or regulation that reflects your failure to fully comply with the law, rule or regulation.

## 16.   INSPECTION AND AUDIT

**16.1.**   **Inspections.** To ensure compliance with this Agreement, we or our representatives will have the right to enter your Clinic, evaluate your operations and inspect or examine your books, records, accounts and tax returns. Our evaluation may include watching your provision of services and contacting your landlord, patients and caregivers/employees. We may conduct our evaluation at any time and without prior notice. During the course of our inspections, we and our representatives will use reasonable efforts to minimize our interference with the operation of your Business, and you and your employees will cooperate and not interfere with our inspection. You consent to us accessing your computer system and retrieving any information that we deem appropriate in conducting the inspection.

**16.2.**   **Audit.** We have the right, at any time, to have an independent audit made of your books and financial records. You agree to fully cooperate with us and any third parties that we hire to conduct the audit. If an audit reveals an understatement of your Gross Revenues or any amount that you owe us, you agree to immediately pay to us any additional fees that you owe us together with any late fee payable pursuant to Section 13.4. Any audit will be performed at our cost and expense unless the audit: (i) is necessitated by your failure to provide the information requested or to preserve records or file reports as required by this Agreement; or (ii) reveals an understatement of any amount due to us by at least three percent (3%), in which case you agree to reimburse us for the cost of the audit or inspection, including without limitation, reasonable accounting and attorneys' fees and travel and lodging expenses that we or our representatives incur. The audit cost reimbursements will be due 10 days after invoicing. We shall not be deemed to have waived our right to terminate this Agreement by accepting reimbursements of our audit costs.

## 17.    INTELLECTUAL PROPERTY

**17.1.    Ownership and Use of Intellectual Property.** You acknowledge that: (i) we are the sole and exclusive owner of the Intellectual Property and the goodwill associated with the Marks; (ii) your right to use the Intellectual Property is derived solely from this Agreement; and (iii) your right to use the Intellectual Property is limited to a license granted by us to operate your Business during the Term pursuant to, and only in compliance with, this Agreement, the Manual, and all applicable standards, specifications and operating procedures that we prescribe from time to time. You may not use any of the Intellectual Property in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized by us. Any unauthorized use of the Intellectual Property constitutes an infringement of our rights. You agree to comply with all provisions of the Manual governing your use of the Intellectual Property. This Agreement does not confer to you any goodwill, title or interest in any of the Intellectual Property.

**17.2.    Changes to Intellectual Property.** We have the right to modify the Intellectual Property at any time in our sole and absolute discretion, including by changing the Marks, the System, the Copyrights or the Know-how. If we modify or discontinue use of any of the Intellectual Property, then you must comply with any such instructions from us within 30 days at your expense. We will not be liable to you for any expenses, losses or damages that you incur (including the loss of any goodwill associated with a Mark) because of any addition, modification, substitution or discontinuation of the Intellectual Property.

**17.3.    Use of Marks.** You agree to use the Marks as the sole identification of your Clinic; provided, however that you must identify yourself as the independent owner of your Business in the manner that we prescribe. You may not use any Marks in any modified form or as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs or symbols (other than logos licensed to you by this Agreement). You agree to: (i) prominently display the Marks on or in connection with any media advertising, promotional materials, posters and displays, receipts, stationery and forms that we designate and in the manner that we prescribe to give notice of trade and service mark registrations and copyrights; and (ii) obtain any fictitious or assumed name registrations required under applicable law. You may not use the Marks in signing any contract, lease, mortgage, check, purchase agreement, negotiable instrument or other legal obligation or in any manner that is likely to confuse or result in liability to us for any indebtedness or obligation of yours.

**17.4.    Use of Know-how.** We will disclose the Know-how to you in the initial training program, the Manual, and in other guidance furnished to you during the Term. You agree that you will not acquire any interest in the Know-how other than the right to utilize it in strict accordance with the terms of this Agreement in the development and operation of your Business. You acknowledge that the Know-how is proprietary and is disclosed to you solely for use in the development and operation of your Clinic during the Term.

**17.5.    Improvements.** If you conceive of or develop any improvements or additions to the marketing, method of operation or the services or products offered at a Vida-Flo clinic (collectively, "Improvements"), you agree to promptly and fully disclose the Improvements to us without disclosing the Improvements to others. You must obtain our approval prior to using any such Improvements. Any Improvement that we approve may be used by us and any third parties that we authorize to operate a Vida-Flo franchise, without any obligation to pay you royalties or other fees. You must assign to us or our designee, without charge, all rights to any such Improvement, including the right to grant sublicenses. In return, we will authorize you to use any Improvements that we or other franchisees develop that we authorize for general use in connection with the operation of a Vida-Flo business.

**17.6.    Notification of Infringements and Claims.** You must immediately notify us of any: (i) apparent infringement of any of the Intellectual Property; (ii) challenge to your use of any of the Intellectual Property; or (iii) claim by any person of any rights in any of the Intellectual Property. You may not communicate with any person other than us and our counsel in connection with any such infringement,

challenge or claim. We will have sole discretion to take such action as we deem appropriate. We have the right to exclusively control any litigation, Patent and Trademark Office proceeding, or other proceeding arising out of any such infringement, challenge or claim. You agree to execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of our counsel, be necessary or advisable to protect and maintain our interest in any such litigation, Patent and Trademark Office proceeding or other proceeding, or to otherwise protect and maintain our interest in the Intellectual Property. We are not required to indemnify you if you are a party to any judicial or administrative proceeding relating to your use of the Marks or other Intellectual Property.

**18.     INDEMNITY.** You agree to indemnify the Indemnified Parties and hold them harmless for, from and against any and all Losses and Expenses incurred by any of them as a result of or in connection with any of the following: (i) the marketing, use or operation of your Clinic or your performance and/or breach of any of your obligations under this Agreement; (ii) any other Claim arising from alleged violations of your relationship with and responsibility to us; or (iii) any Claim relating to taxes or penalties assessed by any governmental entity against us that are directly related to your failure to pay or perform functions required of you under this Agreement. The Indemnified Parties shall have the right, in their sole discretion to: (i) retain counsel of their own choosing to represent them with respect to any Claim; and (ii) control the response thereto and the defense thereof, including the right to enter into an agreement to settle such Claim. You may participate in such defense at your own expense. You agree to give your full cooperation to the Indemnified Parties in assisting the Indemnified Parties with the defense of any such Claim, and to reimburse the Indemnified Parties for all of their costs and expenses in defending any such Claim, including court costs and reasonable attorneys' fees, within 10 days of the date of each invoice delivered by such Indemnified Party to you enumerating such costs, expenses and attorneys' fees.

**19.     TRANSFERS**

**19.1.     By Us.** This Agreement and the franchise is fully assignable by us (without prior notice to you) and shall inure to the benefit of any assignee(s) or other legal successor(s) to our interest in this Agreement, provided that we shall, subsequent to any such assignment, remain liable for the performance of our obligations under this Agreement up to the effective date of the assignment. We may also delegate some or all of our obligations under this Agreement to one or more persons (including an area representative) without assigning the Agreement.

