# EXHIBIT B

Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.
Keith McDermott on 10/12/2021

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION


 3    _____


 4

      HYDRATION STATION USA FRANCHISE         :
 5    SYSTEM, LLC and VIDA-FLO USA            :
      FULFILLMENT, LLC,                       :
 6                                            :
              Plaintiffs,                     :CIVIL ACTION FILE
 7                                            :NUMBER:
      versus                                  :1:19-cv-5192-LLM
 8                                            :
      JARED CHRISTIAN SEAVERNS, et al.        :
 9                                            :
              Defendants.                     :
10
      _____
11
                  DEPOSITION OF KEITH MCDERMOTT
12


13                        10:22 A.M.


14                     October 12, 2021


15                    POOLE HUFFMAN, LLC
             3562 Habersham at Northlake, Suite 200
16                       Building J
                      Tucker, Georgia
17


18


19


20
          Susan DiFilippantonio, RPR, CCR No. B-2125
21


22


23


24


25
```

Case 1:19-cv-05192-LMM   Document 514-4   Filed 04/30/23   Page 3 of 10

Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.
Keith McDermott on 10/12/2021
Pages 34..37

**Page 34**

1  in IV hydration, and that was a company called Hangover
2  Heaven in Las Vegas.  Certainly nothing in Atlanta,
3  nothing in Colorado, nothing in Louisiana, nothing in
4  Alabama.
5  Q.      Were you living in Atlanta when you said you had
6  the doctor treat you in your house?
7  A.      Yes.  Not in my house, in his house.
8  Q.      In his house.  I apologize.  Thank you.
9          And where was the wedding that you said that you
10 went to about ten days later?
11 A.      Ponte Vedra, Florida.
12 Q.      Were you aware of any businesses that were
13 providing IV hydration on a mobile basis at hotels,
14 let's say?
15 A.      Like I said, the only one that I was able to
16 find was the one in Las Vegas.
17 Q.      So am I correct that it was in 2012 that you put
18 together the idea of starting a brick-and-mortar IV
19 hydration clinic?
20 A.      Yes.
21 Q.      At that time were you considering franchising or
22 at that time were you looking at operating individual
23 clinics?
24 A.      Just wanted to open one.
25 Q.      And tell me what you did.

**Page 35**

1  A.      Well, just like I did with my -- with anything
2  I've ever tried to do in the past, I tried to figure out
3  what the elements of the business are that we had to do
4  to be legally compliant but also successful.  So, first,
5  wanted to find a good location for the first clinic.  I
6  enlisted the help of the same person who gave me the IV
7  as our first medical director, and he helped me along
8  with our first protocols and procedures, our first
9  vendors who we bought supplies from, tried to figure out
10 what those supplies needed to be, tried to figure out
11 what the employees that were going to be administering
12 the IVs -- what type of certifications or licenses they
13 needed to have, and then went to work on raising some
14 money from some friends and family in order to open the
15 business and have some operating capital to make it
16 successful.
17 Q.      So who was the doctor that you said you
18 originally got the guidance from?
19 A.      T.C. Roepke.
20 Q.      Can you spell that?
21 A.      T.C. R-O-E-P-K-E.
22 Q.      And you said he's the one that directed you as
23 to what supplies you would need?
24 A.      Correct.
25 Q.      And what vendors that might be available for

**Page 36**

1  those supplies?
2  A.      Yes, originally.  We went on to use many, many,
3  many more vendors.
4  Q.      And you said he told you what certifications
5  might be necessary for the people to actually operate
6  the clinics?
7  A.      In addition to legal counsel that we had spoken
8  with about...
9  Q.      Now, as far as certifications go, were you
10 looking at what certifications were required in Atlanta,
11 Georgia?
12 A.      Yes.
13 Q.      Are those certifications the same in other
14 locations?
15 A.      I mean, that's a fairly vague question.  Can
16 you --
17 Q.      Let's say if you were looking to open a clinic
18 outside the state of Georgia --
19 A.      Yes.
20 Q.      -- would you have to research different
21 certifications?
22 A.      If it was my clinic?
23 Q.      If it was anyone's clinic.  Would -- would --
24 from your knowledge now, are the certifications the
25 same?

**Page 37**

1  A.      In some cases they are, in some cases they
2  aren't.
3  Q.      So is it regulated on a state-by-state level?
4  A.      In certain instances, yes.
5  Q.      Is it regulated at lower than a state level, at
6  a city level or a county level?
7  A.      Not that I have encountered.
8  Q.      So it's state-level regulation?
9  A.      Again, I am not familiar with all 50 states and
10 United States territories and how certifications need to
11 be for medical clinics, for doctor's offices, emergency
12 rooms.  I'm not sure.  But what we do do with our
13 franchises is we provide them or we tell them that
14 anything with regard to certifications or licenses is
15 their responsibility to do the due diligence.
16 Q.      So let me go back a minute.  At the time that
17 you were considering starting an IV hydration
18 brick-and-mortar business in 2020, had you personally
19 had any experience in any sort of medical field?
20 A.      No.
21 Q.      What about in anything related to retail?
22 A.      Not as an owner, no.
23 Q.      What about franchising?
24 A.      No.
25 Q.      What about being a CEO of a company?

Case 1:19-cv-05192-LMM   Document 514-4   Filed 04/30/23   Page 4 of 10

Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.
Keith McDermott on 10/12/2021
Pages 38..41

Page 38