**19.2.     By You.** You understand that the rights and duties created by this Agreement are personal to you and the Owners and that we have granted the franchise in reliance upon the individual or collective character, skill, aptitude, attitude, business ability and financial capacity of you and your Owners. Therefore, neither you nor any Owner may engage in any Transfer other than a Permitted Transfer without our prior written approval. Any Transfer (other than a Permitted Transfer) without our approval shall be void and constitute a breach of this Agreement. We will not unreasonably withhold our approval of any proposed Transfer, provided that the following conditions are all satisfied:

(i)     the proposed transferee is, in our opinion, an individual of good moral character, who has sufficient business experience, aptitude and financial resources to own and operate a Vida-Flo clinic and otherwise meets all of our then applicable standards for franchisees;

(ii)     you and your Owners are in full compliance with the terms of this Agreement and all other agreements with us or our affiliate;

(iii)     all of the owners of the transferee have successfully completed, or made arrangements to attend, the initial training program (and the transferee has paid us the training fee for each new person who must attend training); provided that we may revoke our approval of the transfer if the transferee fails to successfully complete training;

15

(iv)     your landlord consents to your assignment of the lease to the transferee, or the transferee is diligently pursuing an approved substitute location within the Franchise Area;

(v)     the transferee and its owners, to the extent necessary, have obtained all licenses and permits required by applicable law in order to own and operate the Business;

(vi)     the transferee and its owners sign our then-current form of franchise agreement (unless we, in our sole discretion, instruct you to assign this Agreement to the transferee), except that: (a) the Term and renewal term(s) shall be the Term and renewal term(s) remaining under this Agreement; and (b) the transferee need not pay a separate initial franchise fee;

(vii)     you remodel your Clinic to comply with our then-current standards and specifications or you obtain a commitment from the transferee to do so;

(viii)     you or the transferee pay us a transfer fee equal to the greater of $2,500 or 10% of our then-current initial franchise fee to defray expenses that we incur in connection with the Transfer;

(ix)     you and your Owners sign a General Release for all claims arising before or contemporaneously with the Transfer;

(x)     you enter into an agreement with us to subordinate the transferee's obligations to you to the transferee's financial obligations owed to us pursuant to the franchise agreement;

(xi)     we do not elect to exercise our right of first refusal described in Section 19.5; and

(xii)     you or the transferring Owner, as applicable, and the transferee have satisfied any other conditions we reasonably require as a condition to our approval of the Transfer.

Our consent to a Transfer shall not constitute a waiver of any claims we may have against the transferor, nor shall it be deemed a waiver of our right to demand exact compliance with any of the terms or conditions of the franchise by the transferee.

19.3.    **Permitted Transfers.** You may engage in a Permitted Transfer without our prior approval, but you must give us at least 10 days prior written notice. You and the Owners (and the transferee) agree to sign all documents that we reasonably request to effectuate and document the Permitted Transfer.

19.4.    **Death or Disability of an Owner.** Upon the death or permanent disability of an Owner, the Owner's ownership interest in you or the franchise, as applicable, must be assigned to another Owner or to a third party approved by us within 180 days. Any assignment to a third party will be subject to all of the terms and conditions of Section 19.2 unless the assignment qualifies as a Permitted Transfer. For purposes of this Section, an Owner is deemed to have a "permanent disability" only if the person has a medical or mental problem that prevents the person from substantially complying with his or her obligations under this Agreement or otherwise operating the Business in the manner required by this Agreement and the Manual for a continuous period of at least three (3) months.

19.5.    **Our Right of First Refusal.** If you or an Owner desires to engage in a Transfer, you or the Owner, as applicable, must obtain a bona fide, signed written offer from the fully disclosed purchaser and submit an exact copy of the offer to us. We will have 30 days after receipt of the offer to decide whether we will purchase the interest in your Business or the ownership interest in you for the same price and upon the same terms contained in the offer (however, we may substitute cash for any form of payment proposed in the offer). If we notify you that we intend to purchase the interest within the 30-day period, you or the Owner, as applicable, must sell the interest to us. We will have at least an additional 30 days to prepare for closing. We will be entitled to receive from you or the Owner, as applicable, all customary representations and warranties given by you as the seller of the assets or the Owner as the seller of the ownership interest or, at our election, the representations

16

and warranties contained in the offer. If we do not exercise our right of first refusal, you or the Owner, as applicable, may complete the Transfer to the purchaser pursuant to and on the terms of the offer, subject to the requirements of Section 19.2 (including our approval of the transferee). However, if the sale to the purchaser is not completed within 120 days after delivery of the offer to us, or there is a material change in the terms of the sale, we will again have the right of first refusal specified in this Section. Our right of first refusal in this Section shall not apply to any Permitted Transfer.

## 20.    TERMINATION

**20.1.    By You**.  You may terminate this Agreement if we materially breach this Agreement and fail to cure the breach within 90 days after you send us a written notice specifying the nature of the breach. If you terminate this Agreement, you must still comply with your post-termination obligations described in Section 21 and all other obligations that survive the expiration or termination of this Agreement.

**20.2.    Termination By Us Without Cure Period**. We may, in our sole discretion, terminate this Agreement upon five (5) days' written notice, without opportunity to cure, for any of the following reasons, all of which constitute material events of default under this Agreement:

(i)    if the Managing Owner fails to satisfactorily complete the initial training program in the manner required by Section 5.1;

(ii)    if you fail to obtain our approval of your site within the time period required by Sections 7.1;

(iii)    if you fail to obtain our approval of your lease within the time period required by Section 7.2;

(iv)    if you fail to open your Clinic within the time period required by Section 7.4;

(v)    if you become insolvent by reason of your inability to pay your debts as they become due or you file a voluntary petition in bankruptcy or any pleading seeking any reorganization, liquidation, dissolution or composition or other settlement with creditors under any law, or are the subject of an involuntary bankruptcy (which may or may not be enforceable under the Bankruptcy Act of 1978);

(vi)    if your Clinic, or a substantial portion of the assets associated with your Clinic, are seized, taken over or foreclosed by a government official in the exercise of his or her duties, or seized, taken over or foreclosed by a creditor, lienholder or lessor; or a final judgment against you remains unsatisfied for 30 days (unless a supersedes or other appeal bond has been filed); or a levy of execution has been made upon the license granted by this Agreement or upon any property used in your Clinic, and it is not discharged within five (5) days of the levy;

(vii)    if you abandon or fail to operate your Clinic for three (3) consecutive business days, unless the failure is due to an event of force majeure or another reason that we approve;

(viii)    if a regulatory authority suspends or revokes a license or permit held by you or an Owner that is required to operate the Clinic, even if you or the Owner still maintain appeal rights;

(ix)    if you or an Owner (a) is convicted of or pleads no contest to a felony, a crime involving moral turpitude or any other material crime or (b) is subject to any material administrative disciplinary action or (c) fails to comply with any material federal, state or local law or regulation applicable to your Business;

(x)    if you or an Owner commits an act that can reasonably be expected to adversely affect the reputation of the System or the goodwill associated with the Marks;

17

(xi)   if you manage or operate your Clinic in a manner that presents a health or safety hazard to your customers, employees or the public;

(xii)   if you or an Owner make any material misrepresentation to us, whether occurring before or after being granted the franchise;

(xiii)   if you fail to pay any amount owed to us or an affiliate of ours within ten (10) days after receipt of a demand for payment;

(xiv)   if you underreport any amount owed to us by at least three percent (3%), after having already committed a similar breach that had been cured in accordance with Section 20.3;

(xv)   if you or an Owner makes an unauthorized Transfer;

(xvi)   if you or an Owner makes an unauthorized use of the Intellectual Property;

(xvii)   if you or an Owner breaches any of the restrictive covenants described in Section 14;

(xviii)   if the lease for your premises is terminated due to your default;

(xix)   if you provide "on-site" Vida-Flo treatments at a home or business establishment that is located outside of your Territory without our prior written permission; or

(xx)   if we terminate any other agreement between you and us or if any affiliate of ours terminates any agreement between you and the affiliate because of your default.

**20.3.   Additional Conditions of Termination.** In addition to our termination rights in Section 20.2, we may, in our sole discretion, terminate this Agreement upon 30 days' written notice if you or an Owner fail to comply with any other provision of this Agreement (including any mandatory provision in the Manual) or any other agreement with us, unless such default is cured, as determined by us in our sole discretion, within such 30-day notice period. If we deliver a notice of default to you pursuant to this Section 20.3, we may suspend performance of any of our obligations under this Agreement until you fully cure the breach.

**20.4.   Mutual Agreement to Terminate.** If you and we mutually agree in writing to terminate this Agreement, you and we will be deemed to have waived any required notice period.