```
 1  A.      No.
 2  Q.      So what was the first hydration therapy business
 3  that you opened that you -- and I don't mean physical
 4  location.  I mean the actual business.  What was the
 5  first business that you formed?
 6  A.      Hydration Station USA, LLC.
 7  Q.      And what did that company do?
 8  A.      It operated our first location in -- at 2221
 9  Peachtree Road in Atlanta.
10  Q.      And at that time were you calling that the
11  Buckhead location?
12  A.      Well, I mean, it was the only location so, yeah,
13  the Buckhead location.
14  Q.      Did that later come to be referred to as the
15  Buckhead location?
16  A.      Yes.
17  Q.      Who were the owners of Hydration Station USA,
18  LLC?
19  A.      The investors, my partners.  That would have
20  been my father, John McDermott; my brother, Steven
21  McDermott; Steve Shamatta; Gary Saar; Mike Rymsha; JJ
22  and Ryan Radding; and later, after the store was opened,
23  Jamey and Benjie Shirah.
24  Q.      To your knowledge, did your father, John
25  McDermott, have experience in the medical industry?
```

Page 39

```
 1  A.      No.
 2  Q.      What about your brother, Steven McDermott?
 3  A.      No.  None of them did, if you want to --
 4  Q.      None of the people that you listed, if I ask
 5  that same question --
 6  A.      Correct.
 7  Q.      Tell me how you went about -- so Hydration
 8  Station USA, LLC became the owner/operator of the
 9  Buckhead clinic -- or the Buckhead location?
10  A.      Yes.
11  Q.      Okay.  And when did that location open?
12  A.      March of 2013.
13  Q.      And what did you do -- this is a very broad
14  question, but I could narrow it after you answer, I
15  guess.  You tell me what you did to get that location
16  open.
17  A.      Yeah, why don't you narrow it.  I mean, there is
18  so many things that we did to open it.
19  Q.      Okay.  So let's start with, did you go out and
20  find that location?
21  A.      Yes.
22  Q.      How did you determine how to build that out?
23  A.      How did I determine how to build it out?
24  Q.      What were you looking for in the location, how
25  you would set it up?  So talk to me about your steps in
```

Page 40

```
 1  setting up that location.
 2  A.      Well, the first step was finding a location with
 3  a real estate broker.  Second was conferring with some
 4  people I trusted regarding design, because we wanted to
 5  have a location that was clean, that was -- you know,
 6  built confidence that you should do a medical treatment
 7  here, that was serene and peaceful because we knew that
 8  people were -- could be potentially anxious coming in to
 9  get an IV and, therefore, you know, started the process
10  of designing the location with those things in mind.
11  Q.      And did you work with an architect or designer
12  to figure out your square footage requirements?
13  A.      Are you talking about prior to signing the
14  lease?
15  Q.      Yes.
16  A.      No.  We were -- we were more concerned with
17  location than we were with specificity of the footprint.
18  It was -- because it was our first foray into finding a
19  location, we just -- we looked around, and once we found
20  one that fit our price and seemed to be -- fit our
21  needs, we signed a deal.  And it was a -- previously it
22  was a tanning salon, so it had already been segmented
23  into -- into rooms where people could have privacy.  We
24  made some changes.  We knocked down some walls, made
25  some of the rooms bigger.  But one of our goals then, as
```

Page 41