## 21.   POST-TERM OBLIGATIONS.

**21.1.   Obligations of You and the Owners.** After the termination, expiration or Transfer of this Agreement, you and the Owners agree to:

(i)   immediately cease to use the Intellectual Property;

(ii)   pay us all amounts that you owe us;

(iii)   comply with all covenants described in Section 14 that apply after the expiration, termination or Transfer of this Agreement or the disposal of an ownership interest by an Owner;

(iv)   return all copies of the Manual, or any portions thereof, as well as all signs, sign faces, brochures, advertising and promotional materials, forms, and any other materials bearing or containing any of the Marks, Copyrights or other identification relating to a Vida-Flo clinic, unless we allow you to transfer such items to an approved transferee;

(v)   take such action as may be required to cancel all fictitious or assumed names or

18

equivalent registrations relating to your use of any of the Marks;

        (vi)     provide us with a list of all of your current, former and prospective patients and their files;

        (vii)    make such modifications and alterations to the premises that are necessary or that we require to prevent any association between us or the System and any business subsequently operated by you or any third party at the premises; provided, however, that this subsection shall not apply if your franchise is transferred to an approved transferee or if we exercise our right to purchase your entire Business;

        (viii)   notify all telephone companies, listing agencies and domain name registration companies (collectively, the "Agencies") of the termination or expiration of your right to use: (a) the telephone numbers and/or domain names, if applicable, related to the operation of your Clinic; and (b) any regular, classified or other telephone directory listings associated with the Marks (you hereby authorize the Agencies to transfer such telephone numbers, domain names and listings to us and you authorize us, and appoint us and any officer we designate as your attorney-in-fact to direct the Agencies to transfer the telephone numbers, domain names and listings to us if you fail or refuse to do so); and

        (ix)     provide us with satisfactory evidence of your compliance with the above obligations within 30 days after the effective date of the termination, expiration or Transfer of this Agreement.

### 21.2.   Right to Purchase Clinic and Assets.

        (a)     Generally.  Upon the termination or expiration of this Agreement, we shall have the right, but not the obligation, to purchase your Clinic and/or its assets at fair market value as ascertained by an independent business appraiser. If we elect to exercise this option, the date of determination of the fair market value shall be the effective date of the termination or expiration of the Agreement (the "Appraisal Date"). We will notify you of the specific items that we wish to purchase (the "Acquired Assets"). We may also require that you assign your lease to us at no additional charge.

        (b)     Selecting Qualified Appraisers.  You and we each shall appoint an appraiser with experience appraising businesses comparable to your Business in the United States (a "Qualified Appraiser"). This appointment of the appraisers shall be made within 30 days after the Appraisal Date by giving written notice to the other party of the name and address of the Qualified Appraiser.  If either of us fails to appoint a Qualified Appraiser within the 30-day period, the appraisal shall be made by the sole Qualified Appraiser appointed within that period.  If each of us shall have appointed a Qualified Appraiser within the 30-day period, then within 30 days after that the two (2) Qualified Appraisers shall appoint a third (3rd) Qualified Appraiser.  If the two (2) Qualified Appraisers fail to agree on the appointment of a third (3rd) Qualified Appraiser within the 30-day period, then a third (3rd) Qualified Appraiser shall be appointed by the American Arbitration Association (acting through its office located closest to our corporate headquarters) as promptly as possible after that, upon application by either us or you. Nothing in this provision shall prohibit us and you from jointly approving a single appraiser, nor shall it obligate us or you to do so.

        (c)     Information for Appraisal.  You must furnish to the Qualified Appraisers a copy of your current financial statements, as well as your financial statements for the prior three (3) years (or the period of time that you have operated your Business, if less than three (3) years), together with the work papers and other financial information or other documents or information that the Qualified Appraisers may request. The Qualified Appraisers shall take into account the other information and factors that they deem relevant, but the Qualified Appraisers shall be instructed that there shall be no consideration of goodwill in the determination of fair market value.

        (d)     Appraisal Process.  Within 60 days after the appointment of the third Qualified Appraiser, the three (3) Qualified Appraisers shall appraise the Appraised Assets at fair market value without

taking into account any value for goodwill (the "Appraised Value"). If the three (3) Qualified Appraisers agree on a single value, then they shall issue a joint report and the Appraised Value shall be the value determined by the agreement of the three (3) Qualified Appraisers. If two (2) of the three (3) Qualified Appraisers agree on a single value, these two (2) Qualified Appraisers shall issue a joint report, and the dissenting Qualified Appraiser may (but need not) issue a separate report, and the value determined by agreement of the two (2) Qualified Appraisers who shall agree shall be the Appraised Value. If none of the Qualified Appraisers are able to agree on a single value, each Qualified Appraiser shall issue a report setting forth the value determined by him or her, and the average of the two values that are closest to each other shall be the Appraised Value. Before the issuance of a report by any Qualified Appraiser, each Qualified Appraiser shall advise the others of the value that will appear in his or her report to ensure that the determination of value made by any Qualified Appraiser is made with knowledge of the values determined by the other Qualified Appraisers. If there shall be only a single Qualified Appraiser (because you or we failed to appoint a Qualified Appraiser within the time provided), then the Appraised Value shall be the value determined by the single Qualified Appraiser.

(e)     Cost of Appraisal.  You and we shall equally bear the cost of the appraisal.

(f)     Closing.  Once the Appraised Value has been determined, we will have at least 60 days to prepare for the closing. We will be entitled to receive from you all customary representations and warranties given by you as the seller of the Acquired Assets and you must transfer good and clean title to the Acquired Assets, subject to any exceptions agreed to by us.

**22.     DISPUTE RESOLUTION.** The parties agree to submit any claim, dispute or disagreement, including any matter pertaining to the interpretation of this Agreement or issues relating to the offer and sale of the franchise or the relationship between the parties (a "Dispute") to mediation before a mutually-agreeable mediator prior to arbitration. If the Dispute is not resolved by mediation within 30 days after either party makes a demand for mediation, the parties will submit the dispute to mandatory and binding arbitration conducted pursuant to the Commercial Arbitration Rules of the American Arbitration Association. The party filing the arbitration must initially bear the cost of any arbitration fees or costs. The arbitrators will not have authority to award exemplary or punitive damages. Notwithstanding the foregoing, any Dispute that involves an alleged breach of Section 14 or Section 17 will not be subject to mediation or arbitration unless otherwise agreed to by both parties, and either party may immediately file a lawsuit in accordance with this Section with respect to any alleged breach of Section 14 or Section 17. All mediation, arbitration and litigation shall take place in the county in which we maintain our principal place of business at the time the Dispute arises (currently, Fulton County, Georgia) and the parties irrevocably waive any objection to such venue. If we or you must enforce this Agreement in a judicial or arbitration proceeding, the substantially prevailing party will be entitled to reimbursement of its costs and expenses, including reasonable accounting and legal fees. UNLESS PROHIBITED BY APPLICABLE LAW, ANY DISPUTE (OTHER THAN FOR PAYMENT OF MONIES OWED OR A VIOLATION OF SECTION 14 OR SECTION 17) MUST BE BROUGHT BY FILING A WRITTEN DEMAND FOR ARBITRATION (OR IF PERMITTED, LITIGATION) WITHIN ONE (1) YEAR FOLLOWING THE CONDUCT, ACT OR OTHER EVENT OR OCCURRENCE GIVING RISE TO THE CLAIM, OR THE RIGHT TO ANY REMEDY WILL BE DEEMED FOREVER WAIVED AND BARRED. WE AND YOU IRREVOCABLY WAIVE: (i) TRIAL BY JURY; AND (ii) THE RIGHT TO ARBITRATE OR LITIGATE ON A CLASS ACTION BASIS, IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THE PARTIES.

**23.     YOUR REPRESENTATIONS.** YOU HEREBY REPRESENT THAT: (i) YOU HAVE NOT RECEIVED OR RELIED UPON ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT, EXCEPT FOR ANY INFORMATION DISCLOSED IN THE FRANCHISE DISCLOSURE DOCUMENT; (ii) YOU HAVE NO KNOWLEDGE OF ANY REPRESENTATIONS BY US OR ANY OF OUR OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES OR REPRESENTATIVES ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT OR THE FRANCHISE DISCLOSURE DOCUMENT; (iii) YOU RECEIVED (1) AN

EXACT COPY OF THIS AGREEMENT AND ITS ATTACHMENTS AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT IS EXECUTED; AND (2) OUR FRANCHISE DISCLOSURE DOCUMENT AT THE EARLIER OF (A) TEN (10) BUSINESS DAYS BEFORE YOU SIGNED A BINDING AGREEMENT OR PAID ANY MONEY TO US OR OUR AFFILIATES OR (B) AT SUCH EARLIER TIME IN THE SALES PROCESS THAT YOU REQUESTED A COPY; (iv) YOU ARE AWARE OF THE FACT THAT OTHER PRESENT OR FUTURE FRANCHISEES OF OURS MAY OPERATE UNDER DIFFERENT FORMS OF AGREEMENT AND CONSEQUENTLY THAT OUR OBLIGATIONS AND RIGHTS WITH RESPECT TO OUR VARIOUS FRANCHISEES MAY DIFFER MATERIALLY IN CERTAIN CIRCUMSTANCES; (v) YOU ARE AWARE OF THE FACT THAT WE MAY HAVE NEGOTIATED TERMS OR OFFERED CONCESSIONS TO OTHER FRANCHISEES AND WE HAVE NO OBLIGATION TO OFFER YOU THE SAME OR SIMILAR NEGOTIATED TERMS OR CONCESSIONS; AND (vi) YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND RECOGNIZE THAT IT INVOLVES BUSINESS RISKS, MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON YOUR OWN BUSINESS ABILITIES, EFFORTS AND JUDGMENTS, AND THE SERVICES OF YOU AND THOSE YOU EMPLOY.