```
 1  it is today, is to try and keep start-up costs low, and
 2  an existing footprint of a location can definitely help
 3  that, as opposed to a major build-out.
 4  Q.      Okay.  After you opened the Buckhead location,
 5  was the next location the location of Brookhaven?
 6  A.      Yes.
 7  Q.      And what made you decide to open a second store?
 8  A.      Well, we -- we had become successful.  We felt
 9  that we could serve more people with a second location,
10  and we had been thinking -- I mean, honestly,
11  franchising had come up almost immediately after we
12  opened the first store, and we wanted to have the
13  Brookhaven location be more of a showpiece, our template
14  for how we wanted additional stores, be they corporate
15  stores or franchise stores, to look.  We had some
16  more -- we also had some more capital that we could use
17  to spruce it up, for lack of a better term.
18  Q.      Okay.  And did you have the same investors at
19  the Brookhaven location as you did in the Buckhead
20  location?
21  A.      Well, we started from the position that everyone
22  that invested in the Buckhead location, that would be
23  the investors of the Brookhaven location.  What we did
24  to raise capital was bring on additional investors, and
25  the original investors in the Buckhead location were
```

Case 1:19-cv-05192-LMM   Document 514-4   Filed 04/30/23   Page 5 of 10

Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.
Keith McDermott on 10/12/2021
Pages 46..49

Page 46

1  not.  I am going to go to the bottom of page 4 of that
2  document.  And do you see where it starts "topics of
3  examination"?
4  A.    Yes.
5           MS. BUDA:  And if I did not, Court
6     Reporter, can we call this Exhibit 2?
7           (Defendants' Exhibit 2, Amended Notice of
8     Deposition of Hydration Station USA Franchise
9     System, LLC, was marked for identification.)
10 BY MS. BUDA:
11 Q.    And I am going to slowly scroll through -- there
12 is a number of topics, so as you look, I would just like
13 you to tell me if you believe that you are the best
14 person for corporate to testify on these topics or if
15 you think anyone would be better suited to testify on
16 these topics, okay?
17 A.    Okay.
18 Q.    And you currently --
19          MR. KNOWLES:  I have it pulled up on my
20    thing here, too, if you wanted him to scroll
21    through it at his own speed.
22 BY MS. BUDA:
23 Q.    Yeah.  You are welcome to scroll through that at
24 your own speed.  That would be great.
25          MR. KNOWLES:  Sherri, do you want to

Page 47

1     repeat the question so that he knows what he is
2     looking for, or do you want me to try to repeat it?
3     Is there somebody better at Vida-Flo than you to --
4     just tell us if there is a topic there.
5           THE WITNESS:  I mean, there may be as far
6     as the amendments to the Colorado and Louisiana
7     franchise agreements.  Those were negotiated by
8     Shaun Curtis.  And the training provided to
9     Alabama, Colorado and Louisiana, I was not the one
10    that conducted the training.
11 BY MS. BUDA:
12 Q.    And we will see if we get to any questions about
13 those that you are unable to answer.  And if that comes
14 up, we will address it at that time.
15 A.    Okay.
16 Q.    Any other topics?
17          MR. KNOWLES:  Did you scroll all the way
18    to the bottom?
19          THE WITNESS:  No.
20 BY MS. BUDA:
21 Q.    And can you give me the topic numbers of the
22 items that you just said?
23 A.    Yes.  14 is the amendments to Colorado and
24 Louisiana.  15 is training provided.
25 Q.    And who do you think would be a better person to

Page 48

1  discuss the training?
2  A.    I assume -- well, I don't want to assume that.
3  I think that that training was conducted by both Jamey
4  and Katie Shirah.
5           And then 16, with regard to marketing materials
6  provided.  We had different marketing people at our
7  company from time to time, so they may be -- you know,
8  from a broad standpoint, I can speak to all the
9  marketing materials, but individually day-to-day,
10 operationally, it may have been better that Susie Kelly
11 or Ivy Robinson --
12 Q.    And let me rephrase my question as you're
13 looking.  Is there anyone, I guess, that is currently
14 associated with corporate that would be better to
15 testify on these topics?
16 A.    Okay.  Then in that case, no to 16 and 17, but
17 also previously 14 and 15.
18 Q.    Well, now, 14, I think you told me Shaun Curtis
19 would be better able to testify.
20 A.    Yes.
21 Q.    Is he --
22 A.    Yes.
23 Q.    He is still with Hydration -- with corporate?
24 A.    Correct.  Correct.
25       Again, 28, Shaun Curtis might have a more -- a

Page 49

1  better knowledge of specifics.  Same to 29.
2  Q.    Okay.  Is that all of them?
3  A.    Yes.
4  Q.    Now, have you been told prior to now that you
5  were designated as the corporate representative to
6  testify as to each of these topics?
7  A.    Yes.
8  Q.    Did you talk to anyone in particular to help you
9  prepare for Topic 14 concerning amendments?
10 A.    Topic 14?  At any time?
11 Q.    No, to prepare for today.
12 A.    I don't recall specifically.
13 Q.    Tell me what you did to prepare for the
14 deposition today.
15 A.    I met with Ramsey Knowles on the last two
16 weekends for two to three hours each day -- each Sunday,
17 and Chris Timmons the second Sunday, same amount of
18 time.  I had a call yesterday with John Rogers, short, I
19 think, 30-minute call.  Longer call with Ramsey, about
20 an hour and a half, and then two other attorneys
21 yesterday afternoon.  I can't recall their names.
22 Q.    And what was those attorneys' roles?
23 A.    Just advisory.
24 Q.    Have you retained them in this case?