## 24.    GENERAL PROVISIONS

**24.1.    Governing Law.** Except as governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051, et seq.), this Agreement and the franchise relationship shall be governed by the laws of the State of Georgia (without reference to its principles of conflicts of law), but any law of the State of Georgia that regulates the offer and sale of franchises or business opportunities or governs the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this Section.

**24.2.    Relationship of the Parties.** You understand and agree that nothing in this Agreement creates a fiduciary relationship between you and us or is intended to make either party a general or special agent, legal representative, subsidiary, joint venture, partner, employee or servant of the other for any purpose. During the Term, you must conspicuously identify yourself at your base of operations, and in all dealings with third parties, as a franchisee of ours and the independent owner of your Business. You agree to place such other notices of independent ownership on such forms, stationery, advertising, business cards and other materials as we may require from time to time. Neither we nor you are permitted to make any express or implied agreement, warranty or representation, or incur any debt, in the name of or on behalf of the other, or represent that our relationship is other than franchisor and franchisee. In addition, neither we nor you will be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized by this Agreement.

**24.3.    Severability and Substitution.** Each section, subsection, term and provision of this Agreement, and any portion thereof, shall be considered severable. If any applicable and binding law imposes mandatory, non-waivable terms or conditions that conflict with a provision of this Agreement, the terms or conditions required by such law shall govern to the extent of the inconsistency and supersede the conflicting provision of this Agreement. If a court concludes that any promise or covenant in this Agreement is unreasonable and unenforceable: (i) the court may modify such promise or covenant to the minimum extent necessary to make such promise or covenant enforceable; or (ii) we may unilaterally modify such promise or covenant to the minimum extent necessary to make such promise or covenant enforceable.

**24.4.    Waivers.** We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other. Any waiver granted by us shall be without prejudice to any other rights we may have. We and you shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including the right to demand exact compliance with every term, condition and covenant in this Agreement or to declare any breach of this Agreement to be a default and to terminate the franchise before the expiration of its term) by virtue of: (i) any custom or practice of the parties at variance with the terms of this Agreement; (ii) any failure, refusal or neglect of us or you to exercise any right under this Agreement or to insist

upon exact compliance by the other with its obligations under this Agreement, including any mandatory specification, standard, or operating procedure; (iii) any waiver, forbearance, delay, failure or omission by us to exercise any right, power or option, whether of the same, similar or different nature, relating to other Vida-Flo franchisees; or (iv) the acceptance by us of any payments due from you after breach of this Agreement.

      24.5.   **Approvals.**  Whenever this Agreement requires our approval, you must make a timely written request for approval, and the approval must be in writing in order to bind us. Except as otherwise expressly provided in this Agreement, if we fail to approve any request for approval within the required period of time, we shall be deemed to have disapproved your request. If we deny approval and you seek legal redress for the denial, the only relief to which you may be entitled is to acquire our approval. You are not entitled to any other relief or damages for our denial of approval.

      24.6.   **Force Majeure.** Neither we nor you shall be liable for loss or damage or deemed to be in breach of this Agreement if our or your failure to perform our or your obligations results from any event of force majeure. Any delay resulting from an event of force majeure will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable under the circumstances.

      24.7.   **Binding Effect.** This Agreement is binding upon the parties to this Agreement and their respective executors, administrators, heirs, assigns and successors in interest. Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party to this Agreement; provided, however, that the additional insureds listed in <u>Section 15.1</u> and the Indemnified Parties are intended third party beneficiaries under this Agreement with respect to <u>Section 15.1</u> and <u>Section 18</u>, respectively.

      24.8.   **Integration.** THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND MAY NOT, EXCEPT AS PERMITTED BY <u>SECTION 12.2</u> AND <u>SECTION 24.3</u>, BE CHANGED EXCEPT BY A WRITTEN DOCUMENT SIGNED BY BOTH PARTIES. Any e-mail correspondence or other form of informal electronic communication shall not be deemed to modify this Agreement unless such communication is signed by both parties and specifically states that it is intended to modify this Agreement. The attachment(s) are part of this Agreement, which, together with any Amendments or Addenda executed on or after the Effective Date, constitutes the entire understanding and agreement of the parties, and there are no other oral or written understandings or agreements between us and you about the subject matter of this Agreement. As referenced above, all mandatory provisions of the Manual are part of this Agreement. Any representations not specifically contained in this Agreement made before entering into this Agreement do not survive after the signing of this Agreement. This provision is intended to define the nature and extent of the parties' mutual contractual intent, there being no mutual intent to enter into contract relations, whether by agreement or by implication, other than as set forth above. The parties acknowledge that these limitations are intended to achieve the highest possible degree of certainty in the definition of the contract being formed, in recognition of the fact that uncertainty creates economic risks for both parties which, if not addressed as provided in this Agreement, would affect the economic terms of this Agreement. Nothing in this Agreement is intended to disclaim any of the representations we made in the Franchise Disclosure Document.

      24.9.   **Covenant of Good Faith.** If applicable law implies a covenant of good faith and fair dealing in this Agreement, the parties agree that the covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement. Additionally, if applicable law shall imply the covenant, you agree that: (i) this Agreement (and the relationship of the parties that is inherent in this Agreement) grants us the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with our explicit rights and obligations under this Agreement that may affect favorably or adversely your interests; (ii) we will use our judgment in exercising the discretion based on our assessment of our own interests and balancing those interests against the interests of our franchisees generally (including ourselves and our affiliates if applicable), and specifically without considering your individual interests or the individual interests of any other particular franchisee; (iii) we will have no liability to you for the exercise of our discretion in this manner, so long as the discretion is not exercised in bad faith; and (iv) in the absence of bad faith, no trier of fact in any

arbitration or litigation shall substitute its judgment for our judgment so exercised.

**24.10. <u>Rights of Parties are Cumulative</u>.** The rights of the parties under this Agreement are cumulative and no exercise or enforcement by either party of any right or remedy under this Agreement will preclude any other right or remedy available under this Agreement or by law.

**24.11. <u>Survival</u>.** All provisions that expressly or by their nature survive the termination, expiration or Transfer of this Agreement (or the Transfer of an ownership interest in the franchise) shall continue in full force and effect subsequent to and notwithstanding its termination, expiration or Transfer and until they are satisfied in full or by their nature expire, including, without limitation, <u>Section 13</u>, <u>Section 14</u>, <u>Section 16</u>, <u>Section 18</u>, <u>Section 21</u>, <u>Section 22</u> and <u>Section 24</u>.

**24.12. <u>Construction</u>.** The headings in this Agreement are for convenience only and do not define, limit or construe the contents of the sections or subsections. All references to Sections refer to the Sections contained in this Agreement unless otherwise specified. All references to days in this Agreement refer to calendar days unless otherwise specified. The term "you" as used in this Agreement is applicable to one or more persons or an Entity, and the singular usage includes the plural and the masculine and neuter usages include the other and the feminine and the possessive.

**24.13. <u>Time of Essence</u>.** Time is of the essence in this Agreement and every term thereof.

**24.14. <u>Counterparts</u>.** This Agreement may be signed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same document.