25 A.    Yes.

Case 1:19-cv-05192-LMM   Document 514-4   Filed 04/30/23   Page 6 of 10

Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.
Keith McDermott on 10/12/2021
Pages 58..61

**Page 58**

1 just the initial contact but showed us a great deal with
2 regard to how a franchise system needed to be
3 structured, and most importantly introduced us to a law
4 firm that specialized in franchising.
5 Q.   Who was the head of training that you referred
6 to?
7 A.   Susan Landgraf.
8 Q.   Landgraf?
9 A.   L-A-N-D-G-R-A-F.
10 Q.   And about how many times did you meet with Susan
11 to learn about franchising?
12 A.   Well, probably, between calls and meetings, 30
13 times.  She came to Atlanta for more than a week and we
14 were speaking for, you know, the period of two to
15 three months leading up to us developing our franchise's
16 disclosure document, every day.
17 Q.   Did you enter into any formal agreement with
18 her?
19 A.   We did.
20 Q.   Did you pay her for her services?
21 A.   We did.
22 Q.   And when you say "we," who did that?
23 A.   Hydration Station USA Franchise System.
24 Q.   Corporate?
25 A.   Correct.

**Page 59**

1 Q.   And about when was that?
2 A.   2014, 2015.
3 Q.   And you said she introduced you to some
4 franchise lawyers.  Who was that?
5 A.   Warshawsky and Seltzer.
6 Q.   Did you receive training from anyone else in
7 terms of how to set up a franchise and become a
8 franchisor?
9 A.   No.  That was sufficient.
10 Q.   And we mentioned corporate.  When was HS --
11 A.   Can you still see me?
12      (Recess.)
13 BY MS. BUDA:
14 Q.   Okay.  We are back on the record.
15      I think what I was starting to ask was, for
16 corporate, Hydration Station USA Franchise System, LLC,
17 when was that formed?
18 A.   Say that again.
19 Q.   When was corporate formed?
20 A.   I believe at some point in 2014.
21 Q.   And who were the investors in corporate?
22 A.   The same investors that were from the first
23 store.  Do you want me to rename them all?
24 Q.   If it's the same with no changes over time
25 even --

**Page 60**

1 A.   Hydration Station USA, LLC had the same
2 Hydration Station -- corporate had the same investors as
3 Hydration Station USA, LLC.
4 Q.   Okay.  And Hydration Station USA, LLC was formed
5 in 2012, correct?
6 A.   Correct.
7 Q.   Had any investors come or gone during that time?
8 A.   Well, from the beginning of 2012 we added Jamey
9 and Benjie Shirah from the initial list, but then not --
10 between that -- their addition to -- to the -- to
11 corporate being formed.
12 Q.   Okay.  So it's the same list that you already
13 gave me of investors?
14 A.   Correct, yes.
15 Q.   Okay.  Let's talk for a minute about what we
16 said we would call "Fulfillment."  And you know what I
17 mean by that?
18 A.   (Witness moves head up and down.)
19 Q.   When was Fulfillment formed?
20 A.   I believe 2014 also.
21 Q.   And who were the investors in Fulfillment?
22 A.   Same investors, same as corporate.
23 Q.   Is it the same percentage of investment?
24 A.   No.  It is the same percentage of investment as
25 Hydration Station USA.

**Page 61**

1 Q.   Okay.  So is there a difference in the
2 percentage ownership of corporate than in Hydration
3 Station USA?
4 A.   Yes.
5 Q.   Okay.
6 A.   At that time.
7 Q.   Okay.  Now I'm going to hold that aside for a
8 minute.
9      Okay.  What is the relationship, other than
10 shared owners, between Fulfillment and corporate?
11 A.   Can you be more specific?
12 Q.   Sure.  Is one a subsidiary of the other?
13 A.   No.
14 Q.   Are they, from a corporate basis, just two
15 different companies with the same owners?
16 A.   Yes.
17 Q.   What is the purpose of Fulfillment?
18 A.   To procure medical supplies and other supplies
19 that are utilized in the operation of Vida-Flo clinics;
20 to develop relationships with those vendors to secure
21 good pricing through economies of scale; and then to
22 pass those -- or to make those supplies and different
23 things available to our franchisees and also our
24 corporate stores.
25 Q.   And when you say "corporate stores," are those

Case 1:19-cv-05192-LMM   Document 514-4   Filed 04/30/23   Page 7 of 10

Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.
Keith McDermott on 10/12/2021
Pages 102..105

**Page 102**

1  A.  Say again.
2  Q.  You've had a number of franchisees. You
3  mentioned before at some point there was seven. Now
4  there is a different number. I want to talk to you
5  about that a little bit. When you talk about that
6  corporate environment and a positive environment, how do
7  you feel generally about franchisees talking to each
8  other?
9  A.  It's encouraged.
10 Q.  It's encouraged?
11     Do you think that they should be able to share
12 best practices?
13 A.  Yes.
14 Q.  Success stories?
15 A.  Yes.
16 Q.  Should they be able to share disappointment?
17 A.  Yes.
18 Q.  Things that did not go right for them, maybe?
19 A.  Yes.
20 Q.  Should they be able to share things about their
21 relationship with the franchisor?
22 A.  Yes.
23 Q.  And you know that -- I assume you know that some
24 of your franchisees have long-standing friendships or
25 relationships outside of the franchise, correct?

**Page 103**

1  A.  Yes.
2  Q.  And there is nothing wrong with them continuing
3  to talk to each other?
4  A.  No.
5  Q.  And corporate's had meetings of all the
6  franchisees, correct?
7  A.  Not in person, but on a phone call.
8  Q.  Telephone?
9  A.  Yes.
10 Q.  Tell me, were those meetings set at certain
11 times? I mean, was it certain -- a certain periodic
12 meeting or did you just do them ad hoc when you felt
13 there needed to be one?
14 A.  I think at certain times they were ad hoc, at
15 certain times it was more set in stone or we scheduled