**24.15. <u>Notice</u>.** All notices given under this Agreement must be in writing, delivered by hand, telegram or first class mail, to the following addresses (which may be changed upon 10 business days prior written notice):

| | |
|---|---|
| YOU: | As set forth below your signature on this Agreement |
| US: | Hydration Station USA Franchise System, LLC<br>1819 Peachtree Road, Suite 205<br>Atlanta, Georgia 30309 |
| WITH A COPY TO: | Daniel Warshawsky<br>Warshawsky Seltzer, PLLC<br>9943 East Bell Road<br>Scottsdale, Arizona 85260 |

Notice shall be considered given at the time delivered by hand, or one (1) business day after sending by telegraph or comparable electronic or computer system, or three (3) business days after placed in the mail, postage prepaid, by certified mail with a return receipt requested.

[Signature Page Follows]

23

The parties to this Agreement have executed this Agreement effective as of the Effective Date first above written.

**FRANCHISOR:**

Hydration Station USA Franchise System, LLC, a Georgia limited liability company

By: _____

Name: KEITH MᶜDERMOTT

Its: CEO

**YOU (If you are an entity):**

Vida·Flo Louisiana, LLC ,

a(n) Louisiana LLC

By _____

Name: Brian L. McCullough

Its: Manager

**YOU (If you are not an entity):**

Name:_____

Name:_____

Name:_____

Name:_____

**Franchisee's Principal Business Address:**

_____

_____

_____

_____

24

## ATTACHMENT "A"

### TO FRANCHISE AGREEMENT

#### DEFINITIONS

*"Account"* is defined in Section 13.5.

*"Acquired Assets"* is defined in Section 21.2.

*"Agencies"* is defined in Section 21.1(viii).

*"Agreement"* is defined in the Introductory Paragraph.

*"Alternative Channels of Distribution"* means all channels of distribution other than retail sales made to customers from a Vida-Flo clinic, including, but not limited to: (i) sales through direct marketing, such as over the Internet or through catalogs or telemarketing; (ii) sales through retail stores that do not operate under the Marks, such as grocery stores, convenience stores or department stores; (iii) sales made at wholesale; and (iv) on-site sales to customers.

*"Appraisal Date"* is defined in Section 21.2.

*"Appraised Value"* is defined in Section 21.2.

*"Business"* is defined in Section 2.

*"Claim"* or *"Claims"* means any and all claims, actions, demands, assessments, litigation, or other form of regulatory or adjudicatory procedures, claims, demands, assessments, investigations, or formal or informal inquiries.

*"Clinic"* is defined in Section 2.

*"Competitive Business"* means any business competitive with us (or competitive with any of our affiliates or our franchisees) that generates at least 50% of its gross revenues from the provision of hydration therapy services.

*"Confidentiality Agreement"* means our form of Confidentiality Agreement, the most current form of which is attached to this Agreement as ATTACHMENT "H".

*"Copyrights"* means all works and materials for which we or our affiliate has secured common law or registered copyright protection and that we allow Vida-Flo franchisees to use, sell or display in connection with the marketing and/or operation of a Vida-Flo clinic, whether now in existence or created in the future.

*"Dispute"* is defined in Section 22.

*"Effective Date"* is defined in the Introductory Paragraph.

*"Entity"* means a corporation, partnership, limited liability company or other form of association.

*"Franchise Area"* is defined in Sections 7.1.

*"General Release"* means our current form of general release of all claims against us and our affiliates and subsidiaries, and our and their respective members, officers, directors, agents and employees, in both their corporate and individual capacities.

*"Gross Revenues"* means all gross sums collected or billed by you from all goods and services sold in connection with your Clinic (whether off-site or from your Clinic), together with any other revenue or monies derived in connection with your Business, including the proceeds of any business interruption insurance. "Gross Revenues" does not include: (i) revenues that you collect from a customer and later refund to that customer; (ii) any sales or use taxes that you pay to a government agency; or (iii) .the value of complimentary or "comped" products or services offered for promotional purposes (we may limit the maximum amount of the weekly deduction for "comped" products or services, and the value of any comped products or services in excess of the weekly cap, calculated based on our suggested retail pricing, must be included in Gross Revenues).

*"Improvements"* is defined in <u>Section 17.5</u>.

*"Indemnified Party"* or *"Indemnified Parties"* means us and each of our past, present and future owners, members, officers, directors, employees and agents, as well as our parent companies, subsidiaries and affiliates, and each of their past, present and future owners, members, officers, directors, employees and agents.

*"Intellectual Property"* means, collectively or individually, our Marks, Copyrights, Know-how, System and Improvements.

*"Interim Term"* is defined in <u>Section 4.3</u>.

*"Know-how"* means all of our trade secrets and other proprietary information relating to the development, construction, marketing and/or operation of a Vida-Flo clinic, including, but not limited to, methods, techniques, specifications, medical treatments, procedures, policies, marketing strategies and information comprising the System and the Manual.

*"Losses and Expenses"* means all compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against Claims; settlement amounts; judgments; compensation for damages to our reputation and goodwill; and all other costs, damages, liabilities and expenses associated with any of the foregoing losses and expenses or incurred by an Indemnified Party as a result of a Claim.

*"Managing Owner"* means the Owner that you designate and we approve who is primarily responsible for the daily on-premises management and supervision of the Clinic.

*"Manual"* is defined in <u>Section 6.1</u>.

*"Marks"* means the logotypes, service marks, and trademarks now or hereafter involved in the operation of a Vida-Flo clinic, including "Vida-Flo" and related logo and the tagline "THE HYDRATION STATION", and any other trademarks, service marks or trade names that we designate for use in a Vida-Flo clinic. The term "Marks" also includes any distinctive trade dress used to identify a Vida-Flo clinic, whether now in existence or hereafter created.

*"Marketing Campaign"* is defined in <u>Section 11.1(a)</u>.

*"Noncompetition Agreement"* means our form of Nondisclosure, Nonsolicitation and Noncompetition Agreement, the most current form of which is attached to this Agreement as <u>ATTACHMENT "G"</u>.

*"Owner"* or *"Owners"* means any individual who owns a direct or indirect ownership interest in the franchise or the Entity that is the franchisee under this Agreement. "Owner" includes both passive and active owners.

*"Permitted Transfer"* means: (i) a Transfer from one Owner to another Owner who was an approved Owner prior to such Transfer, other than a Transfer by an Owner who is the Managing Owner that results in the Managing Owner holding less than a 10% ownership interest in the franchise; and/or (ii) a Transfer to a newly established Entity for which the Owners collectively own and control 100% of the ownership interests and voting power.

*"Post-Term Restricted Period"* means, with respect to you, a period of two (2) years after the termination, expiration or Transfer of this Agreement; provided, however, that if a court of competent jurisdiction determines that the two-year Post-Term Restricted Period is too long to be enforceable, then the "Post-Term Restricted Period" means, with respect to you, a period of one (1) year after the termination, expiration or Transfer of this Agreement. "Post-Term Restricted Period" means, with respect to an Owner, a period of two (2) years after the earlier to occur of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the Entity that is the franchisee, as applicable; provided, however, that if a court of competent jurisdiction determines that the two-year Post-Term Restricted Period is too long to be enforceable, then the "Post-Term Restricted Period" means, with respect to an Owner, a period of one (1) year after the earlier to occur of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the Entity that is the franchisee, as applicable.

*"Prohibited Activities"* is defined in <u>Section 14.3</u>.

*"Qualified Appraiser"* is defined in <u>Section 21.2</u>.

*"Restricted Territory"* means the geographic area within: (i) a 15 mile radius from your Clinic (and including your Clinic itself); and (ii) a 15 radius from all other Vida-Flo Clinics that are operating or under construction as of the Effective Date and remain in operation or under construction during all or any part of the Post-Term Restricted Period; provided, however, that if a court of competent jurisdiction determines that the foregoing Restricted Territory is too broad to be enforceable, then the "Restricted Territory" means the geographic area within a 15 mile radius from your Clinic (and including your Clinic itself).

*"Successor Agreement"* is defined in <u>Section 4.1</u>.

*"System"* means our distinct system for the operation of a Vida-Flo clinic, the distinctive characteristics of which include logo, trade secrets, concept, style, specially formulated programs, products and treatments, confidential operations manuals and operating system.

*"Term"* is defined in <u>Section 4.1</u>.

*"Territory"* is defined in <u>Section 3</u>.