16 them on a monthly basis. I believe it monthly, maybe
17 every six weeks.
18 Q.  What types of things were discussed on those
19 franchisee telephonic meetings?
20 A.  Exactly the things that you just mentioned:
21 Success stories, where there were concerns. What we
22 usually would do is ask for any questions ahead of time
23 so that, you know, if you have 10, 12 people on the
24 phone at one time, people aren't talking over each
25 other. And we would address those types of things, talk

**Page 104**

1  about any new offerings we might be bringing out, talk
2  about if we hired somebody new, just basic
3  state-of-the-union-type stuff.
4  Q.  And did you run those meetings?
5  A.  Yes.
6  Q.  Was Jamey Shirah involved in them?
7  A.  Yes.
8  Q.  Were those mandatory for the franchisees?
9  A.  I mean, I don't think so. I mean, there was not
10 anything that we could -- it was not like we were going
11 to fine them if they did not join. We encouraged it.
12 We thought that it was beneficial to everybody.
13 Q.  Did you think that it would sort of build some
14 sort of esprit de corps with all of the franchisees?
15 A.  That was the hope.
16 Q.  And obviously that would be something that would
17 benefit everyone, including corporate and the
18 franchisees, if everyone got along?
19 A.  Correct.
20 Q.  And when you started franchising, am I correct
21 that Breckenridge was the first franchise?
22 A.  Yes.
23 Q.  And I think they were in 2015 that they signed
24 the franchise agreement.
25 A.  I believe that is correct.

**Page 105**

1  Q.  And can you tell me if you think I am correct
2  that they began operating in 2015?
3  A.  That sounds correct.
4  Q.  And to your knowledge, are the owners -- I won't
5  even ask you.
6      What is your understanding of who the owners of
7  the Breckenridge franchise are?
8  A.  At the time they signed the agreement?
9  Q.  Sure, at the time they signed the agreement.
10 A.  Ryan Heavern and Steve Shamatta.
11 Q.  And then which was the next franchise to open?
12 A.  I am not sure if it was Birmingham or Baton
13 Rouge, but they were both around the same time.
14 Q.  And were those both in 2016?
15 A.  That sounds right.
16 Q.  And then what about after those two?
17 A.  Again, not exactly sure of the order, but
18 Nashville and Chattanooga.
19 Q.  And do you know what years that was at least?
20 A.  I think they were all in 2016, if I am not
21 mistaken.
22 Q.  And do those two franchises, Nashville and
23 Chattanooga, have the same ownership group or different
24 ownership groups?
25 A.  Different.

Case 1:19-cv-05192-LMM   Document 514-4   Filed 04/30/23   Page 8 of 10

Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.
Keith McDermott on 10/12/2021                                       Pages 106..109

**Page 106**

1  Q.   At the time of franchising, who were the owners
2  of the Chattanooga group?
3  A.   The managing operating partner was Web Ralston,
4  and he had a partner who I met once, but I don't recall
5  his name.
6  Q.   Did you kind of consider Mr. Ralston to be the
7  lead among the ownership group?
8  A.   Yes.
9  Q.   And did he remain the leader of that ownership
10 group for the entire time that they were a franchise?
11 A.   As far as I know.
12 Q.   And maybe I should have asked this first:  Am I
13 correct that Chattanooga is no longer a franchise?
14 A.   Correct.
15 Q.   And do you know when they left the system?
16 A.   I am not sure.
17 Q.   Do you know approximately?
18 A.   2019, beginning of 2019.
19 Q.   And did they leave the system voluntarily or
20 were they terminated?
21 A.   They stopped paying royalties and changed their
22 name.
23 Q.   And do you know what the current name is or what
24 name they changed to?
25 A.   Whydrate Chattanooga.

**Page 107**

1  Q.   And did they operate that in the same location
2  as they were operating the franchise?
3  A.   I know that they did for some time and now they
4  have changed locations.
5  Q.   For a while, they were in the same location?
6  A.   I believe so.
7  Q.   Do you know if they are still in Chattanooga?
8  A.   Yes.
9  Q.   Have you entered into any sort of a settlement
10 agreement or termination agreement with the Chattanooga
11 franchise?
12 A.   No.
13 Q.   Or any of its members?
14 A.   No.  Oh.  Currently Whydrate?  That's a legal
15 decision, I think, that still needs to be decided.
16           MR. KNOWLES:  Can we specify what we are
17      talking about exactly, which -- which -- are we
18      talking about the Chattanooga store or are we
19      talking about Whydrate generally?
20           MS. BUDA:  The Chattanooga store.
21           MR. KNOWLES:  Okay.  I think that we're
22      getting confusing since the Chattanooga store has
23      now joined Whydrate.
24           MS. BUDA:  That is why I take
25      depositions.  I did not know that.

**Page 108**

1           MR. KNOWLES:  Yes.
2  BY MS. BUDA:
3  Q.   So as far as the specific Chattanooga entity,
4  what was the Chattanooga entity called?  Do you know
5  what entity owned it?
6  A.   Vida-Flo Chattanooga.
7  Q.   Vida-Flo?
8  A.   I think, I am not sure.
9  Q.   And its owners including Web Ralston?
10 A.   Yes.
11 Q.   Have you entered into any sort of agreement to
12 terminate or a settlement agreement with that LLC,
13 Vida-Flo Chattanooga, or Mr. Ralston or any other
14 owners?
15 A.   No.
16 Q.   Do you have pending litigation against them?
17 A.   As it -- yes.  I mean, there is arbitration.  We
18 are waiting to go to arbitration.
19 Q.   So you're currently in arbitration with those --
20 A.   It has not begun yet, but I know that -- yes.  I
21 believe -- yes.  I don't know what -- from the legal
22 standpoint whether it's -- I mean, it has been filed.  I
23 think we have hired an arbitrator.  We have not started