*"Transfer"* means any direct or indirect, voluntary or involuntary (including by judicial award, order or decree), assignment, sale, conveyance, subdivision, sublicense or other transfer or disposition of the franchise (or any interest therein), the Business (or any portion thereof) or an ownership interest in an Entity that is the franchisee, including by merger or consolidation, by issuance of additional securities representing an ownership interest in the Entity that is the franchisee, or by operation of law, will or a trust upon the death of an Owner (including the laws of intestate succession).

*"We" or "us"* is defined in the Introductory Paragraph.

*"You"* is defined in the Introductory Paragraph.

## ATTACHMENT "B"

## TO FRANCHISE AGREEMENT

### FRANCHISE AREA

The Franchise Area referenced in the Franchise Agreement shall consist of the following geographic area:

Baton Rouge, LA

# EXHIBIT "D"

## TO DISCLOSURE DOCUMENT

### TABLE OF CONTENTS OF OPERATING MANUAL

Page numbers are approximate and may change at any time

**CHAPTER 1: INTRODUCTION** ................................................. **5**
How to use this manual .............................................................5
Confidential Disclosure Agreement ..........................................6
**CHAPTER 2: WELCOME TO VIDA-FLO** .............................. **7**
History of the Company ............................................................8
Our Management Team .............................................................9
Legal Advisory and franchisor's management support .............11
Company Mission & Principles ...............................................12
**CHAPTER 3: SUPPORT RESOURCES** .............................. **13**
Franchise support matrix ........................................................14
**CHAPTER 4: PRE-OPENING TIMETABLE & OBLIGATIONS** ........ **15**
Company pre-opening timetable ..............................................16
Week One .................................................................................20
Week Two .................................................................................21
Week Three ...............................................................................22
Week Four .................................................................................23
Week Five .................................................................................24
Week Six ...................................................................................25
**CHAPTER 5: FRANCHISEE TRAINING REQUIREMENTS** ........ **27**
Company Orientation Training ................................................28
Necessary Employee Certifications .........................................29
Additional Training .................................................................30
Annual Vida-Flo Conference ...................................................31
**CHAPTER 6: STAFFING YOUR CLINIC** ......................... **33**
Staffing your Company Franchise ...........................................34
Necessary certifications, licenses and experience ...................36
Position descriptions with profiles ..........................................38
**CHAPTER 7: OFFICE POLICIES** ...................................... **40**
Setting up the office ................................................................41
Quality Standards of Service ...................................................42
Service and courtesy to patients ..............................................45
Handling typical complaints and problems ..............................47
Employee appearance (uniforms) and hygiene ........................49
Visitors in the workplace .........................................................50
Computer usage .......................................................................51
**CHAPTER 8: OFFICE OPERATION AND MAINTENANCE** ........ **52**

General housekeeping ........................................................................................................... 53
Opening procedures ............................................................................................................. 54
Closing procedures............................................................................................................... 57
Cleaning procedures............................................................................................................. 59
Miscellaneous franchise duties and responsibilities ........................................................... 62
Office administration major activities listing...................................................................... 63
Administrative management checklist ................................................................................. 65
Alarms, locks and keys ........................................................................................................ 66
Inventory levels.................................................................................................................... 67
Daily procedures .................................................................................................................. 68
Restrooms ............................................................................................................................ 69
**CHAPTER 9: PROCEDURES AND PROTOCOLS.............................................. 70**
Standing delegated medical & prescription orders and protocols......................................... 71
Patient introduction and evaluation...................................................................................... 72
Medication preparation ......................................................................................................... 74
Medication information ......................................................................................................... 76
Medication procedures........................................................................................................... 77
Safety precautions and response ............................................................................................ 85
In-clinic rules ......................................................................................................................... 88
General office rules................................................................................................................. 92
OSHA bloodborne pathogen ECP........................................................................................... 93
Strike system overview .........................................................................................................118
**CHAPTER 10: EMPLOYEE HANDBOOK ....................................................... 119**
**CHAPTER 11: OFFICE INVENTORY AND SUPPLIES................................... 166**
Office equipment ..................................................................................................................167
Approved vendors and items ...............................................................................................168
Opening inventory necessities .............................................................................................170
**CHAPTER 12: REPORTS, AUDITS & INSPECTIONS ................................... 172**
Franchisee reports ...............................................................................................................173
Records and reports..............................................................................................................175
Failure to report....................................................................................................................176
Audits and inspections .........................................................................................................177
Contact with others ..............................................................................................................178
**CHAPTER 13: MARKETING............................................................................. 179**
Company franchisee marketing requirements.......................................................................183
Targeting your markets ........................................................................................................185
Executing the marketing plan ..............................................................................................188
**CHAPTER 14: SALES & PRICING ................................................................... 192**
Introduction..........................................................................................................................194
Membership ..........................................................................................................................196
Referrals................................................................................................................................198
Strategic partnerships...........................................................................................................200
Group presentations .............................................................................................................202
Pricing policies and fee structure .........................................................................................203

**CHAPTER 15: INSURANCE REQUIREMENTS & RISK MANAGEMENT ........... 204**

General Insurance coverage ............................................................................................................205

Risk management ............................................................................................................................206

Managing risk at the franchise location, in-home or events ..........................................................207

Franchisee site security ..................................................................................................................208

Reporting incidents ........................................................................................................................209

**CHAPTER 16: CORPORATE STRUCTURE AND FINANCING ............................... 212**

Setting up your entity .....................................................................................................................213

Legal business structure .................................................................................................................213

Types of structures .........................................................................................................................215

Setting up the new corporation ......................................................................................................219

Financing arrangements ..................................................................................................................221

Financing alternatives .....................................................................................................................221

**CHAPTER 17: SERVICE & TRADEMARKS & TRADE SECRETS ......................... 223**

Patents, copyrights and proprietary information ............................................................................223

Service and trademarks usage and guidelines ................................................................................224

Examples of service and trademark misuse ...................................................................................225

**CHAPTER 18: RESALE, TRANSFER, RENEWAL AND CLOSING ....................... 226**

Conditions of renewal ....................................................................................................................227

Continuation ...................................................................................................................................228

Assignment of transfer ...................................................................................................................228

Termination .....................................................................................................................................230

**CHAPTER 19: EXPANSION AND RELOCATION REQUIREMENTS ................... 233**

Franchise expansion, new territory, resale purchase or territory expansion .......................................233

Franchise Disclosure Document

### EXHIBIT "E"

### TO DISCLOSURE DOCUMENT

#### LIST OF FRANCHISEES

**Part A** (Current Franchisees)

| State | City | Address | Phone | Owner Name(s) |
|---|---|---|---|---|
| Colorado* | Littleton | To be determined | (770) 656-9951<br>(832) 316-4911<br>(404) 667-6525 | Ryan Heavern<br>Eva Shubertova<br>Steve Shamatta |

* This franchisee signed a franchise agreement in 2015 but was not open as of the date of this Disclosure Document. One of the members of the ownership group will move to Colorado to open the Clinic.

**Part B** (Former Franchisees Who Left System During Prior Fiscal Year)

| State | City | Current Business Phone or Last Known Home Phone | Owner Name(s) |
|---|---|---|---|
| None | | | |

**If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.**

# EXHIBIT "F"

## TO DISCLOSURE DOCUMENT

### FINANCIAL STATEMENTS

[See Attached]

HYDRATION STATION USA FRANCHISE SYSTEM, LLC

FINANCIAL STATEMENTS
AND INDEPENDENT AUDITOR'S REPORT

DECEMBER 31, 2014

Franchise Disclosure Document

Hydration Station USA Franchise System, LLC

TABLE OF CONTENTS

|  | PAGE |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | 2 |
| FINANCIAL STATEMENTS | |
| BALANCE SHEET | 4 |
| STATEMENT OF OPERATIONS | 5 |
| STATEMENT OF MEMBERS' EQUITY | 6 |
| STATEMENT OF CASH FLOWS | 7 |
| NOTES TO FINANCIAL STATEMENTS | 8 |

Franchise Disclosure Document



INDEPENDENT AUDITOR'S REPORT

To the Members
Hydration Station USA Franchise System, LLC

We have audited the accompanying financial statements of Hydration Station USA Franchise System, LLC, which comprise the balance sheet as of December 31, 2014, and the related statements of operations, members' equity and cash flows for the period from May 10, 2014 (date of inception) through December 31, 2014, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

-2-

345 Peachtree Industrial Pkwy, Suite 1206, Suwanee, GA 30024     (470)273-6610     tidwellgroup.com

Franchise Disclosure Document

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Hydration Station USA Franchise System, LLC, as of December 31, 2014, and the results of its operations and its cash flows for the period from May 10, 2014 (date of inception) through December 31, 2014, in accordance with accounting principles generally accepted in the United States of America.