24 anything.
25 Q.   Okay.  But you filed an arbitration demand?

**Page 109**

1  A.   I believe so, yes.  Or it was filed.  I don't
2  know that we filed it.  They may have filed it.
3  Q.   Do you know what claims you are alleging in that
4  arbitration?
5  A.   I do not.
6  Q.   Do you know if there is a violation of trade
7  secrets claim?
8  A.   Yes, there should be.
9  Q.   Do you know if there is a fraud claim?
10 A.   I am not -- I am not sure.
11 Q.   You just don't know what claims there are?
12 A.   I don't.
13 Q.   Okay.
14 A.   I would -- well, I just -- I don't.
15           MR. KNOWLES:  And, Sherri, if you want to
16      go off the record, I can tell you what is going on,
17      if that makes your questions easier.
18           MS. BUDA:  Yeah.  We don't need to do it
19      now, but I appreciate that.
20           MR. KNOWLES:  Okay.
21 BY MS. BUDA:
22 Q.   As far as the Chattanooga, I guess, now former
23 franchise, what is your understanding of why they chose
24 to leave corporate or chose to rebrand?
25 A.   They didn't want to pay us anymore.

Case 1:19-cv-05192-LMM   Document 514-4   Filed 04/30/23   Page 9 of 10

**Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.**
Keith McDermott on 10/12/2021                                    Pages 114..117

### Page 114

1  that Charleston opened in 2018?
2  A.    That was -- I believe so. I am pretty sure --
3  it may have been 2017, but I am pretty sure it was 2018.
4  Q.    And do you know the entity that was the
5  franchisee in Charleston?
6  A.    I want to say it was Vida-Flo CHS.
7  Q.    And to your knowledge, who were the owners of
8  Vida-Flo CHS?
9  A.    That was Jamey and Benjie Shirah.
10 Q.    And am I correct that that is no longer a
11 Vida-Flo franchisee?
12 A.    Correct.
13 Q.    To your knowledge, is there currently a
14 hydration therapy clinic in the location where the
15 former Vida-Flo franchisee operated?
16 A.    Yes.
17 Q.    Do you know the name that that clinic operates
18 under?
19 A.    I think it's Thrive Wellness.
20 Q.    And is it your understanding that Jamey Shirah
21 and Benjie Shirah are the owners of Thrive Wellness?
22 A.    Yes.
23 Q.    Did Vida-Flo CHS rebrand or were they terminated
24 or leave in some other manner?
25 A.    We -- they bought out their franchise agreement.

### Page 115

1  Q.    And by that, do you mean they made a payment to
2  corporate to be able to stop being a franchise?
3  A.    Well, it's -- it was part of the deal when I
4  bought out the Shirahs of all of their interests,
5  including that, and we did not -- I mean, it was all
6  figured out with regard to what the equity had a value
7  of and what the value of, to us, the franchise was. So
8  by allowing them to operate independently of Vida-Flo,
9  it decreased the amount of the payment to buy them out
10 of their equity.
11 Q.    Did Jamey Shirah express to you why he wanted to
12 operate a hydration therapy clinic independent of
13 Vida-Flo?
14 A.    I don't think that that's a good
15 characterization of how things transpired. I wanted to
16 buy them out and it was part of the negotiation.
17 Q.    You wanted to buy them out of what?
18 A.    Of all their interests in Vida-Flo.
19 Q.    Including their franchise location?
20 A.    I did not want their franchise location. I
21 wanted their equity and I said, As part of the deal, you
22 can operate it on your own.
23 Q.    Well, why would they consider that more
24 favorable than considering to operate as Vida-Flo with
25 franchise support?

### Page 116

1  A.    I don't understand the question.
2  Q.    Well, you said as part of the consideration for
3  buying them out, you would allow them to operate
4  independently, correct?
5  A.    Correct.
6  Q.    Why would you think that would -- why would you
7  offer that as a benefit to them?
8  A.    Well, I did, and they accepted it.
9  Q.    But what made -- I mean, had they ever told you
10 prior to that that they would rather not operate within
11 the franchise system?
12 A.    No.
13 Q.    What -- what was your thought process in making
14 that as part of an offer?
15 A.    I was trying to put a deal in front of somebody
16 that was a win-win for everybody involved. If they have
17 their own operation, they don't have to pay us
18 royalties. That was the benefit to them.
19 Q.    So you did that as part of a deal, and when you
20 made the offer, you thought the benefit was they would
21 stop paying royalties?
22 A.    The benefit to them.
23 Q.    Right, the benefit to them.
24 A.    Right. Additionally, it wasn't a very
25 well-performing store, and the amount of money that we

### Page 117

1  spent supporting them might not have even been covered
2  by the 7 percent royalty. Also didn't like the
3  location.
4  Q.    Is there currently a Vida-Flo franchise in
5  Charleston?
6  A.    No.
7  Q.    Not at a different location?
8  A.    No.
9  Q.    Before Vida-Flo CHS, am I correct that there was
10 a prior Vida-Flo franchise in Charleston?
11 A.    Yes.
12 Q.    And when was that location opened?
13 A.    Late 2015, early 2016.
14 Q.    And who are the owners at that location?
15 A.    Eric Bowman.
16 Q.    And do you know the entity that operated that
17 location?
18 A.    I am not sure of the spelling because I thought
19 it was spelled incorrectly, but Gravatas something or
20 other.
21 Q.    And --
22 A.    I am an English major, you know.
23 Q.    I know now.
24       And do you recall when Gravatas or the first
25 Charleston clinic stopped being part of the franchise

Case 1:19-cv-05192-LMM   Document 514-4   Filed 04/30/23   Page 10 of 10

**Hydration Station USA Franchise Sys., et al. vs Jared Christian Seaverns, et al.**
Keith McDermott on 10/12/2021                                    Pages 118..121

### Page 118