*Tidwell Group*

Suwanee, Georgia
October 23, 2015

-3-

345 Peachtree Industrial Pkwy, Suite 1206, Suwanee, GA 30024     (470)273-6610     tidwellgroup.com

Franchise Disclosure Document

Hydration Station USA Franchise System, LLC

BALANCE SHEET

December 31, 2014

<u>ASSETS</u>

**CURRENT ASSETS**
| | | |
|---|---|---|
| Cash | $ | 81,423 |
| Due from affiliate | | 1,806 |
| Total current assets | | 83,229 |

**FURNITURE, FIXTURES AND EQUIPMENT**
| | | |
|---|---|---|
| Furniture and equipment, net | | 18,937 |
| Less accumulated depreciation | | (912) |
| Total furniture, fixtures and equipment | | 18,025 |

**OTHER ASSETS**
| | | |
|---|---|---|
| Security deposit | | 4,138 |
| Total other assets | | 4,138 |
| Total assets | $ | 105,392 |

<u>LIABILITIES AND MEMBERS' EQUITY</u>

**CURRENT LIABILITIES**
| | | |
|---|---|---|
| Accounts payable | $ | 10,943 |
| Accrued expenses | | 13,195 |
| Current maturities of notes payable | | 6,667 |
| Total current liabilities | | 30,805 |

Contingencies

| | | |
|---|---|---|
| Members' equity | | 74,587 |
| Total liabilities and members' equity | $ | 105,392 |

See notes to financial statements.

- 4 -

Franchise Disclosure Document

Hydration Station USA Franchise System, LLC

STATEMENT OF OPERATIONS

Period from May 10, 2014 (date of inception) through December 31, 2014

| | | |
|---|---|---:|
| Operating expenses | | |
| Salaries and employee benefits | $ | 81,708 |
| Repairs and maintenance | | 4,193 |
| Utilities | | 998 |
| Insurance | | 156 |
| Office supplies and expense | | 7,444 |
| Training and travel | | 11,288 |
| Telephone and answering service | | 918 |
| Computer supplies and expense | | 6,054 |
| Rent | | 19,168 |
| Advertising | | 118 |
| Legal | | 23,307 |
| Other professional fees | | 19,149 |
| | | |
| Total operating expenses | | 174,501 |
| | | |
| Net operating loss | | (174,501) |
| | | |
| Other income (expense) | | |
| Depreciation | | (912) |
| | | |
| Total other income (expense) | | (912) |
| | | |
| Net loss | $ | (175,413) |

See notes to financial statements.

- 5 -

Hydration Station USA Franchise System, LLC

STATEMENT OF MEMBERS' EQUITY

Period from May 10, 2014 (date of inception) through December 31, 2014

| | | |
|---|---|---|
| Balance, May 10, 2014 (date of inception) | $ | - |
| Net loss | | (175,413) |
| Contributions | | 250,000 |
| Balance, December 31, 2014 | $ | 74,587 |

See notes to financial statements.

- 6 -

Franchise Disclosure Document

Hydration Station USA Franchise System, LLC

STATEMENT OF CASH FLOWS

Period from May 10, 2014 (date of inception) through December 31, 2014

| | |
|---|---:|
| Cash flows from operating activities | |
| Net loss | $  (175,413) |
| Adjustments to reconcile net loss to net cash used in operating activities | |
| Depreciation | 912 |
| Separation liability | 10,000 |
| Changes in: | |
| Due from affiliate | (1,806) |
| Other assets | (4,138) |
| Accounts payable | 10,943 |
| Accrued expenses | 13,195 |
| Separation liability | (3,333) |
| | |
| Net cash used in operating activities | (149,640) |
| | |
| Cash flows from investing activities | |
| Expenditures on furniture, fixtures, and equipment | (18,937) |
| | |
| Net cash used in investing activities | (18,937) |
| | |
| Cash flows from financing activities | |
| Contributions | 250,000 |
| | |
| Net cash provided by financing activities | 250,000 |
| | |
| Net increase in cash and cash equivalents | 81,423 |
| | |
| Cash and cash equivalents, beginning | - |
| | |
| Cash and cash equivalents, ending | $     81,423 |
| | |
| Supplemental disclosure of cash flow information | |
| Cash paid for interest | $        - |

See notes to financial statements.

- 7 -

Franchise Disclosure Document

Hydration Station USA Franchise System, LLC

NOTES TO FINANCIAL STATEMENTS

December 31, 2014

## NOTE 1 - ORGANIZATION AND NATURE OF OPERATIONS

Hydration Station USA Franchise System, LLC (the Company) was organized as a limited liability company under the laws of the State of Georgia on May 10, 2014. The Company was established to offer franchises for the operation of clinics that provide high quality hydration therapy services and related treatments in a convenient setting utilizing proven medical techniques and treatments.

Franchise operations are regulated by the Federal Trade Commission (FTC). The Company must also complete franchise registration, pursuant to state law, in those states where franchises are planned to be sold. Once registered, the Company will provide franchisees with uniform standards and procedures for efficient business operations, territorial rights, management training, and a license to use specified names and trademarks. The Company is currently going through the registration process.

## NOTE 2 - SIGNIFICANT ACCOUNTING POLICIES

### Basis of Accounting

The Company prepares its financial statements on the accrual basis of accounting consistent with accounting principles generally accepted in the United States of America.

### Furniture, Fixtures, and Equipment

Furnishings and equipment are depreciated over their estimated useful lives of five or seven years using the straight-line method. Improvements are capitalized, while expenditures for maintenances and repairs are charged to expense as incurred. Upon disposal of depreciable property, the appropriate accounts will be reduced by the related costs and accumulated depreciation. The resulting gains and losses will be reflected in the statement of operations. For the period from May 10, 2014 (date of inception) through December 31, 2014, depreciation expense was $912. As of December 31, 2014, accumulated depreciation was $912.

### Impairment of long-lived assets

The Company reviews its furniture, fixtures, and equipment for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. When recovery is reviewed, if the undiscounted cash flows estimated to be generated by the furniture, fixtures, and equipment are less than its carrying amount, management compares the carrying amount of the furniture, fixtures, and equipment to its fair value in order to determine whether an impairment loss has occurred. The amount of the impairment loss is equal to the excess of the asset's carrying value over its estimated fair value. No impairment losses have been recognized during the period from May 10, 2014 (date of inception) through December 31, 2014.

- 8 -

Hydration Station USA Franchise System, LLC

NOTES TO FINANCIAL STATEMENTS - CONTINUED

December 31, 2014

Advertising Costs

The Company's policy is to expense advertising costs when incurred.

Income Taxes

The Company has elected to be treated as a pass-through entity for income tax purposes and, as such, is not subject to income taxes. Rather, all items of taxable income, deductions and tax credits are passed through to and are reported by its owners on their respective income tax returns. The Company's federal tax status as a pass-through entity is based on its legal status as a limited liability company. Accordingly, the Company is not required to take any tax positions in order to qualify as a pass-through entity. The Company is required to file and does file tax returns with the Internal Revenue Service and other taxing authorities. Accordingly, these financial statements do not reflect a provision for income taxes and the Company has no other tax positions which must be considered for disclosure. Income tax returns filed by the Company are subject to examination by the Internal Revenue Service for a period of three years. While no income tax returns are currently being examined by the Internal Revenue Service, tax years since 2014, the initial year of the Company, remain open.

Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

Recently Issued Accounting Pronouncements

Accounting Standards Update (ASU) No. 2014-10, *Development Stage Entities (Topic 915): Elimination of Certain Financial Reporting Requirements, Including an Amendment to Variable Interest Entities Guidance in Topic 810, Consolidation* removes all incremental financial reporting requirements for development stage entities, including the removal of reporting of the cumulative results of operations and cash flows for the period from inception to the end of the current period. The ASU is effective for the first annual period beginning after December 15, 2014. Early adoption is permitted, and the Company adopted this change during 2014.