```
 1  system?
 2  A.      Yeah.  We terminated them almost -- you know,
 3  within the first six months.
 4  Q.      And why was that?
 5  A.      They were doing things that were not allowable
 6  under the franchise agreement.
 7  Q.      And what specifically?
 8  A.      The things that -- well, the people that were
 9  working in the location, we felt did not have the
10  correct license and certification to be working there
11  and administering IVs.  They were not following
12  marketing guidelines.  They were providing treatments
13  that were not approved by corporate and were not even
14  discussed with corporate.  The look of the clinic was
15  not within the guidelines of our design and construction
16  manual.  There might be others, but those are the main
17  ones.
18  Q.      When Vida-Flo CHS opened in Charleston, was it
19  the same location as the prior clinic or a different
20  location?
21  A.      Different location.
22  Q.      To your knowledge, did Gravatas or Mr. Bowman
23  continue to operate an IV hydration clinic in
24  Charleston?
25  A.      Not to my knowledge.
```

### Page 119

```
 1  Q.      Okay.  So we've discussed Breckenridge, Baton
 2  Rouge, Birmingham, Chattanooga, two Charleston
 3  locations, Nashville.  You started to mention
 4  Wilmington.  When did the Wilmington location open?
 5  A.      In late 2019.
 6  Q.      And do you know the entity that operates the
 7  Wilmington location?
 8  A.      I believe it's Vida-Flo Wilmington.
 9  Q.      And do you know who those owners are?
10  A.      Yes.  Dustin and Susan Gross.
11  Q.      And is Wilmington still a franchise location?
12  A.      Yes.
13  Q.      And I will let Mr. Powell talk about the
14  Buckhead, Virginia Highlands, and Sandy Springs
15  locations.
16          Was there also a Tampa location?
17  A.      Yes.
18  Q.      And when did that open?
19  A.      Late 2019.
20  Q.      And is Tampa still a franchise location?
21  A.      No.
22  Q.      What was the name of the entity that operated
23  the Tampa location?
24  A.      I am not sure.  I am not sure.
25  Q.      And do you know who the owners were, the
```

### Page 120