- 9 -

Hydration Station USA Franchise System, LLC

NOTES TO FINANCIAL STATEMENTS - CONTINUED

December 31, 2014

NOTE 3 - MEMBERS' EQUITY

The Company has two groups of unit owners, Class A and Class B. The Class A unit owners are members who hold all voting rights and are not required to contribute capital, but they are entitled to return of capital if such capital is contributed, as defined in the operating agreement. The Class B unit owners do not have any voting rights and are not required to contribute capital, but they are not entitled to return of capital if such capital is contributed, as defined in the operating agreement. All unit owners are allocated their share of profits, losses, and distributions based on their ownership percentages.

As of December 31, 2014, all capital contributed has been from Class A members totaling $250,000. As of December 31, 2014, Class A and Class B ownership percentages totaled 61.6% and 38.4%, respectively.

NOTE 4 - RELATED PARTY TRANSACTIONS

The Company is affiliated and under common management control with Hydration Station USA, LLC and Hydration Station TWNBRK, LLC. The existence of this control could result in operating results and a financial position of the Company significantly different from those that would have been obtained if the companies were autonomous.

Hydration Station USA, LLC is a guarantor of the office space lease (see Note 5).

Due from affiliate

During 2014, the Company advanced funds to an affiliate in the amount of $4,000. The advance does not bear interest and is payable on demand. As of December 31, 2014, $1,806 remains receivable.

NOTE 5 - NOTE PAYABLE

On June 30, 2014, the Company entered into an unsecured promissory note and loan agreement with a former employee of the Company to provide separation benefits. The sum of the promissory note is $30,000 and has a term of 18 months. The note does not bear interest if paid timely under the terms of the agreement. If an Event of Default, as defined in the loan agreement, occurs, the note will bear interest at a fixed rate of 18 percent per annum. Monthly payments of $1,667 are due commencing July 10, 2014 through maturity. The sum of the promissory note and monthly payments due are allocated between the Company and affiliates for which the former employee provided services. As of December 31, 2014, the outstanding principal balance was $6,667.

- 10 -

Franchise Disclosure Document

Hydration Station USA Franchise System, LLC

NOTES TO FINANCIAL STATEMENTS - CONTINUED

December 31, 2014

The estimated principal maturities subsequent to December 31, 2014 are as follows:

| | | |
|---|---|---|
| 2015 | $ | 6,667 |
| Total | $ | 6,667 |

## NOTE 6 - COMMITMENTS AND CONTINGENCIES

Operating Lease

During 2014, the Company executed a non-cancelable operating lease for office space.  The lease commenced on August 1, 2014 and expires October 31, 2017.  Future minimum payments due under the lease as of December 31, 2014 are as follows:

| December 31 | |
|---|---|
| 2015 | $ 44,115 |
| 2016 | 47,392 |
| 2017 | 40,534 |
| | $132,041 |

## NOTE 7 - CONCENTRATION OF CREDIT RISK

The Company maintains cash balances with financial institutions. At times, these balances may exceed the federal insurance limits; however, the Company has not experienced any losses with respect to its bank balances in excess of government provided insurance. Management believes that no significant concentration of credit risk exists with respect to these balances at December 31, 2014.

## NOTE 8 - SUBSEQUENT EVENTS

Events that occur after the balance sheet date but before the financial statements were available to be issued must be evaluated for recognition or disclosure. The effects of subsequent events that provide evidence about conditions that existed at the balance sheet date are recognized in the accompanying financial statements. Subsequent events which provide evidence about conditions that existed after the balance sheet date require disclosure in the accompanying notes. Management evaluated the activity of Hydration Station USA Franchise System, LLC through October 23, 2015 (the date the financial statements were available to be issued) and concluded that no subsequent events have

- 11 -

Franchise Disclosure Document

Hydration Station USA Franchise System, LLC

NOTES TO FINANCIAL STATEMENTS - CONTINUED

December 31, 2014

occurred that would require recognition in the financial statements and that the following subsequent events have occurred that require disclosure in the notes to the financial statements:

Franchise Agreements

Subsequent to December 31, 2014, the Company entered into three franchise agreements for the operation of clinics in Breckenridge, Colorado, Key West, Florida, and Charleston, South Carolina. With the execution of the franchise agreements, the Company earned initial franchise fees of $117,000.

Admission of Member

On July 30, 2015, the Company entered into a service agreement with Gravatus Holdings, LLC, in conjunction with SPARC, LLC, to facilitate and bear all costs associated with the construction, development, implementation, installation, integration and delivery of software, applications, and other programs on behalf of the Company. Service costs under the agreement are not to exceed $200,000. In exchange for the combined service costs in lieu of cash payment, plus an additional $100,000 cash payments, the Company remitted a 10% Class A ownership in the Company. In conjunction with the agreement, the operating agreement of the Company was amended to admit Gravatus Holdings, LLC as a member of the Company.

- 12 -

Franchise Disclosure Document

# EXHIBIT "G"

## TO DISCLOSURE DOCUMENT

### <u>FRANCHISEE DISCLOSURE QUESTIONNAIRE</u>

*[See Attached]*

### FRANCHISEE DISCLOSURE QUESTIONNAIRE

As you know Hydration Station USA Franchise System, LLC ("we" or "us), and you are preparing to enter into a Franchise Agreement for the operation of a Vida-Flo franchise. The purpose of this Questionnaire is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise. **You cannot sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.** Please review each of the following questions carefully and provide honest responses to each question. If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

Yes ✓   No___   1.   Have you received and personally reviewed the Franchise Agreement and each attachment or schedule attached to it?

Yes ✓   No___   2.   Have you received and personally reviewed the Franchise Disclosure Document we provided?

Yes ✓   No___   3.   Did you sign a receipt for the Franchise Disclosure Document indicating the date you received it?

Yes ✓   No___   4.   Do you understand all the information contained in the Franchise Disclosure Document and Franchise Agreement?

Yes ✓   No___   5.   Did you receive the FDD at least 14 days before you signed any agreement or paid any fee to us or any affiliate of ours?

Yes ✓   No___   6.   Did you receive a complete execution copy of the Franchise Agreement, with all material terms filled in, at least seven (7) days before you signed it?

Yes ✓   No___   7.   Have you reviewed the Franchise Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor?

Yes ✓   No___   8.   Have you discussed the benefits and risks of developing and operating a Vida-Flo franchise with an existing Vida-Flo franchisee?

Yes ✓   No___   9.   Do you understand the risks of developing and operating a Vida-Flo franchise?

Yes ✓   No___   10.   Do you understand the success or failure of your franchise will depend in large part upon your skills, abilities and efforts and those of the persons you employ as well as many factors beyond your control such as competition, interest rates, the economy, inflation, labor and supply costs and other relevant factors?

Yes ✓   No___   11.   Do you understand all disputes or claims you may have arising out of or relating to the Franchise Agreement must be arbitrated in Georgia, if not resolved informally or by mediation?

Yes ✓   No___   12.   Do you understand that you must satisfactorily complete the initial training course before we will allow your franchised business to open or consent to a transfer?

Yes ✓   No___   13.   Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a Vida-Flo franchise that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

Yes ✓   No___   14.   Do you agree that no employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement, concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

Yes ✓   No___   15.   Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success,

the amount of money you may earn, or the total amount of revenue a Vida-Flo franchise will generate, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

Yes ✓   No___   16.   Do you understand that the Franchise Agreement and attachments to the Franchise Agreement contain the entire agreement between us and you concerning the franchise for the Vida-Flo business, meaning any prior oral or written statements not set out in the Franchise Agreement or the attachments to the Franchise Agreement will not be binding?

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM.  BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.

Vida- Flo, Louisiana, LLC

_____
Signature of Franchise Applicant

_____
Signature of Franchise Applicant

Brian L McCullough
_____
Name (please print)

_____
Name (please print)

Dated   November 6, 2015

Dated _____

_____
Signature of Franchise Applicant

_____
Signature of Franchise Applicant

_____
Name (please print)

_____
Name (please print)

Dated _____

Dated _____


EXPLANATION OF ANY  NEGATIVE RESPONSES [REFER TO QUESTION NUMBER]:

# EXHIBIT "H"

## TO DISCLOSURE DOCUMENT

### GENERAL RELEASE

*[See Attached]*