```
 1  individuals?
 2  A.      Yes.  Davin Harris, D-A-V-I-N, and Minh, M-I-N-H
 3  Ngo, N-G-O -- or G-N-O?  N-G-O.
 4  Q.      Probably N-G-O.
 5  A.      Yeah.  Yeah.
 6  Q.      Is Tampa still a franchise location?
 7  A.      No.
 8  Q.      And when did Tampa stop being a franchise
 9  location?
10  A.      I mean, beginning second quarter of 2020.
11  Q.      And what were the circumstances of Tampa --
12  A.      It opened right when COVID hit.
13          Oh, sorry.  My bad.
14  Q.      I'm sorry.  Say that again.
15  A.      I said it opened right when COVID hit and never
16  had a chance.
17  Q.      So is it just a failure to thrive?
18  A.      Yes.
19  Q.      Was that franchise agreement terminated?
20  A.      You know, I don't know that we ever did anything
21  formally.  We just kind of walked away.  We understood
22  that it was a bad situation and didn't want them have to
23  them incur any legal bills or anything like that.
24  Q.      To your knowledge, did the owners, either Davin
25  Harris or Minh Ngo, become involved with any other IV
```

### Page 121

```
 1  hydration clinics?
 2  A.      Not that I am aware.
 3  Q.      Can you think of any locations I have not named
 4  that have been a Vida-Flo clinic?
 5  A.      Yes.
 6  Q.      Okay.
 7  A.      Hoboken, which suffered the same fate as Tampa.
 8  Q.      What was the entity that the franchise was with
 9  Hoboken --
10  A.      I want to say Vida-Flo Hoboken or Vida-Flo New
11  Jersey.
12  Q.      And who were those owners?
13  A.      I can't recall the names right now.  I can get
14  those for you.
15  Q.      And is it your understanding that that was just
16  a failure to thrive kind of situation?
17  A.      Yes.  Hoboken is basically an extension of New
18  York City, and it was -- nothing was open.  They weren't
19  allowed to open from -- you know, they opened in, I
20  believe, January and were closed by May or June.  They
21  just -- for the first three -- three of the first six
22  months, they weren't even allowed to be open.
23  Q.      So with the Hoboken location, did the franchisee
24  and franchisor just agree to a mutual walkaway?
25  A.      Yes.
```