# EXHIBIT C

```
 1
                IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF GEORGIA
                        ATLANTA DIVISION
 3

 4 HYDRATION STATION USA FRANCHISE    )
   SYSTEM, LLC and VIDA-FLO USA       )
 5 FULFILLMENT, LLC,                  )
                                      )CIVIL ACTION FILE
 6    Plaintiffs,                     )NO.: 1:19-cv-5192-LMM
                                      )
 7 vs.                                )
                                      )
 8 JARED CHRISTIAN SEAVERNS, et al.,  )
                                      )
 9    Defendants.                     )
   _____   )
10

11
                 CONTINUED 30(b)(6) DEPOSITION OF:
12
          HYDRATION STATION USA FRANCHISE SYSTEM, LLC
13             VIDA-FLO USA FULFILLMENT, LLC

14
                 CONTINUED DEPOSITION OF:
15
                    KEITH MCDERMOTT
16
                    July 13th, 2022
17              10:26 a.m. - 5:33 p.m.

18

19              KNOWLES GALLANT, LLC
           6400 Powers Ferry Road, Suite 350
20              Atlanta, GA 30339

21

22

23
   REPORTED BY:
24    Susan W. McHenry, CCR, CVR
      GA Certification No.: 5746-9391-6121-4976
25    Expiration date: April 1, 2023
```

Case 1:19-cv-05192-LMM   Document 514-5   Filed 04/30/23   Page 3 of 182

HYDRATION STATION USA FRANCHISE, ET AL. vs JARED CHRISTIAN SEAVERNS, ET AL.
30(b)(6)
Keith McDermott on 07/13/2022                                    Pages 30..33

**Page 30**

1  Was his testimony false?

2  A.  Well, I certainly --

3  Q.  That's a "yes" or "no" question.

4  A.  I don't know.  I don't know because -- I

5  mean, do you want me to continue to answer it?

6  Q.  Well, I want you to answer "yes" or "no," and

7  then you can explain it.

8  A.  Well, again, I don't know that -- well, first

9  of all, the projections that I gave him, are not the

10 projections that are in the report.  And when you talk

11 about -- and can you specify, are you talking about the

12 projections of total revenue?  Of total clinics opened?

13 What are you referring to?

14 Q.  Total clinics opened.

15 A.  Okay.  Again, the number that we projected

16 during our period when we were still -- when all the

17 Defendants were still part of Vida-Flo, is much, much

18 higher than the projections in his report.

19 Q.  So it's your testimony that Mr. Couillard

20 came up with his own projection of the number of

21 franchises?

22 A.  Yes.

23 Q.  Did you approve of those before they were put

24 into his report?

25 A.  Absolutely not.

**Page 31**

1  Q.  Did he discuss the basis of his projections

2  to you?

3  A.  I don't believe we had any discussions after

4  the report came out.

5  Q.  And you disagree with the projections in the

6  report?

7  A.  I do.  I think they're too low.

8  Q.  Okay.  But at any rate, you don't think that

9  they're right?

10 A.  I think that --

11 MR. TIMMONS:  Object to the form.

12 BY MS. BUDA:

13 Q.  You can answer.

14 A.  I think that that is a very -- much more of a

15 complex question than just a "yes" or "no" on any

16 projection, so.

17 Q.  Well, they're not the projections that you

18 gave him?

19 A.  I don't think I -- I can't remember if we

20 gave him -- no, we -- I mean, we gave him projections,

21 and his report came back, I mean, I'm going to say they

22 were ten percent of what we thought they would be.

23 Q.  So you disagree with his projection for the

24 number of franchised units?

25 A.  They were just much more conservative.  Yes,

**Page 32**

1  I disagreed because they were more conservative.

2  Q.  Okay.  Did you express that to Mr. Couillard

3  once you saw the report?

4  A.  No.

5  Q.  Even after his deposition, did you talk to

6  Mr. Couillard about disagreeing with the projections in

7  his report?

8  A.  No.

9  Q.  Other than the number of franchise units, did

10 you see anything else in Mr. Couillard's report that you

11 disagreed with?

12 A.  Nothing glaring, no.

13 Q.  Prior to Mr. Couillard preparing his report,

14 did you talk to him?

15 A.  Yes.

16 Q.  Did you meet with him in person?

17 A.  I did not.

18 Q.  Did you speak with him via audio phone,

19 videoconference, or both?

20 A.  Audio phone.  We just -- I was, at that

21 point, when he was preparing the report, I was traveling

22 a great deal, so we had multiple, I believe three,

23 possibly four conversations.  Or maybe it was -- it was

24 either -- because we had one that was cut off very

25 quickly because of my work, and I think it was either

**Page 33**

1  three or four, and they were anywhere from 90 minutes to

2  a couple hours, each one.

3  Q.  Was there anyone else on those calls?

4  A.  I know that Ramsey was on the calls.  I don't

5  know if Ramsey Knowles, my attorney.  Chris Timmons may

6  have been on one or more, and I'm not sure if anybody

7  from his office was on it.  But I can recall, I'm pretty

8  sure, that Ramsey was on every one, and obviously Kevin.

9  Q.  Okay.  What about anyone else from Vida-Flo?

10 Was Shaun Curtis on any of those calls?

11 A.  Not that I can recall.  It's -- I'm not sure.

12 Q.  Go ahead.

13 A.  I'm not sure.  I just remember, when I was on

14 those calls, I was the main focus.  If Shaun was, I don't

15 recall, but he was -- I don't know.  I cannot recall.

16 Q.  Okay.  There was a lot of calls.  Tell me the

17 nature of what you discussed with Mr. Couillard.

18 A.  He was trying to get a handle on Vida-Flo

19 and, you know, the financial picture, really, all through

20 our -- since we -- our whole existence, really, from

21 understanding every stage from the opening of our first

22 store, to the beginning of franchising, to selling

23 franchises, to the situation with the Defendants, and,

24 you know, where we've gone since then.

25 And then, you know, that had to do -- and

**HYDRATION STATION USA FRANCHISE,ET AL. vs JARED CHRISTIAN SEAVERNS,ET AL.**
**30(b)(6)**          **Keith McDermott on 07/13/2022**          **Pages 34..37**

---

Page 34

1  there was a lot of information with regard to the
2  financials. And I think -- and again, I'm not sure about
3  the timeline, but maybe after a first initial call, we
4  provided a great deal of information, whether it be
5  projections, or actual numbers through P&Ls, and balance
6  sheets, and, you know, maybe our Franchise Disclosure
7  Document, franchise agreement.
8          But it was sort of that initial call, getting
9  a lay of the land, getting him a bunch of information,
10  and then subsequently questions about all that
11  information that we had provided.
12      Q.    And part of what you told Mr. Couillard is
13  that the Defendants named under the Sherman Act claim did
14  things to damage Vida-Flo, correct?
15      A.    Correct.
16      Q.    And part of what you told Mr. Couillard is
17  that due to the actions of the Defendants that are named
18  under the Sherman Act claim, HSUSA had a lessoned ability
19  to attract new franchises, correct?
20      A.    Absolutely.
21      Q.    So that's a conclusion that you had that you
22  shared with Mr. Couillard?
23      A.    Yes.
24      Q.    Okay. Did you exchange any e-mails with
25  Mr. Couillard?

---

Page 35

1      A.    I don't recall if I ever sent him anything
2  directly, or whether I responded, or whether I used
3  Ramsey Knowles as a conduit to deliver information. I
4  don't think I ever had, but I can't recall specifically
5  if I had --
6          Are you asking is it just a direct e-mail
7  with he and I, or? Can you specify a little bit more on
8  the question?
9      Q.    Exactly what I asked: Did you send an e-mail
10  to Mr. Couillard, or an e-mail to your -- I don't want to
11  know what you sent to Counsel.
12      A.    No, I understand.
13      Q.    But I want to know, first, my question is:
14  Did you send any e-mail directly to Mr. Couillard?
15      A.    I can't recall specifically, but I would say
16  it's a possibility.
17      Q.    I have not seen any, and that would certainly
18  fall within our discovery request. Can you check your
19  e-mail for that, and if you sent him anything directly,
20  provide that to your Counsel to send to me?
21      A.    Of course.
22      Q.    Okay. Did you ever send a text message to
23  Mr. Couillard?
24      A.    No.
25      Q.    Did you send an e-mail to your Counsel

---

Page 36

1  knowing it would be forwarded to Mr. Couillard?
2      A.    Yeah. Again, I think that when we were
3  providing information, financials and such, that's why
4  I'm saying I can't remember whether it was directly to
5  Mr. Couillard, or through Counsel, or maybe he was copied
6  on it. But we definitely sent him information which
7  emanated from me.
8      Q.    Okay. And you'll check for that --
9      A.    Yes.
10      Q.    -- and if you sent him an e-mail, you'll
11  produce it, right?
12      A.    Yes, ma'am.
13      Q.    Okay. And we've been talking a little bit
14  about --
15          MR. KNOWLES: Sherri, sorry to -- I'd
16  just interject. You know, Mr. McDermott's not
17  a lawyer, so, you know, I hear him saying
18  he'll produce something.
19          If it's privileged, then we won't
20  produce it; but otherwise, we would.
21          MS. BUDA: Absolutely. Understood.
22          And I would caveat that with if it went
23  to Mr. Couillard, communications with
24  Mr. Couillard would not be protected; can we
25  agree on that?

---

Page 37

1          MR. KNOWLES: I think if
2  Mr. McDermott -- and we can talk about this
3  off-line -- I think if Mr. McDermott sent an
4  e-mail to Mr. Couillard with counsel copied,
5  my understanding's that would be privileged,
6  but we can talk about it. I don't want to
7  waste your depo time.
8          MS. BUDA: Thank you. You're right. I
9  appreciate both your response, and that we can
10  talk about it later. So thanks, Ramsey.
11  BY MS. BUDA:
12      Q.    Okay. We've been talking, kind of, generally
13  about something we've been calling the Couillard Report,
14  or something like that. I'm going to go ahead and screen
15  share again.
16          Can you now see the document that says,
17  FairValue, in the upper right?
18      A.    Yes.
19      Q.    Let's go ahead and number that as
20  Exhibit 103.
21          (Whereupon, Defendants' Exhibit 103, was
22  marked for identification.)
23  BY MS. BUDA:
24      Q.    And when we've been talking about the
25  Couillard Report, or at least you've been talking about

---

**HYDRATION STATION USA FRANCHISE,ET AL. vs JARED CHRISTIAN SEAVERNS,ET AL.**
**30(b)(6)**                                                                Pages 182..185
Keith McDermott on 07/13/2022

**Page 182**

1  A.   No.
2      Q.   Okay.  Let's go back to Exhibit 102, which is
3  the Damages Summary, and let's go ahead and look at the
4  fraud claim.
5          And under that claim, Plaintiffs wrote:
6  "Vida-Flo agents will testify as to the value of the
7  resources as expended on franchise locations associated
8  with the above-listed Defendants, which could have been
9  avoided if VF Franchise had not reasonably relied on the
10 Defendants' fraudulent misrepresentations."
11         Let's set aside what those misrepresentations
12 might be.  It says:  Vida-Flo agents will testify to the
13 value of the resources expended on franchise locations
14 that would've been avoided if they hadn't done whatever
15 you say is fraudulent.
16         So here's your opportunity to testify on
17 that.  Tell me specifically the value -- well, first, the
18 resources expended that could have been avoided, but for
19 the fraudulent misrepresentations.
20     A.   Well, we were under the impression that all
21 of the franchisees, the Defendants, were acting in good
22 faith in telling us that they were going to continue to
23 be Vida-Flo franchisees.
24         We know that that was a lie, because we've
25 seen their text messages, their WhatsApp chain that said

**Page 183**

1  that they were -- it was all part of a conspiracy, and a
2  fraud, to eventually break away from us, cause us
3  bankruptcy, et cetera, et cetera.
4          So we were under the impression and operating
5  as though we needed to support these guys.  Whether it be
6  through the salaries of Ibe (phonetically) Robinson,
7  first, and Shawn Curtis, and after that Holly Glaze; a
8  number of marketing things that we did with regard to
9  their website, continually promoting the website,
10 continually providing them marketing materials that they
11 were asking for us to localize for them.
12         All, again, under the guise that we were
13 going to continue as one franchise system, which we know
14 was complete malarkey.  And they knew it.  And we went
15 along for all this time.  It was our cost of doing
16 business, and operating our business to support, not one
17 or two franchises, but six or seven franchises.
18     Q.   Now, first of all, you don't know a lot of
19 things that you say, but you could try to prove it as we
20 move down this, but setting that aside --
21         MR. KNOWLES:  Object to the form.
22 BY MS. BUDA:
23     Q.   -- during what period -- what would be the
24 first day that this fraud, alleged fraud, caused you to
25 expend resources?

**Page 184**

1      A.   I mean, it's impossible for me to say, based
2  upon what has been provided to us.  I don't know that we
3  received all the text messages and e-mails that showed
4  the outset of this conspiracy; however, and I don't know
5  what the date was, but we know that there was either an
6  e-mail or a conversation, I can't remember, that is
7  memorialized in a, again, text message or e-mail that
8  said they met to discuss Neptune Spear, a reference to
9  taking out Bin Laden.
10         And I would point to that as the first date
11 of this conspiracy, and I would say that's when this all
12 started.  So let's take that date, and say 80 percent of
13 the money that I expended on my expenses, having to do
14 with supporting these franchises, I wouldn't have spent.
15     Q.   So let me ask about that.  Okay.  First of
16 all, we don't know that date; but, you know, do you
17 recall that we had discussions about Brookhaven in a
18 different case?
19         MR. KNOWLES:  Object to --
20         MS. BUDA:  It's okay.
21         MR. TIMMONS: -- testimony in a different
22     case.
23 BY MS. BUDA:
24     Q.   You can still answer.
25         Do you recall discussions about Brookhaven in

**Page 185**

1  a separate case?
2      A.   Regarding what?
3      Q.   About your salary.
4      A.   My salary?
5      Q.   Yes.
6      A.   Not my salary.  I don't think so.
7      Q.   Okay.  Do you recall a hearing where there
8  was evidence shown about what percentage of your salary
9  was charged to Brookhaven as compared to HSUSA?
10     A.   I don't recall.  I mean, I know that we
11 talked about the fact that -- and this, to me, proves our
12 point -- that when we moved some of these people over --
13     Q.   Wait a second.
14         MS. BUDA:  And I am going to move to
15     strike.
16 BY MS. BUDA:
17     Q.   My question was, not what your point is, my
18 question was:  Do you remember prior testimony -- and if
19 your answer's no, your answer's no -- do you remember
20 prior testimony about what percentage of your salary was
21 paid by Brookhaven as a resul -- as an expense of
22 Brookhaven, as compared with how much of your salary was
23 paid by HSUSA?
24     A.   I don't recall.
25     Q.   Okay.  Is it your testimony today that



EXHIBIT
Defendants' 106
7/13/22    k.mcdermott
Huseby.com

# FRANCHISE DISCLOSURE DOCUMENT



**Hydration Station USA Franchise System, LLC,**
**A Georgia limited liability company**

**2964 Peachtree Road, Suite 420,**
**Atlanta, Georgia 30305**

**Phone: (404) 458-4431**

**E-Mail: info@govidaflo.com**

**Website: www.govidaflo.com**

Hydration Station USA Franchise System, LLC offers franchises for the operation of a specialized medical clinic that offers rehydration treatments and related services and merchandise to individuals for a variety of purposes, including treatment and/or recovery from illnesses and hangovers as well as enhancing athletic performance and/or recovery from intense athletic activities.

The total investment necessary to begin operation of a Vida-Flo franchise ranges from $209,350 to $349,500. This includes $104,000 to $120,250 that must be paid to us and our affiliates.

This Disclosure Document summarizes certain provisions of your franchise agreement and other information in plain English. Read this Disclosure Document and all accompanying agreements carefully. You must receive this Disclosure Document at least 14 calendar days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no government agency has verified the information contained in this document**.

You may wish to receive your Disclosure Document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact the franchisor at 2964 Peachtree Road, Suite 420, Atlanta, Georgia 30305 or by phone at (404) 458-4431.

The terms of your contract will govern your franchise relationship. Don't rely on the Disclosure Document alone to understand your contract. Read all of your contract carefully. Show your contract and this Disclosure Document to an advisor, like a lawyer or accountant.

Buying a franchise is a complex investment. The information in this Disclosure Document can help you make up your mind. More information on franchising, such as "*A Consumer's Guide to Buying a Franchise*," which can help you understand how to use this Disclosure Document, is available from the Federal Trade Commission (the "FTC"). You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, DC 20580. You can also visit the FTC's home page at *www.ftc.gov* for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance Date: June 10, 2021

**How to Use this Franchise Disclosure Document**

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or EXHIBIT "F". |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or EXHIBIT "G" includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only Vida-Flo business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a Vida-Flo franchisee?** | Item 20 or EXHIBIT "F" lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

## What You Need To Know About Franchising *Generally*

**Continuing responsibility to pay fees**. You may have to pay royalties and other fees even if you are losing money.

**Business model can change**. The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions**. You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**Operating restrictions**. The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor**. Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal**. Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends.** The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

### Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in EXHIBIT "A".

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

**Special Risks to Consider About *This* Franchise**

Certain states require that the following risk(s) be highlighted:

1. **<u>Out-of-State Dispute Resolution.</u>** The franchise agreement requires you to resolve disputes with the franchisor by mediation, arbitration and/or litigation only in Georgia. Out-of-state mediation, arbitration, or litigation may force you to accept a less favorable settlement for disputes. It may also cost more to mediate, arbitrate, or litigate with the franchisor in Georgia than in your own state.

Certain states may require other risks to be highlighted. Check the "State Specific Addenda" (if any) to see whether your state requires other risks to be highlighted.

Franchise Disclosure Document (2021 Multi-State)

# TABLE OF CONTENTS

**ITEM 1**   FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES ..................... 1
**ITEM 2**   BUSINESS EXPERIENCE ............................................................................................ 4
**ITEM 3**   LITIGATION .............................................................................................................. 5
**ITEM 4**   BANKRUPTCY ........................................................................................................... 5
**ITEM 5**   INITIAL FEES ............................................................................................................ 7
**ITEM 6**   OTHER FEES ............................................................................................................. 8
**ITEM 7**   ESTIMATED INITIAL INVESTMENT ..................................................................... 11
**ITEM 8**   RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES.................................. 14
**ITEM 9**   FRANCHISEE'S OBLIGATIONS ................................................................................ 18
**ITEM 10** FINANCING ............................................................................................................. 19
**ITEM 11** FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND
            TRAINING ................................................................................................................ 19
**ITEM 12** TERRITORY ............................................................................................................. 27
**ITEM 13** TRADEMARKS ......................................................................................................... 30
**ITEM 14** PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION................................. 31
**ITEM 15** OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE
            BUSINESS ................................................................................................................ 31
**ITEM 16** RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL ......................................... 32
**ITEM 17** RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION ..................... 32
**ITEM 18** PUBLIC FIGURES .................................................................................................... 35
**ITEM 19** FINANCIAL PERFORMANCE REPRESENTATIONS ..................................................... 35
**ITEM 20** OUTLETS AND FRANCHISEE INFORMATION .......................................................... 36
**ITEM 21** FINANCIAL STATEMENTS ........................................................................................ 39
**ITEM 22** CONTRACTS ............................................................................................................ 39
**ITEM 23** RECEIPT .................................................................................................................. 39

EXHIBIT "A"          STATE AGENCIES AND ADMINISTRATORS
EXHIBIT "A"          FRANCHISORS AGENT FOR SERVICE OF PROCESS
EXHIBIT "C"          FRANCHISE AGREEMENT
EXHIBIT "D"          OTHER AGREEMENTS
EXHIBIT "E"          TABLE OF CONTENTS OF BRAND STANDARDS MANUAL
EXHIBIT "F"          LIST OF FRANCHISEES
EXHIBIT "G"          FINANCIAL STATEMENTS FOR HYDRATION STATION USA FRANCHISE
                     SYSTEM, LLC
EXHIBIT "H"          AREA REPRESENTATIVES
EXHIBIT "I"          STATE EFFECTIVE DATES
EXHIBIT "J"          RECEIPTS

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.**

Each of the following provisions is void and unenforceable if contained in any document relating to a franchise:

(a) A prohibition on the right of a franchisee to join an association of franchisees.

(b) A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c) A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

(d) A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) The term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e) A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f) A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g) A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

     (i) The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.

     (ii) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

     (iii) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

     (iv) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h) A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i) A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000.00, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

Any questions regarding this notice should be directed to:

State of Michigan
Department of Attorney General
CONSUMER PROTECTION DIVISION
Attention: Franchise Section
G. Mennen Williams Building, 1st Floor
525 West Ottawa Street
Lansing, Michigan 48913
Telephone Number: (517) 373-7117

Franchise Disclosure Document (2021 Multi-State)

**ITEM 1**              **FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES**

To simplify the language in this Disclosure Document, "we," "us" and "the Company" mean Hydration Station USA Franchise System, LLC - the franchisor. "You" means the person who buys a Vida-Flo: The Hydration Station franchise (referred to as "Vida-Flo" throughout this document) - the franchisee, and includes your partners if you are a partnership, your shareholders if you are a corporation, and your members if you are a limited liability company. The franchised business you will operate is referred to as your "Clinic" or your "Business."

**Corporate Information**

Hydration Station USA Franchise System, LLC is a Georgia limited liability company that was formed on May 10, 2014. Our principal business address is located at 2964 Peachtree Road, Suite 420, Atlanta, Georgia 30305 and our telephone number is (404) 458-4431. Our agent for service of process is disclosed in EXHIBIT "A" to this Disclosure Document. We do not do business under any names other than "Hydration Station USA Franchise System, LLC".

**Business History**

We began offering franchises in August of 2014. We are not engaged in any business other than offering Vida-Flo franchises and administering the Vida-Flo franchise system. We have never offered franchises in any other line of business. We have never directly operated a Vida-Flo clinic. Our principals have operated a Vida-Flo clinic in Atlanta, Georgia since 2012. This clinic originally operated under the name "Hydration Station" but now operates under the name "Vida-Flo".

We offered area representative franchises from January of 2015 until May 2019. During that time, we did not sell any area representative franchises. An area representative helps us grow our franchise system by soliciting, screening, recruiting, developing, servicing and supporting third party franchisees in their development territory. The area representative franchise opportunity is offered under a separate Franchise Disclosure Document. If you purchase a franchise within an area representative's territory, the area representative may provide you with certain initial and ongoing support. We ceased offering area representative franchises in May 2019 but may resume offering and selling area representative franchises in the future.

**Parents, Affiliates and Predecessors**

We do not have any parent companies or predecessors. We do not have any affiliates that offer franchises in any line of business. We have one affiliate, Vida-Flo USA Fulfillment, LLC ("VFUF"), that provides products to our franchisees. VFUF operates our web-based store from which you will purchase a variety of items relating to the development and operation of your Clinic. As discussed in Item 5, you will purchase your "Startup Package" from VFUF. VFUF's principal business address is the same as ours. VFUF has never offered franchises in this or any other line of business and has never operated a Vida-Flo Clinic. We do not have any affiliates that provide products or services to our franchisees other than VFUF.

**Description of Franchised Business**

A Vida-Flo clinic provides high quality hydration therapy services and related treatments in a convenient setting utilizing proven medical techniques and treatments. Each patient is evaluated for the appropriate treatment (i.e., the specific medications and/or supplements). All treatments and our vendors are FDA approved and targeted to the goals, needs and symptoms of each patient.

Vida-Flo treatments are currently limited to:

- Injection and hydration therapy utilizing an electrolyte replenishment solution;
- Oxygen treatments to increase alertness and overall oxygenation of the blood;

Franchise Disclosure Document (2021 Multi-State)

- Vitamin B Complex, Vitamin B-12, Vitamin C, Vitamin B5, B6, B7 and B9, MIC+B12, Zinc and Vitamin D treatments for overall nutritional value;

- Toradol (anti-inflammatory) non-narcotic pain relief and anti-inflammatory for headaches, migraines and joint pain;

- Pepcid or Zantac antacid for heartburn, indigestion and sour stomach;

- Glutathione which is a powerful antioxidant, immune system booster and detoxifier used to clean the blood of free radicals and heavy metals;

- Zofran to provide relief from nausea and vomiting; and

- Myers' Cocktail, a vitamin mixture popular with holistic wellness circles.

We may develop new or substitute treatments and services from time to time. All treatments must be provided by a licensed medical professional. As discussed below under "Laws and Regulations," in some states you must be a licensed medical professional in order to acquire the franchise or you must enter into legally permissible arrangements with licensed medical professionals. We have also developed branded merchandise that may be sold at Vida-Flo clinics.

At this time Vida-Flo clinics are "cash businesses" and do not accept insurance. We currently offer an optional membership model. The purpose of the membership program is to provide cost effective treatments for members in a simple, easy and affordable manner. Members may receive certain complimentary treatments and reduced pricing for other treatments. The same treatments are available to non-members but at higher prices. Members "prepay" for certain services at discounted prices. We have monthly, 6-month and annual contracts with one, two or three treatments per month for our members. They may cancel at any time by providing 30 days' advance notice, but if cancellation occurs before the end of the membership period, a penalty fee applies. There are stipulations for special circumstances having to do with relocations or medical issues. The membership program allows members to purchase a membership from one Vida-Flo clinic and redeem membership services at another clinic. As a result, you must provide services to a member who purchased his or her membership from another clinic even though you cannot charge for the service. You must also provide the member with any other discounted services to which the member is entitled under the terms of their membership agreement. Likewise, a member who purchases his or her membership from your Clinic may receive services at any other Vida-Flo clinic for no additional charge (or, if applicable, at discounted prices). At any time, we may develop a franchisee cooperation program that allows for sharing of membership fees among multiple Vida-Flo clinics that provide membership services to the same member.

If we award you a franchise, you will sign a franchise agreement (the "Franchise Agreement") and operate your Clinic in accordance with all of the terms and conditions of the Franchise Agreement. The form of Franchise Agreement is attached to this Disclosure Document as EXHIBIT "C". We will license you the right to use certain logos, service marks and trademarks, including the mark "VIDA-FLO" and related logo and the taglines "THE HYDRATION STATION," "GET REVIDALIZED" and "VIDA-FLO ON-THE-GO" (collectively, the "Marks") in the operation of your Clinic. The "Marks" also include our distinctive trade dress used to identify a Vida-Flo clinic, whether now in existence or created in the future.

We have developed a distinct system (the "System") for the operation of a Vida-Flo clinic. Distinctive characteristics of the System include logo, trade secrets, concept, style, specially formulated programs, products and treatments, confidential brand standards manual and operating system. The operational aspects of a Vida-Flo franchise are contained within our confidential Brand Standards Manual (the "Manual"). You will operate your Clinic as an independent business using the Marks, the System, the Vida-Flo name, as well as the support, guidance and other methods and materials provided or developed by us.

Franchise Disclosure Document (2021 Multi-State)

**Market and Competition**

The target market for Vida-Flo customers includes members of the general public who are seeking to improve their overall health and wellbeing through the use of hydration therapy. Typical customers include college students, athletes, pregnant women and persons suffering from the effects of certain illnesses, such as the flu.

The alternative health industry is competitive and continuing to develop. Vida-Flo clinics compete with both alternative healthcare providers (such as naturopathic physicians and medical spas) as well as providers of traditional medicine (such as urgent care facilities, hospitals and doctors' offices).

**Laws and Regulations**

You must comply with all federal, state and local laws and regulations that apply to the operation of your Clinic, including obtaining all required licenses, permits and authorizations. Some of these laws apply to businesses generally, such as federal, state, county and municipal building codes and handicap access codes as well as laws restricting smoking in public places, the public posting of notices regarding health hazards, fire safety and general emergency preparedness, rules regarding the proper use, storage and disposal of hazardous waste and materials, and other building, fire and health standards. In addition, you must operate your Clinic in full compliance with all applicable workplace laws, ordinances and regulations, including governmental regulations relating to occupational hazards, health, the Equal Employment Opportunity Commission (EEOC), the Occupational Safety & Health Administration (OSHA), discrimination, employment, sexual harassment, worker's compensation and unemployment insurance and withholding and payment of federal, state and local income taxes, social security taxes and sales and use taxes.

In addition to the laws and regulations listed above that apply to businesses generally, you must also comply with all federal, state and local healthcare laws and regulations that apply to the ownership, management, marketing and operation of a Vida-Flo clinic. Below are examples of potential healthcare regulatory issues that you should research before purchasing the franchise in order to determine their applicability to your Clinic. It is ultimately your responsibility to investigate all general and special laws in the jurisdiction of your Clinic. We strongly advise you to consult with a licensed healthcare attorney and contact federal, state and local medical boards before signing a Franchise Agreement with us in order to determine how these laws may impact your Business and their potential effect on your revenues and expenses.

*Professional Licensing*

Under the laws of some states, certain treatments offered at Vida-Flo clinics may be considered medical procedures and/or may need to be administered or supervised by a licensed medical professional. For example, most treatments involving the use of needles (such as intravenous hydration therapy and Vitamin B-12 injections) constitute the "practice of medicine" and must be administered or supervised by a licensed medical professional. Therefore, you will need to either employ or contract with a licensed medical doctor who is authorized under the laws of your state to provide these medical treatments ("Medical Director"). You must ensure that no person other than licensed medical professionals provide medical treatments or procedures to your patients.

*Corporate Practice of Medicine*

Some states have corporate practice of medicine laws that prohibit a person who is not a licensed medical professional (or a business entity that is not a "professional entity") from providing medical treatments or employing licensed medical professionals to provide medical treatments. In some states, a professional entity may be owned by a person who is not a licensed medical professional, provided that a certain minimum level of ownership in the franchise (or in the professional entity that is the franchisee) is held by 1 or more licensed medical professionals. In some states, a professional entity must be owned exclusively by licensed medical professionals.

If you are not a licensed medical professional and your state has a corporate practice of medicine law, you may need to enter into a lease, management services or comparable agreement (in either case, an "MSA") with a licensed medical professional, or a professional entity owned by licensed medical professionals. The licensed medical professional will provide the medical treatments to your patients under the terms of your MSA. Your inability to employ licensed medical professionals for your Clinic may adversely affect the revenues you receive from your Business. In some states, it is possible that you must be a licensed medical professional in order to acquire the franchise.

*Fraud and Abuse*

Numerous federal and state "anti-kickback" regulations prohibit the receipt of compensation or fee-splitting in exchange for referring patients to licensed health care providers. Accordingly, you will need to structure your compensation arrangements with your licensed medical professionals carefully to meet the statutory safe harbors or exceptions under these federal and state fraud and abuse laws. Compensation arrangements should be based on the fair market value of the bona fide services that are provided and not based on the volume or value of referrals between you and the licensed medical professional.

*Advertising*

Some states also have laws regulating advertising and how you may advertise clients' results and products in various media. Some states may also limit the trade names that you may use.

*Privacy and Security of Patient Records*

Various federal and state laws regulate the privacy and security of patient healthcare information. For example, under the federal Health Insurance Portability and Accountability Act (HIPAA), as amended by the federal Health Information Technology for Economic and Clinical Health (HITECH) Act, healthcare professionals have certain legal obligations to keep patient healthcare information confidential, and are also required to disclose that information to patients and third parties when requests are properly submitted. In addition, you must ensure the privacy and security of patient healthcare information you share with any "business associate" as defined under the HITECH Act, such as service providers, attorneys, or third-party billing companies. Note that many states also have laws regulating the privacy and security of patient healthcare information and these laws may impose even greater restrictions and obligations on your business regarding the privacy and security of patient healthcare information.

There may be other local, state and/or federal laws or regulations pertaining to your Clinic with which you must comply. We strongly suggest that you investigate these laws before buying this franchise.

**ITEM 2**               **BUSINESS EXPERIENCE**

**Keith McDermott – Founder, Member, President and Chief Executive Officer**

Keith McDermott is a co-founder and Member of Vida-Flo and has served as our President and Chief Executive Officer since May 2014.  Mr. McDermott has also served as the co-founder and President of Hydration Station USA, LLC in Atlanta, Georgia from November of 2012 to present.

**Shaun Curtis – Chief Operating Officer**

Shaun Curtis has served as our Chief Operating Officer since November 2017. From January 2011 to January 2017, Mr. Curtis served as Chief Operating Officer for Buffalo's Franchise Concepts and Fat Burger North American in Beverly Hills, California and Atlanta, Georgia.  From August 2011 to January 2017, Mr. Curtis was the owner of Buffalo's Cafe (BFCI) of Loganville, LLC in Loganville, Georgia.  From March 2013 to January

Franchise Disclosure Document (2021 Multi-State)

2017, Mr. Curtis was the managing member of Buffalo's Cafe of Palmdale, LLC, BFCI Palm Desert, and BFCI Canyon, LLC (entities operated Buffalo's Café locations) in the cities of Palmdale and Palm Desert, California as well as Canyon, Texas.

### John McDermott – Founder and Member

John McDermott is a co-founder of Vida-Flo and has been a Member since May 2014. From August 2000 to present, Mr. McDermott has been a Partner with the law firm of Holland & Knight LLP in New York, New York.

### Ryan Radding – Founder and Member

Ryan Radding is a co-founder of Vida-Flo and has been a Member since May 2014. From April 2010 to present, Mr. Radding has also served as Regional Vice President for Salesforce.com in San Francisco, California.

### Holly Glaze – Director of Franchise Coaching

Holly Glaze has served as our Director of Franchise Coaching since November 2018. Prior to assuming this position, she served as one of managers from January 2018 to November 2018 and as a Wellness Consultant for us from September 2017 to January 2018. From October 2015 to May 2018, Ms. Glaze served as an ER Technician for Children's Healthcare of Atlanta in Atlanta, Georgia.

### Stephen McDermott – IT Director

Stephen McDermott has served as our IT Director since May of 2014. From March 2016 to present, Mr. McDermott has also served as IT Director for ThePennyHoarder (Taylor Media) in St. Petersburg, Florida. From March 2016 to November 2016 , Mr. McDermott served as Manager, Application Development (Consultant) for Nielsen in Oldsmar, New York. From August 2014 to November 2017, Mr. McDermott served as Senior Manager of TampaBay Times in St. Petersburg, Florida.

### Area Representatives

As discussed in Item 1, area representatives assist us in selling and supporting franchises. If you buy a franchise for a Vida-Flo Clinic that will be located in the development territory of an area representative, the area representative may provide you with initial and ongoing support and guidance. A list of our current area representatives, including their litigation and bankruptcy history, is included as <u>EXHIBIT "H"</u>.

### ITEM 3                  LITIGATION

### *<u>Vida CHS, LLC; Gravitus, LLC. V Hydration Station USA Franchise System, LLC; Keith McDermott (Civil Action No: 2:16-cv-1948-RMG))</u>*

On June 14, 2016, Vida CHA, LLC and Gravitus, LLC (collectively "Plaintiffs") filed a civil action against us and our President, Keith McDermott ("Defendants"), in the United States District Court for the District of South Carolina alleging the Defendants made false, material representations to Plaintiffs regarding the nature of our business and our business practices. Plaintiff was a Vida-Flo franchisee in Charleston, South Carolina. Plaintiff did not comply with multiple provisions in its franchise agreement and the Manual and it also ceased operation of its business, without our approval. Due to these defaults, in March 2016, in accordance with the franchise agreement, we terminated the Plaintiffs franchise agreement. Following the termination, Plaintiff filed the above titled action. Plaintiff sought damages plus pre and post judgment interest. Plaintiff also sought an award of attorney's fees and costs from Defendants.

Defendants filed an answer and motion to dismiss to the complaint. The Defendants denied all allegations and

asserted certain counterclaims against Plaintiffs, including Plaintiffs alleged failures to comply with the Franchise Agreement, which failure was the basis for the termination of that agreement and a request for injunctive relief. This dispute was submitted to binding arbitration with the American Arbitration Association.

On November 5, 2018, the parties settled the dispute pursuant to a Settlement Agreement and Mutual Release (the Settlement Agreement"). Under the Settlement Agreement: (i) the Parties mutually released each other from all claims; (ii) we paid the Defendants the sum of $250,000; (iii) in consideration of a $1 payment from us, Defendants assigned to us all ownership interests in Hydration Station USA Franchise System, LLC previously held by Defendants; and (iv) we agree to indemnify Defendants for any claims made by third-parties relating to our business operations, practices and/or corporate governance.

***Hydration Station USA Franchise System, LLC v. Crimson & Red Holdings, LLC, Shawn Fobas, Matt Borah, Jason Trembley, Peter Park, Hydralife Sandy Springs, LLC f/k/a VF Sandy Springs, LLC, Hydralife Buckhead, LLC f/k/a VF Buckhead, LLC, and Hydralife Highlands, LLC, f/k/a VF Highlands, LLC (Case 1:19-cv-01250-LMM)***

On March 19, 2019, we filed a lawsuit in the Northern District of Georgia against a group of corporate franchisees and the owners of those entities who operated 3 franchised units, were terminated by us and then continued operating intravenous hydration clinics in the same locations. The Complaint seeks injunctive relief and compensatory and punitive damages, as well as attorney's fees and expense of litigation, alleging breaches of the Franchise Agreements and the contractual restrictive covenants contained therein, violations of the Lanham Act (trademark infringement), defamation against us and our CEO, taking/misuse of trade secrets and confidential information, including the Defend Trade Secrets Act, the Georgia Trade Secrets Act, the Georgia Deceptive Trade Practices Act,  and failure to pay royalties and other fees.

Defendants filed an Answer on June 12, 2019 and asserted a counterclaim for rescission of the Franchise Agreement on the basis of fraud (asserting that the FDD received was not in compliance with franchise laws due to certain false statements relating to the litigation disclosures) and nonperformance. The Court dismissed Defendants' counterclaim on December 13, 2019, and we voluntarily dismissed our claims on March 4, 2020 because the claims in this litigation are addressed by the litigation below.

***Hydration Station USA Franchise System, LLC and Vida-Flo USA Fulfillment, LLC v. Jared Christian Seaverns, Ryan Heavern, Eva Heavern, Brett Mccullough, Brian Mccullough, Michael Gayle, Matthew "Web" Raulston, Shawn Fobas, Matt Borah, Jason Trembly, Peter Park, Lauren Kaufman, Brett Snellgrove, Derrick Purdy, Jonathan Frost, Brendan Joseph Doucette, Timothy Nowak, Vida Flo Alabama, Llc, Crimson & Red Holdings, LLC, Hydralife Sandy Springs, LLC F/K/A Vf Sandy Springs, LLC, Hydralife Buckhead, LLC F/K/A Vf Buckhead, LLC, Hydralife Highlands, LLC F/K/A Vf Highlands, LLC, REVA Investments, LLC, Flo West, LLC, Holistic Hydration Organization, LLC, Vida-Flo Louisiana, L.L.C., Geaux Fleaux, LLC, Moose, Llc F/K/A Vida-Flo Chattanooga, The wHydrate Group, Inc., wHydrate Fulfillment Group Inc., and John Does 1-10***

On November 15, 2019, we and our affiliate, VFUF, filed a lawsuit in the Northern District of Georgia against Jared Christian Seaverns, Ryan Heavern, Eva Heavern, Brett McCullough, Brian McCullough, Michael Gayle, Matthew "Web" Raulston, Shawn Fobas, Matt Borah, Jason Trembly, Peter Park, Lauren Kaufman, Brett Snellgrove, Derrick Purdy, Jonathan Frost, Brendan Joseph Doucette, Timothy Nowak, Vida Flo Alabama, LLC, Crimson & Red Holdings, LLC, HydraLife Sandy Springs, LLC, HydraLife Buckhead, LLC, HydraLife Highlands, LLC, REVA Investments, LLC, Flo West, LLC, Holistic Hydration Organization, LLC, Vida-Flo Louisiana, L.L.C., Geaux Fleaux, LLC, Moose, LLC, the wHydrate Group Inc. and wHydrate Fulfillment Group Inc. The defendants are all former Vida-Flo franchisees (including the corporate entities and the owners of the corporate entities) that were terminated by us and subsequently operated intravenous hydration clinics from the same locations as their franchised locations in violation of the noncompetition covenants imposed under their Franchise Agreements.

Franchise Disclosure Document (2021 Multi-State)

The Complaint seeks injunctive relief and compensatory and punitive damages, as well as attorney's fees and expense of litigation, alleging breaches of the Franchise Agreements and the contractual restrictive covenants contained therein, violations of the Sherman Act (antitrust), violations of the Lanham Act (trademark infringement), defamation against us and our CEO, taking/misuse of trade secrets and confidential information, including the Defend Trade Secrets Act, the Georgia Trade Secrets Act, the Georgia Deceptive Trade Practices Act, and failure to pay royalties and other fees.  Discovery is ongoing and currently scheduled to close on May 1, 2021.

Except for the 3 actions listed above, no litigation is required to be disclosed in this Item.

**ITEM 4**                    **BANKRUPTCY**

No bankruptcy information is required to be disclosed in this Item.

**ITEM 5**                    **INITIAL FEES**

**Initial Franchise Fee**

You will pay us a $59,000 initial franchise fee, which is payable in full at the time you sign the Franchise Agreement. We will refund $10,000 of the initial franchise fee if we terminate the Franchise Agreement in accordance with <u>Section 20.2(i)</u> (failure to successfully complete training in a timely manner), <u>Section 20.2(ii)</u> (failure to find an approved site in a timely manner) or <u>Section 20.2(iii)</u> (failure to open your Clinic in a timely manner), but only if you sign a Waiver and Release of Claims. Our current form of Waiver and Release of Claims is attached to this Disclosure Document as <u>EXHIBIT "D"-3</u> (although the form document attached to this Disclosure Document will be modified by (i) changing the recitals to reflect the termination in the recitals and (ii) adding the refund obligation). In partial consideration of the initial franchise fee, we will lease to you 12 treatment chairs for use at your Clinic. If you fully comply with your obligations under the Franchise Agreement for the entire term, we will transfer ownership of these chairs to you at no additional charge upon the expiration of the initial term.  The initial franchise fee is not refundable under any other circumstances. All initial franchise fees are uniform and fully earned.

**Startup Package**

Before opening, you must purchase a startup package for your Clinic from our affiliate, VFUF (your "<u>Startup Package</u>"). The Startup Package currently consists of the following items: your interior decorating package (excluding the 12 treatment chairs we lease to you in partial consideration of the initial franchise fee); reception desk; certain of your Clinic electronics; integrated software platform: Vida-Flo Central Office; initial inventory of medications and vitamins; initial inventory of recurring medical supplies; initial inventory of retail and promotional items; certain medical equipment; and office and miscellaneous Clinic supplies. We will provide you with an itemized breakdown of the specific items that are included, and the associated cost, upon your request.

The cost of the Startup Package ranges from $45,000 to $61,250 depending on certain factors such as the size and layout of your Clinic. Our affiliate purchases most of these items from third party suppliers and resells them to you at its cost plus a markup not to exceed 13% of our affiliate's cost associated with the item (this cost includes invoiced price from the supplier including and discounts, shipping costs, taxes, fulfillment manager fees, associated credit card fees and webstore maintenance fees). The purchase price is uniformly imposed and nonrefundable.

Franchise Disclosure Document (2021 Multi-State)

## ITEM 6                    OTHER FEES

| Type of Fee [1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty Fee | 7% of Gross Revenues [2] | 10th day of month | You must provide us with monthly reports of your Gross Revenues. Alternatively, we may (at our option) automatically retrieve reports of your Gross Revenues through your POS system. |
| Brand and System Development Fund Contribution | Up to 2% of Gross Revenues [2] (not currently charged) | Same as royalty fee | See Note 3. |
| Cooperative Advertising Fee | Up to 2% of Gross Revenue [2] (not currently charged) | Same as royalty fee | See Note 4. |
| Training and Assistance Fee | Up to $500 per person per day (plus reimbursement of expenses for onsite training or assistance) | Before training | See Note 5. |
| Conference Registration Fee | Up to $750 per person | 10 days after invoice | See Note 6. |
| Technology Fee | Varies (currently $1,250 per month) | 1st business day of each month | See Note 7. |
| Marketing Materials and Inventory | Varies depending on item purchased | 10 days after invoice | You will be able to purchase various marketing materials, inventory items, merchandise and operating supplies and equipment through our affiliate's online store. |
| Audit Fee | Actual cost of audit (including travel and lodging expenses for audit team) plus applicable late fee | 10 days after invoice | Payable only if the audit (i) reveals that you have understated any amount that you owe us by at least 3% or (ii) is necessary because you fail to furnish required information or reports to us in a timely manner. |
| Mystery Shopper / Quality Assurance Program  Expense | Varies | 10 days after invoice | See Note 8. |
| Fines | Up to $500 per incident | Upon demand | Payable if you fail to comply with a mandatory standard or operating procedure and you do not cure the non-compliance within the time period we require. We will deposit all fines into the brand and system development fund (if and when established). |
| Renewal Fee | Lesser of 20% of then-current initial franchise fee or $10,000 | At time you sign Renewal Agreement | None. |
| Transfer Fee | Greater of $5,000 or 10% of then-current initial franchise fee | Before transfer | Payable when you transfer or sell your franchise. No charge if franchise transferred to an entity that you control. |

| TYPE OF FEE [1] | AMOUNT | DUE DATE | REMARKS |
|---|---|---|---|
| Supplier Review Fee | Varies (up to $500) | 10 days after invoice | This covers the cost of inspecting new products or suppliers you propose. |
| Late Fee | Lesser of 1.5% of amount past due per month or highest rate allowed by applicable law | 10 days after invoice | None. |
| Indemnification | Will vary with circumstances | 10 days after invoice | You must indemnify and reimburse us for any damages, losses or expenses we incur as a result of the operation of your Clinic or your breach of the Franchise Agreement. |
| Insurance | Actual cost of premiums, plus our costs and expenses | 10 days after invoice | You may, but need not, purchase your general liability and medical malpractice insurance through our carrier. If you choose to do so, we will collect the premiums from you, together with a reasonable administrative fee for our service, and remit the premiums to the insurance company. You are also required to purchase other types of policies as further described elsewhere in this Disclosure Document. If you fail to obtain and maintain any insurance we require, and we elect to do so on your behalf, you must reimburse us. |

Notes:

1. All fees are imposed by and are payable to us, except for payments made for marketing materials and inventory items purchased from our affiliate, VFUF. We may also require that you pay the monthly technology fee  to us. All fees are non-refundable and uniformly imposed on franchisees. You will be required to sign an ACH Authorization Form (attached to the Franchise Agreement as ATTACHMENT "F"), permitting us to electronically debit your designated bank account for payment of all fees payable to us (other than the initial franchise fee) as well as any amounts that you owe to us or our affiliates for the purchase of goods or services. You must deposit all Gross Revenues into the bank account and ensure that there are sufficient funds available for withdrawal before each due date. You must pay us all taxes that are imposed upon us or that we are required to collect and pay by reason of the furnishing of products, intangible property (including trademarks) or services to you.  Any payment made to us in any format other than ACH will be subject to a 5% processing fee.

2. "Gross Revenues" means all gross sums that you bill or collect from all goods and services that you sell (whether off-site or from your Clinic), plus all other sums that you collect from the operation of your Business, including the proceeds of any business interruption insurance. "Gross Revenues" does not include sales or use taxes, amounts refunded to customers, or the value of complimentary or "comped" products or services offered for promotional purposes. We may limit the maximum amount of the weekly deduction for "comped" products or services (currently limited to $500 per week for the first year of operation and $250 per week after your first year of operation). The value of any comped products or services in excess of the weekly cap (calculated based on our suggested retail pricing) must be included in Gross Revenues. From time to time, we may establish policies governing the manner in which the proceeds from the sale of gift cards are treated for purposes of calculating Gross Revenues. Similarly, if we implement a membership model that allows customers to redeem goods or services associated with the membership from multiple Vida-Flo clinics, we may establish policies governing the manner in which the monthly membership dues are allocated between the clinic that sold the membership and the clinic where the goods or services are redeemed.

3. We may, but need not, establish and maintain a brand and system development fund to promote public awareness of our brand and improve our System. As of the issuance date of this Disclosure Document, we have not yet formed the fund. You will have no voting rights pertaining to the administration of the fund, the creation and placement of the marketing materials or the amount of the required contribution. In addition to your contributions to the brand and system development fund, you must spend a minimum monthly amount of money (your "Local Marketing Commitment") on local advertising to promote your Clinic. The monthly Local Marketing Commitment is equal to the greater of $500 or 2% of your monthly Gross Revenues.

4. We may establish regional advertising cooperatives for purposes of pooling advertising funds to be used in discrete regions. We will collect the cooperative advertising fees and remit these fees to the applicable advertising cooperative (unless we administer the advertising cooperative ourselves). The amount of the cooperative advertising fee may be adjusted (or temporarily suspended) upon the majority vote of all franchisees within the advertising cooperative. Any Vida-Flo clinic that we operate will have the same voting power as third party franchisees. If we own the majority of Vida-Flo clinics within an advertising cooperative, we will not increase the cooperative advertising fee without the consent of a majority of all third-party franchisees within the advertising cooperative. All cooperative advertising fees will be uniformly imposed on all franchisees within the advertising cooperative, including any Vida-Flo clinic that we operate. All cooperative advertising fees that you pay will be credited towards your Local Marketing Commitment.

5. Before you open, we will provide our initial training program for your Managing Owner and your initial managers at no additional charge. You must pay us the $500 per day training fee for any additional training we provide, including: (i) each person that attends our initial training program after you open your Clinic (such as a new Managing Owner or manager); (ii) any person who must retake training after failing to successfully complete training on a prior attempt; (iii) any training or on-site assistance that you request; (iv) any remedial training that we require based on your operational deficiencies; and (v) any additional or refresher training programs. If we provide training or assistance at your Clinic, you must also reimburse us for all costs incurred by our representative for meals, travel and lodging. You are responsible for all expenses and costs that your trainees incur for training, including wages, travel and living expenses.

6. We may hold periodic national or regional conferences to discuss business and operational issues affecting Vida-Flo franchisees. Attendance at these conferences is mandatory, although we will not require your owners to attend more than one (1) conference during any calendar year. You are also responsible for all expenses and costs that the conference attendees incur, including wages, travel and living expenses. You must pay us the fee even if you fail to attend.

7. You must acquire and utilize all information and communication technology systems that we specify from time to time (the "Technology Systems"). Our required Technology Systems may include computer systems, webcam systems, telecommunications systems, security systems, music systems, and similar systems, together with the associated hardware, software (including cloud-based software) and related equipment, software applications, mobile apps and third-party services relating to the establishment, use, maintenance, monitoring, security or improvement of these systems. Certain components of the Technology Systems must be purchased or licensed from third party suppliers. We and/or our affiliate may develop proprietary software, technology or other components of the Technology Systems that will become part of our System. If this occurs, you agree to pay us (or our affiliate) commercially reasonable licensing, support and maintenance fees. We also reserve the right to enter into master agreements with third party suppliers relating to any components of the Technology Systems and then charge you for all amounts that we must pay to these suppliers based upon your use of the software, technology, equipment, or services provided by the suppliers (plus a markup that we may keep). The "technology fee" includes all amounts that you must pay us or our affiliates relating to the Technology Systems, including amounts paid for proprietary items and amounts that we collect from you and remit to third-party suppliers based on your use of their systems, software, technology or services. The amount of the technology fee may change based upon changes to the Technology Systems or the prices charged by third-party suppliers with whom we enter into master agreements. The technology fee does not include any

amounts that you directly pay to third party suppliers for any component of the Technology Systems.

As of the issuance date of this Disclose Document, we require that you utilize certain cloud-based software provided by third party suppliers, which comprises our integrated software system. You must pay our affiliate a $3,000 one-time setup and implementation fee for the program. This fee is included as part of the Startup Package. In addition, you must pay our affiliate our current technology fee of $1,250 per month. The setup and implementation fee includes the first $1,250 monthly technology fee. Our affiliate remits a portion of this fee to various software and technology licensors and retains a portion as an administrative fee for services rendered.

8.  We reserve the right to engage the services of one or more "mystery shoppers" or quality assurance inspection firms for purposes of inspecting Vida-Flo clinics for quality control purposes. These inspections may address a variety of issues, including customer service, safety, sanitation, inventory rotation, etc. If we implement such a program, we intend to utilize the program for all Vida-Flo clinics, including clinics owned by us and our affiliates. Franchisees may be invoiced directly by the mystery shopper or quality assurance firm for the services rendered. Alternatively, we may be invoiced by the mystery shopper or quality assurance firm, in which case all franchisees must pay their proportional share of the total fee based on the number of open clinics owned by the franchisee as compared to the total number of all open clinics at the time of the program (including company and affiliate-owned clinics). We agree to pay our proportionate share of these costs with respect to each clinic that is owned by us or our affiliates. We do not mark up these fees or retain any portion of the amounts that you pay to us for our mystery shopper / quality assurance program.

## ITEM 7                     ESTIMATED INITIAL INVESTMENT

| YOUR ESTIMATED INITIAL INVESTMENT | | | | |
|---|---|---|---|---|
| TYPE OF EXPENDITURE | AMOUNT [1] | METHOD OF PAYMENT | WHEN DUE | TO WHOM PAYMENT IS TO BE MADE |
| Initial Franchise Fee | $59,000 | Lump sum | At time you sign Franchise Agreement | Us |
| Food, Lodging & Travel (2 to 3 people while training at corporate headquarters) | $5,000 to $7,500 | As incurred | During training | Hotels, restaurants and airlines |
| Real Estate Locating Service [2] | $0 to $7,500 (free if you use our vendor, Wildmor Advisors Atlanta) | Lump sum | Before opening | Suppliers |
| Lease Deposit & 3 Months' Rent [3] | $10,000 to $25,000 | Lump sum | Monthly (with security deposit paid before opening) | Landlord |
| Architecture & Design Services | $1,000 to $10,000 | As incurred | Before opening | Architect or construction manager |
| Build Out & Improvements [4] | $20,000 to $75,000 | As incurred | Before opening | Contractors and suppliers |
| Interior & Exterior Signage [5] | $2,000 to $7,500 | Lump sum | Before opening | Suppliers |
| Interior Decorating Package [6] | $18,750 to $26,750 (included in Startup Package) | Lump sum | Before opening | VFUF (our affiliate) |

| YOUR ESTIMATED INITIAL INVESTMENT | | | | |
|---|---|---|---|---|
| TYPE OF EXPENDITURE | AMOUNT [1] | METHOD OF PAYMENT | WHEN DUE | TO WHOM PAYMENT IS TO BE MADE |
| Reception Desk | $2,000 to $3,500 (included in Startup Package) | Lump sum | Before opening | VFUF (our affiliate) |
| Clinic Electronics [7] | $8,000 to $10,000 (certain Clinic Electronics are included in Startup Package) | Lump sum | Before opening | VFUF (our affiliate) and Suppliers |
| Integrated Software Platform [8] | $3,000 (included in Startup Package) | Lump sum | Before opening | VFUF (our affiliate) |
| Initial Inventory of Medications and Vitamins [9] | $4,500 to $6,000 (included in Startup Package) | Lump sum | Before opening | VFUF (our affiliate) |
| Initial Inventory of Recurring Medical Supplies [10] | $2,750 to $4,000 (included in Startup Package) | Lump sum | Before opening | VFUF (our affiliate) |
| Initial Inventory of Retail and Promotional Items [11] | $2,000 to $3,000 (included in Startup Package) | Lump sum | Before opening | VFUF (our affiliate) |
| Medical Equipment [12] | $5,000 to $7,000 (included in Startup Package) | Lump Sum | Before opening | VFUF (our affiliate) |
| Office Supplies & Miscellaneous [13] | $6,000 to $7,000 (included in Startup Package) | Lump Sum | Before opening | VFUF (our affiliate) |
| Miscellaneous Clinic Supplies [14] | $6,000 to $7,500 | As incurred | Before opening | Suppliers |
| Grand Opening Advertising Expenditures [15] | $10,000 to $15,000 | Lump sum | 30 days before through 90 days after opening | Newspaper, social media, PR, ad printers, other media |
| Utility Deposits & Business Licenses | $350 to $1,250 | As incurred | Before opening | Utility companies and government agencies |
| Professional Fees [16] | $1,000 to $10,000 | Lump sum | Before opening | Lawyers & accountants |
| Insurance | $3,000 to $4,000 | Lump sum | Before opening | Insurance companies |
| Additional Funds (3 month period after opening) [17] | $40,000 to $50,000 | As incurred | As incurred | Suppliers, employees and us |
| **Total Estimated Initial Investment** [18] | $209,350 to $349,500 | | | |

Notes:

1. We do not offer direct or indirect financing for any of these items. None of the fees payable to us or our affiliate are refundable except that a portion of the initial franchise fee may be refunded under the circumstances described in Item 5. We are unaware of any fees payable to third party suppliers that are refundable, although

Franchise Disclosure Document (2021 Multi-State)

some landlords refund security deposits at the end of the lease if the tenant does not default.

2. Wildmor Advisors Atlanta is our preferred real estate broker.

3. These figures presume that you will be leasing your premises. The expense of leasing will vary depending upon the size of the premises, its location, landlord contributions, and the requirements of individual landlords. We anticipate that most Vida-Flo Clinics will range in size from 1,200 to 2,400 square feet. We estimate the rent will range from $2,500 to $6,250 per month, although your actual rent may vary significantly above or below this range depending on your area and the local market conditions. Landlords typically require security deposits equal to 1 or 2 months' rent and may, in addition, require payment in advance of the first and/or last (or more) month's rent. The total estimated initial investment shown in the chart above includes 1 months' security plus 3 month's rent. Some franchisees may prefer to own their facility. The costs of purchasing a facility vary so widely that we cannot reasonably estimate the cost.

4. The cost of leasehold improvements and build-out vary widely based upon a number of factors, including the size and condition of the premises, whether or not there are any existing leasehold improvements and whether the landlord will contribute to the cost of the improvements.

5. The type and size of the signage you actually install will be based upon the zoning, property use requirements and any landlord imposed restrictions. There could be an occasion where signage is not permitted because of zoning or use restrictions.

6. This is your cost to purchase the Vida-Flo interior decorating package, which includes treatment room, side tables, lighting, treatment room busy chairs, garbage receptacles, rolling treatment cabinets with mayo trays, treatment room rolling stools, Vida-Flo Mission Statement wall mount, medication prep-room cabinetry, wallpaper, wall art, and reception area furniture.

7. This includes mandatory and optional electronic items that are purchased through the Fulfillment Web Store, including credit card reader and printer, id scanner, paper shredder, televisions, iPad tablets, POS desktop computer, all-in-one printer and Medical Refrigerator with lockbox. Of the total estimated cost, approximately $1,000 is paid to us and the balance is paid to third party suppliers (although we may collect these funds and pay them to the third party suppliers).

8. Vida-Flo has developed an integrated software system, that includes and achieves the following:  Vida-Flo proprietary EMR Software for Electronic Medical Record Keeping; Deputy.com for employee scheduling; Gusto for payroll; Vida-Flo proprietary software for point of sale and membership management; Dropbox for file sharing; Xero for clinic accounting; Vida-Flo Fulfillment Web Store for ordering of startup and recurring clinic necessities. The monthly system cost is $1,250 (i.e., our current monthly technology fee) plus a minimal additional cost per employee for both Gusto and Deputy.com. The initial start-up fee to onboard all systems is $3,000. This includes the first monthly technology fee.

9. This estimates the costs for your initial supply of medical inventory items, including IV fluids, IV medications and IV vitamins.

10. This estimates the costs for your initial supply of recurring medical supplies, including thermometers and sheaths, BP cuffs. stethoscopes, gloves, catheters, syringes, needles, IV drip sets, nasal cannulas, saniwipes, Band-Aids, transparent dressings, tourniquets, gauze, Coban bandages, etc.

11. This estimates the costs for your initial supply of branded merchandise and promotional items that may be resold or given away, such as t-shirts, koozies, hats, etc.

12. This estimates the costs for all Oxygen related items, including O2 compressor, O2 condenser, transfer adapter,

Franchise Disclosure Document (2021 Multi-State)

O2 cylinder, cylinder rack, O2 wall brackets, regulators and regulator gaskets.

13. This estimates the costs for supplies of letterhead and envelopes, onboarding folders, trifold brochures, "thank you" notes and envelopes, business cards, bath tissue, paper towel and dispenser, plain paper, training manuals, uniforms, open sign, name tags, blankets, housecall bags, etc.

14. This estimates the costs for various in-clinic items, such as coffee maker(s), coffee, tea, office supplies, cleaning supplies, vacuum, gorilla racks, light bulbs, breakroom refrigerator and microwave, security cameras, etc.

15. During the period beginning 30 days before opening through 90 days after opening, you must spend a minimum of $10,000 on grand opening marketing activities. We anticipate some franchisees will spend more than the $10,000 minimum. We must approve your grand opening event and all related promotional activities. You must also utilize different social media and media channels, including Facebook, Twitter, Instagram, etc. to reach your target market. We may require that you utilize a social media marketing company that we designate for these purposes. You may need to hire a PR firm as well.

16. We strongly recommend that you hire 1 or more attorneys to review your franchise documents as well as the healthcare laws and regulations in your state before you purchase the franchise. You may also wish to hire an accountant.

17. This estimates your expenses during the first 3 months of operation, including payroll costs (excluding any wage or salary paid to you), utilities, monthly technology fees, marketing expenses and other miscellaneous expenses and required working capital. It does not include any salary paid to you. Your initial 3 months of rent is separately stated in the table above. You will be required to provide a dated screen shot of the bank account utilized for clinic operations for Vida-Flo Corporate to ascertain there are sufficient funds for operation. Our estimate of Additional Funds is based on the past experience of our principals in operating a Vida-Flo clinic in Atlanta, Georgia since 2012 as well as the experience of our franchisees.

18. You may have additional expenses starting your Business. Your costs will depend on a variety of factors, including: how closely you follow our methods and procedures; your management skills, experience and knowledge; the local real estate market; the prevailing wage rate; competition; and the sales level achieved during the initial period. We strongly recommend that you have independent estimates on your anticipated cost to develop, open and operate your Business.

## ITEM 8                 RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

**Source Restricted Purchases and Leases - Generally**

We require that you purchase or lease certain "source restricted" goods and services for the development and ongoing operation of your Clinic. By "source restricted," we mean that the good or service must meet our specifications and/or must be purchased from an approved or designated supplier (in some cases, an exclusive designated supplier, which may be us or an affiliate). Our specifications and list of approved, designated or preferred suppliers are contained in the Manual. We will notify you within 30 days of any changes to our specifications or list of approved or designated suppliers. We may notify you of these changes in various ways, including written or electronic correspondence, verbal or telephonic notification, amendments or updates to the Manual, bulletins, or other means of communication.

**Supplier Criteria**

Our criteria for evaluating a supplier include standards for quality, delivery, performance, design, appearance and price of the product or service as well as the dependability, reputation and financial viability of the supplier. Upon

your request, we will provide you with any objective specifications pertaining to our evaluation of a supplier, although certain important subjective criteria (e.g., product appearance, design, functionality, etc.) are important to our evaluation but cannot be described in writing.

If you want to purchase or lease a source restricted item from a non-approved supplier, you must send us a written request for approval and submit any additional information that we request. We may require that you send us samples from the supplier for testing. We may also require that we be allowed to inspect the supplier's facilities. We will notify you of our approval or disapproval within 30 days after we receive your request for approval plus all additional information and samples that we require. We may, at our option, re-inspect the facilities and products of any approved supplier and revoke our approval if the supplier fails to meet any of our then-current criteria. You must reimburse us for all costs that we incur in reviewing a proposed supplier and testing the products.

**Current Source Restricted Items**

As described below in more detail, we currently require that you purchase or lease the following source restricted goods and services: the lease for your Clinic; real estate brokerage services; fixtures, furnishings and décor; signage; computer equipment and the integrated software system; credit card processing services; payroll processing services; operating equipment; inventory and operating supplies; retail and promotional items; uniforms; insurance policies; and marketing materials and services. We estimate that nearly 85% of the total purchases and leases that will be required to establish your Business and 90% of your ongoing operating expenses will consist of source restricted goods or services.

*Lease*

We do not review the terms of your lease. However, if you will lease the premises for your Clinic, you must use your best efforts to ensure your landlord signs the Lease Addendum that is attached to the Franchise Agreement as ATTACHMENT "D". If your landlord refuses to sign the Lease Addendum in substantially the form attached to the Franchise Agreement, we may require that you find a new site for your Clinic. The terms of the Lease Addendum are designed to protect our interests. For example, the landlord must notify us of your defaults, offer us the opportunity to cure your defaults, allow us to take an assignment of your lease in certain situations, permit us to enter the premises to remove items bearing our Marks if you refuse to do so and give us a right of first refusal to lease the premises upon the expiration or termination of your lease.

*Real Estate Broker*

We recommend utilizing our recommended real estate brokerage company to help you identify sites that meet our minimum qualifications and assist you in reviewing and negotiating the terms of your lease. You may propose an alternative real estate broker but (i) we must approve the broker you propose (and we may require that the broker complete training at our headquarters relating to Vida-Flo sites and requirements) and (ii) we may require that your broker coordinate efforts and work with our recommend real estate brokerage company.

*Fixtures, Furnishings and Décor*

All of your fixtures, furnishings and décor must meet our standards and specifications, which comprises part of our proprietary brand identity (i.e., trade dress). You must purchase certain furniture, furnishings and décor items exclusively from our affiliate as part of your Startup Package. We will lease to you 12 treatment chairs at no additional charge beyond the initial franchise fee. If you require additional treatment chairs, you must purchase them from our affiliate at then-current pricing. You may purchase other items listed in the Construction Manual from any supplier of your choosing.

*Signage*

All of your interior and exterior signage must meet our standards and specifications and must be purchased from our designated supplier. If our designated supplier is unable to service the area in which your Clinic is located, you will be permitted to use an alternate local supplier with our written approval. All signage produced by an alternate supplier using our Marks must be reviewed and approved by us prior to production and installation.  We reserve the right to deny any signage that (i) does not meet our brand standards in terms of design and materials, (ii) is produced without our approval, or (iii) could, in our reasonable opinion, cause a negative impact on our brand image for any other reason.

*Computer Equipment and POS System*

Your computer system (including software) and POS system must meet our minimum standards and specifications. Certain components of your computer system, POS system and related equipment must be purchased from our affiliate as part of your Startup Package. However, other components must be purchased separately from designated or approved third-party suppliers.

*Credit Card Processing Services*

You must utilize the credit card processing company that we designate. You must accept MasterCard, Visa and American Express as well as such other credit and debit cards and other non-cash systems, loyalty cards and gift cards as we specify, and you must obtain, replace and modify all equipment required to implement the same in accordance with our policies and procedures.

*Payroll Processing Services*

You must utilize the payroll processing company that we designate. With our current designated company, you will pay us a one-time $500 setup and implementation fee (which is included in your Startup Package) to integrate your payroll processing company with your cloud-based employee tracking/scheduling program. In addition, you will pay the payroll processing company a monthly fee equal to $25 plus an additional $4 per employee for use of the payroll processing system (the first 2 months are free).

*Operating Equipment*

You must purchase certain operating equipment that meets our standards and specifications, including mayo trays, mounted sharps containers, bio-hazard and garbage receptacles and refrigerator for medications. These items must be purchased exclusively from our affiliate through its online store. Your initial supply of these items is included in your Startup Package.

*Inventory and Operating Supplies*

Most of your inventory items and operating supplies must meet our standards and specifications, including medical treatment supplies (such as IV drip sets, catheters, lactated ringers, Oxygen filling system, tourniquets, gauze, transparent dressings, etc.) as well as medicine and vitamins (including IV medications and IV vitamins, etc.). All patient forms and other business forms are included in the integrated software platform. We require that you utilize these items exclusively through the Vida-Flo Central Office. These items must be purchased from our affiliate.

*Retail and Promotional Items*

You must purchase all branded merchandise and promotional items (such as t-shirts, hats, koozies, etc.) exclusively from our affiliate through its online store. Your initial supply of these items is detailed in your Startup

Franchise Disclosure Document (2021 Multi-State)

Package. You may not use or authorize a third party to use or produce any branded merchandise or promotional items without our written approval.

*Uniforms*

Your managers and caregivers must wear the uniforms we designate during normal business hours. You must purchase your uniforms exclusively from our affiliate through its online store. Your initial supply of these items is included in your Startup Package. You may not use or authorize a third party to use or produce any branded uniforms without our written approval.

*Insurance Policies*

You must obtain the insurance coverage that we require from time to time (whether in the Franchise Agreement or in the Manual). You must purchase these policies from a carrier that is rated A or better by Alfred M. Best & Company, Inc. The required coverage currently includes: "all risk" property insurance; comprehensive general liability and medical malpractice insurance in the minimum amount of $1,000,000 per occurrence and $3,000,000 in the aggregate; automobile liability insurance in the minimum amount of $1,000,000 per occurrence; worker's compensation and employer liability insurance as required by law; and any other limits and coverage that we periodically require. We recommend (but do not require) that you purchase your general liability and medical malpractice insurance from our insurance carrier. The required coverage and policies are subject to change. All insurance policies must be endorsed to: (i) name us (and our members, officers, directors, and employees) as additional insureds; (ii) contain a waiver by the insurance carrier of all subrogation rights against us; and (iii) provide that we receive 10 days' prior written notice of the termination, expiration, cancellation or modification of the policy.

*Marketing Materials and Services*

All of your marketing materials must comply with our standards and requirements. We must approve all of your marketing materials before you use them. You must purchase all branded marketing materials only from us or other suppliers that we designate or approve. We may require that you utilize a designated marketing company to implement your grand opening marketing campaign and/or ongoing marketing campaigns (we do not have a designated marketing company at this time). You may only utilize the social media sites and channels that we approve from time to time. We may require that you use a designated online marketing company to assist you with the development and implementation of your social media marketing campaigns (we do not have a designated social media company at this time).

**Purchase Agreement**

We have negotiated purchase agreements with suppliers for certain items franchisees must purchase, including pricing terms. As of the issuance date of this Disclosure Document, we have negotiated purchase agreements for the following items: furniture and décor; all medications, vitamins and treatment supplies; uniforms; and POS and computer systems. Our affiliate generally purchases the recurring medical and non-medical supplies necessary for the ongoing operations of a clinic in bulk and resells them to our franchisees at our affiliate's cost plus a markup not to exceed 13% of our affiliate's cost associated with the item (this cost includes invoiced price from the supplier including any discounts, shipping costs, taxes, fulfillment manager fees, associated credit card fees and webstore maintenance fees). We may in the future try to establish relationships with additional suppliers to enable our affiliates and franchisees to purchase other items at discounted prices. There are no purchasing cooperatives, although we reserve the right to establish one or more purchasing cooperatives in the future. You do not receive any material benefits for using designated or approved suppliers other than having access to any discounted pricing that we negotiate.

**Franchisor Revenues from Source Restricted Purchases**

We are currently the exclusive supplier of the 12 treatment chairs that we lease to you for the duration of the franchise. We will own the chairs and may repossess them if you default. If you fully comply with your obligations under the Franchise Agreement for the entire term, we will transfer ownership of these chairs to you at no additional charge upon the expiration of the initial term. We do not generate revenues from leasing these chairs to you beyond the initial franchise fee.

Our affiliate is currently the exclusive designated supplier for all of the items included in your Startup Package as well as all items that must be purchased through our online store, including inventory, operating supplies, operating equipment, uniforms and retail and promotional items. You must also pay us or our affiliate the monthly technology fee. Our affiliate generates revenues from all of these purchases and licenses. We reserve the right to designate ourselves or an affiliate as an approved or designated supplier for other items in the future. There are no approved or designated suppliers (other than us and our affiliate) in which any of our officers owns an interest. No persons affiliated with us are currently approved suppliers other than VFUF.

We and our affiliate may receive rebates, payments or other material benefits from suppliers based on franchisee purchases and we and our affiliate have no obligation to pass them on to our franchisees or use them in any particular manner. We are not aware of any rebates received by our area representatives or their affiliates as a result of required franchisee leases or purchases of goods and services.

During the fiscal year ended December 31, 2020, we did not receive any revenues from franchisee purchases from us or other designated or approved suppliers. During the fiscal year ended December 31, 2020, our affiliate VFUF received $101,025 in net revenues as a result of franchisee purchases from designated and approved suppliers (including purchases directly from VFUF). The source of this information is internal financial accounting maintained on Xero.

**ITEM 9          FRANCHISEE'S OBLIGATIONS**

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and other items in this Disclosure Document.**

| OBLIGATION | SECTIONS IN FRANCHISE AGREEMENT | DISCLOSURE DOCUMENT ITEM |
|---|---|---|
| a. Site selection and acquisition/lease | Section 7.1 & 7.2 | Item 7 & Item 11 |
| b. Pre-opening purchases/leases | Section 6.2, 7.3, 12.5 & 15.1 | Item 5, Item 7, Item 8 & Item 11 |
| c. Site development and other pre-opening requirements | Section 7.3 & 7.4 | Item 6, Item 7 & Item 11 |
| d. Initial and ongoing training | Section 5 | Item 6 & Item 11 |
| e. Opening | Section 7.4 | Item 11 |
| f. Fees | Section 4.2, 5.1, 5.7, 5.8, 11.1, 11.4, 12.7, 12.16, 13, 16.2, 19.2 | Item 5 & Item 6 |
| g. Compliance with standards and policies/Operating Manuals | Section 6.1, 7.1, 7.3, 11.3, 12 & 17.1 | Item 11 |
| h. Trademarks and proprietary information | Section 17 | Item 13 & Item 14 |
| i. Restrictions on products/services offered | Section 12.3 | Item 16 |

Franchise Disclosure Document (2021 Multi-State)

| OBLIGATION | SECTIONS IN FRANCHISE AGREEMENT | DISCLOSURE DOCUMENT ITEM |
|---|---|---|
| j. Warranty and client service requirements | Not Applicable | Not Applicable |
| k. Territorial development and sales quotas | Not Applicable | Item 12 |
| l. Ongoing product/service purchases | Section 6.4 & 12.5 | Item 8 |
| m. Maintenance, appearance and remodeling requirements | Section 12.6 & 12.8 | Item 11 |
| n. Insurance | Section 15.1 | Item 6 & Item 7 & Item 8 |
| o. Advertising | Section 0 | Item 6, Item 7 & Item 11 |
| p. Indemnification | Section 18 | Item 6 |
| q. Owner's participation/ management/staffing | Section 8 | Item 11 & Item 15 |
| r. Records/reports | Section 15.2 & 15.3 | Item 6 |
| s. Inspections/audits | Section 16 | Item 6 & Item 11 |
| t. Transfer | Section 19 | Item 17 |
| u. Renewal | Section 4 | Item 17 |
| v. Post termination obligations | Section 21 | Item 17 |
| w. Non-competition covenants | Section 14 | Item 17 |
| x. Dispute resolution | Section 22 | Item 17 |
| y. Franchise Owner Agreement | ATTACHMENT "E" | Item 15 |

## ITEM 10                            FINANCING

We do not offer direct or indirect financing. We do not guarantee any of your notes, leases or obligations.

## ITEM 11          FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

Before you open your Business, we will:

1. License you the Marks necessary to begin operating your Clinic. (Section 2)

2. Assist you in selecting a site by making available a representative from Wildmor Advisors Atlanta, our approved real estate company. (Section 7.1)

3. Approve the location, build-out and design of your Clinic. See Section below entitled "Site Development" for additional information. (Sections 7.1, 7.3 & 7.4)

4. Loan you 1 copy of the Manual, which will help you establish and operate your Business. See Section below entitled "Manual" for additional information. (Section 6.1)

5. Provide you with written specifications for the goods and services you must purchase to establish your Clinic, as well as a written list of approved and/or designated suppliers for purposes of acquiring these goods and services. (Section 12.2)

6. Deliver your Startup Package and the 12 treatment chairs we will lease to you. We do not deliver any other items you must purchase. We do not install any items you must purchase. (Section 6.2 & 6.3)

Franchise Disclosure Document (2021 Multi-State)

7. Assist you in developing your grand opening marketing campaign. See Section below entitled "Local Advertising" for additional information. (Section 11.2)

8. Provide an initial training program. See Section below entitled "Training Program" for additional information. (Section 5.1)

9. Provide our marketing plan, which may be described in the Manual. (Section 11.2)

10. Send one or more of our representatives to your Clinic to provide up to 3 days of on-site training and assistance relating to the opening of your Clinic. If additional on-site training is required, you must pay us the training and assistance fee of up to $500 per day plus reimbursement of our costs and expenses (Section 5.1)

<u>During the operation of your Business, we will:</u>

1. Provide ongoing guidance and recommendations on ways to improve the marketing and operation of your Business. (Section 6.5 & 11.2)

2. Conduct periodic telephonic meetings or conference calls (which may be group conference calls with other franchisees or one-on-one calls with you) to discuss operational and other issues impacting your Clinic. You must participate in all mandatory telephonic meetings and conference calls. (Section 6.5)

3. Advise you of changes to our System or the products or services offered at Vida-Flo clinics. (Section 6.10 & 12.3)

4. Provide periodic training programs. See Section below entitled "Training Program" for additional information. (Section 5.3)

5. Provide you with access to our affiliate's online store for purposes of purchasing certain inventory items, marketing materials, merchandise, operating equipment and supplies. (Section 6.4)

6. Conduct periodic quality control visits and inspections of your Clinic (which may be announced or unannounced). (Section 16.1)

7. Maintain a website that will include a list of all of the Vida-Flo franchisees that are in good standing with us. We may modify the content of and/or discontinue this website at any time in our sole discretion. (Section 6.7 & 11.3(e))

8. Provide you with your own local webpage to promote your Clinic, which will be linked to our main website. See Section below entitled "Local Marketing" for additional information. (Section 6.7)

9. Provide you with our suggested retail pricing. (Section 12.4)

<u>During the operation of your Business, we may, but need not:</u>

1. Develop branded merchandise for sale by at Vida-Flo clinics. (Section 6.10)

2. Negotiate new or additional purchase agreements with suppliers. (Section 6.9)

3. Hold periodic national or regional conferences to discuss business and operational issues affecting Vida-Flo clinics, including industry changes, new services and/or merchandise, marketing strategies and the like. (Section 5.7)

4. Establish and implement the brand and system development fund. See Section below entitled "Brand and System Development Fund" for additional information. (Section 11.1)

5. Upon your request, provide additional training or assistance (either at our headquarters or at your Clinic). See Section below entitled "Training Program" for additional information. (Section 5.4)

**Training Program** (Section 5 & 20.2(i))

*Overview*

We will provide an initial training program for your Managing Owner, head of department trainers and your management team. These individuals must successfully complete the initial training program to our satisfaction before you open your Clinic. Unless we agree to the contrary, initial training will be provided approximately 30 to 60 days before your projected opening date. You may send other owners and employees to initial training, but it is not required. The initial training program includes between 1 to 2 weeks of training at our corporate headquarters located in Atlanta, Georgia and up to 3 days of on-site training/assistance at your Clinic. A portion of the corporate training may also take place at a company-owned Vida-Flo training clinic in Georgia. The on-site training is an informal training program where we monitor your operations and assist you with the opening of your Vida-Flo clinic. In addition to our initial training program, we may (but need not) require that you visit an operational Vida-Flo clinic that we designate for up to 1 week to monitor and assist with the operation of the business. Currently, we intend to offer the initial training program once a month assuming sufficient demand.

*Training Topics*

The initial training program consists of the following:

**TRAINING PROGRAM**

| SUBJECT | HOURS OF CLASSROOM TRAINING | HOURS ON THE JOB TRAINING | LOCATION |
|---|---|---|---|
| Clinic Operations | 8 | 20 | Atlanta, Georgia |
| Treatment Safety and Purchasing | 2 | 4 | Atlanta, Georgia |
| Customer Service and Employee-Customer Interaction | 2 | 4 | Atlanta, Georgia |
| Management Training | 2 | 4 | Atlanta, Georgia |
| Merchandising | 1 | 1 | Atlanta, Georgia |
| Interior/Exterior Decor and Business Layout | 2 | 2 | Atlanta, Georgia |
| Franchise Compliance | 1 | 2 | Atlanta, Georgia |
| Total | 18 | 37 | |

*Training Materials*

For the classroom training, the training materials will consist of the Manual and operating equipment. You will not be charged an additional fee for any of the training materials.

Franchise Disclosure Document (2021 Multi-State)
Page 21

*Instructors*

Shaun Curtis oversees all corporate training for the Vida-Flo System.  Mr. Curtis has been the COO of Vida-Flo since November 2017. The information covered includes new store openings, operating a Vida-Flo clinic, cost and employee management, and standard non-medical brand policies and procedures, in which Mr. Curtis has over 23 years of hands on experience in these areas. We may designate one or more certified training staff members and/or a certified regional developer to conduct the initial training program with you and your staff. Each certified staff member or regional developer would have a minimum of 1 year of experience in Vida-Flo (or a similar business) and have successfully completed our training program. By law, further medical based training can only be provided by the clinic's registered Medical Director through methods that typically include standing orders, written protocols and procedures, and recommended dosage amounts.

*Ongoing Training*

From time to time, we may require that your Managing Owner, managers and caregivers attend system-wide refresher or additional training courses. If you appoint a new Managing Owner or manager, that person must attend and successfully complete our initial training program before assuming responsibility for the management of your Clinic. We may also require that your caregivers attend and complete additional training as a condition to offering new products or services.

From time to time, we may require that you provide new managers, employees, and caregivers certain mandatory training programs at your Clinic.

We require all of your employees to complete an IV instructional class prior to working at your Clinic. This training must be done with a licensed infusion specialist either at a local college or trade school or in-clinic with the employees being taught in a classroom setting.

If we conduct an inspection of your Clinic and determine you are not operating in compliance with the Franchise Agreement and/or the Manual, we may require that your Managing Owner, managers and select staff members attend remedial training that addresses your operational deficiencies.

You may also request that we provide additional training (either at corporate headquarters or at your Clinic). We are not required to provide this additional training.

Each clinic you operate must have at least 2 corporate certified trainers (1 Wellness Consultant and 1 Hydrocare Provider) at all times. These individuals must: (1) successfully complete all training courses we require; (2) pass applicable testing; and (3) have sufficient availability, knowledge and physical ability to train new staff members on an ongoing basis.

*Training Fees and Costs*

We will provide the initial training program at no additional charge. However, we may charge you a training fee of up to $500 per day for any additional training, including: (i) providing our initial training program for new Managing Owners, managers or caregivers after you open your Clinic; (ii) conducting remedial training; (iii) providing initial training for a second time to a person who failed to successfully complete training on a prior attempt; (iv) providing additional training that you request; (v) providing additional or refresher training programs and (vi) providing any on-site initial training in excess of 3 days. If we provide any training at your Clinic, you must also reimburse us for all costs that we incur for food, lodging and travel. You are also responsible for all food, lodging and travel costs that your owners and employees incur while attending a training program.

Franchise Disclosure Document (2021 Multi-State)

**Manual** (Section 6.1, 12.2 & 24.8)

We will lend you our Manual in text or electronic form for the term of your Franchise Agreement. The Manual may include, among other things, (i) a description of the authorized goods and services that you may offer at your Clinic; (ii) mandatory and suggested specifications, operating procedures, and quality standards for products, services and procedures that we prescribe from time to time for Vida-Flo franchisees; (iii) mandatory reporting and insurance requirements; (iv) mandatory and suggested specifications for your facility; (v) policies and procedures pertaining to the membership program and gift card sales; and (vi) a written list of goods and services (or specifications for goods and services) you must purchase for the construction, development and operation of your Clinic and a list of any designated, approved, recommended suppliers for these goods or services. Brand Standards Manual is designed to establish and protect our brand standards and the uniformity and quality of the goods and services offered by our franchisees. We can modify the Manual at any time. You must comply with all mandatory provisions contained in the Manual. The Manual is confidential and remains our property. We may modify the Manual upon 30 days' prior notice, but the modification(s) will not alter your status or fundamental rights under the Franchise Agreement. The Manual currently contains a total of 374 pages. A copy of the Table of Contents to the Manual is attached to this Disclosure Document as EXHIBIT "E".

**Site Development** (Section 7.1, 7.2, 7.3, 7.5 & 12.8)

A Vida-Flo clinic typically ranges in size from 1,200 to 2,400 square feet and is located in a shopping center or strip mall. You must locate and obtain our approval of the premises from which you will operate your Clinic within 90 days after your sign the Franchise Agreement. The premises must be located within the Site Selection Area identified in Part B of ATTACHMENT "B" to the Franchise Agreement and must conform to our minimum site selection criteria. You must contract with our designated site selection company to confirm whether your proposed sites meet our minimum requirements. You must send us a complete site report (containing the demographic, commercial and other information, photographs and video tapes that we may reasonably require) for your proposed site. We will use our best efforts to approve or disapprove a proposed site within 30 days after we receive all of the requisite materials. Your site is deemed disapproved if we fail to issue our written approval within the 30-day period. If we disapprove a site, you will have an additional 60 days to find another site that we approve. In reviewing a proposed site, we will consider factors such as parking, size, traffic counts, general location, existence and location of competitive businesses, general character of the neighborhood and various economic indicators. We do not select the site for your location and we do not purchase the premises and lease it to you. If you fail to obtain our approval of your site in the required period of time, we may terminate your Franchise Agreement and refund $10,000 of your initial franchise fee (but only after you sign a Waiver and Release of Claims).

If your site has been approved prior to signing the Franchise Agreement, then the address of your approved site will be listed in Part C of ATTACHMENT "B" to the Franchise Agreement. If your site has not been approved prior to signing the Franchise Agreement, then within 15 days after we approve your site, we will send you a Site Approval Notice in the form attached to the Franchise Agreement as ATTACHMENT "C" (the "Site Approval Notice"). The Site Approval Notice will list the address of your approved location.

We do not review the terms of your lease. However, if you will lease the premises for your Clinic, you must use your best efforts to ensure your landlord signs the Lease Addendum that is attached to the Franchise Agreement as ATTACHMENT "D". If your landlord refuses to sign the Lease Addendum in substantially the form attached to the Franchise Agreement, we may require that you find a new site for your Clinic. You must obtain our approval of your lease within 45 days after we approve your site.

After you purchase or lease your approved site, you must construct and equip the premises to the specifications contained in the Manual. You must also install the equipment, fixtures, signs and other items that we require. Before you open, we must approve the build-out and layout of your Clinic. You must remodel and make all improvements and alterations to your facility that we reasonably require from time to time to reflect our then-

Franchise Disclosure Document (2021 Multi-State)

current image, appearance and clinic specifications. There are no limitations on the cost or frequency of these remodeling obligations. You may not remodel or significantly alter your premises without our prior approval.

**Computer System** (Section 12.5, 12.6, 12.7, 15.3 & 16.1)

You must purchase and use all Technology Systems (as defined in Note 7 in Item 6) that we designate from time to time. One component of the Technology Systems is your "computer system", which consists of the following items: (i) One desktop Apple (Mac) computer for the POS System and general business management task (reception desk) with the Xero software we designate, credit card swipe and an all-in-one printer/scanner/copier; (ii) cloud-based POS system software; and (iii) a minimum of 6 patient & Hydrocare Provider iPads.

Vida-Flo has developed a proprietary integrated software management system to help you run your franchise. It provides the following functionality to achieve the following tasks:

- Point of Sale
- Electronic Medical Record Storage
- Electronic Consent and Membership Forms
- Accounting and Bookkeeping
- Start-up and Recurring Supply Webstore
- Training
- Reporting and Benchmarking
- Shared Database for Marketing Materials and Downloads

Your POS system will be operated through your desktop computer. Your electronic medical records software and POS will interface with your patient iPads. You must have high speed internet access. The cost of your computer system will range from $3,500 to $5,000.

You will use your computer system for a variety of business management purposes, including bookkeeping, preparing reports, scheduling patients, storing patient information, communicating with us electronically, processing credit card payments and reporting/tracking sales. Hydrocare Providers will use the patient iPads for checking in patients and retrieving patient records. Your computer system will collect and store patient information (including medical records and prior visit history) and sales data. We will have independent unlimited access to the data collected on your computer system and there are no contractual limits imposed on our access. We may also inspect your computer system and access the data as part of an inspection, subject to any applicable privacy laws.

You will pay us or our affiliate (as specified by us) a monthly technology fee of $1,250 per month ($15,000 per year) for use of the Vida-Flo system together with a $3,000 one-time implementation fee. The $3,000 one-time implementation fee includes the first monthly technology fee. This fee is initially paid to Vida-Flo Corporate and remitted, in part, to various third-party licensors. In exchange for the monthly technology fee, the respective third-party licensors will provide ongoing maintenance, repairs, upgrades and updates to the various software and technology associated with the Vida-Flo system. Except as stated above (i) neither we nor any other party has any obligation to provide ongoing maintenance, repairs, upgrades or updates to the Vida-Flo system; and (ii) we are not aware of any optional or required maintenance, updating, upgrading or support contracts relating to the Vida-Flo system.

At no additional charge, we will provide you with one or more Vida-Flo email addresses for use with your Business. You must exclusively use the email address or addresses that we provide for all communications with us, customers, suppliers and other persons relating to your Business. You may not use any email address that we provide to you for any purpose unrelated to your Business. We will own the email addresses and the account but will allow you to use them during the term of your franchise.

Franchise Disclosure Document (2021 Multi-State)

You must maintain the computer system in good working order at your cost. During the term of your franchise, you may be required to upgrade or update your computer hardware and/or software to conform to our then-current specifications. There are no contractual limitations on the frequency or cost of these updates or upgrades.

We may change the components of the Technology Systems from time to time, including your computer system. We and/or our affiliate may develop proprietary software, technology or other components of the Technology Systems that will become part of our System. If this occurs you agree to pay us (or our affiliate) commercially reasonable licensing, support and maintenance fees. We also reserve the right to enter into master agreements with third-party suppliers relating to any components of the Technology Systems and then charge you for all amounts that we must pay to these suppliers based upon your use of the software, technology, equipment, or services provided by the suppliers, plus a markup which we may keep. The "technology fee" includes all amounts that you must pay us or our affiliates relating to the Technology Systems, including amounts paid for proprietary items and amounts that we collect from you and remit to third-party suppliers based on your use of their systems, software, technology or services. The amount of the technology fee may change based upon changes to the Technology Systems or the prices charged by third-party suppliers with whom we enter into master agreements. The technology fee does not include any amounts that you directly pay to third party suppliers for any component of the Technology Systems.

**Brand and System Development Fund** (Section 11.1)

We may, but need not, establish and maintain a brand and system development fund to promote public awareness of our brand and to improve our System. We may use the fund to pay for any of the following in our discretion: (i) developing maintaining, administering, directing, preparing, or reviewing advertising and marketing materials, promotions and programs; (ii) conducting and administering promotions, contests or giveaways; (iii) public awareness of any of the Marks; (iv) public and consumer relations and publicity; (v) brand development; (vi) research and development of technology, products and services; (vii) website development and search engine optimization; (viii) development and implementation of quality control programs, including the use of mystery shoppers or customer satisfaction surveys; (ix) conducting market research; (x) changes and improvements to the System; (xi) the fees and expenses of any advertising agency we engage to assist in producing or conducting advertising or marketing efforts; (xii) collecting and account for contributions to the fund; (xiii) preparing and distributing financial accountings of the fund; (xiv) any other programs or activities that we deem necessary or appropriate to promote or improve the System; and (xv) our and our affiliates' expenses associated with direct or indirect labor, administrative, overhead or other expenses incurred in relation to any of these activities We have sole discretion in determining the content, concepts, materials, media, endorsements, frequency, placement, location and all other matters pertaining to any of the foregoing activities. The fund will not be used for pay for advertisements principally directed at selling additional franchises, although consumer advertising may include notations such as "franchises available" and one or more pages on our website may promote the franchise opportunity.   We do not anticipate establishing a system and development fund at this time but we will provide you with at least 60 days' notice before we establish the fund.

You must contribute to the fund the amount we specify from time to time (not to exceed 2% of Gross Revenues). We will deposit into the fund all: (i) fund contributions paid by you and other franchisees (unless we allocate the fees to an advertising cooperative); and (ii) fines paid by you and other franchisees. Any company-owned Vida-Flo clinic will contribute to the fund on the same basis as our franchisees. However, if we modify the amount or timing of the contributions that must be made to the fund, any company-owned Vida-Flo clinic that is established or acquired after the modification may contribute to the fund utilizing the modified amount or timing. Except as stated in this paragraph, we have no obligation to expend our own funds or resources for any marketing activities in your area.

All monies deposited into the fund that are not used in the fiscal year in which they accrue will be utilized in the following fiscal year. Any surplus of monies in the fund may be invested and we may lend money to the fund if there is a deficit. During the fiscal year ended December 31, 2020, we did not collect or spend any monies from

Franchise Disclosure Document (2021 Multi-State)

the brand and system development fund.

We will direct and have complete control and discretion over all advertising programs paid for by the fund, including the creative concepts, materials, endorsements and media used for the programs, and the placement and allocation of the programs. In terms of marketing activities paid for by the fund, we do not ensure that these expenditures in or affecting any geographic area are proportionate or equivalent to the fund contributions by franchisees operating in that geographic area or that any franchisee benefits directly or in proportion to their fund contributions. We assume no direct or indirect liability or obligation to you with respect to the maintenance, direction or administration of the fund. The fund will not be a trust and we will have no fiduciary obligations with respect to our administration of the fund. Once established, we reserve the right to discontinue the fund at any time in our sole discretion upon at least 30 days' prior notice. An unaudited financial accounting of the operations of the fund will be prepared annually and made available to you upon request.

**Local Advertising** (Section 11.2 & 11.3)

You must spend at least $10,000 on your grand opening marketing activities. We must approve your grand opening event and related promotional activities. We may require that you utilize our designated marketing company to design and implement your grand opening marketing plan.

In addition to your grand opening marketing obligations, you must spend a minimum monthly amount on local advertising (your "Local Marketing Commitment"). The amount of the Local Marketing Commitment is equal to the greater of $500 or 2% of your monthly Gross Revenues. You must participate at your own expense in all advertising, promotional and marketing programs that we require.

We may create and make available to you advertising and marketing materials for your purchase through our online store. We may use the brand and system development fund to pay for the creation and distribution of these materials, in which case there will be no additional charge. We may make these materials available over the Internet (in which case you must arrange for printing the materials and paying all printing costs). Alternatively, we may enter into relationships with third party suppliers who will create the advertising or marketing materials for your purchase. We will provide reasonable marketing consulting, guidance and support throughout the franchise term on an as needed basis.

You will also have an opportunity to create advertising for your own use, provided we approve it in advance. You may not use any advertising materials that have not been approved by us. You must submit to us any advertising materials that you prepare or modify and we will have 15 days to review and either approve or reject the materials. Our failure to approve any advertising materials within the 15-day period will constitute our disapproval of the materials. You must comply with any minimum advertised pricing policy that we implement from time to time.

You are encouraged to (and we may require that you) market your Clinic through approved social media channels in accordance with our social media policy. We may require that you utilize our designated supplier for social media marketing services. At all times you must comply with any social media policy that we develop.

We will provide you with a local webpage about your Clinic that will be linked to our website. Your webpage will list certain information about your Clinic, such as location, hours of operation, staff bios, etc. At this time, we do not allow our franchisees to maintain their own websites or market their businesses on the Internet (except through the webpage we provide and through approved social media channels). Therefore, you may not maintain a website, conduct e-commerce, or otherwise maintain a presence or advertise on the Internet or any other public computer network. If we change our policy at a later date to allow franchisees to maintain their own websites or market on the Internet, you may do so only if you comply with all of the website and Internet requirements that we specify. In that case, we may require that you sign an amendment to the Franchise Agreement that will govern your ability to maintain a separate website and/or market on the Internet.

Franchise Disclosure Document (2021 Multi-State)

We may enter your Clinic premises at any time, upon reasonable notice to you, for the purpose of photographing the interior and/or exterior of your Clinic for promotional purposes. You must cooperate with our representatives for these purposes and in obtaining photo releases from employees and other individuals, if necessary. Photographs of the interior or exterior of your Clinic may be included in any promotional materials we develop or distribute without your consent or any payment to you.

**Advertising Cooperatives** (Section 11.4)

We may, but need not, form one or more advertising cooperatives for the benefit of all Vida-Flo clinics located within a particular region. If your franchise is located within a region subject to an advertising cooperative, you will be required to pay a cooperative advertising fee imposed by the cooperative (which may not exceed 2% of your Gross Revenues). All cooperative advertising fees that you pay will be credited against your Local Marketing Commitment. We have the right to determine the composition of all geographic territories and market areas for the implementation of each advertising cooperative. Generally, the boundaries of an advertising cooperative will coincide with municipal boundaries, zip codes or designated market areas.

If we implement an advertising cooperative in a particular region, we have the right to establish an advertising council to self-administer the cooperative. You must participate in the council according to the council's rules and procedures and you agree to abide by the council's decisions. Alternatively, we may administer the cooperative ourselves. Advertising cooperatives are not required to operate from written governing documents or prepare annual or periodic financial statements. Any financial statements that are prepared will be made available to franchisees within the advertising cooperative upon request. We reserve the right to form, change, merge or terminate advertising cooperatives at any time.

**Opening Requirements** (Section 7.4)

You may not open your Business before: (i) successful completion of the initial training program; (ii) you purchase all required insurance; (iii) you obtain all required licenses, permits and other governmental approvals; (iv) a state medical board licensed Medical Director who has been approved by us has been on your staff for a minimum of 2 weeks; and (v) we provide our written approval of the construction, build-out and layout of your Clinic. We anticipate that a typical franchisee will open his or her Vida-Flo clinic within 2 to 6 months after signing the Franchise Agreement. Some of the factors that may affect this time are identification of a suitable location, financing, the extent to which an existing location must be upgraded or remodeled, delayed installation of equipment and fixtures, completion of training, obtaining insurance, obtaining required licenses and permits, and complying with local laws and regulations. Unless we agree to the contrary, your Business must be opened within 180 days after you sign the Franchise Agreement. Your failure to open within the 180-day period constitutes an event of default under your Franchise Agreement.

**Delegation of Obligations** (Section 19.1)

We may delegate any of our obligations to provide you with the assistance described above to 1 or more third parties (including any affiliate of ours and area representatives). There are no restrictions on our ability to do so.

## ITEM 12                    TERRITORY

**Location of Your Business**

Each Franchise Agreement grants you the right to operate a single Vida-Flo clinic at a single location that must be approved by us in advance. You will be required to identify a location for your Vida-Flo clinic within the Site Selection Area described in Part B of ATTACHMENT "B" to your Franchise Agreement. You may relocate your Clinic with our prior written approval, which we will not unreasonably withhold. If we allow you to relocate, you must: (i) locate your new Clinic within Site Selection Area described Part A of ATTACHMENT "B" to your

Franchise Disclosure Document (2021 Multi-State)

Franchise Agreement (but outside of any territory granted or reserved to us, our affiliate or any other franchisee); (ii) comply with all of our then-current site selection and development requirements; and (iii) open your new Vida-Flo clinic and resume operations within 30 days after closing your prior Vida-Flo clinic.

In addition to operating from your Vida-Flo clinic, you may provide "on-site" treatments (other than oxygen therapy) to customers at homes and/or business establishments that are located within your territory (described below). With our prior permission, you may also set up and provide "on-site" treatments at Vida-Flo sponsored events that are conducted within your territory.

## Your Territory

We will identify the boundaries of your territory. Your territory will consist of the geographic area within a specified radius from your Clinic that is dependent upon population density. The minimum size territory is a 1 mile radius from the Clinic's entrance door. In some cases the territory extends for up to a 3 mile radius from the Clinic's front door. The specific radius for your territory will be determined based on a combination of market saturation, population density and the level of brand recognition in your market. Your specific territory will be determined before you sign the Franchise Agreement and will be identified in Part D of ATTACHMENT "B" to your Franchise Agreement.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

However, we do grant you certain territorial protections. Specifically, we will not operate or authorize a third party to operate a Vida-Flo clinic using our Marks that is physically located within your territory during the term of your Franchise Agreement except as otherwise permitted below with respect to Acquisitions (defined below). In addition, we will not provide "on-site" treatments or authorize a third party to provide "on-site" treatments at homes and/or business establishments that are located within your territory, except as otherwise permitted below with respect to Alternative Channels of Distribution and Acquisitions.

## Acquisitions

We reserve the right to acquire, or be acquired by, another business or chain that may sell competitive or identical goods or services, and those businesses may be converted into Vida-Flo clinics operating by us under the Marks regardless of their location (an "Acquisition"). Any such acquired or converted businesses may be located within your territory, and if this occurs, you will not be entitled to any compensation for sales made by the business.

## Alternative Channels of Distribution

We also reserve the right to sell or license others to sell competitive or identical goods or services (whether under the Marks or under different trademarks) through Alternative Channels of Distribution. An "Alternative Channel of Distribution" means any channel of distribution other than retail sales made to customers from a Vida-Flo clinic. Examples of Alternative Channels of Distribution include: (i) sales through direct marketing, such as over the Internet or through catalogs or telemarketing; (ii) sales through retail stores that do not operate under the Marks, such as grocery stores, convenience stores or department stores; (iii) sales made at wholesale; and (iv) on-site sales to customers. We may sell or license a third party to sell competitive or identical goods or services through Alternative Channels of Distribution (whether under the Marks or different trademarks) anywhere within your territory. You are not entitled to any compensation for sales that take place through Alternative Channels of Distribution. However, as further discussed below, it is our current policy that if we sell a gift card through our website and the customer exchanges the gift card for products or services at a franchisee's Vida-Flo clinic, we will pay that franchisee 80% of the revenues and retain 20% of the revenues from the gift card sale (we may change this policy at any time).

Franchise Disclosure Document (2021 Multi-State)

**Restrictions on Your Sales and Marketing Activities**

You may advertise within the protected territories of other Vida-Flo franchisees, although your advertising must be primarily directed towards customers within your territory. Similarly, other Vida-Flo franchisees may advertise within your territory, although their advertising must be primarily directed towards customers within their protected territory. You must comply with any policies we establish from time to time regarding a franchisee's ability to advertise outside of their territory.

You may service all patients who come to your Clinic, regardless of where they come from. You are permitted to market your Clinic through approved alternative channels of distribution, which currently include: (i) over the internet through the local webpage we provide to you (if we provide this service); and (ii) through approved social media channels in accordance with our social media policy. You are not permitted to market or sell through any other alternative channel of distribution without our prior written approval. You may not induce or encourage members of one Vida-Flo clinic to cancel and transfer their membership to your Clinic. You may provide "on-site" Vida-Flo treatments to customers at homes and business establishments that are located in your territory. You may not provide "on-site" Vida-Flo treatments at any home or business establishment that is located outside of your territory. Your marketing activities are also subject to the additional restrictions described in Item 11 under the Section entitled "Local Advertising." There are no other restrictions on your right to solicit patients, whether from inside or outside of your territory.

You may not offer any discounts, coupons, or reduced pricing in any form without our prior written approval. All approved materials must include disclaimers and restrictions provided by us at time of approval. You may not offer services through "on-line marketplaces" such as Groupon, eBay, Amazon, Facebook Marketplace, or Craigslist.

**Minimum Performance Requirements**

Your territorial exclusivity does not depend on achieving a certain sales volume, market penetration, or other contingency.

**Additional Franchises and Territories**

You are not granted any options, rights of first refusal or similar rights to acquire additional territories or franchises.

**Membership and Gift Card Purchases**

You will be permitted to sell membership and series packages to Vida-Flo customers. All members and their information is our property and is not transferable to any person other than us without our prior consent.

All Vida-Flo clinics must honor memberships purchased by Vida-Flo customers. A customer who purchases a membership from your Clinic is entitled to redeem their membership benefits and services (or if membership benefits have been utilized that month, obtain discounted membership pricing on products or services) at another Vida-Flo clinic. Similarly, a customer who purchases a membership from another Vida-Flo clinic is entitled to redeem their membership benefits and services (or if membership benefits have been utilized that month, obtain discounted membership pricing on products or services) at your Clinic.

When a customer first purchases a membership from a Vida-Flo clinic, the customer will pay that franchisee in full for the monthly membership (the "Originating Clinic"). If the customer then visits another Vida-Flo clinic (the "Treatment Clinic") to receive the services that were purchased as part of the membership, the Treatment Clinic must provide the services even though it did not receive any payment from the sale of the membership.

You agree to comply with all policies and procedures that we specify from time to time relating to customers who

Franchise Disclosure Document (2021 Multi-State)

obtain services from multiple clinics as part of a membership purchase. In the future, we may (but need not) implement new software to monitor sales and allocate payments to the clinic where services are provided (either in full or on a percentage basis), in which case we may require that the customer pay us for the membership (and we will then allocate the payments between the Vida-Flo clinics). We may also adopt policies regarding cooperation between franchisees relating to members who redeem services from multiple clinics. You agree to comply with all policies and procedures that we specify from time to time.

In addition to the membership model, we offer gift cards for products and services that may be redeemed at any Vida-Flo clinic. We may sell these gift cards on our website. You may offer gift cards at your Clinic. You must honor all gift cards, even if the customer purchased the gift card from our website or from another Vida-Flo clinic. If a customer purchases a gift card from one clinic and redeems the products or services at another clinic, our current policy is that the clinic that sold the card will retain 20% of the revenues from the gift card purchase while the clinic providing the services or products will retain 80% of the revenues from the gift card purchase. We may change our gift card policies at any time.

**Competitive Businesses Under Different Marks**

Currently, neither we nor any affiliate of ours intends to operate or franchise another business under a different trademark that sells products or services similar to services offered at a Vida-Flo clinic. However, we reserve the right to do so in the future.

**ITEM 13                      TRADEMARKS**

We registered the following trademark on the Principal Register at the United States Patent and Trademark Office ("USPTO"):

| REGISTERED MARKS | | |
|---|---|---|
| **MARK** | **REGISTRATION NUMBER** | **REGISTRATION DATE** |
| VIDA-FLO | 5221191 | June 13, 2017 |
| GET REVIDALIZED | 5868486 | September 24, 2019 |
|  | 5878620 | October 8, 2019 |

All required affidavits have been filed.

We grant you the right to operate a franchise under the name "Vida-Flo" and logo shown on the cover page of this Disclosure Document. By trademark, we mean trade names, trademarks, service marks, and logotypes used to identify your Vida-Flo franchise or the products or services sold at your Business. It also includes trade dress. We may change the trademarks you may use from time to time (including by discontinuing use of the Marks listed in this Item 13). If this happens, you must change to the new trademark at your expense.

You must follow our rules when using the Marks. You cannot use our name or mark as part of a corporate name or with modifying words, designs, or symbols unless you receive our prior written consent. You may not use the Vida-Flo name relating to the sale of any product or service that is not previously authorized by us in writing.

You must notify us immediately when you learn about an infringing or challenging use of the Marks. We will take the action we think appropriate, but we are not required to take any action if we do not feel it is warranted. We

may require your assistance, but you are not permitted to control any proceeding or litigation relating to our Marks. You must not directly or indirectly contest our or HSFS's right to the Marks. We are not required under the Franchise Agreement to protect your right to use the Marks or protect you against claims of infringement or unfair competition arising out of your use of the marks. The Franchise Agreement also does not require us to participate in your defense or indemnify you for expenses or damages you incur if you are a party to an administrative or judicial proceeding involving our marks or if the proceeding is resolved in a manner that is unfavorable to you.

There are no currently effective material determinations of the Patent and Trademark Office, the Trademark Trial and Appeal Board, the trademark administrator of this state or any court; no pending infringements, oppositions or cancellations; and no pending material litigation involving any of the Marks. There are no agreements that significantly limit our right to sue or license the Marks. We do not know of any infringing uses that could materially affect your use of the Marks.

## ITEM 14                    PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION

No patents or pending patent applications are material to the franchise. Although we have not filed an application for copyright registration for the Manual, our website or our marketing materials, we do claim a copyright to these items. During the term of your Franchise Agreement, we will allow you to use our proprietary information relating to the development, marketing and operation of a Vida-Flo clinic, including, methods, techniques, specifications, procedures, policies, membership data, marketing strategies and information comprising the System and the Manual. We will also own, as our proprietary information, all of your patient lists and records (we will maintain the confidentiality of all such information).

You are required to maintain the confidentiality of all of our proprietary information and use it only in strict accordance with the terms of the Franchise Agreement and the Manual. You must promptly tell us when you learn about unauthorized use of our proprietary information. We are not obligated to act, but will respond to this information as we deem appropriate. You are not permitted to control any proceeding or litigation alleging the unauthorized use of any of our proprietary information. We have no obligation to indemnify you for any expenses or damages arising from any proceeding or litigation involving our proprietary information. There are no infringements that are known by us at this time.

## ITEM 15                    OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

The Franchise Agreement requires that you designate an owner who will be primarily responsible for the daily on-premises management and supervision of your Clinic (the "Managing Owner"). We must approve the owner that you appoint to serve as the Managing Owner. The Managing Owner must dedicate his or her full time efforts to your Business unless you delegate management functions to a manager. Any new Managing Owner must successfully complete the initial training program before becoming involved with the supervision, management or operation of your Clinic. The Managing Owner must also complete any mandatory refresher or advanced training courses that we require. The Managing Owner will be the designated representative of the franchise group and primary contact for communications, directives, and area marketing initiatives between your Clinic and the corporate support staff.

You may hire a manager to assume responsibility for the daily on-site management and supervision of your Clinic, but only if: (i) the manager successfully completes the initial training program; (ii) the manager signs a Brand Protection Agreement, the form of which is attached to the Franchise Agreement as ATTACHMENT "G" (a "Brand Protection Agreement"); and (iii) the Managing Owner agrees to assume full responsibility for the on-site management and supervision of your Clinic if the manager is unable to perform his or her duties due to death, disability, termination of employment, or for any other reason, until such time that you obtain a suitable replacement manager. The Managing Owner must monitor and supervise each manager to ensure the Clinic is managed in accordance with the Franchise Agreement and Manual. We do not require that the manager own any

Franchise Disclosure Document (2021 Multi-State)

equity interest in the franchise.

All of your employees (other than managers who sign a Noncompetition Agreement) and other agents or representatives who may have access to our confidential information must sign a Confidentiality Agreement, the current form of which is attached to the Franchise Agreement as <u>ATTACHMENT "H"</u>. If you are an entity, each owner (i.e., each person holding an ownership interest in you) and the spouse of each owner must sign a Franchise Owner Agreement, the form of which is attached to the Franchise Agreement as <u>ATTACHMENT "E"</u>.

## ITEM 16                RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

We must approve all goods and services that you sell as part of your Business. You must offer all goods and services that we require. You may not sell any goods or services that we have disapproved or that we have not approved. Your request for approval must be sent at least 10 business days prior to offering any new goods or services.  We have the unrestricted right to change the goods and/or services that you are required to sell as part of your Business at any time in our sole discretion, and you must comply with any such change within 30 days after notice from us.

You may not deviate from our suggested retail pricing by more than 10% without our prior written approval. To the extent permitted by applicable law, we may set maximum or minimum prices on the goods and services you offer. We also reserve the right to require that you comply with any minimum advertised pricing policy that we establish from time to time.

We may require that you participate in a gift card or other customer loyalty program (including utilization of a "membership" model) in accordance with our policies and procedures. In order to participate, you may be required to purchase additional equipment, software and/or Apps and pay fees relating to the use of that equipment, software and/or Apps. If we establish a gift card or loyalty program, we have the right to determine how the proceeds from the sale of gift cards or membership fees will be divided or otherwise accounted for, and we reserve the right to retain the amount of any unredeemed gift cards. You must follow all of our policies regarding any gift card or loyalty program that we establish.

## ITEM 17                RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this Disclosure Document.**

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **PROVISION** | **SECTIONS IN AGREEMENT** | **SUMMARY** |
| a.  Length of the franchise term | Section 4.1 | Term is equal to 10 years. |
| b.  Renewal or extension of the term | Section 4.1 & 4.2 | If you meet our conditions for renewal, you can enter into 2 consecutive successor franchise agreements. Each renewal term will be 5 years, for a total maximum term of 20 years. We may, but need not, allow you to renew beyond this 20 year period. |

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **PROVISION** | **SECTIONS IN AGREEMENT** | **SUMMARY** |
| c.  Requirements for you to renew or extend | Section 4.1 & 4.2 | You must: not be in default; give us timely notice; sign our then-current form of franchise agreement and related documents (e.g., franchise owner agreement, noncompetition agreement, etc.); sign a general release (subject to state law); pay the renewal fee; remodel or upgrade your Clinic to comply with our then-current standards and specifications; and maintain possession of your Clinic under your lease. If you renew, you may be required to sign a contract with materially different terms and conditions than the original contract. |
| d.  Termination by you | Section 20.1 | You can terminate only if we fail to cure a material default within the cure period. |
| e.  Termination by us without cause | Section 20.4 | We can terminate without cause if you and we mutually agree to terminate. |
| f.  Termination by us with cause | Section 20.2 & 20.3 | We can terminate if you default. |
| g.  "Cause" defined - curable defaults | Section 20.2 & 20.3 | You have 10 days to cure any monetary default. You have 30 days to cure any other default (other than defaults described below under "non-curable defaults"). |
| h. "Cause" defined - non-curable defaults | Section 20.2 | The following defaults cannot be cured: failure to successfully complete training; failure to find approved site, secure lease or open in timely manner; insolvency, bankruptcy or seizure of assets; abandonment of franchise; failure to maintain required license or permit; conviction of certain types of crimes or subject of certain administrative actions; failure to comply with material law; commission of act that may adversely affect reputation of System or Marks; health or safety hazards; material misrepresentations; 2nd underreporting of any amount due by at least 3%; unauthorized transfers; unauthorized use of our intellectual property; violation of confidentiality or noncompetition covenant; providing Vida-Flo treatments at sites that are located outside your Territory without our permission; termination of your lease due to your default; or termination of any other agreement between you and us or an affiliate due to your default. |
| i.  Your obligations on termination/non-renewal | Section 21.1 | Obligations include: complete deidentification; cease use of intellectual property; return of Manual and all branded materials; assignment of telephone numbers, listings and domain names; assignment of patient information; cease communications with Vida-Flo members; cancellation of fictitious names; and payment of amounts due (also see "r", below). |
| j.  Assignment of contract by us | Section 19.1 | No restriction on our right to assign. |
| k.  "Transfer" by you – definition | Section 19.2 & Attachment A (definition of "Transfer") | Includes transfer of contract or assets, or ownership change. |

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **PROVISION** | **SECTIONS IN AGREEMENT** | **SUMMARY** |
| l.  Our approval of transfer by you | Section 19.2, 19.3 & Attachment A (definition of "Permitted Transfer") | If certain conditions are met, you may transfer to a newly-formed entity owned by you, or in certain instances, to an existing owner, without our approval. We have the right to approve all other transfers but will not unreasonably withhold approval. |
| m.  Conditions for our approval of transfer | Section 19.2 | Transferee must: meet our qualifications; successfully complete training (or commit to do so, in which case we can revoke our approval if transferee fails training); obtain all required licenses and permits; and sign a new franchise agreement for the remainder of the term (or at our option, take assignment of existing franchise agreement). You must: be in compliance with Franchise Agreement; assign your lease, if applicable; remodel your facility to current standards (or get a commitment from transferee to do so); pay us the transfer fee; and sign a general release (subject to state law) and subordination agreement. We must notify you that we do not intend to exercise our right of first refusal. |
| n.  Our right of first refusal to acquire your business | Section 19.5 | We have the right to match any bona fide, arms-length offer for your business. |
| o.  Our option to purchase your business | Section 21.2 & 21.3 | Upon the expiration or termination of the Franchise Agreement, we have the option to operate your Clinic for up to 180 days. At any point during this period of time, we will have the option, but not the obligation, to purchase your Business. |
| p.  Your death or disability | Section 19.4 | Within 180 days, franchise must be assigned by estate to an assignee in compliance with conditions for other transfers. We may designate manager to operate the Business prior to transfer. |
| q.  Non-competition covenants during the term of the franchise | Section 14.2 & 14.3 | No involvement in competing business; comply with non-solicitation and non-disclosure covenants. |
| r.  Non-competition covenants after the franchise is terminated or expires | Section 14.2, 14.4 & 21.1 | No involvement for 2 years in competing business within 15 miles of your approved clinic or any other Vida-Flo clinic; comply with non-solicitation and non-disclosure covenants; cease use of intellectual property. |
| s.  Modification of the agreement | Section 24.3 & 24.8 | Requires writing signed by both parties (except for unilateral changes to Manual or unilateral reduction of scope of restrictive covenants by us). Other modifications primarily to comply with various states laws. |
| t.  Integration/merger clause | Section 24.8 | Only the terms of the Franchise Agreement and attachments to Franchise Agreement are binding (subject to state law). Any representations or promises made outside the Disclosure Document and Franchise Agreement may not be enforceable. Nothing in the Franchise Agreement or any related agreements is intended to disclaim any of the representations we made in this Disclosure Document. |
| u.  Dispute resolution by arbitration or mediation | Section 22 | Subject to state law, all disputes must be mediated or arbitrated before litigation, except for certain disputes involving our intellectual property or compliance with restrictive covenants. |

Franchise Disclosure Document (2021 Multi-State)

| THE FRANCHISE RELATIONSHIP | | |
|---|---|---|
| **PROVISION** | **SECTIONS IN AGREEMENT** | **SUMMARY** |
| v.  Choice of forum | Section 22 | Subject to state law, all mediation, arbitration and litigation must take place in county where we maintain our principal place of business (currently, Fulton County, Georgia) at time dispute arises. |
| w.  Choice of law | Section 24.1 | Subject to state law, Georgia law governs. |

## ITEM 18              PUBLIC FIGURES

We do not use any public figures to promote our franchise.

## ITEM 19              FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the Disclosure Document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

The following presents certain financial performance information for the operation of Vida-Flo Clinics for the 2020 calendar year. The 12-month period between January 1, 2020 and December 31, 2020 is referred to as the "Measuring Period." The table only includes the data for the clinics that were open and in operation for the entire Measuring Period. As of December 31, 2020, there were: (i) 5 franchised outlets in operation, 3 of which were open for the entire Measuring Period (excluding temporary closures due to COVID-19); and (ii) 2 affiliate-owned outlets, both of which were open for the entire Measuring Period (excluding temporary closures due to COVID-19). This financial performance representation includes the financial data for the 3 franchised outlets and the 2 affiliate outlets that were open the entire Measuring Period. Data for 2 of the 5 franchised outlets was excluded because these outlets opened after January 1, 2020 and were not in operation for the entire Measuring Period. There are no material differences between the clinics whose data was provided and the franchise being offered under this Disclosure Document.

The financial information presented in the table below is for the 3 franchised outlets in operation from January 1, 2020 through December 31, 2020. None of these franchised outlets was required to close as a result of the COVID-19 pandemic.

| 2020 Gross Revenues – Franchised Outlets | | | | |
|---|---|---|---|---|
| **Lowest** | **Highest** | **Median** | **Average** | **Number & Percentage Attaining / Surpassing Average** |
| $245,592 | $514,589 | $283,253 | $347,811 | 1 of 3 (33%) |

The financial information presented in the table below is for the 2 affiliate outlets in operation from January 1, 2020 through December 31, 2020. The first outlet listed below was closed from March 17, 2020 to May 4, 2020

as a result of the COVID-19 pandemic. The second outlet did not need to close as a result of the COVID-19 pandemic.

| 2020 Gross Revenues – Affiliate Owned Outlets | |
|---|---|
| **Outlet** | **2020 Gross Revenues** |
| Outlet 1 | $651,137 |
| Outlet 2 | $580,611 |

Notes:

1. For purposes of the table above, the term "Gross Revenues" means all gross sums billed or collected by the clinic from all goods and services that it sells (whether off-site or from the clinic), plus all other sums that the clinic collects from the operation of the business, including the proceeds of any business interruption insurance. "Gross Revenues" does not include sales or use taxes, amounts refunded to customers, or the value of complimentary or "comped" products or services offered for promotional purposes.

2. In making the above financial performance representation, we have relied upon the data collected through the POS System used at all franchised and affiliate outlets. We are able to independently access this data. Neither we nor any independent certified public accountant has independently audited or verified the information.

3. The financial performance representation does not include any expense information. You will incur a variety of expenses, including the fees listed in Items 5 and 6 of this Disclosure Document.

4. The revenue figures in the tables above are based on the historical results from the clinics described above.

**Some Vida-Flo clinics have earned this amount. Your individual results may differ. There is no assurance that you will earn as much.**

Written substantiation for this financial performance representation will be made available to you upon your reasonable written request.

Other than the preceding financial performance representation, we do not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting our Chief Executive Officer, Keith McDermott at 2964 Peachtree Road, Suite 420, Atlanta, Georgia 30305 and our telephone number is (404) 458-4431, the Federal Trade Commission, and the appropriate state regulatory agencies.

**ITEM 20**               **OUTLETS AND FRANCHISEE INFORMATION**

| TABLE 1 - SYSTEM-WIDE OUTLET SUMMARY FOR YEARS 2018 TO 2020 | | | | |
|---|---|---|---|---|
| **Outlet Type** | **Year** | **Outlets at the Start of the Year** | **Outlets at the End of the Year** | **Net Change** |
| Franchised | 2018 | 8 | 7 | -1 |
| | 2019 | 7 | 5 | -2 |
| | 2020 | 5 | 5 | 0 |

Franchise Disclosure Document (2021 Multi-State)

| TABLE 1 - SYSTEM-WIDE OUTLET SUMMARY FOR YEARS 2018 TO 2020 | | | | |
|---|---|---|---|---|
| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
| Company-Owned | 2018 | 1 | 1 | 0 |
| | 2019 | 1 | 2 | +1 |
| | 2020 | 2 | 2 | 0 |
| Total Outlets | 2018 | 9 | 8 | -1 |
| | 2019 | 8 | 7 | -1 |
| | 2020 | 7 | 7 | 0 |

| TABLE 2 - TRANSFERS OF OUTLETS FROM FRANCHISEES TO NEW OWNERS (OTHER THAN THE FRANCHISOR) FOR YEARS 2018 TO 2020 | | |
|---|---|---|
| State | Year | Number of Transfers |
| Total | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |

| TABLE 3 - STATUS OF FRANCHISED OUTLETS FOR YEARS 2018 TO 2020 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| State | Year | Outlets at Start of Year | Outlets Opened | Termin-ations | Non-Renewals | Reacquired by Franchisor | Ceased Operations - Other Reasons | Outlets at End of Year |
| Alabama | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| Georgia | 2018 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2019 | 2 | 2 | 3 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Louisiana | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| North Carolina | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |

Franchise Disclosure Document (2021 Multi-State)

| TABLE 3 - STATUS OF FRANCHISED OUTLETS FOR YEARS 2018 TO 2020 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| State | Year | Outlets at Start of Year | Outlets Opened | Termin-ations | Non-Renewals | Reacquired by Franchisor | Ceased Operations - Other Reasons | Outlets at End of Year |
| South Carolina | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Tennessee | 2018 | 2 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Totals | 2018 | 8 | 0 | 1 | 0 | 0 | 0 | 7 |
| | 2019 | 7 | 4 | 4 | 0 | 0 | 2 | 5 |
| | 2020 | 5 | 2 | 1 | 0 | 0 | 1 | 5 |

| TABLE 4 - STATUS OF COMPANY-OWNED OUTLETS FOR YEARS 2018 TO 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired From Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of Year |
| Georgia | 2018 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 1 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 0 | 0 | 0 | 2 |
| Totals | 2018 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 1 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 0 | 0 | 0 | 2 |

| TABLE 5 - PROJECTED OPENINGS AS OF DECEMBER 31, 2020 | | | |
|---|---|---|---|
| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets in the Next Fiscal Year | Projected New Company-Owned Outlets in the Next Fiscal Year |
| Georgia | 0 | 0 | 1 |
| Total | 0 | 0 | 1 |

Our fiscal year ends on December 31st. All references to years in these tables refer to December 31st of that year.

A list of all current Vida-Flo franchisees is attached to this Disclosure Document as EXHIBIT "F" (Part A), including their names and the addresses and telephone numbers of their outlets as of December 31, 2020. In addition, EXHIBIT "F" (Part B) lists the name, city and state, and the current business telephone number (or, if unknown, the last known home telephone number) of every franchisee who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during our most recently completed fiscal year or who has not communicated with us within 10 weeks of the issuance date of this Disclosure Document. **If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.**

In the last 3 fiscal years, some franchisees have signed confidentiality agreements with us. In some instances, current and former franchisees sign provisions restricting their ability to speak openly about their experience with

Franchise Disclosure Document (2021 Multi-State)

us. You may wish to speak with current and former franchisees, but be aware that not all such franchisees will be able to communicate with you. There are no (i) trademark-specific franchisee organizations associated with the franchise system being offered that we have created, sponsored or endorsed or (ii) independent franchisee organizations that have asked to be included in this Disclosure Document.

**ITEM 21              FINANCIAL STATEMENTS**

Audited financial statements for Hydration Station USA Franchise System, LLC for the fiscal years ended December 31, 2020, December 31, 2019 and December 31, 2018 are attached to this Disclosure Document as EXHIBIT "G".

**ITEM 22              CONTRACTS**

Attached to this Disclosure Document (or the Franchise Agreement attached to this Disclosure Document) are copies of the following franchise and other contracts or agreements proposed for use or in use in this state:

Exhibits to Disclosure Document

| | |
|---|---|
| EXHIBIT "C" | Franchise Agreement |
| EXHIBIT "D"-1 | State Addenda and Agreement Riders |
| EXHIBIT "D"-2 | Franchisee Disclosure Questionnaire |
| EXHIBIT "D"-3 | General Release |

Attachments to Franchise Agreement

| | |
|---|---|
| ATTACHMENT "C" | Site Approval Notice |
| ATTACHMENT "D" | Lease Addendum |
| ATTACHMENT "E" | Franchise Owner Agreement |
| ATTACHMENT "F" | ACH Authorization Form |
| ATTACHMENT "G" | Brand Protection Agreement |
| ATTACHMENT "H" | Confidentiality Agreement |

**ITEM 23              RECEIPT**

EXHIBIT "J" to this Disclosure Document are detachable receipts. You are to sign both, keep one copy and return the other copy to us.

# EXHIBIT "A"

## TO DISCLOSURE DOCUMENT

### STATE AGENCIES AND ADMINISTRATORS

**CALIFORNIA**
Commissioner of Financial
Protection and Innovation
Department of Financial
Protection and Innovation
320 West 4th Street, #750
Los Angeles, CA 90013
(213) 576-7500
1-866-275-2677

**HAWAII**
Commissioner of Securities of
the State of Hawaii
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
(808) 586-2722
Agents for Service of Process:
Commissioner of Securities of
the State of Hawaii
Department of Commerce and
Consumer Affairs
Business Registration Division
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
(808) 586-2722

**ILLINOIS**
Illinois Attorney General
Chief, Franchise Division
500 South Second Street
Springfield, IL 62706
(217) 782-4465

**INDIANA**
Secretary of State
Securities Division
Room E-018
302 West Washington Street
Indianapolis, IN 46204
(317) 232-6681

**MARYLAND**
Office of the Attorney General
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202
(410) 576-6360

**MICHIGAN**
Franchise Administrator
Consumer Protection Division
670 Law Building
Lansing, MI 48913
(517) 373-7117

**MINNESOTA**
Department of Commerce
Commissioner of Commerce
85 Seventh Place East, #500
St. Paul, MN 55101-3165
(651) 296-4026

**NEW YORK**
New York Attorney General
Investor Protection & Securities
Bureau
Franchise Section
120 Broadway, 23rd Floor
New York, NY 10271
(212) 416-8236

**NORTH DAKOTA**
North Dakota Securities
Department
State Capitol, Fifth Floor, Dept 414
600 East Boulevard Avenue
Bismarck, North Dakota 58505-0510
(701) 328-4712

**RHODE ISLAND**
Department of Franchise
Regulation
1511 Pontiac Avenue
John O. Pastore Complex
Bldg 69-1
Cranston, Rhode Island 02920
(401) 462-9527

**SOUTH DAKOTA**
Department of Labor and
Regulation
Division of Securities
445 E Capitol Avenue
Pierre, South Dakota 57501
(605) 773-4823

**VIRGINIA**
State Corporation Commission
Division of Securities and Retail
Franchising
1st Floor (service of process)
9th Floor (administrator)
1300 East Main Street
Richmond, Virginia 23219
(804) 371-9051

**WASHINGTON**
Department of Financial
Institutions
Securities Division
150 Israel Road SW
Tumwater, WA 98501
(360) 902-8760

**WISCONSIN**
Department of Financial
Institutions
Division of Securities
345 West Washington Avenue
4th Floor
Madison, WI 53703
(608) 266-3364

# EXHIBIT "B"

## TO DISCLOSURE DOCUMENT

### FRANCHISOR'S AGENT FOR SERVICE OF PROCESS

Aaron Gagnon
Warshawsky Seltzer, PLLC
9943 East Bell Road
Scottsdale, Arizona 85260

In states listed in EXHIBIT "A", the additional agent
for Service of Process is listed in EXHIBIT "A"

**EXHIBIT "C"**

**TO DISCLOSURE DOCUMENT**

**F<small>RANCHISE</small> A<small>GREEMENT</small>**

[See Attached]



# FRANCHISE AGREEMENT

FRANCHISEE: _____

DATE: _____

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **1.** | DEFINITIONS | 1 |
| **2.** | GRANT OF FRANCHISE | 1 |
| **3.** | TERRITORIAL RIGHTS AND LIMITATIONS | 1 |
| **4.** | TERM AND RENEWAL | 1 |
| **5.** | TRAINING AND CONFERENCES | 2 |
| **6.** | OTHER FRANCHISOR ASSISTANCE. | 3 |
| **7.** | ESTABLISHING YOUR VIDA-FLO CLINIC | 4 |
| **8.** | MANAGEMENT AND STAFFING. | 5 |
| **9.** | FRANCHISEE AS ENTITY | 6 |
| **11.** | ADVERTISING & MARKETING. | 7 |
| **12.** | OPERATING STANDARDS. | 9 |
| **13.** | FEES | 12 |
| **14.** | RESTRICTIVE COVENANTS. | 13 |
| **15.** | YOUR OTHER RESPONSIBILITIES | 14 |
| **16.** | INSPECTION AND AUDIT | 16 |
| **17.** | INTELLECTUAL PROPERTY | 16 |
| **18.** | INDEMNITY | 17 |
| **19.** | TRANSFERS | 18 |
| **20.** | TERMINATION | 19 |
| **21.** | POST-TERM OBLIGATIONS. | 21 |
| **22.** | DISPUTE RESOLUTION | 23 |
| **23.** | YOUR REPRESENTATIONS | 24 |
| **24.** | GENERAL PROVISIONS | 24 |

ATTACHMENTS

| | |
|---|---|
| ATTACHMENT "A" | Definitions |
| ATTACHMENT "B" | Deal Terms |
| ATTACHMENT "C" | Site Approval Notice |
| ATTACHMENT "D" | Lease Addendum |
| ATTACHMENT "E" | Franchise Owner Agreement |
| ATTACHMENT "F" | ACH Authorization Form |
| ATTACHMENT "G" | Brand Protection Agreement |
| ATTACHMENT "H" | Confidentiality Agreement |

i

## VIDA-FLO FRANCHISE AGREEMENT

This Vida-Flo Franchise Agreement (this "<u>Agreement</u>") is entered into as of _____, 202__ (the "<u>Effective Date</u>") between Hydration Station USA Franchise System, LLC, a Georgia limited liability company ("<u>we</u>" or "<u>us</u>") and _____, a(n) _____ ("<u>you</u>").

**1.      DEFINITIONS**. Capitalized terms used in this Agreement are defined either in the body of this Agreement or in <u>ATTACHMENT "A"</u>. For capitalized terms that are defined in the body of this Agreement, <u>ATTACHMENT "A"</u> lists the Sections of this Agreement in which such terms are defined.

**2.      GRANT OF FRANCHISE**. We hereby grant you a license to own and operate a Vida-Flo clinic (your "<u>Business</u>" or your "<u>Clinic</u>") using our Intellectual Property from a single location that we approve. As a franchisee, you will establish and operate a specialized medical clinic that offers rehydration treatments and related services to individuals for a variety of purposes, including treatment and/or recovery from illnesses and hangovers as well as enhancing athletic performance and/or recovery from intense athletic activities. You will provide Vida-Flo services and related products from your Clinic. You may also provide "on-site" Vida-Flo treatments at homes and business establishments that are located within your Territory (defined below). With our prior written permission, you may also set up and provide "on-site" treatments at Vida-Flo sponsored events that are conducted within your Territory. We reserve all rights not expressly granted to you.

**3.      TERRITORIAL RIGHTS AND LIMITATIONS**. We will grant you a protected territory consisting of the geographic area identified in Part D of <u>ATTACHMENT "B"</u> (your "<u>Territory</u>"). By protected, we mean that: (i) we will not operate, or grant a franchise or license to a third party to operate, a Vida-Flo clinic that is physically located within your Territory during the Term; and (ii) we will not provide, or authorize a third party to provide, "on-site" Vida-Flo treatments at homes and/or business establishments that are located within your Territory, except as otherwise provided in this Section with respect to Alternative Channels of Distribution and Acquisitions. We reserve the right to: (i) sell, or grant franchises or licenses to third parties to sell, competitive or identical goods or services (including under the Marks) through Alternative Channels of Distribution, irrespective of whether the sales take place in your Territory; and (ii) engage in Acquisitions, even if as a result of an Acquisition one or more competitive businesses of the acquired or acquiring company begin using our Intellectual Property (including our Marks) and are located within your Territory (however, any such outlets would be operated by us or an affiliate and we would not allow a franchisee to own or operate such an outlet in your Territory).

**4.      TERM AND RENEWAL**.

   **4.1.      <u>Generally</u>.** The term of this Agreement will begin on the Effective Date and expire ten (10) years thereafter (the "<u>Term</u>"). If this Agreement is the initial franchise agreement for your Business, you may enter into a maximum of two (2) successor franchise agreements (each, a "<u>Successor Agreement</u>") as long as you meet the conditions for renewal specified below. The Successor Agreement shall be the current form of franchise agreement that we use in granting Vida-Flo franchises as of the expiration of the Term or renewal term, as applicable. The terms and conditions of the Successor Agreement may vary materially and substantially from the terms and conditions of this Agreement. Each renewal term will be five (5) years, for a maximum total term of 20 years. You will have no further right to operate your Clinic following the expiration of the final renewal term unless we grant you another franchise in our sole discretion.  If this Agreement is a Successor Agreement, the renewal provisions in your original franchise agreement will dictate the length of the Term of this Agreement as well as your remaining renewal rights, if any.

   **4.2.      <u>Renewal Requirements</u>.** In order to enter into a Successor Agreement, you and the Owners (as applicable) must: (i) notify us in writing of your desire to enter into a Successor Agreement not less than 180 days nor more than 360 days before the expiration of the Term or renewal term, as applicable; (ii) not be in default under this Agreement or any other agreement with us or any affiliate of ours at the time you send the renewal notice or the time you sign the Successor Agreement; (iii) sign the Successor Agreement and all ancillary documents that we require franchisees to sign; (iv) sign a General Release; (v) pay us a renewal fee equal to the

lesser of 10% of our then-current initial franchise fee or $10,000; (vi) remodel your Clinic to comply with our then-current standards and specifications; (vii) have the right under your lease to maintain possession of your premises for the duration of the renewal term; and (viii) take any additional action that we reasonably require.

**4.3.    Interim Term.** If you do not sign a Successor Agreement after the expiration of the Term and you continue to accept the benefits of this Agreement, then at our option, this Agreement may be treated either as: (i) expired as of the date of the expiration with you then operating without a franchise to do so and in violation of our rights; or (ii) continued on a month-to-month basis (the "Interim Term") for up to 6 months or until either party provides the other party with 30 days' prior written notice of the party's intention to terminate the Interim Term. In the latter case, all of your obligations will remain in full force and effect during the Interim Term as if this Agreement had not expired, and all obligations and restrictions imposed on you upon the expiration or termination of this Agreement will be deemed to take effect upon the termination of the Interim Term.

Except as otherwise permitted by this Section 4, you have no right to continue to operate your Business following the expiration of the Term.

**5.     TRAINING AND CONFERENCES**

**5.1.    Initial Training Program.**   The Managing Owner, head of department trainers and your management team must attend and successfully complete our initial training program in Atlanta, Georgia before you open your Clinic. Unless we agree to the contrary, training must be completed approximately 30 to 60 days prior to your expected opening date. We will also provide up to three (3) days of onsite training and assistance relating to the opening of your Clinic. We may charge you a training fee of $500 per day and require you to reimburse us for our expenses if we provide any additional onsite training beyond this three-day period.

**5.2.    Initial Training For New Owners/Managers.**   If you hire a new manager or appoint a new Managing Owner after we conduct our pre-opening initial training program, the new manager or Managing Owner, as applicable, must attend and successfully complete our then-current initial training program at the location we designate.

**5.3.    Periodic Training.** We may offer periodic refresher or additional training courses for your Owners and employees. Attendance at these training programs may be optional or mandatory, at our option, depending on the specific training program. We may require that your caregivers attend and complete additional training as a condition to offering new products or services. From time to time, we may require that you provide new managers, employees, and caregivers certain mandatory training programs at your Clinic. All of your employees much complete an IV instructional class prior to working at your Clinic. The IV instructional training must be done with a licensed infusion specialist either at a local college or trade school or in-clinic with the employees being taught in a classroom setting.

**5.4.    Additional Training Upon Request.** Upon your written request, we may provide additional assistance or training to you at a mutually convenient time.

**5.5.    Remedial Training.** If we conduct an inspection of your Clinic and determine that you are not operating in compliance with this Agreement and/or the Manual, we may, at our option, require that your Managing Owner, management personnel and select staff trainers attend remedial training that is relevant to your operational deficiencies.

**5.6.    Certified Trainers.** Each clinic you operate must have a minimum of two (2) Corporate Certified Trainers (one Wellness Consultant and one Hydrocare Provider) at all times. Each corporate certified trainer must (i) successfully complete all training courses we require; (ii) pass all applicable testing; and (iii) have sufficient availability, knowledge, and physical ability to train new staff members on an ongoing basis.

**5.7.    Conferences.** We may hold periodic national or regional conferences to discuss various business issues and operational and general business concerns affecting Vida-Flo franchisees. Attendance at these

conferences is mandatory. We may charge you up to $750 for each person that attends, or is required to attend, a conference. This fee is due 10 days after invoicing.

**5.8.** **Training Fees and Expenses.** You are responsible for all food, lodging and travel costs that your Owners and employees incur while attending any training program or conference. We may charge you a training fee of $500 per day for all training specified in this Agreement other than the pre-opening initial training program specified in Section 5.1 (unless you require more than three (3) days of initial onsite training and assistance). In addition, if we agree to provide any on-site training at your Clinic (other than the on-site training specified in Section 5.1), you must also reimburse us for all costs that we incur for food, lodging and travel. The fee and expense reimbursements, if applicable, are due 10 days after invoicing.

## 6.    OTHER FRANCHISOR ASSISTANCE.

**6.1.** **Manual.** During the Term, we will lend you our confidential Brand Standards Manual (the "Manual") in text or electronic form. The Manual will help you establish and operate your Business. The information in the Manual is confidential and proprietary and may not be disclosed to third parties without our prior approval.

**6.2.** **Startup Package**. Before opening, we will deliver to you the following items (collectively, your "Startup Package"): your interior decorating package; reception desk; certain of your Clinic electronics; integrated software platform: Vida-Flo Central Office; initial inventory of medications and vitamins; initial inventory of recurring medical supplies; initial inventory of retail and promotional items; certain medical equipment; and office and miscellaneous Clinic supplies. You will purchase the Startup Package from our affiliate. You agree to pay our affiliate's current pricing for the Startup Package. Upon request, we will provide you with an itemized breakdown of the components of the Startup Package together with the associated cost. The purchase price is nonrefundable. The contents and pricing of our Startup Package may change at any time.

**6.3.** **Treatment Chairs**. Before opening, we will lease to you 12 treatment chairs for use at your Clinic in partial consideration of the initial franchise fee. You must follow our instructions regarding proper upkeep and maintenance of the treatment chairs at your sole expense. If you fully comply with your obligations under this Agreement for the entire Term, we will transfer ownership of these chairs to you at no additional charge upon the expiration of the Term. If this Agreement is terminated by either party prior to the expiration of the Term, or at any time that you are in default, we may, upon written notice to you, repossess the treatment chairs leased from us. You agree to cooperate with our instructions for packing and shipment of the treatment chairs to our designated warehouse or other location for storage of the chairs. If you require additional treatment chairs beyond the 12 leased to you (including replacements of treatment chairs leased from us that are damaged or destroyed), then you must purchase them from our affiliate at then-current pricing. If any treatment chair leased to you is damaged or destroyed, you must reimburse us for our cost to acquire a replacement treatment chair of comparable quality. Any such reimbursement will be due 10 days after invoicing.

**6.4.** **Online Store**.  We will provide you with access to our affiliate's online store for purposes of purchasing certain inventory items, marketing materials, merchandise, operating equipment and supplies.

**6.5.** **General Guidance.** Based upon our periodic inspections of your Clinic or reports that you submit to us, we will provide our guidance and recommendations on ways to improve the marketing and/or operation of your Clinic. From time to time, we will also conduct periodic telephonic meetings or conference calls, which may consist of group calls with other franchisees or one-on-one calls with you. You must participate in all telephonic meetings and conference calls that we designate as mandatory.

**6.6.** **Marketing Assistance.** As further described in Section 11.2, we will provide you with certain marketing assistance during the Term.

**6.7.** **Website.** We will maintain a website for Vida-Flo franchisees that will include the information

3

about your Clinic that we deem appropriate. We may modify the content of and/or discontinue the website at any time in our sole discretion. Throughout the Term, we will also provide you with your own local webpage that will be linked to our main website. Your webpage will include localized information about your Clinic, such as address, hours of operation, contact information, staff bios, etc. We must approve all content on your webpage, but we will consider all information that you suggest in good faith. We will own the website (including your webpage) and domain name at all times. You are not permitted to establish, own, operate, or conduct any marketing using the Vida-Flo name, marks, design elements, or likeness on any website or internet domain without our written approval.

  **6.8.**   **Email Addresses.** At no additional charge, we will provide you with one or more Vida-Flo email addresses for use with your Business. You must exclusively use the email address or addresses that we provide for all communications with us, customers, suppliers and other persons relating to your Business. You may not use any email address that we provide to you for any purpose unrelated to your Business. We will own the email addresses and the account but will allow you to use them during the term of your franchise.

  **6.9.**   **Purchase Agreements.** We may, but need not, negotiate purchase agreements with suppliers to obtain discounted prices for us and our franchisees. If we succeed in negotiating a purchase agreement, we will arrange for you to be able to purchase the goods directly from the supplier at the discounted prices that we negotiate (subject to any rebates the supplier pays to us). We (or our affiliate) may also purchase certain items from suppliers in bulk (such as recurring medical and non-medical supplies necessary for the ongoing operation of your Clinic) and resell them to you at cost plus a markup not to exceed 13% of our affiliate's cost associated with the item (this cost includes invoiced price from the supplier including and discounts, shipping costs, taxes, fulfillment manager fees, associated credit card fees and webstore maintenance fees).

  **6.10.**   **Research and Development.** We may, but need not, create branded merchandise and other retail items for resale at your Clinic. If we develop any of these products, you agree to maintain a reasonable inventory of these items at your Clinic at all times. From time to time, we may also research and develop new treatments, formulations or services that may be offered at Vida-Flo clinics. We will advise you of all new authorized products and services that you may offer.

**7.**   **ESTABLISHING YOUR VIDA-FLO CLINIC**

  **7.1.**   **Site Selection**.  You agree to locate and obtain our approval of the premises from which you will operate your Clinic within 90 days after the Effective Date. The premises must be located within the Site Selection Area identified in Part B of <u>ATTACHMENT "B"</u> (the "<u>Site Selection Area</u>") and must conform to our minimum site selection criteria. You must send us a complete site report (containing the demographic, commercial and other information, photographs and video tapes that we may reasonably require) for your proposed site. You must also contract with our designated site selection company to review your proposed sites to confirm whether they meet our minimum requirements. You must use our designated real estate brokerage company (or another broker that you propose and we approve) to assist you in finding potential sites and negotiating your lease. We have the right to accept or reject all proposed sites in our commercially reasonable judgment. We will use our best efforts to approve or disapprove a proposed site within 30 days after we receive all of the requisite materials. Your site is deemed disapproved if we fail to issue our written approval within the 30-day period. If we have approved the site for your Clinic prior to execution of this Agreement, then the address of the approved site will be listed in <u>Part C</u> of <u>ATTACHMENT "B"</u>. If we have not approved your site for your Clinic prior to execution of this Agreement, then within 15 days after we approve your site, we will send you the Site Approval Notice that will identify the approved site for your Clinic. Within five (5) business days after we send you the Site Approval Notice, you must sign and date the franchisee acknowledgement section of the Site Approval Notice and send us a copy for our records. Our approval of the site, and our designation of your Territory, in the Site Approval Notice shall be deemed immediately effective and binding on you at the time we issue such notice, regardless of whether you sign and/or send us the signed acknowledgement. You understand that our approval of a site does not constitute a representation or warranty of any kind, express or implied, of the suitability of the site for a Vida-Flo clinic. Our approval of the site indicates only that we believe the site meets our minimum criteria.

4

**7.2.**     **Lease**.  If you will lease the premises for your Vida-Flo clinic, you must use your best efforts to ensure your landlord signs the Lease Addendum that is attached to this Agreement as ATTACHMENT "D". If your landlord refuses to sign the Lease Addendum in substantially the form attached to this Agreement, we have the right to disapprove your lease in our commercially reasonable judgment, in which case you must find a new site for your Vida-Flo clinic. You must obtain our approval of your lease within 45 days after we approve your site. You must promptly send us a copy of your fully executed lease and Lease Addendum for our records.

**7.3.**     **Construction.**  You must hire an architect to prepare the plans for your Clinic. The plans must comply with all of the standards and specifications set forth in the Manual. Your architect must also ensure that your plans comply with all local ordinances, building codes, permits requirements, and lease requirements and restrictions applicable to the premises. You must submit the final plans to us for approval. Once approved, you must, at your sole expense, construct and equip the premises to the specifications contained in the Manual and purchase (or lease) and install the equipment, fixtures, signs and other items that we require. You acknowledge these requirements are necessary and reasonable to preserve the identity, reputation and goodwill we developed and the value of the franchise. Before you open, we must approve the layout of your Clinic.

**7.4.**     **Opening**.  You must open your Business to the public within 180 days after the Effective Date. You may not open your Business before: (i) successful completion of the initial training program by your Managing Owner and initial managers; (ii) you purchase all required insurance; (iii) you obtain all required licenses, permits and other governmental approvals; (iv) a state medical board licensed Medical Director who has been approved by us has been on your staff for a minimum of two (2) weeks and (v) we provide our written approval of the construction, build-out and layout of your Clinic. You must send us a written notice identifying your proposed opening date at least 30 days before opening. We may conduct a pre-opening inspection of your Clinic and you agree to make any changes we require before opening. BY VIRTUE OF OPENING YOUR BUSINESS, YOU ACKNOWLEDGE THAT WE HAVE FULFILLED ALL OF OUR PRE-OPENING OBLIGATIONS TO YOU.

**7.5.**     **Relocation.**  You may relocate your Clinic with our prior written approval, which we will not unreasonably withhold. If we allow you to relocate, you must: (i) locate your new Clinic within the Site Selection Area (but outside any territory granted to us, our affiliate or any other franchisee); (ii) comply with Sections 7.1 through Section 7.4 of this Agreement with respect to your new Clinic (excluding the 180-day opening period); and (iii) open your new Clinic and resume operations within 30 days after closing your prior Clinic. The radius of your territory may be adjusted based on the classification of the area in which your new Clinic is located.

**8.**     **MANAGEMENT AND STAFFING.**

**8.1.**     **Owner Participation.**  You acknowledge that a major requirement for the success of your Business is the active, continuing, and substantial personal involvement and hands-on supervision by your Managing Owner. The Managing Owner must at all times be actively involved in the operation of the Business on a full time basis and provide on-site management and supervision unless you delegate management functions to a manager. Any new Managing Owner that we approve must successfully complete the initial training program. The Managing Owner will be the designated representative of the franchise group and primary contact for communications, directives, and area marketing initiatives between your Clinic and the corporate support staff.

**8.2.**     **Managers.**  You may hire a manager to assume responsibility for the daily on-site management and supervision of your Clinic, but only if: (i) the manager successfully completes the initial training program; (ii) the manager signs a Noncompetition Agreement; and (iii) the Managing Owner agrees to assume responsibility for the on-site management and supervision of your Clinic if the manager is unable to perform his or her duties due to death, disability, termination of employment, or for any other reason, until such time that you obtain a suitable replacement manager. Your Managing Owner is responsible for supervising your managers to ensure they manage your Clinic in accordance with the Franchise Agreement and Manual.

**8.3.**     **Caregivers.**  You must employ or contract with a head licensed medical doctor who is authorized

5

under the laws of your state to administer the medical treatments and perform the medical procedures offered at your Clinic ("<u>Medical Director</u>"). Under the direction of the Medical Director, you must also employ or contract with a licensed medical professional who is authorized under the laws of your state to administer the medical treatments and perform the medical procedures offered at your Clinic. You represent and warrant that you or your Owners are licensed medical professionals or you have employed or entered into agreements with licensed medical professionals in compliance with applicable law to perform all medical treatments and procedures in connection with your Clinic. You understand that compliance with applicable law may involve entering into a management services agreement, rental agreement or similar agreement and that you may be required to hire a licensed healthcare attorney to assist you in structuring these relationships. We strongly recommend that you engage a healthcare attorney to provide this advice before purchasing the franchise. You, through your personnel, are solely responsible for, and have complete authority, responsibility, supervision and control over, the provision of all medical treatments and procedures performed for patients at your Clinic, including, all diagnoses, treatments, procedures and other professional health care services, as such personnel deem appropriate in their discretion. You will determine the assignments and scheduled hours of work for your caregivers. You must cause such personnel to provide the medical treatments in full compliance with applicable standards, laws, rules and regulations. Your Medical Director shall have the sole discretion regarding the method and manner in which you (if licensed to do so) and your caregivers provide the medical treatments and procedures, including, without limitation: (a) determining what diagnostic tests are appropriate; (b) determining the need for referrals to or consultation with another medical professional or specialist; (c) responsibility for the ultimate overall care of the patient, including treatment options available to the patient; and (d) determining how many patients you will see in a given period of time or how many hours you or the licensed medical professionals you employ must work. We shall not in any way control or exert any influence over, nor shall we have the right to control or exert any influence over, either your professional judgment or the professional judgment of any licensed medical professionals that you employ or retain pertaining to provision of medical treatments and procedures. You acknowledge that our franchise training and support programs shall not include any training or support regarding the approved medical treatments or procedures.

      **8.4.**    **<u>Other Employees.</u>** You must determine appropriate staffing levels for your Business to ensure full compliance with this Agreement and our system standards. You may hire, train, and supervise employees to assist you with the proper operation of the Business. You must pay all wages, commissions, fringe benefits, worker's compensation premiums and payroll taxes (and other withholdings required by law) due for your employees. These employees will be employees of yours and not of ours. We do not control the day to day activities of your employees or the manner in which they perform their assigned tasks. You must inform your employees that you exclusively supervise their activities and dictate the manner in which they perform their assigned tasks. In this regard, you must use your legal business entity name (not our Marks or a fictitious name) on all employee applications, paystubs, pay checks, employment agreements, time cards, and similar items. We also do not control the hiring, firing or disciplining of your employees. We will not provide you any advice or guidance on these matters. You must also post a conspicuous notice for employees in the back-of-the-house area explaining your franchise relationship with us and that you (and not we) are the employee's sole employer. We may prescribe the form and content of this notice.  You must also hire employees to fill each key position as specified in the Manual.

**9.**    **FRANCHISEE AS ENTITY**. If you are an Entity, you represent that Part A of <u>ATTACHMENT "B"</u> includes a complete and accurate list of all of your Owners. Upon our request, you must provide us with a resolution of the Entity authorizing the execution of this Agreement, a copy of the Entity's organizational documents and a current Certificate of Good Standing (or the functional equivalent thereof). You represent that the Entity is duly formed and validly existing under the laws of the state of its formation or incorporation.

. If you are an Entity, all Owners (whether direct or indirect) must sign a Franchise Owner Agreement, the current form of which is attached as <u>ATTACHMENT "E"</u>.

11.      **ADVERTISING & MARKETING.**

11.1.    **Brand and System Fund.**

(a)      <u>Administration</u>. We may, but need not OR will establish and maintain a brand and system development fund to promote public awareness of our brand and to improve our System. We may use the fund to pay for any of the following in our sole discretion: (i) developing, maintaining, administering, directing, preparing, or reviewing advertising and marketing materials, promotions and programs; (ii) conducting and administering promotions, contests or giveaways; (iii) public awareness of any of the Marks; (iv) public and consumer relations and publicity; (v) brand development; (vi) research and development of technology, products and services; (vii) website development and search engine optimization; (viii) development and implementation of quality control programs, including the use of mystery shoppers or customer satisfaction surveys; (viii) conducting market research; (ix) changes and improvements to the System; (x) the fees and expenses of any advertising agency we engage to assist in producing or conducting advertising or marketing efforts; (xi) collecting and account for contributions to the fund; (xii) preparing and distributing financial accountings of the fund; (xiii) any other programs or activities that we deem necessary or appropriate to promote or improve the System; and (xiv) our and our affiliates' expenses associated with direct or indirect labor, administrative, overhead or other expenses incurred in relation to any of these activities We have sole discretion in determining the content, concepts, materials, media, endorsements, frequency, placement, location and all other matters pertaining to any of the foregoing activities. Any surplus of monies in the fund may be invested and we may lend money to the fund if there is a deficit. The fund is not a trust and we have no fiduciary obligations to you with respect to our administration of the fund. A financial accounting of the operations of the fund, including deposits into and disbursements from the fund, will be prepared annually and made available to you upon request. In terms of marketing activities paid for by the fund, we do not ensure that these expenditures in or affecting any geographic area are proportionate or equivalent to the fund contributions by franchisees operating in that geographic area or that any franchisee benefits directly or in proportion to their fund contributions. Once established, we reserve the right to discontinue the fund at any time in our sole discretion upon at least 30 days' prior notice.

(b)      <u>Contributions</u>. If we establish the brand and system development fund, then you must pay us a monthly brand and system development system fee in the amount that we specify from time to time (not to exceed 2% of your Gross Revenues). The brand and system development fund fee will be payable at the same time and in the same manner as the royalty fee. We will deposit into the fund all: (i) fund contributions paid by you and other franchisees; and (ii) fines paid by you and other franchisees.

11.2.    **Marketing Assistance From Us.** We will provide you with our recommended marketing plan for your Business. The marketing plan will be included in the Manual. We may create and make available to you advertising and other marketing materials for your purchase through our online store. We may use the brand and system development fund to pay for the creation and distribution of these materials, in which case there will be no additional charge. We may make these materials available over the Internet (in which case you must arrange for printing the materials using our quality specifications and paying all printing costs). Alternatively, we may enter into relationships with third party suppliers who will create the advertising or marketing materials for your purchase. We will provide reasonable marketing consulting, guidance and support throughout the Term on an as-needed basis. We may enter your Clinic premises at any time, upon reasonable notice to you, for the purpose of photographing the interior and/or exterior of your Clinic for promotional purposes. You must cooperate with our representatives for these purposes and in obtaining photo releases from employees and other individuals, if necessary. Photographs of the interior or exterior of your Clinic may be included in any promotional materials we develop or distribute without your consent or any payment to you.

11.3.    **Your Marketing Activities**.

(a)      <u>Generally</u>. In addition to your required contribution to the brand and system development fund, you must spend, on a monthly basis, an amount equal to the greater of $500 or 2% of your Gross Revenues on local advertising to promote your Clinic. We must approve all such advertising in accordance with <u>Section</u>

11.3(d). You agree to participate at your own expense in all advertising, promotional and marketing programs that we require, including any advertising cooperative that we establish pursuant to Section 11.4.  You also agree to comply with any gift card program that we establish, the specific terms of which may be set forth in the Manual.

(b)    Grand Opening. During the period beginning 30 days before opening and ending 90 days after opening, you must spend a total of at least $10,000 on advertising and other marketing activities to promote the grand opening of your Business. We will assist you in developing your grand opening marketing campaign. We must approve your grand opening event and all related promotional activities in accordance with Section 11.3(d).

(c)    Standards for Advertising. All advertisements and promotions that you create or use must be completely factual and conform to the highest standards of ethical advertising and comply with all federal, state and local laws. You must ensure that your advertisements and promotional materials do not infringe upon the intellectual property rights of others. We reserve the right to require that you comply with any minimum advertised pricing policy that we establish from time to time. You must follow any policies that we establish from time to time governing a franchisee's right to engage in marketing or advertising outside of the franchisee's territory.

(d)    Approval of Advertising. Before you use them, we must approve all advertising and promotional materials that we did not prepare or previously approve (including materials that we prepared or approved and you modify). We will be deemed to have disapproved the materials if we fail to issue our approval within 15 days after receipt. You may not use any advertising or promotional materials that we have disapproved (including materials that we previously approved and later disapprove).

(e)    Internet and Websites. You may market your Clinic through approved social media channels in accordance with our social media policy. We may require that you utilize our designated supplier for social media marketing services. At this time, we do not allow our franchisees to maintain their own websites (other than the localized webpage that we provide) or market their Vida-Flo clinics on the Internet (other than through approved social media outlets). Accordingly, you may not maintain a website, conduct e-commerce, or otherwise maintain a presence or advertise on the Internet or any other public computer network in connection with your Business. If we change our policy at a later date to allow franchisees to maintain their own websites or market on the Internet, you may do so only if you comply with all of the website and Internet requirements that we specify. In that case, we may require that you sign an amendment to this Agreement that will govern your ability to maintain a website and/or market on the Internet.

**11.4.    Advertising Cooperative.** We have the right, but not the obligation, to create one or more advertising cooperatives for the purpose of creating and/or purchasing advertising programs for the benefit of all franchisees operating within a particular region. We have the right to: (i) determine the composition of all geographic territories and market areas for each advertising cooperative; and (ii) require that you participate in any advertising cooperative if and when established by us. If we implement an advertising cooperative, we may establish an advertising council to self-administer the advertising cooperative. You must participate in the council according to the council's rules and procedures and you must abide by the council's decisions.  Alternatively, we may administer the advertising cooperative ourselves. We reserve the right to form, change, merge or dissolve advertising cooperatives in our discretion. You must pay the monthly cooperative advertising fee established by us or the council, as applicable, which will be payable at the same time and in the same manner as the royalty fee. The cooperative advertising fee shall not exceed 2% of your Gross Revenues. Upon the majority vote of all franchisees within the advertising cooperative, the amount of the cooperative advertising fee may be adjusted (or temporarily suspended). All cooperative advertising fees that you pay will be credited against your minimum local marketing expenditure requirement set forth in Section 11.3(a). If we or an affiliate of ours operate a majority of the Vida-Flo clinics within the advertising cooperative, we will increase the cooperative advertising fee only with the consent of a majority of all third-party franchisees within the advertising cooperative. We will collect all cooperative advertising fees and pay them to the applicable advertising cooperative unless we administer the advertising cooperative ourselves.

12.    **OPERATING STANDARDS.**

12.1.    <u>Generally</u>. You agree to operate your Business: (i) in a manner that will promote the goodwill of the Marks; and (ii) in full compliance with our standards and all other terms of this Agreement and the Manual.

12.2.    <u>Brand Standards Manual</u>. You agree to establish and operate your Clinic in accordance with the Manual. The Manual may contain, among other things: (i) a description of the authorized goods and services that you may offer at your Clinic; (ii) mandatory and suggested specifications, operating procedures, and quality standards for products, services and procedures that we prescribe from time to time for Vida-Flo franchisees; (iii) mandatory reporting and insurance requirements; (iv) mandatory and suggested specifications for your Clinic; (v) policies and procedures pertaining to the membership program and gift card sales; and (vi) a written list of goods and services (or specifications for goods and services) you must purchase for the construction, development and operation of your Clinic and a list of any designated, approved or preferred suppliers for these goods or services. The Brand Standards Manual is designed to establish and protect our brand standards and the uniformity and quality of the goods and services offered by our franchisees. We can modify the Manual at any time. The modifications will become binding 30 days after we send you notice of the modification. All mandatory provisions contained in the Manual (whether they are included now or in the future) are binding on you.

12.3.    <u>Authorized Goods and Services</u>. You agree to offer all goods and services that we require from time to time in our commercially reasonable discretion. You may not offer any other goods or services at your Clinic without our prior written permission. Your request for approval must be submitted at least 10 business days prior to offering the new good or service. You may not use your Clinic or permit your Clinic to be used for any purpose other than offering the goods and services that we authorize. We may, without obligation to do so, add, modify or delete authorized goods and services, and you must do the same upon notice from us. Our addition, modification or deletion of one or more goods or services shall not constitute a termination of the franchise or this Agreement. You may not offer services through "on-line marketplaces", including but not limited to; Groupon, eBay, Amazon, Facebook Marketplace, or Craigslist.

12.4.    <u>Pricing</u>. We will provide you with our suggested retail pricing. You may deviate from our suggested retail pricing in your discretion. However, we must approve any deviation that is more than 10% higher or lower than our suggested retail pricing, unless such pricing is part of a temporary advertising campaign that we have approved. You must comply with any minimum advertised pricing policy that we implement pursuant to Section 11.3(c). To the extent permitted by applicable law, we may set maximum or minimum prices on the goods and services you offer.

12.5.    <u>Suppliers and Purchasing</u>. You agree to purchase or lease all products, supplies, equipment, services and other items specified in the Manual from time to time. If required by the Manual, you agree to purchase certain goods and services only from suppliers designated or approved by us (which may include, or be limited exclusively to, us or our affiliate). You acknowledge that our right to specify the suppliers that you may use is necessary and desirable so that we can control the uniformity and quality of goods and services used, sold or distributed in connection with the development and ongoing operation of Vida-Flo clinics, maintain the confidentiality of our trade secrets, obtain discounted prices for our franchisees if we choose to do so, and protect the reputation and goodwill associated with the System and the Marks. If we receive rebates or other financial consideration from these suppliers based upon franchisee purchases, we have no obligation to pass these amounts on to you or to use them for your benefit. If you want us to approve a supplier that you propose, you must send us a written notice specifying the supplier's name and qualifications and provide any additional information that we request. We will approve or reject your request within 30 days after we receive your notice and all additional information (and samples) that we require. We shall be deemed to have rejected your request if we fail to issue our approval within the 30-day period. You must reimburse us for all costs and expenses that we incur in reviewing a proposed supplier within 10 days after invoicing.

12.6.    <u>Equipment Maintenance and Changes</u>. You agree to maintain all of your equipment in good condition and promptly replace or repair any equipment that is damaged, worn-out or obsolete. Without limiting

the generality of the foregoing, all oxygen related equipment must be inspected and/or serviced on an annual basis. We may require that you change your equipment, which may require you to make additional investments. You acknowledge that our ability to require franchisees to make significant changes to their equipment is critical to our ability to administer and change the System and you agree to comply with any such required change within the time period that we reasonably prescribe.

### 12.7.   **Technology Systems.**

(a)   <u>Generally</u>. You must acquire and utilize all information and communication technology systems that we specify from time to time, including, without limitation, computer systems, webcam systems, telecommunications systems, security systems, music systems and similar systems, together with the associated hardware, software (including cloud-based software) and related equipment, software applications, mobile apps, and third-party services relating to the establishment, use, maintenance, monitoring, security or improvement of these systems (collectively referred to as the "<u>Technology Systems</u>"). The Technology Systems may relate to matters such as purchasing, pricing, accounting, order entry, inventory control, security, information storage, retrieval and transmission, customer information, customer loyalty, marketing, communications, copying, printing and scanning, or any other business purpose that we deem appropriate. We may require that you, at your expense, acquire new or substitute Technology Systems, and/or replace, upgrade or update existing Technology Systems, upon reasonable prior notice.

(b)   <u>Use and Access</u>. You must utilize your Technology Systems in accordance with the Manual. You may not load or permit any unauthorized programs or games on your Technology Systems. You must ensure that your employees are adequately trained in the use of the Technology Systems. You agree to take all steps necessary to enable us to have independent and unlimited access to the operational data collected through your Technology Systems, including information regarding your Gross Revenues for purposes of calculating fees owed. Upon our request, you agree to provide us with the user IDs and passwords for your Technology Systems, including upon termination or expiration of this Agreement.

(c)   <u>Disruptions</u>. You are solely responsible for protecting against computer viruses, bugs, power disruptions, communication line disruptions, internet access failures, internet content failures, date-related problems, and attacks by hackers and other unauthorized intruders. Upon our request, you must obtain and maintain cyber insurance and business interruption insurance for technology disruptions.

(d)   <u>Fees and Costs</u>. You are responsible for all fees, costs and expenses associated with acquiring, licensing, utilizing, updating and upgrading the Technology Systems. Certain components of the Technology Systems must be purchased or licensed from third party suppliers. We and/or our affiliate may develop proprietary software, technology or other components of the Technology Systems that will become part of our System. If this occurs: (i) you agree to pay us (or our affiliate) commercially reasonable licensing, support and maintenance fees; and (ii) upon our request, you agree to enter into a license agreement with us (or our affiliate) in a form that we prescribe governing your use of the proprietary software, technology or other component of the Technology Systems. We also reserve the right to enter into master agreements with third-party suppliers relating to any components of the Technology Systems and then charge you for all amounts that we must pay to these suppliers based upon your use of the software, technology, equipment, or services provided by the suppliers (including amounts we must pay to the licensor plus a markup that we keep). The "technology fee" includes all amounts that you must pay us or our affiliates relating to the Technology Systems, including amounts paid for proprietary items and amounts that we collect from you and remit to third-party suppliers based on your use of their systems, software, technology or services. The amount of the technology fee may change based upon changes to the Technology Systems or the prices charged by third-party suppliers with whom we enter into master agreements. The technology fee does not include any amounts that you directly pay to third party suppliers for any component of the Technology Systems. The technology fee is due 10 days after invoicing or as otherwise specified by us from time to time.  As of the Effective Date, we (or an affiliate of ours) charge you a $1,250 monthly technology fee. You must also pay a $3,000 one-time setup and implementation fee for our program. The $3,000 one-time setup and implementation fee includes the first $1,250 monthly technology fee. All fees

referenced in this Section are due on the 1st business day of each month (or as otherwise specified by us from time to time).

**12.8.** __Remodeling and Maintenance__. You agree to remodel and make all improvements and alterations to your Clinic that we reasonably require from time to time to reflect our then-current image, appearance and clinic specifications. There are no limitations on the cost or frequency of these remodeling obligations. You may not remodel or significantly alter your premises without our prior written approval, which will not be unreasonably withheld. However we will not be required to approve any proposed remodeling or alteration if the same would not conform to our then-current specifications, standards or image requirements. You agree to maintain your Clinic in good order and condition, reasonable wear and tear excepted, and make all necessary repairs, including replacements, renewals and alterations, at your sole expense, to comply with our standards and specifications. Without limiting the generality of the foregoing, you agree to take the following actions at your sole expense: (i) thorough cleaning, repainting, redecorating of the interior and exterior of your facility at the intervals we may prescribe (or at such earlier times that such actions are required or advisable); and (ii) interior and exterior repair of the facility as needed. You agree to comply with any maintenance, cleaning or clinic upkeep schedule that we prescribe from time to time.

**12.9.** __Gift Card and Loyalty Programs__. We may require that you participate in a gift card or other customer loyalty program (including utilization of a "membership" model) in accordance with our policies and procedures. In order to participate, you may be required to purchase and utilize additional equipment, software and/or Apps and pay fees relating to the use of that equipment, software and/or Apps. If we establish a gift card or loyalty program, we have the right to determine how the proceeds from the sale of gift cards and/or membership fees will be divided or otherwise accounted for, and we reserve the right to retain the amount of any unredeemed gift cards. You agree to comply with all policies and procedures that we specify from time to time relating to customers who purchase a membership or gift card at one clinic and redeem products or services from one or more other clinics. We may implement new software and/or Apps to monitor sales and allocate payments to the clinic where goods or services are redeemed (either in whole or on a percentage basis), in which case we may require that the customer pay us for membership fees or that the proceeds from gift card sales be deposited into a trust account that we control. You agree to comply with all policies and procedures that we specify and we may modify these policies and procedures at any time.

**12.10.** __Memberships__. All Vida-Flo clinics must honor membership purchases by Vida-Flo customers. A customer who purchases a membership from your Clinic is entitled to redeem their membership benefits and services, and if membership benefits have been utilized that month, receive discounted membership pricing, at another Vida-Flo clinic. Similarly, a customer who purchases a membership from another Vida-Flo clinic is entitled to redeem their membership benefits and services, and if membership benefits have been utilized that month, receive discounted membership pricing, at your Clinic. You agree to comply with all policies and procedures that we specify from time to time relating to customers who services from multiple clinics as part of a membership purchase.

**12.11.** __Membership Database__. You may offer and sell Vida-Flo Membership and Series Packages on our behalf to Vida-Flo customers within your Clinic and within your Territory using our Marks, brand value, and sales materials. You are compensated for your sales efforts by the revenues received minus applicable taxes and fees. All "memberships" are issued by us (in no specific format), and the information collected in association with memberships, including but not limited to, names, address, phone numbers, email, and social media related, is our property. This information is nontransferable and is not considered an asset or property of your individual Clinic.

**12.12.** __Membership Dues__. You are responsible for the monthly collection of dues associated with Vida-Flo Memberships sold through your Clinic. This includes maintaining current payment information for each associated member and pursuing collections on canceled, declined, or NSF transactions. Failure to properly maintain current collections may result in the addition of late fees (as described in __Section 13.4__) associated with the amount owed to us through applicable fees.

**12.13.  Hours of Operation.**  The standard hours of operation for a Vida-Flo clinic are Monday to Sunday from 10 a.m. until 7 p.m. You may request, or we may suggest, alternate hours of operation for your Clinic based on geographic location, which must be approved by us in writing prior to implementation.

**12.14.  Customer Complaints.** If you receive a complaint from a patient, you must follow the complaint resolution process that we specify to protect the goodwill associated with the Marks. You must send us an incident report of all customer related problems/concerns/complaints within five (5) days of the occurrence of the event. We reserve the right to centralize customer service of your location to an associate or third party if we find necessary.

**12.15.  Quality Assurance Programs**. At any time, we reserve the right to engage the services of one or more "mystery shoppers" or quality assurance inspection firms who will inspect Vida-Flo clinics for quality control purposes. These inspections may address a variety of issues, including customer service, safety, sanitation, inventory rotation, etc. You agree to fully cooperate with any such inspection. If we implement such a program, you may be invoiced directly by the mystery shopper or quality assurance firm for the services rendered. Alternatively, we may be invoiced by the mystery shopper or quality assurance firm, in which you must pay your proportional share of the total fee based on the number of open inspect Vida-Flo clinics owned by you as compared to the total number of all open inspect Vida-Flo clinics at the time of the program (including company and affiliate-owned clinics). You agree to pay us this fee within 10 days after invoicing.

**12.16.  Failure to Comply with Standards.**  You acknowledge the importance of every one of our standards and operating procedures to the reputation and integrity of the System and the goodwill associated with the Marks. If we notify you of a failure to comply with our standards or operating procedures and you fail to correct the non-compliance within the period of time that we require, then, in addition to any other remedies available to us under this Agreement, we may impose a fine of up to $500 per occurrence.

13.  **FEES**

**13.1.  Initial Franchise Fee.** You agree to pay us a $59,000 initial franchise fee in one lump sum at the time you sign this Agreement. The initial franchise fee is fully earned by us and non-refundable once this Agreement has been signed, except that we will refund $10,000 of the initial franchise fee if you and your Owners sign a General Release after we terminate this Agreement pursuant to: (i) Section 20.2(i) for failure to successfully complete the initial training program in a timely manner; (ii) Section 20.2(ii) for failure to obtain our approval of your site in a timely manner; or (iii) Section 20.2(iv) for failure to open your Clinic in a timely manner despite your diligent and good faith attempts to do so.

**13.2.  Royalty Fee.** On the 10th day of each month, you agree to pay us a royalty fee equal to 7% of your Gross Revenues from the prior month of operations.

**13.3.  Other Fees and Payments.** You agree to pay all other fees, expense reimbursements and other amounts specified in this Agreement in a timely manner as if fully set forth in this Section 13. You also agree to promptly pay us an amount equal to all taxes levied or assessed against us based upon goods or services that you sell or based upon goods or services that we furnish to you (other than income taxes that we pay based on amounts that you pay us under this Agreement).

**13.4.  Late Fee.** If any sums due under this Agreement have not been received by us when due (or there are insufficient funds in your Account to cover any sums owed to us when due) then, in addition to those sums, you must pay us interest on the amounts past due at the rate equal to the lesser of 1.5% per month, or the highest rate permitted by your State's law. If no due date has been specified by us, then interest begins to run 10 days after we bill you. We will not impose a late fee for any amounts paid pursuant to Section 13.5 if, but only to the extent that, sufficient funds were available in your Account to be applied towards the payments at the time the payments became due and payable. However, we may impose a late fee for any amounts that we are unable to reasonably determine due to your failure to furnish us with a report required by Section 15.3 within the required period of

time or record sales in a timely manner, in which case we may assess a late fee on the entire amount that was due and payable. You acknowledge that this Section 13.4 shall not constitute our agreement to accept the late payments after same are due, or a commitment by us to extend credit to or otherwise finance the operation of your Business.

**13.5.** **Method of Payment.** You must complete and send us an ACH Authorization Form allowing us to electronically debit a banking account that you designate (your "Account") for: (i) all fees payable to us pursuant to this Agreement (other than the initial franchise fee); and (ii) any amounts that you owe to us or any of our affiliates for the purchase of goods or services. We will debit your Account for these payments on or after the due date. Our current form of ACH Authorization Form is attached to this Agreement as ATTACHMENT "F". You must sign and deliver to us any other documents that we or your bank may require to authorize us to debit your Account for these amounts. You must deposit into the Account all revenues that you generate from the operation of your Business. You must make sufficient funds available for withdrawal by electronic transfer before each due date. If there are insufficient funds in your Account to cover all amounts that you owe, any excess amounts that you owe will be payable upon demand, together with any late charge imposed pursuant to Section 13.4 and all applicable banking fees associated with the failed transaction. Any payment made to us in any format other than ACH will be subject to a 5% processing fee.

**13.6.** **Application of Payments**. We have sole discretion to apply any payments from you to any past due indebtedness of yours or in any other manner we feel appropriate.

## 14.   RESTRICTIVE COVENANTS.

**14.1.** **Reason for Covenants**. You acknowledge that the Intellectual Property and the training and assistance that we provide would not be acquired except through implementation of this Agreement. You also acknowledge that competition by you, the Owners or persons associated with you or the Owners (including family members) could seriously jeopardize the entire franchise system because you and the Owners have received an advantage through knowledge of our day-to-day operations and Know-how related to the System. Accordingly, you and the Owners agree to comply with the covenants described in this Section to protect the Intellectual Property and our franchise system.

**14.2.** **Our Know-how**. You and the Owners agree: (i) neither you nor any Owner will use the Know-how in any business or capacity other than the operation of your Business pursuant to this Agreement; (ii) you and the Owners will maintain the confidentiality of the Know-how at all times; (iii) neither you nor any Owner will make unauthorized copies of documents containing any Know-how; (iv) you and the Owners will take all reasonable steps that we require from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you and the Owners will stop using the Know-how immediately upon the expiration, termination or Transfer of this Agreement, and any Owner who ceases to be an Owner before the expiration, termination or Transfer of this Agreement will stop using the Know-how immediately at the time he or she ceases to be an Owner.

**14.3.** **Unfair Competition During Term**. You and your Owners agree not to unfairly compete with us during the Term by engaging in any of the following activities ("Prohibited Activities"): (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in any Competitive Business, other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business; (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees), including any attempt to cause a Vida-Flo member to cancel their existing membership with another clinic and sign up as a member at your Clinic; or (iii) inducing any customer of ours (or of one of our affiliates or franchisees) to transfer their business to you or to any other person that is not then a franchisee of ours.

**14.4.** **Unfair Competition After Term**. During the Post-Term Restricted Period, you and your Owners agree not to engage in any Prohibited Activities. Notwithstanding the foregoing, you and your Owners may have an interest in a Competitive Business during the Post-Term Restricted Period as long as the Competitive Business is not located within, and does not provide competitive goods or services to customers who are located within, the

Restricted Territory. If you or an Owner engages in a Prohibited Activity during the Post-Term Restricted Period (other than having an interest in a Competitive Business that is permitted under this Section), then the Post-Term Restricted Period applicable to you or the non-compliant Owner, as applicable, shall be extended by the period of time during which you or the non-compliant Owner, as applicable, engaged in the Prohibited Activity.

14.5.   **Immediate Family Members**. The Owners acknowledge that they could circumvent the purpose of Section 14 by disclosing Know-how to an immediate family member (i.e., spouse, parent, sibling, child, or grandchild). The Owners also acknowledge that it would be difficult for us to prove whether the Owners disclosed the Know-how to family members. Therefore, each Owner agrees that he or she will be presumed to have violated the terms of Section 14 if any member of his or her immediate family engages in any Prohibited Activities during the Term or Post-Term Restricted Period or uses or discloses the Know-how. However, the Owner may rebut this presumption by furnishing evidence conclusively showing that the Owner did not disclose the Know-how to the family member.

14.6.   **Employees and Others Associated with You.** You must ensure that all of your employees, officers, directors, partners, members, independent contractors and other persons associated with you or your Business who may have access to our Know-how, and who are not required to sign a Noncompetition Agreement, sign and send us a Confidentiality Agreement before having access to our Know-how. You must use your best efforts to ensure that these individuals comply with the terms of the Noncompetition Agreements and Confidentiality Agreements, as applicable, and you must immediately notify us of any breach that comes to your attention. You agree to reimburse us for all reasonable expenses that we incur in enforcing a Noncompetition Agreement or Confidentiality Agreement, as applicable, including reasonable attorneys' fees and court costs.

14.7.   **Covenants Reasonable.** You and the Owners acknowledge and agree that: (i) the terms of this Agreement are reasonable both in time and in scope of geographic area; (ii) our use and enforcement of covenants similar to those described above with respect to other Vida-Flo franchisees benefits you and the Owners in that it prevents others from unfairly competing with your Business; and (iii) you and the Owners have sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms of this Agreement. **YOU AND THE OWNERS HEREBY WAIVE ANY RIGHT TO CHALLENGE THE TERMS OF THIS SECTION 14 AS BEING OVERLY BROAD, UNREASONABLE OR OTHERWISE UNENFORCEABLE.**

14.8.   **Breach of Covenants**. You and the Owners agree that failure to comply with the terms of this Section 14 will cause substantial and irreparable damage to us and/or other Vida-Flo franchisees for which there is no adequate remedy at law. Therefore, you and the Owners agree that any violation of the terms of this Section 14 will entitle us to injunctive relief. We may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, will be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000. None of the remedies available to us under this Agreement are exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages. Any claim, defense or cause of action that you or an Owner may have against us, regardless of cause or origin, cannot be used as a defense against our enforcement of this Section 14.

## 15.   YOUR OTHER RESPONSIBILITIES

15.1.   **Insurance.** For your protection and ours, you agree to maintain the following insurance policies: (i) "all risk" property insurance coverage on all assets, including inventory, furniture, fixtures, equipment, supplies and other property used in the operation of your Business, which must include coverage for fire, vandalism and malicious mischief and have coverage limits of at least full replacement cost; (ii) comprehensive general liability insurance against claims for bodily and personal injury, death and property damage caused by or occurring in conjunction with the operation of your Clinic, containing minimum liability protection of $1,000,000 combined

single limit per occurrence, and $3,000,000 in the aggregate; (iii) medical malpractice insurance against claims for bodily and personal injury and death caused by or occurring in conjunction with the operation of your Clinic, containing minimum liability protection of $1,000,000 combined single limit per occurrence, and $3,000,000 in the aggregate; (iv) automobile liability and property damage insurance covering all loss, liability, claim or expense of any kind whatsoever resulting from the use, operation, or maintenance of any automobiles or motor vehicles, owned, leased, or used by you, or your officers, directors, employees, partners or agents, in the operation of your Business, containing minimum liability protection of $1,000,000 combined single limit per occurrence; (v) worker's compensation insurance and employer's liability insurance as required by law; and (vi) any other insurance that we specify in the Manual from time to time. You agree to provide us with proof of coverage prior to opening, within 10 days of any renewal of a policy and at any other time on demand. You agree to obtain these insurance policies from insurance carriers that are rated A or better by Alfred M. Best & Company, Inc. and that are licensed and admitted in the state in which you operate your Clinic. All insurance policies must endorsed to: (i) name us (and our members, officers, directors, and employees) as additional insureds; (ii) contain a waiver by the insurance carrier of all subrogation rights against us; and (iii) provide that we receive 10 days prior written notice of the termination, expiration, cancellation or modification of the policy. If any of your policies fail to meet these criteria, then we may disapprove the policy and you must immediately find additional coverage with an alternative carrier satisfactory to us. Upon 10 days' notice to you, we may increase the minimum protection requirement as of the renewal date of any policy, and require different or additional types of insurance at any time, including excess liability (umbrella) insurance, to reflect inflation, identification of special risks, changes in law or standards or liability, higher damage awards or other relevant changes in circumstances. If you fail to maintain any required insurance coverage, we have the right to obtain the coverage on your behalf (which right shall be at our option and in addition to our other rights and remedies in this Agreement), and you must promptly sign all applications and other forms and instruments required to obtain the insurance and pay to us, within 10 days after invoicing, all costs and premiums that we incur.

     **15.2.**   **Books and Records.** You agree to prepare and maintain at your Clinic for at least five (5) years after their preparation, complete and accurate books, records, accounts and tax returns pertaining to your Business. You must maintain, and upon our request furnish to us by e-mail, mail or facsimile, a written list of all of your patients. You must send us copies of your books and records within seven (7) days of our request.

     **15.3.**   **Reports.** On the day of each month that we specify, you must prepare and provide to us monthly statements of: (i) your Gross Revenues and expenses for the prior month's operations; and (ii) your expenditures on local advertising required by Section 11.3 that were incurred during the prior month (which shall be accompanied by copies of receipts for such expenditures). You also agree to prepare all other reports that we require in the form and manner that we require. You agree to send us a copy of any report required by this Section upon request. If we require that you purchase a computer and/or automated cash management system that allows us to electronically retrieve information concerning your sales transactions, you agree that we will have the right to electronically poll your computer and/or automated cash management system to retrieve and compile information regarding the operation of your Business.

     **15.4.**   **Financial Statements.** Within 90 days after the end of each calendar year, you must prepare a balance sheet for your Business (as of the end of the calendar year) and an annual statement of profit and loss and source and application of funds. All financial statements must be: (i) verified and signed by you certifying to us that the information is true, complete, and accurate; (ii) prepared on an accrual basis in compliance with Generally Accepted Accounting Principles; and (iii) submitted in any format that we reasonably require. We have the right to require that your financial statements be audited by a certified public accountant if you have previously provided any materially inaccurate financial statements. You agree to send us a copy of any financial statement required by this Section upon request. You authorize us to disclose the financial statements, reports, and operating data to prospective franchisees, regulatory agencies and others at our discretion, provided the disclosure is not prohibited by applicable law.

     **15.5.**   **Legal Compliance.** You must secure and maintain in force all required licenses, permits and regulatory approvals for the operation of your Business and operate and manage your Business in full compliance

with all applicable laws, ordinances, rules and regulations. You must notify us in writing within two (2) business days of the beginning of any action, suit, investigation or proceeding, or of the issuance of any order, writ, injunction, disciplinary action, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation of your Business or your financial condition. You must immediately deliver to us a copy of any inspection report, warning, certificate or rating by any governmental agency involving any health or safety law, rule or regulation that reflects your failure to fully comply with the law, rule or regulation.

16.    **INSPECTION AND AUDIT**

16.1.    **Inspections.** To ensure compliance with this Agreement, we or our representatives will have the right to enter your Clinic, evaluate your operations and inspect or examine your books, records, inventory, computer system, accounts and tax returns. Our evaluation may include watching your provision of services and contacting your landlord, patients and caregivers/employees. We may conduct our evaluation at any time and without prior notice. During the course of our inspections, we and our representatives will use reasonable efforts to minimize our interference with the operation of your Business, and you and your employees will cooperate and not interfere with our inspection. You consent to us accessing your computer system (either in person or through remote connection) and retrieving any information that we deem appropriate in conducting the inspection.

16.2.    **Audit.** We have the right, at any time, to have an independent audit made of your books and financial records. You agree to fully cooperate with us and any third parties that we hire to conduct the audit. If an audit reveals an understatement of your Gross Revenues or any amount that you owe us, you agree to immediately pay to us any additional fees that you owe us together with any late fee payable pursuant to Section 13.4. Any audit will be performed at our cost and expense unless the audit: (i) is necessitated by your failure to provide the information requested or to preserve records or file reports as required by this Agreement; or (ii) reveals an understatement of any amount due to us by at least three percent (3%), in which case you agree to reimburse us for the cost of the audit or inspection, including without limitation, reasonable accounting and attorneys' fees and travel and lodging expenses that we or our representatives incur. The audit cost reimbursements will be due 10 days after invoicing. We shall not be deemed to have waived our right to terminate this Agreement by accepting reimbursements of our audit costs.

17.    **INTELLECTUAL PROPERTY**

17.1.    **Ownership and Use of Intellectual Property**. You acknowledge that: (i) we are the sole and exclusive owner of the Intellectual Property and the goodwill associated with the Marks; (ii) your right to use the Intellectual Property is derived solely from this Agreement; and (iii) your right to use the Intellectual Property is limited to a license granted by us to operate your Business during the Term pursuant to, and only in compliance with, this Agreement, the Manual, and all applicable standards, specifications and operating procedures that we prescribe from time to time. You may not use any of the Intellectual Property in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized by us. Any unauthorized use of the Intellectual Property constitutes an infringement of our rights. You agree to comply with all provisions of the Manual governing your use of the Intellectual Property. This Agreement does not confer to you any goodwill, title or interest in any of the Intellectual Property.

17.2.    **Changes to Intellectual Property**. We have the right to modify the Intellectual Property at any time in our sole and absolute discretion, including by changing the Marks, the System, the Copyrights or the Know-how. If we modify or discontinue use of any of the Intellectual Property, then you must comply with any such instructions from us within 30 days at your expense. We will not be liable to you for any expenses, losses or damages that you incur (including the loss of any goodwill associated with a Mark) because of any addition, modification, substitution or discontinuation of the Intellectual Property.

17.3.    **Use of Marks**.  You agree to use the Marks as the sole identification of your Clinic; provided, however that you must identify yourself as the independent owner of your Business in the manner that we prescribe. You may not use any Marks in any modified form or as part of any corporate or trade name or with any

prefix, suffix, or other modifying words, terms, designs or symbols (other than logos licensed to you by this Agreement). You agree to: (i) prominently display the Marks on or in connection with any media advertising, promotional materials, posters and displays, receipts, stationery and forms that we designate and in the manner that we prescribe to give notice of trade and service mark registrations and copyrights; and (ii) obtain any fictitious or assumed name registrations required under applicable law. You may not use the Marks in signing any contract, lease, mortgage, check, purchase agreement, negotiable instrument or other legal obligation or in any manner that is likely to confuse or result in liability to us for any indebtedness or obligation of yours.

 **17.4. Use of Know-how**.  We will disclose the Know-how to you in the initial training program, the Manual, and in other guidance furnished to you during the Term. You agree that you will not acquire any interest in the Know-how other than the right to utilize it in strict accordance with the terms of this Agreement in the development and operation of your Business. You acknowledge that the Know-how is proprietary and is disclosed to you solely for use in the development and operation of your Clinic during the Term.

 **17.5. Improvements**.  If you conceive of or develop any improvements or additions to the marketing, method of operation or the services or products offered at a Vida-Flo clinic (collectively, "Improvements"), you agree to promptly and fully disclose the Improvements to us without disclosing the Improvements to others. You must obtain our approval prior to using any such Improvements. Any Improvement that we approve may be used by us and any third parties that we authorize to operate a Vida-Flo franchise, without any obligation to pay you royalties or other fees. You must assign to us or our designee, without charge, all rights to any such Improvement, including the right to grant sublicenses. In return, we will authorize you to use any Improvements that we or other franchisees develop that we authorize for general use in connection with the operation of a Vida-Flo business.

 **17.6. Notification of Infringements and Claims**.  You must immediately notify us of any: (i) apparent infringement of any of the Intellectual Property; (ii) challenge to your use of any of the Intellectual Property; or (iii) claim by any person of any rights in any of the Intellectual Property. You may not communicate with any person other than us and our counsel in connection with any such infringement, challenge or claim. We will have sole discretion to take such action as we deem appropriate. We have the right to exclusively control any litigation, Patent and Trademark Office proceeding, or other proceeding arising out of any such infringement, challenge or claim. You agree to execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of our counsel, be necessary or advisable to protect and maintain our interest in any such litigation, Patent and Trademark Office proceeding or other proceeding, or to otherwise protect and maintain our interest in the Intellectual Property. We are not required to indemnify you if you are a party to any judicial or administrative proceeding relating to your use of the Marks or other Intellectual Property.

**18. INDEMNITY.** You agree to indemnify the Indemnified Parties and hold them harmless for, from and against any and all Losses and Expenses incurred by any of them as a result of or in connection with any of the following: (i) the marketing, use or operation of your Clinic or your performance and/or breach of any of your obligations under this Agreement; (ii) any Claim relating to taxes or penalties assessed by any governmental entity against us that are directly related to your failure to pay or perform functions required of you under this Agreement (iii) any labor, employment or similar type of Claim pertaining to your employees, including claims alleging that we are a joint employer of your employees; (iv) any actions, investigations, rulings or proceedings conducted by any state or federal agency relating to your employees, including, without limitation, the United States Department of Labor, the Equal Employment Opportunity Commission and the National Labor Relations Board; and (v) any labor, employment or similar type of Claim pertaining to our relationship with you or your Owners, including claims alleging that we are a joint employer of you and/or any of your Owners. You and your Owners agree to give us notice of any action, suit, proceeding, claim, demand, inquiry or investigation described above. The Indemnified Parties shall have the right, in their sole discretion to: (i) retain counsel of their own choosing to represent them with respect to any Claim; and (ii) control the response thereto and the defense thereof, including the right to enter into an agreement to settle such Claim. You may participate in such defense at your own expense. You agree to give your full cooperation to the Indemnified Parties in assisting the Indemnified Parties with the defense of any such Claim, and to reimburse the Indemnified Parties for all of their costs and expenses in defending any such Claim, including court costs and reasonable attorneys' fees, within 10 days of the date of each invoice

delivered by such Indemnified Party to you enumerating such costs, expenses and attorneys' fees.

**19.    TRANSFERS**

19.1.    **By Us**.  This Agreement and the franchise is fully assignable by us (without prior notice to you) and shall inure to the benefit of any assignee(s) or other legal successor(s) to our interest in this Agreement, provided that we shall, subsequent to any such assignment, remain liable for the performance of our obligations under this Agreement up to the effective date of the assignment. We may also delegate some or all of our obligations under this Agreement to one or more persons (including an area representative) without assigning the Agreement.

19.2.    **By You**.  You understand that the rights and duties created by this Agreement are personal to you and the Owners and that we have granted the franchise in reliance upon the individual or collective character, skill, aptitude, attitude, business ability and financial capacity of you and your Owners. Therefore, neither you nor any Owner may engage in any Transfer other than a Permitted Transfer without our prior written approval. Any Transfer (other than a Permitted Transfer) without our approval shall be void and constitute a breach of this Agreement. We will not unreasonably withhold our approval of any proposed Transfer, provided that the following conditions are all satisfied:

(i)    the proposed transferee is, in our opinion, an individual of good moral character, who has sufficient business experience, aptitude and financial resources to own and operate a Vida-Flo clinic and otherwise meets all of our then applicable standards for franchisees;

(ii)    you and your Owners are in full compliance with the terms of this Agreement and all other agreements with us or our affiliate;

(iii)    all of the owners of the transferee have successfully completed, or made arrangements to attend, the initial training program (and the transferee has paid us the training fee for each new person who must attend training); provided that we may revoke our approval of the transfer if the transferee fails to successfully complete training;

(iv)    your landlord consents to your assignment of the lease to the transferee, or the transferee is diligently pursuing an approved substitute location within the Site Selection Area;

(v)    the transferee and its owners, to the extent necessary, have obtained all licenses and permits required by applicable law in order to own and operate the Business;

(vi)    the transferee signs an agreement, in a form satisfactory to us, agreeing to discharge and guaranty all of your obligations under this Agreement and any other agreement relating to the Business, including, without limitation, customer contracts and supplier contracts;

(vii)    the transferee and its owners sign our then-current form of franchise agreement (unless we, in our sole discretion, instruct you to assign this Agreement to the transferee), except that: (a) the Term and renewal term(s) shall be the Term and renewal term(s) remaining under this Agreement;  and (b) the transferee need not pay a separate initial franchise fee;

(viii)    you remodel your Clinic to comply with our then-current standards and specifications or you obtain a written commitment from the transferee to do so as a condition to the transfer;

(ix)    you or the transferee pay us a transfer fee equal to the greater of $5,000 or 10% of our then-current initial franchise fee to defray expenses that we incur in connection with the Transfer;

(x)    you and your Owners sign a General Release for all claims arising before or contemporaneously with the Transfer;

(xi)     you enter into an agreement with us to subordinate the transferee's obligations to you to the transferee's financial obligations owed to us pursuant to the franchise agreement;

(xii)    we do not elect to exercise our right of first refusal described in Section 19.5; and

(xiii)   you or the transferring Owner, as applicable, and the transferee have satisfied any other conditions we reasonably require as a condition to our approval of the Transfer.

Our consent to a Transfer shall not constitute a waiver of any claims we may have against the transferor, nor shall it be deemed a waiver of our right to demand exact compliance with any of the terms or conditions of the franchise by the transferee.

**19.3.    Permitted Transfers.** You may engage in a Permitted Transfer without our prior approval, but you must give us at least 10 days prior written notice. You and the Owners (and the transferee) agree to sign all documents that we reasonably request to effectuate and document the Permitted Transfer.

**19.4.    Death or Disability of an Owner.** Upon the death or permanent disability of an Owner, the Owner's ownership interest in you or the franchise, as applicable, must be assigned to another Owner or to a third party approved by us within 180 days. Any assignment to a third party will be subject to all of the terms and conditions of Section 19.2 unless the assignment qualifies as a Permitted Transfer. For purposes of this Section, an Owner is deemed to have a "permanent disability" only if the person has a medical or mental problem that prevents the person from substantially complying with his or her obligations under this Agreement or otherwise operating the Business in the manner required by this Agreement and the Manual for a continuous period of at least three (3) months.

**19.5.    Our Right of First Refusal.** If you or an Owner desires to engage in a Transfer, you or the Owner, as applicable, must obtain a bona fide, signed written offer from the fully disclosed purchaser and submit an exact copy of the offer to us. We will have 30 days after receipt of the offer to decide whether we will purchase the interest in your Business or the ownership interest in you for the same price and upon the same terms contained in the offer (however, we may substitute cash for any form of payment proposed in the offer). If we notify you that we intend to purchase the interest within the 30-day period, you or the Owner, as applicable, must sell the interest to us. We will have at least an additional 30 days to prepare for closing. We will be entitled to receive from you or the Owner, as applicable, all customary representations and warranties given by you as the seller of the assets or the Owner as the seller of the ownership interest or, at our election, the representations and warranties contained in the offer. If we do not exercise our right of first refusal, you or the Owner, as applicable, may complete the Transfer to the purchaser pursuant to and on the terms of the offer, subject to the requirements of Section 19.2 (including our approval of the transferee). However, if the sale to the purchaser is not completed within 120 days after delivery of the offer to us, or there is a material change in the terms of the sale, we will again have the right of first refusal specified in this Section. Our right of first refusal in this Section shall not apply to any Permitted Transfer.

## 20.     TERMINATION

**20.1.    By You**.  You may terminate this Agreement if we materially breach this Agreement and fail to cure the breach within 90 days after you send us a written notice specifying the nature of the breach. If you terminate this Agreement, you must still comply with your post-termination obligations described in Section 21 and all other obligations that survive the expiration or termination of this Agreement.

**20.2.    Termination By Us Without Cure Period**. We may, in our sole discretion, terminate this Agreement upon five (5) days' written notice, without opportunity to cure, for any of the following reasons, all of which constitute material events of default under this Agreement:

(i)      if the Managing Owner fails to satisfactorily complete the initial training program in the manner required by Section 5.1;

(ii)      if you fail to obtain our approval of your site within the time period required by <u>Sections 7.1</u>;

(iii)     if you fail to obtain our approval of your lease within the time period required by <u>Section 7.2</u>;

(iv)     if you fail to open your Clinic within the time period required by <u>Section 7.4</u>;

(v)     if you become insolvent by reason of your inability to pay your debts as they become due or you file a voluntary petition in bankruptcy or any pleading seeking any reorganization, liquidation, dissolution or composition or other settlement with creditors under any law, or are the subject of an involuntary bankruptcy (which may or may not be enforceable under the Bankruptcy Act of 1978);

(vi)     if your Clinic, or a substantial portion of the assets associated with your Clinic, are seized, taken over or foreclosed by a government official in the exercise of his or her duties, or seized, taken over or foreclosed by a creditor, lienholder or lessor; or a final judgment against you remains unsatisfied for 30 days (unless a supersedes or other appeal bond has been filed); or a levy of execution has been made upon the license granted by this Agreement or upon any property used in your Clinic, and it is not discharged within five (5) days of the levy;

(vii)    if you abandon or fail to operate your Clinic for three (3) consecutive business days, unless the failure is due to an event of force majeure or another reason that we approve;

(viii)   if a regulatory authority suspends or revokes a license or permit held by you or an Owner that is required to operate the Clinic, even if you or the Owner still maintain appeal rights;

(ix)     if you or an Owner (a) is convicted of or pleads no contest to a felony, a crime involving moral turpitude or any other material crime or (b) is subject to any material administrative disciplinary action or (c) fails to comply with any material federal, state or local law or regulation applicable to your Business;

(x)     if you or an Owner commits an act that can reasonably be expected to adversely affect the reputation of the System or the goodwill associated with the Marks;

(xi)     if you manage or operate your Clinic in a manner that presents a health or safety hazard to your customers, employees or the public;

(xii)    if you or an Owner make any material misrepresentation to us, whether occurring before or after being granted the franchise;

(xiii)   if you fail to pay any amount owed to us or an affiliate of ours within ten (10) days after receipt of an invoice or demand for payment (whichever occurs first);

(xiv)   if you underreport any amount owed to us by at least three percent (3%), after having already committed a similar breach that had been cured in accordance with <u>Section 20.3</u>;

(xv)    if you or an Owner makes an unauthorized Transfer;

(xvi)   if you or an Owner makes an unauthorized use of the Intellectual Property;

(xvii)  if you or an Owner breaches any of the restrictive covenants described in <u>Section 14</u>;

(xviii) if the lease for your premises is terminated due to your default;

(xix)   if you provide "on-site" Vida-Flo treatments at a home or business establishment that is

located outside of your Territory without our prior written permission; or

(xx)    if we terminate any other agreement between you and us or if any affiliate of ours terminates any agreement between you and the affiliate because of your default.

**20.3.    Additional Conditions of Termination**. In addition to our termination rights in Section 20.2, we may, in our sole discretion, terminate this Agreement upon 30 days' written notice if you or an Owner fail to comply with any other provision of this Agreement (including any mandatory provision in the Manual) or any other agreement with us, unless such default is cured, as determined by us in our sole discretion, within such 30-day notice period. If we deliver a notice of default to you pursuant to this Section 20.3, we may suspend performance of any of our obligations under this Agreement until you fully cure the breach.

**20.4.    Mutual Agreement to Terminate.** If you and we mutually agree in writing to terminate this Agreement, you and we will be deemed to have waived any required notice period.

## 21.    POST-TERM OBLIGATIONS.

**21.1.    Obligations of You and the Owners.** After the termination, expiration or Transfer of this Agreement, you and the Owners agree to:

(i)    immediately cease to use the Intellectual Property;

(ii)    pay us all amounts that you owe us;

(iii)    comply with all covenants described in Section 14 that apply after the expiration, termination or Transfer of this Agreement or the disposal of an ownership interest by an Owner;

(iv)    return all copies of the Manual, or any portions thereof, as well as all signs, sign faces, brochures, advertising and promotional materials, forms, and any other materials bearing or containing any of the Marks, Copyrights or other identification relating to a Vida-Flo clinic, unless we allow you to transfer such items to an approved transferee;

(v)    take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to your use of any of the Marks;

(vi)    provide us with a list of all of your current, former and prospective patients and their files;

(vii)    immediately cease all business-related communications with all persons that you know or believe to be Vida-Flo members;

(viii)    make such modifications and alterations to the premises that are necessary or that we require to prevent any association between us or the System and any business subsequently operated by you or any third party at the premises; provided, however, that this subsection shall not apply if your franchise is transferred to an approved transferee;

(ix)    notify all telephone companies, listing agencies and domain name registration companies (collectively, the "Agencies") of the termination or expiration of your right to use: (a) the telephone numbers and/or domain names, if applicable, related to the operation of your Clinic; and (b) any regular, classified or other telephone directory listings associated with the Marks (you hereby authorize the Agencies to transfer such telephone numbers, domain names and listings to us and you authorize us, and appoint us and any officer we designate as your attorney-in-fact to direct the Agencies to transfer the telephone numbers, domain names and listings to us if you fail or refuse to do so); and

(x)    provide us with satisfactory evidence of your compliance with the above obligations

within 30 days after the effective date of the termination, expiration or Transfer of this Agreement.

If we choose operate your Clinic during the Temporary Operating Period, then your obligations under clause (iv), (viii) and (ix) shall be deferred until such time that we designate or we may waive your obligation to comply with any or all of such clauses.

**21.2.    Right to Purchase Clinic and Assets**.

(a)    Generally.  Upon the termination or expiration of this Agreement, we shall have the right, but not the obligation, to purchase your Clinic and/or its assets at fair market value as ascertained by an independent business appraiser. If we elect to exercise this option, the date of determination of the fair market value shall be the effective date of the termination or expiration of the Agreement (the "Appraisal Date"). We will notify you of the specific items that we wish to purchase (the "Acquired Assets"). We may also require that you assign your lease to us at no additional charge. We shall have a period of up to 180 days following the termination or expiration of this Agreement, as applicable (the "Evaluation Period"), to determine whether to exercise our purchase option. During the Evaluation Period, we shall have the right to assume management of the Clinic in accordance with Section 21.3 below.

(b)    Selecting Qualified Appraisers.  You and we each shall appoint an appraiser with experience appraising businesses comparable to your Business in the United States (a "Qualified Appraiser"). This appointment of the appraisers shall be made within 30 days after the Appraisal Date by giving written notice to the other party of the name and address of the Qualified Appraiser.  If either of us fails to appoint a Qualified Appraiser within the 30-day period, the appraisal shall be made by the sole Qualified Appraiser appointed within that period.  If each of us shall have appointed a Qualified Appraiser within the 30-day period, then within 30 days after that the two (2) Qualified Appraisers shall appoint a third (3rd) Qualified Appraiser.  If the two (2) Qualified Appraisers fail to agree on the appointment of a third (3rd) Qualified Appraiser within the 30-day period, then a third (3rd) Qualified Appraiser shall be appointed by the American Arbitration Association (acting through its office located closest to our corporate headquarters) as promptly as possible after that, upon application by either us or you. Nothing in this provision shall prohibit us and you from jointly approving a single appraiser, nor shall it obligate us or you to do so.

(c)    Information for Appraisal.  You must furnish to the Qualified Appraisers a copy of your current financial statements, as well as your financial statements for the prior three (3) years (or the period of time that you have operated your Business, if less than three (3) years), together with the work papers and other financial information or other documents or information that the Qualified Appraisers may request. The Qualified Appraisers shall take into account the other information and factors that they deem relevant, but the Qualified Appraisers shall be instructed that there shall be no consideration of goodwill in the determination of fair market value.

(d)    Appraisal Process.  Within 30 days after the appointment of the third Qualified Appraiser, the three (3) Qualified Appraisers shall appraise the Appraised Assets at fair market value without taking into account any value for goodwill (the "Appraised Value").  If the three (3) Qualified Appraisers agree on a single value, then they shall issue a joint report and the Appraised Value shall be the value determined by the agreement of the three (3) Qualified Appraisers.  If two (2) of the three (3) Qualified Appraisers agree on a single value, these two (2) Qualified Appraisers shall issue a joint report, and the dissenting Qualified Appraiser may (but need not) issue a separate report, and the value determined by agreement of the two (2) Qualified Appraisers who shall agree shall be the Appraised Value.  If none of the Qualified Appraisers are able to agree on a single value, each Qualified Appraiser shall issue a report setting forth the value determined by him or her, and the average of the two values that are closest to each other shall be the Appraised Value. Before the issuance of a report by any Qualified Appraiser, each Qualified Appraiser shall advise the others of the value that will appear in his or her report to ensure that the determination of value made by any Qualified Appraiser is made with knowledge of the values determined by the other Qualified Appraisers. If there shall be only a single Qualified Appraiser (because you or we failed to appoint a Qualified Appraiser within the time provided), then the Appraised Value shall be the

value determined by the single Qualified Appraiser.

(e)     Cost of Appraisal.  You and we shall equally bear the cost of the appraisal.

(f)     Closing.  Once the Appraised Value has been determined, we will have at least 60 days to prepare for the closing. We will be entitled to receive from you all customary representations and warranties given by you as the seller of the Acquired Assets and you must transfer good and clean title to the Acquired Assets, subject to any exceptions agreed to by us.

**21.3.   Assumption of Management**.

(a)     Option to Operate Clinic. Following the expiration or termination of this Agreement, we shall have the option, in our sole discretion, but not the obligation, to continue to operate your Clinic (directly or through an affiliate of ours, including through a management company hired by us or an affiliate) for a period of time that will in no event extend beyond the expiration of the Evaluation Period (unless we exercise our purchase option). The period of time during which we choose to operate your Clinic during the Evaluation Period is referred to as the "Temporary Operating Period." Within 10 days after the expiration or termination of this Agreement, we will notify you whether we intend to exercise our option to operate your Clinic during all or part of the Evaluation Period. We need not notify you of the specific duration (or intended duration) of the Temporary Operating Period at the time we provide you with this notice.

(b)     Operations. If we exercise our option to operate your Clinic, then during the Temporary Operating Period we will pay all of your normal operating expenses in connection with the operation of the Clinic that are allocable to the Temporary Operating Period. Nothing in this Agreement shall obligate us to assume or be responsible for any indebtedness, liability or obligation due or accrued prior to the time we assume direct control over the operation of the Clinic or after the expiration of the Temporary Operating Period (unless we exercise the purchase option contemplated by Section 21.2 above), whether related to the real estate or equipment leases, for salaries, taxes, goods or services or otherwise. We have the option, subject to agreement of your employees, to transfer your employees to a company that we hire to manage the Clinic during the Temporary Operating Period.

(c)     Executory Obligations. If we elect to temporarily operate the Clinic pursuant to this Section, on or prior to the expiration of the Temporary Operating Period, we will be further entitled, at our sole option, to assume your executory obligations under the real estate and equipment leases applicable to the Clinic and to exercise the purchase options described in Section 21.2 above. Upon our exercising the option to permanently operate the Clinic, we shall use reasonable efforts to secure the release and discharge of you from any executory obligations under the real estate and equipment leases for the Clinic or shall hold you harmless from future rents, future lease charges and all other future liabilities under the applicable leases as well as all other new expenses incurred by the Clinic after the commencement of the Temporary Operating Period.

(d)     Real Estate Lease. If the real estate property of the Clinic's premises is owned by you (or your owners or your affiliates or the owners of your affiliate), and we exercise our option to operate your Clinic during the Temporary Operating Period, you (or the applicable owner of the property) shall lease the premises to us upon the same terms and conditions that like properties for like uses are then being leased in the vicinity of the Clinic (a) for the term of the Temporary Operating Period, and (b) if we exercise the option to purchase your Clinic, for a term designated by us not to exceed 10 years.

**22.     DISPUTE RESOLUTION**. The parties agree to submit any claim, dispute or disagreement, including any matter pertaining to the interpretation of this Agreement or issues relating to the offer and sale of the franchise or the relationship between the parties (a "Dispute") to mediation before a mutually-agreeable mediator prior to arbitration. If the Dispute is not resolved by mediation within 30 days after either party makes a demand for mediation, the parties will submit the dispute to mandatory and binding arbitration conducted pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the "AAA Rules"). The party filing the arbitration must initially bear the cost of any arbitration fees or costs. The arbitrators will not have authority to

award exemplary or punitive damages. Notwithstanding the foregoing, any Dispute involving claims alleging a breach of <u>Section 14</u> or <u>Section 17</u> (referred to as "<u>Excluded Claims</u>") will not be subject to mediation or arbitration unless otherwise agreed to by both parties. Either party may immediately file a lawsuit in accordance with this Section with respect to any Excluded Claim. Despite this Section's incorporation of the AAA Rules, the parties hereby express their clear and unequivocal intent that a court, rather than an arbitrator, shall have exclusive jurisdiction to decide the arbitrability of any Excluded Claim, including the threshold issue of whether a Dispute involves an alleged Excluded Claim (i.e., whether there are any claims alleging a breach of <u>Section 14</u> and/or <u>Section 17</u>). If a party files a lawsuit on the basis that the Dispute involves an alleged Excluded Claim and the other party challenges such basis and seeks an order from the court requiring that the Dispute be submitted to arbitration (a "<u>Jurisdictional Challenge</u>"), then the one (1) year contractual statute of limitations for filing a written demand for arbitration shall be stayed from the date the lawsuit is filed until the date when the court and any appellate courts resolve the Jurisdictional Challenge with finality. All mediation, arbitration and litigation shall take place in the county in which we maintain our principal place of business at the time the Dispute arises (currently, Fulton County, Georgia) and the parties irrevocably waive any objection to such venue. If we or you must enforce this Agreement in a judicial or arbitration proceeding, the substantially prevailing party will be entitled to reimbursement of its costs and expenses, including reasonable accounting and legal fees. UNLESS PROHIBITED BY APPLICABLE LAW, AND EXCEPT AS OTHERWISE PROVIDED ABOVE WITH RESPECT TO A JURISDICTIONAL CHALLENGE, ANY DISPUTE (OTHER THAN FOR PAYMENT OF MONIES OWED OR FOR A VIOLATION OF <u>SECTION 14</u> OR <u>SECTION 17</u>) MUST BE BROUGHT BY FILING A WRITTEN DEMAND FOR ARBITRATION (OR IF PERMITTED, LITIGATION) WITHIN ONE (1) YEAR FOLLOWING THE CONDUCT, ACT OR OTHER EVENT OR OCCURRENCE GIVING RISE TO THE CLAIM, OR THE RIGHT TO ANY REMEDY WILL BE DEEMED FOREVER WAIVED AND BARRED.  WE AND YOU IRREVOCABLY WAIVE: (i) TRIAL BY JURY; AND (ii) THE RIGHT TO ARBITRATE OR LITIGATE ON A CLASS ACTION BASIS, IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THE PARTIES.

23.     **YOUR REPRESENTATIONS**. YOU HEREBY REPRESENT THAT: (i) YOU HAVE NOT RECEIVED OR RELIED UPON ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT, EXCEPT FOR ANY INFORMATION DISCLOSED IN THE FRANCHISE DISCLOSURE DOCUMENT; (ii) YOU HAVE NO KNOWLEDGE OF ANY REPRESENTATIONS BY US OR ANY OF OUR OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES OR REPRESENTATIVES ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT OR THE FRANCHISE DISCLOSURE DOCUMENT; (iii) YOU RECEIVED (1) AN EXACT COPY OF THIS AGREEMENT AND ITS ATTACHMENTS AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT IS EXECUTED; AND (2) OUR FRANCHISE DISCLOSURE DOCUMENT AT THE EARLIER OF (A) TEN (10) BUSINESS DAYS BEFORE YOU SIGNED A BINDING AGREEMENT OR PAID ANY MONEY TO US OR OUR AFFILIATES OR (B) AT SUCH EARLIER TIME IN THE SALES PROCESS THAT YOU REQUESTED A COPY; (iv) YOU ARE AWARE OF THE FACT THAT OTHER PRESENT OR FUTURE FRANCHISEES OF OURS MAY OPERATE UNDER DIFFERENT FORMS OF AGREEMENT AND CONSEQUENTLY THAT OUR OBLIGATIONS AND RIGHTS WITH RESPECT TO OUR VARIOUS FRANCHISEES MAY DIFFER MATERIALLY IN CERTAIN CIRCUMSTANCES; (v) YOU ARE AWARE OF THE FACT THAT WE MAY HAVE NEGOTIATED TERMS OR OFFERED CONCESSIONS TO OTHER FRANCHISEES AND WE HAVE NO OBLIGATION TO OFFER YOU THE SAME OR SIMILAR NEGOTIATED TERMS OR CONCESSIONS; AND (vi) YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND RECOGNIZE THAT IT INVOLVES BUSINESS RISKS, MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON YOUR OWN BUSINESS ABILITIES, EFFORTS AND JUDGMENTS, AND THE SERVICES OF YOU AND THOSE YOU EMPLOY.

24.     **GENERAL PROVISIONS**

24.1.     <u>**Governing Law.**</u> Except as governed by the United States Trademark Act of 1946 (Lanham Act,

15 U.S.C. §§ 1051, et seq.), this Agreement and the franchise relationship shall be governed by the laws of the State of Georgia (without reference to its principles of conflicts of law), but any law of the State of Georgia that regulates the offer and sale of franchises or business opportunities or governs the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this Section.

    **24.2.**   **Relationship of the Parties.** You understand and agree that nothing in this Agreement creates a fiduciary relationship between you and us or is intended to make either party a general or special agent, legal representative, subsidiary, joint venture, partner, employee or servant of the other for any purpose. During the Term, you must conspicuously identify yourself at your base of operations, and in all dealings with third parties, as a franchisee of ours and the independent owner of your Business. You agree to place such other notices of independent ownership on such forms, stationery, advertising, business cards and other materials as we may require from time to time. Neither we nor you are permitted to make any express or implied agreement, warranty or representation, or incur any debt, in the name of or on behalf of the other, or represent that our relationship is other than franchisor and franchisee. In addition, neither we nor you will be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized by this Agreement.

    **24.3.**   **Severability and Substitution.** Each section, subsection, term and provision of this Agreement, and any portion thereof, shall be considered severable. If any applicable and binding law imposes mandatory, non-waivable terms or conditions that conflict with a provision of this Agreement, the terms or conditions required by such law shall govern to the extent of the inconsistency and supersede the conflicting provision of this Agreement. If a court concludes that any promise or covenant in this Agreement is unreasonable and unenforceable: (i) the court may modify such promise or covenant to the minimum extent necessary to make such promise or covenant enforceable; or (ii) we may unilaterally modify such promise or covenant to the minimum extent necessary to make such promise or covenant enforceable.

    **24.4.**   **Waivers.** We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other. Any waiver granted by us shall be without prejudice to any other rights we may have. We and you shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including the right to demand exact compliance with every term, condition and covenant in this Agreement or to declare any breach of this Agreement to be a default and to terminate the franchise before the expiration of its term) by virtue of: (i) any custom or practice of the parties at variance with the terms of this Agreement; (ii) any failure, refusal or neglect of us or you to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations under this Agreement, including any mandatory specification, standard, or operating procedure; (iii) any waiver, forbearance, delay, failure or omission by us to exercise any right, power or option, whether of the same, similar or different nature, relating to other Vida-Flo franchisees; or (iv) the acceptance by us of any payments due from you after breach of this Agreement.

    **24.5.**   **Approvals.** Whenever this Agreement requires our approval, you must make a timely written request for approval, and the approval must be in writing in order to bind us. Except as otherwise expressly provided in this Agreement, if we fail to approve any request for approval within the required period of time, we shall be deemed to have disapproved your request. If we deny approval and you seek legal redress for the denial, the only relief to which you may be entitled is to acquire our approval. You are not entitled to any other relief or damages for our denial of approval.

    **24.6.**   **Force Majeure.** Neither we nor you shall be liable for loss or damage or deemed to be in breach of this Agreement if our or your failure to perform our or your obligations results from any event of force majeure. Any delay resulting from an event of force majeure will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable under the circumstances. Notwithstanding the foregoing, "force majeure" will not: (i) relieve you of any payment obligations under this Agreement; or (ii) excuse, or apply with respect to, any breaches resulting from an epidemic or pandemic of a contagious illness or disease or resulting from any economic or financial changes caused by such epidemic or pandemic.

**24.7.   Binding Effect.** This Agreement is binding upon the parties to this Agreement and their respective executors, administrators, heirs, assigns and successors in interest. Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party to this Agreement; provided, however, that the additional insureds listed in Section 15.1 and the Indemnified Parties are intended third party beneficiaries under this Agreement with respect to Section 15.1 and Section 18, respectively.

**24.8.   Integration.** THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND MAY NOT, EXCEPT AS PERMITTED BY SECTION 12.2 AND SECTION 24.3, BE CHANGED EXCEPT BY A WRITTEN DOCUMENT SIGNED BY BOTH PARTIES. In addition, our issuance of the Site Approval Notice attached hereto as ATTACHMENT "C" shall be deemed to amend this Agreement to identify the approved site for your Business premises, regardless of whether you countersign and/or return the Site Approval Notice. Any e-mail correspondence or other form of informal electronic communication shall not be deemed to modify this Agreement unless such communication is signed by both parties and specifically states that it is intended to modify this Agreement. The attachment(s) are part of this Agreement, which, together with any Amendments or Addenda executed on or after the Effective Date, constitutes the entire understanding and agreement of the parties, and there are no other oral or written understandings or agreements between us and you about the subject matter of this Agreement. As referenced above, all mandatory provisions of the Manual are part of this Agreement. Any representations not specifically contained in this Agreement made before entering into this Agreement do not survive after the signing of this Agreement. This provision is intended to define the nature and extent of the parties' mutual contractual intent, there being no mutual intent to enter into contract relations, whether by agreement or by implication, other than as set forth above. The parties acknowledge that these limitations are intended to achieve the highest possible degree of certainty in the definition of the contract being formed, in recognition of the fact that uncertainty creates economic risks for both parties which, if not addressed as provided in this Agreement, would affect the economic terms of this bargain. Nothing in this Agreement is intended to disclaim any of the representations we made in the Franchise Disclosure Document.

**24.9.   Covenant of Good Faith.** If applicable law implies a covenant of good faith and fair dealing in this Agreement, the parties agree that the covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement. Additionally, if applicable law shall imply the covenant, you agree that: (i) this Agreement (and the relationship of the parties that is inherent in this Agreement) grants us the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with our explicit rights and obligations under this Agreement that may affect favorably or adversely your interests; (ii) we will use our judgment in exercising the discretion based on our assessment of our own interests and balancing those interests against the interests of our franchisees generally (including ourselves and our affiliates if applicable), and specifically without considering your individual interests or the individual interests of any other particular franchisee; (iii) we will have no liability to you for the exercise of our discretion in this manner, so long as the discretion is not exercised in bad faith; and (iv) in the absence of bad faith, no trier of fact in any arbitration or litigation shall substitute its judgment for our judgment so exercised.

**24.10.   Rights of Parties are Cumulative.** The rights of the parties under this Agreement are cumulative and no exercise or enforcement by either party of any right or remedy under this Agreement will preclude any other right or remedy available under this Agreement or by law.

**24.11.   Survival.** All provisions that expressly or by their nature survive the termination, expiration or Transfer of this Agreement (or the Transfer of an ownership interest in the franchise) shall continue in full force and effect subsequent to and notwithstanding its termination, expiration or Transfer and until they are satisfied in full or by their nature expire, including, without limitation, Section 13, Section 14, Section 16, Section 18, Section 21, Section 22 and Section 24.

**24.12.   Construction.** The headings in this Agreement are for convenience only and do not define, limit or construe the contents of the sections or subsections. All references to Sections refer to the Sections contained in this Agreement unless otherwise specified. All references to days in this Agreement refer to calendar days unless otherwise specified. The term "you" as used in this Agreement is applicable to one or more persons or an

Entity, and the singular usage includes the plural and the masculine and neuter usages include the other and the feminine and the possessive.

     **24.13.**  **Time of Essence.** Time is of the essence in this Agreement and every term thereof.

     **24.14.**  **Counterparts.** This Agreement may be signed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same document.

     **24.15.**  **Notice.** All notices given under this Agreement must be in writing, delivered by hand, email (to the last email address provided by the recipient) or first class mail, to the following addresses (which may be changed upon 10 business days prior written notice):

| | |
|---|---|
| YOU: | As set forth in <u>ATTACHMENT "B"</u> |
| US: | Hydration Station USA Franchise System, LLC<br>2964 Peachtree Road, Suite 420<br>Atlanta, Georgia 30305 |
| WITH A COPY TO: | Aaron Gagnon<br>Warshawsky Seltzer, PLLC<br>9943 E. Bell Road<br>Scottsdale, Arizona 85260 |
| | and |
| | Ramsey A. Knowles<br>Knowles Gallant, LLP<br>6400 Powers Ferry Road, Suite 350<br>Atlanta, GA 30339 |

Notice shall be considered given at the time delivered by hand, or one (1) business day after sending by email or comparable electronic system, or three (3) business days after placed in the mail, postage prepaid, by certified mail with a return receipt requested.

[Signature Page Follows]

The parties to this Agreement have executed this Agreement effective as of the Effective Date first above written.

**FRANCHISOR:**

Hydration Station USA Franchise System, LLC,
a Georgia limited liability company

By:_____
Name:_____
Its:_____

**YOU (If you are an entity):**                    **YOU (If you are not an entity):**

_____,
a(n)_____     Name:_____

By:_____     _____
Name:_____     Name:_____
Its:_____

                                        _____
                                        Name:_____

                                        _____
                                        Name:_____

28

## ATTACHMENT "A"

### TO FRANCHISE AGREEMENT

#### DEFINITIONS

*"Account"* is defined in Section 13.5.

*"Acquisition"* means either (i) a competitive or non-competitive company, franchise system, network or chain directly or indirectly acquiring us, whether in whole or in part, including by asset or stock purchase, change of control, merger, affiliation or otherwise or (ii) us directly or indirectly acquiring another competitive or non-competitive company, franchise system, network or chain, whether in whole or in part, including by asset or stock purchase, change of control, merger, affiliation or otherwise.

*"Acquired Assets"* is defined in Section 21.2.

*"Agencies"* is defined in Section 21.1(ix).

*"Agreement"* is defined in the Introductory Paragraph.

*"Alternative Channels of Distribution"* means all channels of distribution other than retail sales made to customers from a Vida-Flo clinic, including, but not limited to: (i) sales through direct marketing, such as over the Internet or through catalogs or telemarketing; (ii) sales through retail stores that do not operate under the Marks, such as grocery stores, convenience stores or department stores; (iii) sales made at wholesale; and (iv) on-site sales to customers.

*"Appraisal Date"* is defined in Section 21.2.

*"Appraised Value"* is defined in Section 21.2.

*"Brand Protection Agreement"* means our form of Brand Protection Agreement, the most current form of which is attached to this Agreement as ATTACHMENT "G".

*"Business"* is defined in Section 2.

*"Claim"* or *"Claims"* means any and all claims, actions, demands, assessments, litigation, or other form of regulatory or adjudicatory procedures, claims, demands, assessments, investigations, or formal or informal inquiries.

*"Clinic"* is defined in Section 2.

*"Competitive Business"* means any business competitive with us (or competitive with any of our affiliates or our franchisees) that generates at least 50% of its gross revenues from the provision of hydration therapy services.

*"Confidentiality Agreement"* means our form of Confidentiality Agreement, the most current form of which is attached to this Agreement as ATTACHMENT "H".

*"Copyrights"* means all works and materials for which we or our affiliate has secured common law or registered copyright protection and that we allow Vida-Flo franchisees to use, sell or display in connection with the marketing and/or operation of a Vida-Flo clinic, whether now in existence or created in the future.

*"Dispute"* is defined in Section 22.

*"Effective Date"* is defined in the Introductory Paragraph.

*"Entity"* means a corporation, partnership, limited liability company or other form of association.

*"Evaluation Period"* is defined in Section 21.2.

*"General Release"* means our current form of general release of all claims against us and our affiliates and subsidiaries, and our and their respective members, officers, directors, agents and employees, in both their corporate and individual capacities.

*"Gross Revenues"* means all gross sums collected or billed by you from all goods and services sold in connection

with your Clinic (whether off-site or from your Clinic), together with any other revenue or monies derived in connection with your Business, including the proceeds of any business interruption insurance. "Gross Revenues" does not include: (i) revenues that you collect from a customer and later refund to that customer; (ii) any sales or use taxes that you pay to a government agency; or (iii) the value of complimentary or "comped" products or services offered for promotional purposes (we may limit the maximum amount of the weekly deduction for "comped" products or services, and the value of any comped products or services in excess of the weekly cap, calculated based on our suggested retail pricing, must be included in Gross Revenues). From time to time, we may establish policies governing the manner in which the proceeds from the sale of gift cards are treated for purposes of calculating Gross Revenues. Similarly, if we implement a membership model that allows customers to redeem goods or services associated with the membership from multiple Vida-Flo clinics, we may establish policies governing the manner in which the monthly membership dues are allocated between the clinic that sold the membership and the clinic where the goods or services are redeemed.

*"Improvements"* is defined in <u>Section 17.5</u>.

*"Indemnified Party"* or *"Indemnified Parties"* means us and each of our past, present and future owners, members, officers, directors, employees and agents, as well as our parent companies, subsidiaries and affiliates, and each of their past, present and future owners, members, officers, directors, employees and agents.

*"Intellectual Property"* means, collectively or individually, our Marks, Copyrights, Know-how, System and Improvements.

*"Interim Term"* is defined in <u>Section 4.3</u>.

*"Know-how"* means all of our trade secrets and other proprietary information relating to the development, construction, marketing and/or operation of a Vida-Flo clinic, including, but not limited to, methods, techniques, specifications, medical treatments, procedures, policies, membership data, marketing strategies and information comprising the System and the Manual.

*"Losses and Expenses"* means all compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against Claims; settlement amounts; judgments; compensation for damages to our reputation and goodwill; and all other costs, damages, liabilities and expenses associated with any of the foregoing losses and expenses or incurred by an Indemnified Party as a result of a Claim.

*"Managing Owner"* means the Owner that you designate and we approve who is primarily responsible for the daily on-premises management and supervision of the Clinic.

*"Manual"* is defined in <u>Section 6.1</u>.

*"Marks"* means the logotypes, service marks, and trademarks now or hereafter involved in the operation of a Vida-Flo clinic, including "Vida-Flo" and related logo and the taglines "THE HYDRATION STATION," "GET REVIDALIZED" and "VIDA-FLO ON-THE-GO" and any other trademarks, service marks or trade names that we designate for use in a Vida-Flo clinic. The term "Marks" also includes any distinctive trade dress used to identify a Vida-Flo clinic, whether now in existence or hereafter created.

*"Owner"* or *"Owners"* means any individual who owns a direct or indirect ownership interest in the franchise or the Entity that is the franchisee under this Agreement. "Owner" includes both passive and active owners.

*"Permitted Transfer"* means: (i) a Transfer from one Owner to another Owner who was an approved Owner prior to such Transfer, other than a Transfer by an Owner who is the Managing Owner that results in the Managing Owner holding less than a 10% ownership interest in the franchise; and/or (ii) a Transfer to a newly established Entity for which the Owners collectively own and control 100% of the ownership interests and voting power.

*"Post-Term Restricted Period"* means, with respect to you, a period of two (2) years after the termination, expiration or Transfer of this Agreement; provided, however, that if a court of competent jurisdiction determines that the two-year Post-Term Restricted Period is too long to be enforceable, then the "Post-Term Restricted Period" means, with respect to you, a period of one (1) year after the termination, expiration or Transfer of this Agreement. "Post-Term Restricted Period" means, with respect to an Owner, a period of two (2) years after the earlier to occur

of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the Entity that is the franchisee, as applicable; provided, however, that if a court of competent jurisdiction determines that the two-year Post-Term Restricted Period is too long to be enforceable, then the "Post-Term Restricted Period" means, with respect to an Owner, a period of one (1) year after the earlier to occur of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the Entity that is the franchisee, as applicable.

*"Prohibited Activities"* is defined in <u>Section 14.3</u>.

*"Qualified Appraiser"* is defined in <u>Section 21.2</u>.

*"Restricted Territory"* means the geographic area within: (i) a 15 mile radius from your Clinic (and including your Clinic itself); and (ii) a 15 radius from all other Vida-Flo Clinics that are operating or under construction as of the Effective Date and remain in operation or under construction during all or any part of the Post-Term Restricted Period; provided, however, that if a court of competent jurisdiction determines that the foregoing Restricted Territory is too broad to be enforceable, then the "Restricted Territory" means the geographic area within a 15 mile radius from your Clinic (and including your Clinic itself).

*"Site Selection Area"* is defined in <u>Sections 7.1</u>.

*"Successor Agreement"* is defined in <u>Section 4.1</u>.

*"System"* means our distinct system for the operation of a Vida-Flo clinic, the distinctive characteristics of which include logo, trade secrets, concept, style, specially formulated programs, products and treatments, confidential brand standards manual and operating system.

*"Technology Systems"* is defined in <u>Section 12.7</u>.

*"Temporary Operating Period"* is defined in <u>Section 21.3</u>.

*"Term"* is defined in <u>Section 4.1</u>.

*"Territory"* is defined in <u>Section 3</u>.

*"Transfer"* means any direct or indirect, voluntary or involuntary (including by judicial award, order or decree), assignment, sale, conveyance, subdivision, sublicense or other transfer or disposition of the franchise (or any interest therein), the Business (or any portion thereof) or an ownership interest in an Entity that is the franchisee, including by merger or consolidation, by issuance of additional securities representing an ownership interest in the Entity that is the franchisee, or by operation of law, will or a trust upon the death of an Owner (including the laws of intestate succession).

*"We" or "us"* is defined in the Introductory Paragraph.

*"You"* is defined in the Introductory Paragraph.

## ATTACHMENT "B"

### TO FRANCHISE AGREEMENT

#### DEAL TERMS

A. **Franchisee Details.**

Name of Franchisee: [_____]

Is the franchisee one or more natural persons signing in their individual capacity? **Yes**: _____   **No**: _____

Type of Entity and State of Formation* (if applicable): [_____]

*\* If the franchisee is a business entity, each natural person holding a direct or indirect ownership interest in the business entity, and spouse of each such person, must sign the Franchise Owner Agreement concurrently with the execution of this Agreement.*

The following table includes the full name of each natural person holding a direct or indirect ownership interest in the franchise (or the franchisee business entity if applicable) along with a description of their ownership interest.

| Owner's Name | % Ownership Interest | Direct or Indirect (if indirect, include description of nature of interest) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Notice Address: [_____]

B. **Site Selection Area**.

The Site Selection Area referenced in the Franchise Agreement shall consist of the following geographic area: [_____]

*\* The Site Selection Area is not your territory and there are no protections associated with this area.*

**C. <u>Approved Site</u>.**

We hereby approve the site listed below for the operation of your Vida-Flo Clinic.

Approved Address: [_____]

*\* If the site for your Clinic has not been approved by us at the time the Franchise Agreement is signed, then we will send you a Site Approval Notice in accordance with <u>Section 7.1</u> listing the address of your approved site.*

**D. <u>Territory</u>.**

The Territory referenced in the Franchise Agreement shall consist of the geographic area within a [_____] mile radius from the approved site for your Vida-Flo Clinic.

**ATTACHMENT "C"**

**TO FRANCHISE AGREEMENT**

**<u>FORM OF SITE APPROVAL NOTICE</u>**

*[See Attached]*

## <u>SITE APPROVAL NOTICE</u>

Hydration Station USA Franchise System, LLC ("<u>we</u>" or "<u>us</u>") is issuing this Site Approval Notice (this "<u>Notice</u>") to _____ ("<u>you</u>"), effective _____, 202___, in connection with the Vida-Flo Franchise Agreement (the "<u>Franchise Agreement</u>") that we executed with you on _____, 202___. The purpose of this Notice is to confirm our approval of the site you have proposed for your Vida-Flo premises.

<u>Approved Address</u>:

Pursuant to <u>Section 7.1</u> of the Franchise Agreement, we hereby approve the site listed below for the operation of your Vida-Flo Clinic:

_____

_____

_____

* * *

By signing below, you and we agree that the address identified in this Notice shall be deemed your approved site for your Vida-Flo Clinic established and operated pursuant to the Franchise Agreement. You acknowledge and agree that our acceptance of the site you have proposed is in no way a representation by us that your site will be successful. Rather, our acceptance of the site you propose merely indicates that the site meets our minimum standards and requirements.

We request that you sign below and send us an executed copy of this Notice to acknowledge your receipt. However, your failure or refusal to sign below will not invalidate or otherwise affect our designation of your approved site. Our designation of your approved site, as set forth in this Notice, shall be binding upon you effective as of the effective date listed in the first paragraph in this Notice, as the approved site for your Vida-Flo-Clinic.

<u>Franchisor</u>                                    <u>Franchisee</u>

Hydration Station USA Franchise System, LLC      _____

By:_____          By:_____

Name:_____          Name:_____

Its:_____          Its:_____

Date: _____          Date: _____

**ATTACHMENT "D"**

**TO FRANCHISE AGREEMENT**

**<u>LEASE ADDENDUM</u>**

*[See Attached]*

**Lease Addendum**

THIS AGREEMENT dated this ___ day of _____, 202__ among Hydration Station USA Franchise System, LLC, a Georgia limited liability company, with principal offices at 2964 Peachtree Road, Suite 420, Atlanta, Georgia 30305 (the "Franchisor"), _____, a(n)_____, with principal offices located at _____ (the "Landlord"), and _____, a(n)_____, with principal offices located at _____ (the "Tenant/Franchisee").

## Introduction

A. On _____, 202___, the Tenant/Franchisee and the Franchisor entered a Vida-Flo, Franchise Agreement (the "Franchise Agreement"). Under the Franchise Agreement, the Franchisor granted the Tenant/Franchisee the right, and the Tenant/Franchisee undertook the duty, to operate a Vida-Flo franchised business (the "Franchised Business") at the Premises (defined below).

B. Simultaneously with entering this Agreement, the Landlord and the Tenant/Franchisee are entering a lease agreement (the "Lease"). Under the Lease, the Tenant/Franchisee leases the premises described in Exhibit "A" (the "Premises").

C. To protect the Franchisor's rights and interests under the Franchise Agreement, the Landlord grants certain rights to the Franchisor under the Lease as set forth below.

## Agreement

The parties, therefore, agree as follows:

1. <u>Notices</u>. At the same time such notices are sent to the Tenant/Franchisee, the Landlord must provide the Franchisor with copies of all written notices of default that it sends to the Tenant/Franchisee. The Landlord agrees to send such copies by first-class mail, postage prepaid, to the Franchisor at its address set forth above or such other address as the Franchisor may notify the Landlord in writing.

2. <u>Right to Cure</u>. If the Tenant/Franchisee defaults under the Lease, the Franchisor has the right (but not the duty) to cure such default within 15 days following the expiration of any applicable cure period. Furthermore, in such event, the Franchisor may immediately commence occupancy of the Premises as the tenant under the Lease without obtaining the Landlord's or Franchisee's consent. The Franchisor may thereafter assign the Lease to another Vida-Flo franchisee or to an entity owned and/or controlled by the Franchisor. If it does, the Franchisor must first obtain the Landlord's written approval of the assignee. The Landlord, however, must neither unreasonably withhold nor delay its approval thereof. The Landlord will acknowledge any such assignment in writing. No assignment permitted under this Section is subject to any assignment or similar fee or will cause any rental acceleration.

3. <u>Right to Assign</u>. At any time (including, without limitation, upon the expiration or sooner termination of the Franchise Agreement) without the Landlord's prior consent, the Tenant/Franchisee may assign the Lease to the Franchisor. In such event, the Franchisor may thereafter assign the Lease to another Vida-Flo franchisee or to an entity owned and/or controlled by the Franchisor. If it does, the Franchisor must first obtain the Landlord's written approval of the assignee. The Landlord, however, must neither unreasonably withhold nor delay its approval thereof. The Landlord will acknowledge any such assignment in writing. No assignment permitted under this Section is subject to any assignment or similar fee or will cause any rental acceleration.

4.   <u>Right of First Refusal</u>. The Landlord agrees that upon the expiration or termination of the Lease, the Franchisor shall have the first right of refusal to lease the Premises as the new tenant.

5.   <u>Expiration or Termination of Franchise Agreement</u>. The Landlord agrees that the expiration or termination of the Franchise Agreement shall constitute a default under the Lease, giving the Franchisor the right, but not the obligation, to cure such default by succeeding to Tenant/Franchisee's interests under the Lease in accordance with <u>Section 2</u> above.

6.   <u>Acknowledgement of Rights</u>.  The Landlord acknowledges the Franchisor's rights under the Franchise Agreement to enter the Premises to: (i) make any modifications or alterations necessary in the Franchisor's sole discretion to protect its franchise system and its trademarks without being guilty of trespass or any other tort or crime; and (ii) remove any trade fixtures, interior or exterior signs and other items bearing the Franchisor's trademarks or service marks upon the expiration or termination of the Franchise Agreement.

7.   <u>Modification of Lease</u>.  Without the Franchisor's prior written consent, the Landlord and the Tenant/Franchisee may not amend, modify, supplement, terminate, renew or extend the Lease.

8.   <u>Miscellaneous</u>.

a.  In the event of any inconsistency between the terms of this Agreement and the terms of the Lease, the terms of this Agreement control.

b.  All of the terms of this Agreement, whether so expressed or not, are binding upon, inure to the benefit of, and are enforceable by the parties and their respective personal and legal representatives, heirs, successors and permitted assigns.

c.  The provisions of this Agreement may be amended, supplemented, waived or changed only by a written document signed by all the parties to this Agreement and making specific reference to this Agreement.

d.  This Agreement may be executed in one or more counterparts, each of which is an original, but all of which together constitute one and the same instrument. Confirmation of execution by telex or by telecopy facsimile signature page is binding upon any party so confirming or telecopying.

IN WITNESS WHEREOF, this Agreement has been executed the date and year first above written.

**FRANCHISOR:**

Hydration Station USA Franchise System, LLC, a Georgia limited liability company

By:_____
Name:_____
Its:_____


**LANDLORD:**

_____, (a)n _____
_____

By:_____
Name:_____
Its:_____


**TENANT/FRANCHISEE:**

_____, (a)n _____
_____

By:_____
Name:_____
Its:_____

**EXHIBIT "A" TO LEASE ADDENDUM**

**DESCRIPTION OF PREMISES**

_____

_____

_____

**ATTACHMENT "E"**

**TO FRANCHISE AGREEMENT**

**<u>FRANCHISE OWNER AGREEMENT</u>**

[See Attached]

## <u>FRANCHISE OWNER AGREEMENT</u>

This Franchise Owner Agreement (this "<u>Agreement</u>") is entered into by: (i) each of the undersigned owners of Franchisee (defined below); and (ii) the spouse of each such owner, in favor of Hydration Station USA Franchise System, LLC, a Georgia limited liability company, and its successors and assigns ("<u>us</u>"), upon the terms and conditions set forth in this Agreement. Each signatory to this Agreement is referred to as "<u>you</u>".

**1.  Definitions.** For purposes of this Agreement, the following terms have the meanings given to them below:

"*Competitive Business*" means any business competitive with us (or competitive with any of our affiliates or our franchisees) that generates at least 50% of its gross revenues from the provision of hydration therapy services.

"*Copyrights*" means all works and materials for which we or our affiliate has secured common law or registered copyright protection and that we allow Vida-Flo franchisees to use, sell or display in connection with the marketing and/or operation of a Vida-Flo clinic, whether now in existence or created in the future.

"*Franchise Agreement*" means the Vida-Flo Franchise Agreement executed by Franchisee with an effective date of _____, 202___.

"*Franchised Business*" means the Vida-Flo clinic operated by Franchisee pursuant to the Franchise Agreement.

"*Franchisee*" means _____.

"*Improvements*" means any additions, modifications or improvements to (i) the goods or services offered at a Vida-Flo clinic, (ii) the method of operation of a Vida-Flo clinic or (iii) any marketing or promotional ideas relating to a Vida-Flo clinic, whether developed by you, Franchisee or any other person.

"*Intellectual Property*" means, collectively or individually, our Marks, Copyrights, Know-how, System and Improvements.

"*Know-how*" means all of our trade secrets and other proprietary information relating to the development, construction, marketing and/or operation of a Vida-Flo clinic, including, but not limited to, methods, techniques, specifications, medical treatments, procedures, policies, membership data, marketing strategies and information comprising the System and the Manual.

"*Manual*" means our confidential brand standards manual for the operation of a Vida-Flo clinic.

"*Marks*" means the logotypes, service marks, and trademarks now or hereafter involved in the operation of a Vida-Flo clinic, including "Vida-Flo" and related logo and the taglines "THE HYDRATION STATION," "GET REVIDALIZED" and "VIDA-FLO ON-THE-GO", and any other trademarks, service marks or trade names that we designate for use in a Vida-Flo clinic. The term "Marks" also includes any distinctive trade dress used to identify a Vida-Flo clinic, whether now in existence or hereafter created.

"*Prohibited Activities*" means any or all of the following: (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in a Competitive Business (other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business); (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); and/or (iii) inducing any Customer of ours (or of one of our affiliates or franchisees) to transfer their business to Owner or to any other person that is not then a franchisee of ours.

"*Restricted Period*" means the two (2) year period after the earliest to occur of the following: (i) the termination or expiration of the Franchise Agreement; (ii) the date on which Franchisee assigns the Franchise Agreement to another person with respect to whom neither you nor your spouse holds any direct or indirect ownership interest; or (iii) the date on which you cease to be an owner of Franchisee or your spouse ceases to be an owner of Franchisee, as applicable; provided however, that if a court of competent jurisdiction determines that this period of time is too long to be enforceable, then the "Restricted Period" means the one (1) year period after the earliest to occur of the following: (i) the termination or expiration of the Franchise Agreement; (ii) the date on

which Franchisee assigns the Franchise Agreement to another person with respect to whom neither you nor your spouse holds any direct or indirect ownership interest; or (iii) the date on which you cease to be an owner of Franchisee or your spouse ceases to be an owner of Franchisee, as applicable.

*"Restricted Territory"* means the geographic area within: (i) a 15 mile radius from your Clinic (and including your Clinic itself); and (ii) a 15 radius from all other Vida-Flo Clinics that are operating or under construction as of the Effective Date and remain in operation or under construction during all or any part of the Post-Term Restricted Period; provided, however, that if a court of competent jurisdiction determines that the foregoing Restricted Territory is too broad to be enforceable, then the "Restricted Territory" means the geographic area within a 15 mile radius from your Clinic (and including your Clinic itself).

*"System"* means our distinct system for the operation of a Vida-Flo clinic, the distinctive characteristics of which include logo, trade secrets, concept, style, specially formulated programs, products and treatments, confidential brand standards manual and operating system.

**2. Background.** In your capacity as an owner of Franchisee, or the spouse of an owner of Franchisee, you may gain knowledge of our System and Know-how. You understand that protecting the Intellectual Property is vital to our success and that of our franchisees and that you could seriously jeopardize our entire franchise system if you were to unfairly compete with us.  In addition, you understand that certain terms of the Franchise Agreement apply to "owners" and not just Franchisee. You agree to comply with the terms of this Agreement In order to: (i) avoid damaging our System by engaging in unfair competition; and (ii) bind yourself to the terms of the Franchise Agreement applicable to owners.

**3. Brand Protection Covenants.**

(a) <u>Intellectual Property</u>.  You agree: (i) you will not use the Know-how in any business or capacity other than the Franchised Business operated by Franchisee; (ii) you will maintain the confidentiality of the Know-how at all times; (iii) you will not make unauthorized copies of documents containing any Know-how; (iv) you will take such reasonable steps as we may ask of you from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you will stop using the Know-how immediately if you are no longer an owner of Franchisee or your spouse is an owner of Franchisee, as applicable. You further agree that you will not use the Intellectual Property for any purpose other than the development and operation of the Franchised Business pursuant to the terms of the Franchise Agreement and Manual. You agree to assign to us or our designee, without charge, all rights to any Improvement developed by you, including the right to grant sublicenses. If applicable law precludes you from assigning ownership of any Improvement to us, then such Improvement shall be perpetually licensed by you to us free of charge, with full rights to use, commercialize, and sublicense the same. (b) <u>Unfair Competition During Relationship</u>. You agree not to unfairly compete with us at any time while you are an owner of Franchisee or while your spouse is an owner of Franchisee, as applicable, by engaging in any Prohibited Activities. (c) <u>Unfair Competition After Relationship</u>.  You agree not to unfairly compete with us during the Restricted Period by engaging in any Prohibited Activities; provided, however, that the Prohibited Activity relating to having an interest in a Competitive Business will only apply with respect to a Competitive Business that is located within or provides competitive goods or services to Customers who are located within the Restricted Territory. If you engage in any Prohibited Activities during the Restricted Period, then you agree that your Restricted Period will be extended by the period of time during which you were engaging in the prohibited activity (any such extension of time will not be construed as a waiver of your breach or otherwise impair any of our rights or remedies relating to your breach).

(d) <u>Immediate Family Members</u>. You acknowledge that you could circumvent the purpose of this Agreement by disclosing Know-how to an immediate family member (i.e., parent, sibling, child, or grandchild). You also acknowledge that it would be difficult for us to prove whether you disclosed the Know-how to family members. Therefore, you agree that you will be presumed to have violated the terms of this Agreement if any member of your immediate family (i) engages in any Prohibited Activities during any period of time during which you are prohibited from engaging in the Prohibited Activities or (ii) uses or discloses the Know-how. However, you may rebut this presumption by furnishing evidence conclusively showing that you did not disclose the Know-

how to the family member.

(e)       Covenants Reasonable. You acknowledge and agree that: (i) the terms of this Agreement are reasonable both in time and in scope of geographic area; and (ii) you have sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms of this Agreement. **YOU HEREBY WAIVE ANY RIGHT TO CHALLENGE THE TERMS OF THIS AGREEMENT AS BEING OVERLY BROAD, UNREASONABLE OR OTHERWISE UNENFORCEABLE.** Although you and we both believe that the covenants in this Agreement are reasonable in terms of scope, duration and geographic area, we may at any time unilaterally modify the terms of the system protection covenants in Section 3 of this Agreement, upon written notice to you, by limiting the scope of the Prohibited Activities, narrowing the definition of a Competitive Business, shortening the duration of the Restricted Period, reducing the geographic scope of the Restricted Territory and/or reducing the scope of any other covenant imposed upon you under Section 3 of this Agreement to ensure that the terms and covenants are enforceable under applicable law

(f)       Breach. You agree that failure to comply with the covenants in this Section 3 will cause substantial and irreparable damage to us and/or other Vida-Flo franchisees for which there is no adequate remedy at law. Therefore, you agree that any violation of these covenants will entitle us to injunctive relief.  You agree that we may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, will be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000. None of the remedies available to us under this Section are exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages.

**4.  Transfer Restrictions.** If you are an owner of Franchisee, you acknowledge that we must approve all persons who hold a direct or indirect ownership interest in Franchisee. Accordingly, you agree that you will not, directly or indirectly or by operation of law, sell, assign, mortgage, pledge or in any manner transfer any direct or indirect ownership interest in Franchisee except in accordance with the terms and conditions set forth in Section 19 of the Franchise Agreement.

**5.  Financial Security.** In order to secure Franchisee's financial obligations under the Franchise Agreement and all ancillary agreements executed by Franchisee in connection with the Franchise Agreement, including, but not limited to, any agreement for the purchase of goods or services from us or an affiliate of ours and any promissory note related to payments owed to us (collectively, the "Secured Agreements"), you, jointly and severally, personally and unconditionally: (a) guarantee to us and our successor and assigns, that Franchisee shall punctually fulfil all of its payment and other financial obligations under the Secured Agreement; and (b) agree to be personally bound by, and personally liable for, each and every monetary provision in the Secured Agreements. You waive: (1) acceptance and notice of acceptance by us of the foregoing undertakings; (2) notice of demand for payment of any indebtedness guaranteed; (3) protest and notice of default to any party with respect to the indebtedness guaranteed; (4) any right you may have to require that an action be brought against Franchisee or any other person as a condition of liability; and (5) the defense of the statute of limitations in any action hereunder or for the collection of any indebtedness hereby guaranteed. You agree that: (1) your direct and immediate liability under this guaranty shall be joint and several with Franchisee and all other signatories to this Agreement; (2) you will render any payment required under the Secured Agreements upon demand if Franchisee fails or refuses punctually to do so; (3) your liability shall not be contingent or conditioned upon pursuit by us of any remedies against Franchisee or any other person; and (4) liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence that we may grant to Franchisee or to any other person, including the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guarantee, which shall be continuing and irrevocable during the term of each of the Secured Agreements and following the termination, expiration or transfer of each of the Secured Agreements to the extent any financial obligations under any such Secured Agreements survive such termination,

expiration or transfer. This guaranty will continue unchanged by the occurrence of any bankruptcy with respect to Franchisee or any assignee or successor of Franchisee or by any abandonment of one or more of the Secured Agreements by a trustee of Franchisee. Neither your obligation to make payment in accordance with the terms of this undertaking nor any remedy for enforcement shall be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Franchisee or its estate in bankruptcy or of any remedy for enforcement, resulting from the operation of any present or future provision of the U.S. Bankruptcy Act or other statute, or from the decision of any court or agency.

**6.  Dispute Resolution.** Any dispute between the parties relating to this Agreement shall be brought in accordance with the dispute resolution procedures set forth in the Franchise Agreement. Notwithstanding the foregoing, if any of the dispute resolution procedures set forth in the Franchise Agreement conflict with any of the terms of this Agreement, the terms of this Agreement shall prevail.  **You acknowledge and agree that a breach of this Agreement by you shall constitute a material event of default under the Franchise Agreement, permitting us to terminate the Franchise Agreement in accordance with the terms thereof.**

**7.  Miscellaneous.** If either party hires an attorney or files suit against the other party relating to or alleging a breach of this Agreement, the losing party agrees to pay the prevailing party's reasonable attorneys' fees and costs incurred in connection with such breach.

(b)    This Agreement will be governed by, construed and enforced under the laws of the State of Georgia and the courts in that state shall have jurisdiction over any legal proceedings arising out of this Agreement.

(c)    Any claim, defense or cause of action that you may have against us or against Franchisee, regardless of cause or origin, cannot be used as a defense against our enforcement of this Agreement.

(d)    Each section of this Agreement, including each subsection and portion thereof, is severable. In the event that any section, subsection or portion of this Agreement is unenforceable, it shall not affect the enforceability of any other section, subsection or portion; and each party to this Agreement agrees that the court may impose such limitations on the terms of this Agreement as it deems in its discretion necessary to make such terms reasonable in scope, duration and geographic area.

(e)    You agree that we may deliver to you any notice or other communication contemplated by this Agreement in the same manner and to the same address listed in the notice provisions of the Franchise Agreement and any such delivery shall be deemed effective for purposes of this Agreement. You may change the address to which notices must be sent by sending us a written notice requesting such change, which notice shall be delivered in the manner and to the address listed in the Franchise Agreement.


[Signature Page Follows]


IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date or dates set forth below.

**OWNER / SPOUSE**

By: _____

Name: _____

Date: _____


**OWNER / SPOUSE**

By: _____

Name: _____

Date: _____


**OWNER / SPOUSE**

By: _____

Name: _____

Date: _____


**OWNER / SPOUSE**

By: _____

Name: _____

Date: _____

**ATTACHMENT "F"**

**TO FRANCHISE AGREEMENT**

**<u>ACH AUTHORIZATION FORM</u>**

[See Attached]

## AUTOMATED CLEARING HOUSE PAYMENT AUTHORIZATION FORM

**Franchisee Information:**

Franchisee Name                                              Business No.

Franchisee Mailing Address (street)                          Franchisee Phone No.

Franchisee Mailing Address (city, state, zip)

Contact Name, Address and Phone number (if different from above)

Franchisee Fax No.                                           Franchisee E-mail Address

**Bank Account Information:**

Bank Name

Bank Mailing Address (street, city, state, zip)

☐ Checking   ☐ Savings

Bank Account No.            (check one)                       Bank Routing No. (9 digits)

Bank Mailing Address (city, state, zip)                      Bank Phone No.

**Authorization:**

Franchisee hereby authorizes Hydration Station USA Franchise System, LLC ("Franchisor") to initiate debit entries to Franchisee's account with the Bank listed above and Franchisee authorizes the Bank to accept and to debit the amount of such entries to Franchisee's account. Each debit shall be made from time to time in an amount sufficient to cover any fees payable to Franchisor pursuant to any agreement between Franchisor and Franchisee as well as to cover any purchases of goods or services from Franchisor or any affiliate of Franchisor. Franchisee agrees to be bound by the National Automated Clearing House Association (NACHA) rules in the administration of these debit entries. Debit entries will be initiated only as authorized above. This authorization is to remain in full force and effect until Franchisor has received written notification from Franchisee of its termination in such time and in such manner as to afford Franchisor and the Bank a reasonable opportunity to act on it. Franchisee shall notify Franchisor of any changes to any of the information contained in this authorization form at least 30 days before such change becomes effective.

Signature:_____    Date:_____

Name:_____

Its:_____

Federal Tax ID Number:_____

## NOTE:  FRANCHISEE MUST ATTACH A VOIDED CHECK RELATING TO THE BANK ACCOUNT.

**ATTACHMENT "G"**

**TO FRANCHISE AGREEMENT**

**B**RAND **P**ROTECTION **A**GREEMENT

[See Attached]

## BRAND PROTECTION AGREEMENT

This Brand Protection Agreement (this "<u>Agreement</u>") is entered into by the undersigned ("<u>you</u>") in favor of Hydration Station USA Franchise System, LLC, a Georgia limited liability company, and its successors and assigns ("<u>us</u>"), upon the terms and conditions set forth in this Agreement.

**1. Definitions.** For purposes of this Agreement, the following terms have the meanings given to them below:

*"Competitive Business"* means any business competitive with us (or competitive with any of our affiliates or our franchisees) that generates at least 50% of its gross revenues from the provision of hydration therapy services.

*"Copyrights"* means all works and materials for which we or our affiliate has secured common law or registered copyright protection and that we allow Vida-Flo franchisees to use, sell or display in connection with the marketing and/or operation of a Vida-Flo clinic, whether now in existence or created in the future.

*"Franchisee"* means the Vida-Flo franchisee for whom you are an officer, director, employee or independent contractor.

*"Improvements"* means any additions, modifications or improvements to (i) the goods or services offered at a Vida-Flo clinic, (ii) the method of operation of a Vida-Flo clinic or (iii) any marketing or promotional ideals relating to a Vida-Flo clinic, whether developed by you, Franchisee or any other person.

*"Intellectual Property"* means, collectively or individually, our Marks, Copyrights, Know-how, System and Improvements.

*"Know-how"* means all of our trade secrets and other proprietary information relating to the development, construction, marketing and/or operation of a Vida-Flo clinic, including, but not limited to, methods, techniques, specifications, medical treatments, procedures, policies, membership data, marketing strategies and information comprising the System and the Manual.

*"Manual"* means our confidential brand standards manual for the operation of a Vida-Flo clinic.

*"Marks"* means the logotypes, service marks, and trademarks now or hereafter involved in the operation of a Vida-Flo clinic, including "Vida-Flo" and related logo and the taglines "THE HYDRATION STATION," "GET REVIDALIZED" and "VIDA-FLO ON-THE-GO", and any other trademarks, service marks or trade names that we designate for use in a Vida-Flo clinic. The term "Marks" also includes any distinctive trade dress used to identify a Vida-Flo clinic, whether now in existence or hereafter created.

*"Prohibited Activities"* means any or all of the following: (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in a Competitive Business (other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business); (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); and/or (iii) inducing any customer of ours (or of one of our affiliates or franchisees) to transfer their business to you or to any other person that is not then a franchisee of ours.

*"Restricted Period"* means the two (2) year period after you cease to be an officer, director, employee or independent contractor of Franchisee; provided, however, that if a court of competent jurisdiction determines that this period of time is too long to be enforceable, then the "Restricted Period" means the one (1) year period after you cease to be an officer, director, employee or independent contractor of Franchisee.

*"Restricted Territory"* means the geographic area within: (i) a 15 mile radius from Franchisee's Vida-Flo clinic (and including the clinic itself); and (ii) a 15 radius from all other Vida-Flo clinics that are operating or under construction as of the date of this agreement and remain in operation or under construction during all or any part of the Restricted Period; provided, however, that if a court of competent jurisdiction determines that the foregoing Restricted Territory is too broad to be enforceable, then the "Restricted Territory" means the geographic area within a 15 mile radius from Franchisee's Vida-Flo clinic (and including the clinic itself).

*"System"* means our distinct system for the operation of a Vida-Flo clinic, the distinctive characteristics of which include logo, trade secrets, concept, style, specially formulated programs, products and treatments,

confidential brand standards manual and operating system.

**2. Background.** You are an officer, director, employee or independent contractor of Franchisee. As a result of this association, you may gain knowledge of our System and Know-how. You understand that protecting the Intellectual Property is vital to our success and that of our franchisees and that you could seriously jeopardize our entire franchise system if you were to unfairly compete with us.  In order to avoid such damage, you agree to comply with the terms of this Agreement.

**3. Intellectual Property**.  You agree: (i) you will not use the Know-how in any business or capacity other than the Vida-Flo clinic operated by Franchisee; (ii) you will maintain the confidentiality of the Know-how at all times; (iii) you will not make unauthorized copies of documents containing any Know-how; (iv) you will take such reasonable steps as we may ask of you from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you will stop using the Know-how immediately if you are no longer an officer, director, employee or independent contractor of Franchisee. You further agree that you will not use the Intellectual Property for any purpose other than the performance of your duties for Franchisee and within the scope of your employment or other engagement with Franchisee.

**4. Unfair Competition During Relationship**. You agree not to unfairly compete with us at any time while you are an officer, director, employee or independent contractor of Franchisee by engaging in any Prohibited Activities.

**5. Unfair Competition After Relationship**.  You agree not to unfairly compete with us during the Restricted Period by engaging in any Prohibited Activities; provided, however, that the Prohibited Activity relating to having an interest in a Competitive Business will only apply with respect to a Competitive Business that is located within or provides competitive goods or services to customers who are located within the Restricted Territory. If you engage in any Prohibited Activities during the Restricted Period, then you agree that your Restricted Period will be extended by the period of time during which you were engaging in the prohibited activity.

**6. Immediate Family Members**. You acknowledge that you could circumvent the purpose of this Agreement by disclosing Know-how to an immediate family member (i.e., spouse, parent, sibling, child, or grandchild). You also acknowledge that it would be difficult for us to prove whether you disclosed the Know-how to family members. Therefore, you agree that you will be presumed to have violated the terms of this Agreement if any member of your immediate family (i) engages in any Prohibited Activities during any period of time during which you are prohibited from engaging in the Prohibited Activities or (ii) uses or discloses the Know-how. However, you may rebut this presumption by furnishing evidence conclusively showing that you did not disclose the Know-how to the family member.

**7. Covenants Reasonable**. You acknowledge and agree that: (i) the terms of this Agreement are reasonable both in time and in scope of geographic area; and (ii) you have sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms of this Agreement. **YOU HEREBY WAIVE ANY RIGHT TO CHALLENGE THE TERMS OF THIS AGREEMENT AS BEING OVERLY BROAD, UNREASONABLE OR OTHERWISE UNENFORCEABLE.**

**8. Breach**. You agree that failure to comply with the terms of this Agreement will cause substantial and irreparable damage to us and/or other Vida-Flo franchisees for which there is no adequate remedy at law. Therefore, you agree that any violation of the terms of this Agreement will entitle us to injunctive relief.  You agree that we may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, will be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000. None of the remedies available to us under this Agreement are exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages. Any claim, defense or cause of action that you may have against

us or against Franchisee, regardless of cause or origin, cannot be used as a defense against our enforcement of this Agreement.

**9.   Miscellaneous**.

(a)    If we hire an attorney or file suit against you because you have breached this Agreement and prevail against you, you agree to pay our reasonable attorneys' fees and costs in doing so.

(b)    This Agreement will be governed by, construed and enforced under the laws of Georgia and the courts in that state shall have jurisdiction over any legal proceedings arising out of this Agreement.

(c)    Each section of this Agreement, including each subsection and portion thereof, is severable. In the event that any section, subsection or portion of this Agreement is unenforceable, it shall not affect the enforceability of any other section, subsection or portion; and each party to this Agreement agrees that the court may impose such limitations on the terms of this Agreement as it deems in its discretion necessary to make such terms reasonable in scope, duration and geographic area.

(d)    You and we both believe that the covenants in this Agreement are reasonable in terms of scope, duration and geographic area. However, we may at any time unilaterally modify the terms of this Agreement upon written notice to you by limiting the scope of the Prohibited Activities, narrowing the definition of a Competitive Business, shortening the duration of the Restricted Period, reducing the geographic scope of the Restricted Territory and/or reducing the scope of any other covenant imposed upon you under this Agreement to ensure that the terms and covenants in this Agreement are enforceable under applicable law.

This Brand Protection Agreement is executed as of the date or dates set forth below.


By: _____

Name: _____

Date: _____

**ATTACHMENT "H"**

**TO FRANCHISE AGREEMENT**

**CONFIDENTIALITY AGREEMENT**

[See Attached]

**CONFIDENTIALITY AGREEMENT**

This Agreement (this "Agreement") is entered into by the undersigned ("you") in favor of Hydration Station USA Franchise System, LLC, a Georgia limited liability company, and its successors and assigns ("us"), upon the terms and conditions set forth in this Agreement.

**1. Definitions.** For purposes of this Agreement, the following terms have the meanings given to them below:

*"Copyrights"* means all works and materials for which we or our affiliate has secured common law or registered copyright protection and that we allow Vida-Flo franchisees to use, sell or display in connection with the marketing and/or operation of a Vida-Flo clinic, whether now in existence or created in the future.

*"Franchisee"* means the Vida-Flo franchisee for whom you are an officer, director, employee or independent contractor.

*"Improvements"* means any additions, modifications or improvements to (i) the goods or services offered at a Vida-Flo clinic, (ii) the method of operation of a Vida-Flo clinic or (iii) any marketing or promotional ideals relating to a Vida-Flo clinic, whether developed by you, Franchisee or any other person.

*"Intellectual Property"* means, collectively or individually, our Marks, Copyrights, Know-how, System and Improvements.

*"Know-how"* means all of our trade secrets and other proprietary information relating to the development, construction, marketing and/or operation of a Vida-Flo clinic, including, but not limited to, methods, techniques, specifications, medical treatments, procedures, policies, membership data, marketing strategies and information comprising the System and the Manual.

*"Manual"* means our confidential brand standards manual for the operation of a Vida-Flo clinic.

*"Marks"* means the logotypes, service marks, and trademarks now or hereafter involved in the operation of a Vida-Flo clinic, including "Vida-Flo" and related logo and the taglines "THE HYDRATION STATION," "GET REVIDALIZED" and "VIDA-FLO ON-THE-GO", and any other trademarks, service marks or trade names that we designate for use in a Vida-Flo clinic. The term "Marks" also includes any distinctive trade dress used to identify a Vida-Flo clinic, whether now in existence or hereafter created.

*"System"* means our distinct system for the operation of a Vida-Flo clinic, the distinctive characteristics of which include logo, trade secrets, concept, style, specially formulated programs, products and treatments, confidential brand standards manual and operating system.

**2. Background.** You are an officer, director, employee or independent contractor of Franchisee. As a result of this association, you may gain knowledge of our System and Know-how. You understand that protecting the Intellectual Property is vital to our success and that of our franchisees and that you could seriously jeopardize our entire franchise system if you were to unfairly compete with us.  In order to avoid such damage, you agree to comply with the terms of this Agreement.

**3. Know-How and Intellectual Property**.  You agree: (i) you will not use the Know-how in any business or capacity other than the Vida-Flo clinic operated by Franchisee; (ii) you will maintain the confidentiality of the Know-how at all times; (iii) you will not make unauthorized copies of documents containing any Know-how; (iv) you will take such reasonable steps as we may ask of you from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you will stop using the Know-how immediately if you are no longer an officer, director, employee or independent contractor of Franchisee. You further agree that you will not use the Intellectual Property for any purpose other than the performance of your duties for Franchisee and within the scope of your employment or other engagement with Franchisee.

**4. Immediate Family Members**. You acknowledge that you could circumvent the purpose of this Agreement by disclosing Know-how to an immediate family member (i.e., spouse, parent, sibling, child, or grandchild). You also acknowledge that it would be difficult for us to prove whether you disclosed the Know-how to family members.  Therefore, you agree that you will be presumed to have violated the terms of this Agreement if any

member of your immediate family uses or discloses the Know-how. However, you may rebut this presumption by furnishing evidence conclusively showing that you did not disclose the Know-how to the family member.

**5.   Covenants Reasonable**. You acknowledge and agree that: (i) the terms of this Agreement are reasonable both in time and in scope of geographic area; and (ii) you have sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms of this Agreement. **YOU HEREBY WAIVE ANY RIGHT TO CHALLENGE THE TERMS OF THIS AGREEMENT AS BEING OVERLY BROAD, UNREASONABLE OR OTHERWISE UNENFORCEABLE.**

**6.   Breach**. You agree that failure to comply with the terms of this Agreement will cause substantial and irreparable damage to us and/or other Vida-Flo franchisees for which there is no adequate remedy at law. Therefore, you agree that any violation of the terms of this Agreement will entitle us to injunctive relief.  You agree that we may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, will be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000. None of the remedies available to us under this Agreement are exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages. Any claim, defense or cause of action that you may have against us or against Franchisee, regardless of cause or origin, cannot be used as a defense against our enforcement of this Agreement.

**7.   Miscellaneous**.

    (a)   If we hire an attorney or file suit against you because you have breached this Agreement and prevail against you, you agree to pay our reasonable attorneys' fees and costs in doing so.

    (b)   This Agreement will be governed by, construed and enforced under the laws of Georgia and the courts in that state shall have jurisdiction over any legal proceedings arising out of this Agreement.

    (c)   Each section of this Agreement, including each subsection and portion thereof, is severable. In the event that any section, subsection or portion of this Agreement is unenforceable, it shall not affect the enforceability of any other section, subsection or portion; and each party to this Agreement agrees that the court may impose such limitations on the terms of this Agreement as it deems in its discretion necessary to make such terms enforceable.

This Confidentiality Agreement is executed as of the date set forth below.


By: _____

Name: _____

Date: _____

**EXHIBIT "D"**

**TO DISCLOSURE DOCUMENT**

**OTHER AGREEMENTS**

**EXHIBIT "D"-1**

<u>STATE ADDENDA AND AGREEMENT RIDERS</u>

*[See Attached]*

**STATE ADDENDA AND AGREEMENT RIDERS**

**ADDENDUM TO FRANCHISE AGREEMENT, SUPPLEMENTAL AGREEMENTS,**

**AND FRANCHISE DISCLOSURE DOCUMENT FOR CERTAIN STATES FOR**

**HYDRATION STATION USA FRANCHISE SYSTEM, LLC**

**BACKGROUND AND PURPOSE**

The following modifications are made to the Vida-Flo Franchise Disclosure Document ("FDD" or "Disclosure Document") issued by Hydration Station USA Franchise System, LLC ("we" or "us" or "franchisor") to franchisee ("you" or "franchisee") and may supersede, to the extent required by applicable state law, certain portions of the Franchise Agreement between you and us dated _____, 202__ (the "Franchise Agreement"). When the term "Supplemental Agreements" is used, it means any area development agreement, area representative agreement, master franchise agreement, or similar agreement entered into between us and you, if applicable.

Certain states have laws governing the franchise relationship and franchise documents. Certain states require modifications to the FDD, Franchise Agreement, Supplemental Agreements and other documents related to the sale of a franchise. This State-Specific Addendum ("State Addendum") will modify these agreements to comply with the applicable state's laws. The terms of this State Addendum will only apply if you meet the requirements of the applicable state independently of your signing of this State Addendum. The terms of this State Addendum (but only the State Addendum for the applicable State) will override any inconsistent provision of the FDD, Franchise Agreement or any Supplemental Documents. This State Addendum only applies to the following states: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

If your state requires these modifications, you will sign this State Addendum along with the Franchise Agreement and any Supplemental Agreements. If you sign this State Addendum, only the terms applicable to the state or states whose franchise laws apply to your transaction will govern. If you sign this State Addendum, but none of the state franchise laws listed above applies because their jurisdictional requirements have not been met, then this State Addendum will be void and inapplicable to you.

## **CALIFORNIA**

1. The California Franchise Investment Law requires a copy of all proposed agreements relating to the sale of the Franchise be delivered together with the Disclosure Document.

2. Section 31125 of the California Corporations Code requires us to give you a disclosure document, in a form containing the information that the Commissioner may by rule or order require, before a solicitation of a proposed material modification of an existing franchise.

3. Neither the franchisor nor any person or franchise broker in Item 2 of the FDD is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a et seq., suspending or expelling such persons from membership in such association or exchange.

4. The Franchise Agreement and Supplemental Agreements require binding arbitration. The arbitration will occur in Fulton County, Georgia with the costs being borne initially by the filing party.

5. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a Franchise Agreement or Supplemental Agreement restricting venue to a forum outside the State of California.

6. The Franchise Agreement and Supplemental Agreements require application of the laws of Georgia.  This provision may not be enforceable under California law.

7. The Franchise Agreement and Supplemental Agreements may provide for termination upon bankruptcy.  Any such provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et seq.).

8. The Franchise Agreement and Supplemental Agreements may contain a covenant not to compete which extends beyond the termination of the franchise.  This provision may not be enforceable under California law.

9. Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.  Any such provisions contained in the Franchise Agreement or Supplemental Agreements may not be enforceable.

10. California Business and Professions Code Sections 20000 through 20043 provide rights to you concerning termination, transfer, or non-renewal of a franchise.  If the Franchise Agreement or Supplemental Agreements contain a provision that is inconsistent with the California Franchise Investment Law, the California Franchise Investment Law will control.

11. You must sign a general release of claims if you renew or transfer your Franchise.  California Corporations Code Section 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code Sections 31000 through 31516).  Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000 through 20043).

12. OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION AT https://dfpi.ca.gov/.

## HAWAII

1. The following is added to the Cover Page:

   **THIS FRANCHISE WILL BE/HAS BEEN FILED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF HAWAII. FILING DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS OR A FINDING BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS THAT THE INFORMATION PROVIDED IN THIS FRANCHISE DISCLOSURE DOCUMENT IS TRUE, COMPLETE AND NOT MISLEADING.**

   **THE FRANCHISE INVESTMENT LAW MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WITHOUT FIRST PROVIDING TO YOU OR SUBFRANCHISOR AT LEAST SEVEN DAYS PRIOR TO THE EXECUTION BY YOU OR SUBFRANCHISOR OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST SEVEN DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY YOU, WHICHEVER OCCURS FIRST, A COPY OF THE FRANCHISE DISCLOSURE DOCUMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE.**

   **THIS FRANCHISE DISCLOSURE DOCUMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR A STATEMENT OF ALL RIGHTS, CONDITIONS, RESTRICTIONS AND OBLIGATIONS OF BOTH US AND YOU.**

2. Our registered agent in the state authorized to receive service of process:

   Commissioner of Securities of the State of Hawaii
   Department of Commerce and Consumer Affairs
   Business Registration Division
   335 Merchant Street, Room 203
   Honolulu, Hawaii 96813

3. The states in which this filing is effective are listed on the Exhibit to the FDD titled "State Effective Dates".

4. The states in which this filing is or will be shortly on file include the following: None

5. The states, if any, which have refused, by order or otherwise, to register these franchises include the following: None

6. The states, if any, which have revoked or suspended the right to offer these franchises include the following: None

7. The states, if any, in which the filing of these franchises has been withdrawn include the following: None

## ILLINOIS

In recognition of the requirements of the Illinois Franchise Disclosure Act, 815 ILCS 705, the Disclosure Document and the Franchise Agreement and Supplemental Agreements are amended as follows:

1.  Illinois law shall apply to and govern the Franchise Agreement and Supplemental Agreements.

2.  In accordance with <u>Section 4</u> of the Illinois Franchise Disclosure Act, any provision in the Franchise Agreement and Supplemental Agreements that designated jurisdiction and venue in a forum outside of the State of Illinoi is void. However, the Franchise Agreement and Supplemental Agreements may provide for arbitration to take place outside of Illinois. Therefore, any arbitration proceeding may be brought in Fulton County, Georgia in accordance with the dispute resolution provision set forth in the Franchise Agreement and Supplemental Agreements.

3.  Your rights upon Termination and Non-Renewal are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

4.  In conformance with Section 41 of the Illinois Franchise Disclosure Act, any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

5.  The Franchise Agreement and Supplemental Agreements are amended to state the following:

    To the extent that any provision in the Illinois State Addendum is inconsistent with any provision in this Agreement, the provision in the Illinois State Addendum shall control.

# INDIANA

In recognition of the requirements of the Indiana Franchise Disclosure Law, IC 23-2-2-2.5, the Franchise Agreement and Supplemental Agreements are amended as follows:

1.  The laws of the State of Indiana supersede any provisions of the Disclosure Document, Franchise Agreement and Supplemental Agreements if such provisions are in conflict with Indiana law.

2.  The Franchise Agreement and Supplemental Agreements are amended to provide that such agreements will be construed in accordance with the laws of the State of Indiana.

3.  Any provision in the Franchise Agreement which designates jurisdiction or venue, or requires the franchisee to agree to jurisdiction or venue, in a forum outside of Indiana, is deleted from any Franchise Agreement and Supplemental Agreement issued in the State of Indiana.

4.  The prohibition by Indiana Code § 23-2-2.7-1(7) against unilateral termination of the franchise without good cause or in bad faith, good cause being defined therein as material breach of the Franchise Agreement or Supplemental Agreement (as applicable), shall supersede the provisions of the Franchise Agreement or Supplemental Agreement (as applicable) in the State of Indiana to the extent they may be inconsistent with such prohibition.

5.  Liquidated damages and termination penalties are prohibited by law in the State of Indiana and, therefore, the Disclosure Document, the Franchise Agreement and Supplemental Agreements are amended by the deletion of all references to liquidated damages and termination penalties and the addition of the following language to the original language that appears therein:

    Notwithstanding any such termination, and in addition to the obligations of the franchisee as otherwise provided, or in the event of termination or cancellation of the Franchise Agreement under any of the other provisions therein, the franchisee nevertheless shall be, continue and remain liable to franchisor for any and all damages which franchisor has sustained or may sustain by reason of such default or defaults and the breach of the Franchise Agreement on the part of the franchisee for the unexpired Term of the Franchise Agreement.

    At the time of such termination of the Franchise Agreement, the franchisee covenants to pay to franchisor within 10 days after demand as compensation all damages, losses, costs and expenses (including reasonable attorney's fees) incurred by franchisor, and/or amounts which would otherwise be payable thereunder but for such termination for and during the remainder of the unexpired Term of the Franchise Agreement.  This Agreement does not constitute a waiver of the franchisee's right to a trial on any of the above matters.

6.  No release language set forth in the Disclosure Document or Franchise Agreement or Supplemental Agreement shall relieve franchisor or any other person, directly or indirectly, from liability imposed by the laws concerning franchising of the State of Indiana. Any provision in the Franchise Agreement or Supplemental Agreement that would require you to prospectively assent to a release, assignment, novation, waiver or estoppel which purports to relieve any person from liability imposed by the Indiana Deceptive Franchise Practices Law is void to the extent that such provision violates such law.

**MARYLAND**

In recognition of the requirements of the Maryland Franchise Registration and Disclosure Law (the "Maryland Franchise Law"), the Disclosure Document is amended as follows:

1. Item 17 of the Disclosure Document is amended to add the following:

    a. The general release required as a condition of renewal, sale and/or assignment/transfer shall not apply any liability under the Maryland Franchise Registration and Disclosure Law.

    b. A franchisee may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

    c. Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

    d. In the event of a conflict of laws to the extent required by the Maryland Franchise Registration and Disclosure Law, Maryland law shall prevail.

    e. The Franchise Agreement and Supplemental Agreements provide for termination upon bankruptcy.  This provision may not be enforceable under federal bankruptcy law (11 U.S.C. Section 101, et seq.).

2. The Franchise Disclosure Questionnaire, which is attached as an Exhibit to the Disclosure Document, is amended as follows:

    All representations requiring prospective franchisees to assent to the release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel, or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

In recognition of the requirements of the Maryland Franchise Law, the Franchise Agreement and Supplemental Agreements are amended to add the following:

1. Any claims arising under the Maryland Franchise Law must be brought within three (3) years after the grant of the franchise.

2. Pursuant to COMAR 02.02.08.16L, the general release required as a condition of renewal, sale, and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Law.

3. You may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Law.

4. The Franchise Questionnaire that you completed in connection with your application for the franchise requires you, as a prospective franchisee, to disclaim the occurrence and/or acknowledge the non-occurrence of acts that would constitute a violation of the Maryland Franchise Law as a condition to your purchase of the franchise.  Any such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Law.

5. Any acknowledgements or representations by you that disclaim the occurrence and/or acknowledge the non-occurrence of acts that would constitute a violation of the Maryland Law are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Law.

6.  Nothing in the Franchise Agreement, Supplemental Agreement or in any related agreement is intended to disclaim the representations made in the Franchise Disclosure Document.

# MICHIGAN

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.**

Each of the following provisions is void and unenforceable if contained in any document relating to a franchise:

(a) A prohibition on the right of a franchisee to join an association of franchisees.

(b) A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c) A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

(d) A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) The term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e) A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f) A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g) A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

    (i) The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.

    (ii) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

    (iii) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h) A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i) A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000.00, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

Any questions regarding this notice should be directed to:

State of Michigan
Department of Attorney General
CONSUMER PROTECTION DIVISION
Attention: Franchise Section
G. Mennen Williams Building, 1st Floor
525 West Ottawa Street
Lansing, Michigan 48913
Telephone Number: (517) 373-7117

## <u>MINNESOTA</u>

In recognition of the Minnesota Franchise Law, Minn. Stat., Chapter 80C, Sections 80C.01 through 80C.22, and the Rules and Regulations promulgated pursuant thereto by the Minnesota Commission of Securities, Minnesota Rule 2860.4400, et. seq., the Disclosure Document, Franchise Agreement and Supplemental Agreements are amended as follows:

1.  Minnesota Rule 2860.4400(D) prohibits us from requiring you to assent to a general release.

2.  We will comply with Minnesota Statute Section 80C.14, Subds. 3, 4 and 5 which require, except in certain specified cases, that you be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the Franchise Agreement or Supplemental Agreement; and that consent to the transfer of the franchise will not be unreasonably withheld.

3.  Minnesota Statute Section 80C.21 and Minnesota Rule 2860.4400(J) prohibit us from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial, or requiring you to consent to liquidated damages, termination penalties or judgment notes.  In addition, nothing in the Franchise Disclosure Document or agreement(s) can abrogate or reduce any of your rights as provided for in Minnesota Statues, chapter 80C, or your rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.  In addition, we will comply with the provisions of Minnesota Rule 2860.4400(J), which state that you cannot waive any rights, you cannot consent to our obtaining injunctive relief, we may seek injunctive relief, and a court will determine if a bond if required.

4.  We will comply with Minnesota Statute Section 80C.12, Subd. 1(g), which requires that we protect your right to use the trademarks, service marks, trade names, logotypes or other commercial symbols or indemnify you from any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the name.

5.  We will comply with Minnesota Statute Section 80C.17, Subd. 5 regarding limitation of claims.

## **NEW YORK**

In recognition of the requirements of the General Business Laws of the State of New York, Article 33, §§680 through 695, the Disclosure Document, Franchise Agreement and Supplemental Agreements are amended as follows:

1.  The following information is added to the cover page of the Disclosure Document:

> **INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THE FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, BUREAU OF INVESTOR PROTECTION, 28 LIBERTY STREET, 21ST FLOOR, NEW YORK, NEW YORK 10005. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**

2.  The following is added at the end of Item 3 of the Disclosure Document:

> Except as provided above, with regard to the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:
>
> A. No such party has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust, or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, or comparable
>
> civil or misdemeanor allegations.
>
> B. No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.
>
> C. No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10 year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud, or securities law; fraud; embezzlement; fraudulent conversion or misappropriation of property; or unfair or deceptive practices or comparable allegations.
>
> D. No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State, or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any

national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a  real estate broker or sales agent.

3.    The following is added to the end of Item 4 of the Disclosure Document:

Neither the franchisor, its affiliate, its predecessor, officers, or general partner during the 10-year period immediately before the date of the offering circular: (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after that officer or general partner of the franchisor held this position in the company or partnership.

4.    The following is added to the end of Item 5 of the Disclosure Document:

The initial franchise fee constitutes part of our general operating funds and will be used as such in our discretion.

5.    The following is added to the end of the "Summary" sections of Item 17(c) of the Disclosure Document, titled "**Requirements for franchisee to renew or extend**," and Item 17(m) of the Disclosure Document, entitled "**Conditions for franchisor approval of transfer**":

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

6.    The following language replaces the "Summary" section of Item 17(d) of the Disclosure Document, titled "**Termination by franchisee**":

You may terminate the agreement on any grounds available by law.

7.    The following is added to the end of the "Summary" section of Item 17(j) of the Disclosure Document, titled "**Assignment of contract by franchisor**":

However, no assignment will be made except to an assignee who in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the Franchise Agreement.

8.    The following is added to the end of the "Summary" sections of Item 17(v) of the Disclosure Document, titled "Choice of forum", and Item 17(w) of the Disclosure Document, titled "**Choice of law**":

The foregoing choice of law should not be considered a waiver of any right conferred upon the franchisor or upon the franchisee by Article 33 of the General Business Law of the State of New York.

9.    We will not require that you prospectively assent to a release, assignment, novation, waiver, or estoppel that purports to relieve any person from liability imposed by the New York Franchise Law.

10. We will not place any condition, stipulation, or provision in the Franchise Agreement that requires you to waive compliance with any provision of the New York Franchise Law.

11. Any provision in the Franchise Agreement that limits the time period in which you may assert a legal claim against us under the New York Franchise Law is amended to provide for a three (3) year statute of limitations for purposes of bringing a claim arising under the New York Franchise Law.

12. Notwithstanding the transfer provision in the Franchise Agreement, we will not assign the Franchise Agreement except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under the Franchise Agreement.

## NORTH DAKOTA

In recognition of the requirements of the North Dakota Franchise Investment Law (the "North Dakota Franchise Law"), the Disclosure Document, Franchise Agreement and Supplemental Agreements are amended as follows:

1.  Covenants not to compete are generally considered unenforceable in the State of North Dakota, pursuant to Section 51-19-09 of the North Dakota Franchise Law. Item 17(r) of the Disclosure Document and certain provisions in the Franchise Agreement and Supplemental Agreements include certain covenants restricting competition to which you must agree. The Commissioner has held that covenants restricting competition contrary to Section 9-08-06 of the North Dakota Century Code, without further disclosing that such covenants may be subject to this statue, are unfair, unjust, or inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Law. The Disclosure Document, Franchise Agreement and Supplemental Agreements are amended accordingly to the extent required by law.

2.  Provisions requiring arbitration or mediation to be held at a location that is remote from the site of the franchisee's business are generally considered unenforceable in the State of North Dakota, pursuant to Section 51-19-09 of the North Dakota Franchise Investment Law. Accordingly, the parties must agree on the site where arbitration or mediation will be held.

3.  Provisions requiring jurisdiction in a state other than North Dakota are generally considered unenforceable in the State of North Dakota, pursuant to Section 51-19-09 of the North Dakota Franchise Investment Law.

4.  Provisions requiring that agreements be governed by the laws of a state other than North Dakota are generally considered unenforceable in the State of North Dakota, pursuant to Section 51-19-09 of the North Dakota Franchise Investment Law.

5.  Provisions requiring your consent to liquidated or termination damages are generally considered unenforceable in the State of North Dakota, pursuant to Section 51-19-09 of the North Dakota Franchise Investment Law.

6.  Provisions requiring you to sign a general release upon renewal of the franchise agreement have been determined to be unfair, unjust and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law.

7.  Provisions requiring you to pay all costs and expenses incurred by us in enforcing the franchise agreement have been determined to be unfair, unjust and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law.  Accordingly, any such provision is modified to read that the prevailing party in any enforcement action is entitled to recover all costs and expenses including attorney's fees.

8.  Provisions requiring you to consent to a waiver of trial by jury have been determined to be unfair, unjust and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law.

9.  Provisions requiring you to consent to a limitation of claims within one year have been determined to be unfair, unjust and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law.  Accordingly, any such provision is modified to read that the statute of limitations under North Dakota Law will apply.

10. Provisions requiring you to consent to a waiver of exemplary and punitive damages have been determined to be unfair, unjust and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Invest Law.

**RHODE ISLAND**

In recognition of the requirements of the Rhode Island Franchise Investment Act (the "Rhode Island Franchise Law"), the Disclosure Document, Franchise Agreement and Supplemental Agreements are amended as follows:

1.  We will not require that you prospectively assent to a waiver, condition, stipulation, or provision that purports to relieve any person from liability imposed by the Rhode Island Franchise Law. This provision does not apply to the settlement of disputes, claims, or civil lawsuits brought under the Rhode Island Franchise Law.

2.  Section 19-28.1-14 of the Rhode Island Franchise Law provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act." If a claim is enforceable under the Rhode Island Franchise Law, we will not restrict jurisdiction or venue to a forum outside the State of Rhode Island or require the application of the laws of another state.

3.  We will not prohibit you from joining a trade association or association of franchisees. We will not retaliate against you for engaging in these activities.

4.  Any provision in the Franchise Agreement that limits the time period in which you may assert a legal claim against us under the Rhode Island Franchise Law is amended to provide for a four (4) year statute of limitations for purposes of bringing a claim arising under the Rhode Island Franchise Law. Notwithstanding the foregoing, if a rescission offer has been approved by the Rhode Island director of business registration, then the statute of limitations is ninety (90) days after your receipt of the rescission offer.

**VIRGINIA**

In recognition of the requirements of the Virginia Retail Franchising Act, the Disclosure Document, Franchise Agreement and Supplemental Agreements are amended as follows:

1.  Item 17 of the Disclosure Document is amended to add the following:

    Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the Franchise Agreement or Supplemental Agreement does not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

    Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to use undue influence to induce a franchisee/area developer to surrender any right given to him under the applicable agreement.

2.  If any provision of the Franchise Agreement or any Supplemental Agreement involves the use of undue influence by the franchisor to induce a franchisee/area developer to surrender any rights given to him under the applicable agreement, that provision may not be enforceable.

3.  We will not require that you prospectively assent to a waiver, condition, stipulation, or provision that purports to relieve any person from liability imposed by the Virginia Retail Franchising Act.  This provision does not prohibit you and us from entering into binding arbitration consistent with the Virginia Retail Franchising Act.

4.  Any provision in the Franchise Agreement or Supplemental Agreement that limits the time period in which you may assert a legal claim against us under the Virginia Retail Franchising Act is amended to provide for a four (4) year statute of limitations for purposes of bringing a claim arising under the Virginia Retail Franchising Act.

5.  Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it shall be unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the Franchise Agreement or Supplemental Agreement does not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

# **WASHINGTON**

In recognition of the requirements of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW, the Disclosure Document, Franchise Agreement and Supplemental Agreements are amended as follows:

1.  In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW, will prevail.

2.  RCW 19.100.180 may supersede the Franchise Agreement and Supplemental Agreements in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the Franchise Agreement and Supplemental Agreements in your relationship with the franchisor including the areas of termination and renewal of your franchise.

3.  In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

4.  A release or waiver of rights executed by a franchisee may not include rights under the Washington Franchise Investment Protection Act or any rule or order thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial, may not be enforceable.

5.  Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

6.  Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the franchise agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

7.  RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement or elsewhere are void and unenforceable in Washington.

## <u>WISCONSIN</u>

The Wisconsin Fair Dealership Law, Chapter 135 of the Wisconsin Statutes supersedes any provision of the Franchise Agreement and Supplement Agreements (if applicable) if such provision is in conflict with that law. The Franchise Disclosure Document, the Franchise Agreement and the Supplemental Agreements are amended accordingly.

***(Signatures on following page)***

## <u>APPLICABLE ADDENDA</u>

If any one of the preceding Addenda for specific states ("**Addenda**") is checked as an "Applicable Addenda" below, then that Applicable Addenda shall be incorporated into the Franchise Disclosure Document, Franchise Agreement, Supplemental Agreements (if applicable) and any other specified agreement(s) entered into by us and the undersigned franchisee. To the extent any terms of an applicable Addenda conflict with the terms of the Franchise Disclosure Document, Franchise Agreement, Supplemental Agreement (if applicable) and other specified agreement(s), the terms of the Applicable Addenda shall supersede the terms of the Franchise Agreement.

| ☐ California | ☐ Michigan | ☐ South Dakota |
|---|---|---|
| ☐ Hawaii | ☐ Minnesota | ☐ Virginia |
| ☐ Illinois | ☐ New York | ☐ Washington |
| ☐ Indiana | ☐ North Dakota | ☐ Wisconsin |
| ☐ Maryland | ☐ Rhode Island | |

Dated: _____, 202____

**FRANCHISOR:**

Hydration Station USA Franchise System, LLC

By: _____

Title: _____


**FRANCHISEE:**

_____

By: _____

Title: _____

**EXHIBIT "D"-2**

<u>Franchisee Disclosure Questionnaire</u>

*[See Attached]*

**FRANCHISEE DISCLOSURE QUESTIONNAIRE**

As you know Hydration Station USA Franchise System, LLC ("we" or "us), and you are preparing to enter into a Franchise Agreement for the operation of a Vida-Flo franchise. The purpose of this Questionnaire is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise. **You cannot sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.** Please review each of the following questions carefully and provide honest responses to each question. If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

Yes___    No___    1.    Have you received and personally reviewed the Franchise Agreement and each attachment or schedule attached to it?

Yes___    No___    2.    Have you received and personally reviewed the Franchise Disclosure Document we provided?

Yes___    No___    3.    Did you sign a receipt for the Franchise Disclosure Document indicating the date you received it?

Yes___    No___    4.    Do you understand all the information contained in the Franchise Disclosure Document and Franchise Agreement?

Yes___    No___    5.    Did you receive the FDD at least 14 days before you signed any agreement or paid any fee to us or any affiliate of ours?

Yes___    No___    6.    Did you receive a complete execution copy of the Franchise Agreement, with all material terms filled in, at least seven (7) days before you signed it?

Yes___    No___    7.    Have you reviewed the Franchise Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor?

Yes___    No___    8.    Have you discussed the benefits and risks of developing and operating a Vida-Flo franchise with an existing Vida-Flo franchisee?

Yes___    No___    9.    Do you understand the risks of developing and operating a Vida-Flo franchise?

Yes___    No___    10.    Do you understand the success or failure of your franchise will depend in large part upon your skills, abilities and efforts and those of the persons you employ as well as many factors beyond your control such as competition, interest rates, the economy, inflation, labor and supply costs and other relevant factors?

Yes___    No___    11.    Do you understand all disputes or claims you may have arising out of or relating to the Franchise Agreement must be arbitrated in Georgia, if not resolved informally or by mediation?

Yes___    No___    12.    Do you understand that you must satisfactorily complete the initial training course before we will allow your franchised business to open or consent to a transfer?

Yes___    No___    13.    Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a Vida-Flo franchise that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

Yes___    No___    14.    Do you agree that no employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement, concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

Yes___   No___   15.   Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a Vida-Flo franchise will generate, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

Yes___   No___   16.   Do you understand that the Franchise Agreement and attachments to the Franchise Agreement contain the entire agreement between us and you concerning the franchise for the Vida-Flo business, meaning any prior oral or written statements not set out in the Franchise Agreement or the attachments to the Franchise Agreement will not be binding?

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM.  BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.

_____          _____
Signature of Franchise Applicant          Signature of Franchise Applicant

_____          _____
Name (please print)                       Name (please print)

Dated _____          Dated _____

_____          _____
Signature of Franchise Applicant          Signature of Franchise Applicant

_____          _____
Name (please print)                       Name (please print)

Dated _____          Dated _____

EXPLANATION OF ANY  NEGATIVE RESPONSES [REFER TO QUESTION NUMBER]:

**EXHIBIT "D"-3**

<u>**GENERAL RELEASE**</u>

*[See Attached]*

## WAIVER AND RELEASE OF CLAIMS

This Waiver and Release of Claims (this "Agreement") is made as of _____, 202__ (the "Effective Date") by _____, a(n) _____ ("you") and each individual holding a direct or indirect ownership interest in you (collectively "Owner") in favor of Hydration Station USA Franchise System, LLC, a Georgia limited liability company ("us," and together with you and Owner, the "Parties").

**WHEREAS,** we signed a Franchise Agreement with you, dated _____, 202____ (the "Franchise Agreement") pursuant to which we granted you the right to own and operate a Vida-Flo clinic;

**WHEREAS,** you have notified us of your desire to transfer the Franchise Agreement and all rights related thereto, or an ownership interest in the franchisee entity, to a transferee, **[enter into a successor franchise agreement]** and we have consented to such transfer **[agreed to enter into a successor franchise agreement]**; and

**WHEREAS,** as a condition to our consent to the transfer **[your ability to enter into a successor franchise agreement]**, you and Owner have agreed to execute this Agreement upon the terms and conditions stated below.

**NOW, THEREFORE,** in consideration of our consent to the transfer **[our entering into a successor franchise agreement]**, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and intending to be legally bound, you and Owner hereby agree as follows:

       1.      Release. Owner, you, and each of your officers, directors, shareholders, members, owners, employees, agents, representatives, affiliates, parents, divisions, successors and assigns, and all persons or firms claiming by, through, under, or on behalf of any or all of them (the "Franchisee Parties"), hereby release, acquit and forever discharge us, any and all of our past and present affiliates, parents, subsidiaries and related companies, divisions and partnerships, consultants, advisors and franchise sellers and its and their respective past and present officers, directors, shareholders, members, owners, employees, agents, representatives, affiliates, parents, divisions, successors and assigns, and the spouses of such individuals (collectively, the "Franchisor Parties"), from any and all claims, liabilities, damages, expenses, actions or causes of action which any of the Franchisee Parties may now have or has ever had, whether known or unknown, past or present, absolute or contingent, suspected or unsuspected, of any nature whatsoever, directly or indirectly arising out of or relating to the execution and performance (or lack thereof) of the Franchise Agreement or the offer, sale or acceptance of the franchise related thereto (including, but not limited to any disclosures and representations made in connection therewith). The foregoing release shall not be construed to apply with respect to any obligations contained within this Agreement.

       2.      California Law. You and Owner hereby express your intention to release all existing claims, whether known or unknown, against the Franchisor Parties. Accordingly, you and Owner hereby waive Section 1542 of the California Civil Code, which provides the following:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

[Section 2 only applies for California franchisees; otherwise it is omitted]

       3.      Nondisparagement. Each of the Franchisee Parties expressly covenant and agree not to make any false representation of facts, or to defame, disparage, discredit or deprecate any of the Franchisor Parties or otherwise communicate with any person or entity in a manner intending to damage any of the Franchisor Parties, the business conducted by any of the Franchisor Parties or the reputation of any of the Franchisor Parties. For purposes of clarity, the obligations in this Section apply to all methods of communications, including the making of statements or representations through direct verbal or written communication as well as the making of statements or representations on the Internet, through social media sites or through any other verbal, digital or

electronic method of communication. The obligations in this Section also prohibit the Franchisee Parties from indirectly violating this Section by influencing or encouraging third parties to engage in activities that would constitute a violation of this Section if conducted directly by a Franchisee Party.

4.      Representations and Warranties. You and Owner each represent and warrant that: (i) [Insert franchisee entity name] is duly authorized to execute this Agreement and perform its obligations hereunder; (ii) neither you nor Owner has assigned, transferred or conveyed, either voluntarily or by operation of law, any of their rights or claims against any of the Franchisor Parties or any of the rights, claims or obligations being terminated or released hereunder; (iii) you and Owner have not and shall not (a) institute or cause to be instituted against any of the Franchisor Parties any legal proceeding of any kind, including the filing of any claim or complaint with any state or federal court or regulatory agency, alleging any violation of common law, statute, regulation or public policy premised upon any legal theory or claim whatsoever relating to the matters released in this Agreement or (b) make any verbal, written or other communication that could reasonably be expected to damage or adversely impact any Franchisor Party's reputation or goodwill; and (iv) the individuals identified as Owners on the signature pages hereto together hold 100% of the legal and beneficial ownership interests in [Insert franchisee entity name].

5.      Miscellaneous.

(a) The Parties agree that each has read and fully understands this Agreement and that the opportunity has been afforded to each Party to discuss the terms and contents of said Agreement with legal counsel and/or that such a discussion with legal counsel has occurred.

(b) This Agreement shall be construed and governed by the laws of the State of Georgia.

(c) In the event that it shall be necessary for any Party to institute legal action to enforce, or for the breach of, any of the terms and conditions or provisions of this Agreement, the prevailing Party in such action shall be entitled to recover all of its reasonable costs and attorneys' fees.

(d) All of the provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective current and future directors, officers, partners, attorneys, agents, employees, shareholders and the spouses of such individuals, successors, affiliates, and assigns.

(e) This Agreement contains the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes and is in lieu of all prior and contemporaneous agreements, understandings, inducements and conditions, expressed or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  This Agreement may not be modified except in a writing signed by each of the Parties.

(f) If one or more of the provisions of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect or impair any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

(g) The Parties agree to do such further acts and things and to execute and deliver such additional agreements and instruments as any Party may reasonably require to consummate, evidence, or confirm the transactions contemplated hereby.

(h) This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute but one document.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**<u>FRANCHISEE:</u>**

_____

By: _____
Name: _____
Its: _____

**<u>FRANCHISE OWNERS:</u>**

_____
Name: _____

_____
Name: _____

_____
Name: _____

**EXHIBIT "E"**

**TO DISCLOSURE DOCUMENT**

**T<small>ABLE OF</small> C<small>ONTENTS OF</small> B<small>RAND</small> S<small>TANDARDS</small> M<small>ANUAL</small>**

*[See Attached]*



*Table of Contents*

Contents

**Introduction** .................................................................................................... 1

    Welcome Letter .............................................................................................. 2

    Disclaimer ...................................................................................................... 3

    Confidentiality Agreement ........................................................................... 4

    History of Vida-Flo ........................................................................................ 7

    Our Leadership Team .................................................................................... 8

    Legal Advisory & Franchisor's Management Support ................................. 8

    Vision and Values ........................................................................................ 10

**Support Resources** ......................................................................................... 11

    Corporate Support ...................................................................................... 12

    Regional Developer .................................................................................... 12

    Real Estate ................................................................................................... 13

    Construction Bid Process............................................................................. 17

    New Construction General Contractor Punch List .................................... 31

    Post Construction ........................................................................................ 34

    Outdoor Signage ........................................................................................ 41

    Interior Signage & Decor ........................................................................... 44

**Pre-Opening Time Table & Obligations** ........................................................ 55

    Company Pre-opening Timetable .............................................................. 56

    Grand Opening Workbook ......................................................................... 56

        Week 16 ................................................................................................ 56

        Week 15 ................................................................................................ 56

        Week 14 ................................................................................................ 57

        Week 13 ................................................................................................ 57

        Week 12 ................................................................................................ 58

        Week 11 ................................................................................................ 59

        Week 10 ................................................................................................ 59

        Week 9 .................................................................................................. 60

        Week 8 .................................................................................................. 60

        Week 7 .................................................................................................. 60

        Week 6 .................................................................................................. 61

        Week 5 .................................................................................................. 61

        Week 4 .................................................................................................. 61

        Week 3 .................................................................................................. 62

©Copyright 2016, Vida-Flo: The Hydration Station, LLC. All Rights Reserved. These materials constitute part of the Confidential Information provided to you under Section 17.4 of the Franchise Agreement and may not be disclosed to any third party without the prior written consent of Vida-Flo: The Hydration Station, LLC.

Franchise Disclosure Document (2021 Multi-State)



*Table of Contents*

Week 2 ......................................................................................................................... 62

Week 1 ......................................................................................................................... 63

Clinic Inspection Checklist ........................................................................................ 64

New Clinic Vida-Flo Ordering Guide ...................................................................... 67

Vida-Flo Start-up Items ............................................................................................. 68

Opening Order Medical Inventory Requirements .............................................. 73

**Franchise Training Requirements ................................................................................. 75**

Franchise Training ...................................................................................................... 76

Clinic Opening ............................................................................................................ 77

Additional Training .................................................................................................... 77

Annual Vida-Flo Conference ................................................................................... 78

Employee Training Certification ............................................................................. 78

**Staffing Your Clinic ......................................................................................................... 79**

Staffing Guidelines .................................................................................................... 80

Owner Participation ............................................................................................. 80

Managers ................................................................................................................ 80

Medical Director ................................................................................................... 80

HydroCare Providers ........................................................................................... 81

Wellness Consultants ........................................................................................... 82

Necessary Certifications, License And Experience ............................................. 83

Professional Licensing .......................................................................................... 83

Sample Medical Director Services Agreement .............................................. 84

**Clinic Operations ........................................................................................................... 89**

Basic Booker Functions ............................................................................................ 90

EMPLOYEE INFORMATION ....................................................................................... 90

ADDING A NEW CUSTOMER (PATIENT) ................................................................. 91

ADJUST INVENTORY .................................................................................................. 93

BILLING TAB ................................................................................................................ 96

BOOK AN APPOINTMENT ......................................................................................... 99

CREATING A BOOKER LOGIN .................................................................................. 101

DAILY TIPS REPORT .................................................................................................... 102

MEMBERSHIP CHARGE REPORT ............................................................................. 106

MEMBERSHIP TAB ...................................................................................................... 113

TAKING PAYMENT AND COMPLETING AN ORDER ............................................. 116

©Copyright 2016, Vida-Flo: The Hydration Station, LLC. All Rights Reserved. These materials constitute part of the Confidential Information provided to you under Section 17.4 of the Franchise Agreement and may not be disclosed to any third party without the prior written consent of Vida-Flo: The Hydration Station, LLC.

Franchise Disclosure Document (2021 Multi-State)



*Table of Contents*

REFUNDING AND VOIDING ORDERS .................................................................... 126

SALES BY DAY REPORT .................................................................................... 131

SELL A MEMBERSHIP WITH A RECURRING PAYMENT PLAN ................................ 137

Ringing Up Multi-Treatment/Series Packages ............................................ 138

MMF VAL-U LINE PLUS CASH DRAWER SETUP ............................................. 139

STAFF SALES REPORT ..................................................................................... 141

STAR TSP 100 ECO RECEIPT PRINTER .......................................................... 147

STAR TSP100 ECO RECEIPT PRINTER - WINDOWS 8 SETUP ......................... 148

STAR TSP 100 ECO RECEIPT PRINTER - WINDOWS 7 SETUP ......................... 157

STAR TSP 100 ECO RECEIPT PRINTER - MAC SETUP .................................... 167

SUGGESTED BANKING PROTOCOLS ............................................................... 173

OPENING AND CLOSING A CASH DRAWER ..................................................... 174

CASH DROPS ................................................................................................. 175

SAFES .......................................................................................................... 175

KEEPING AN ORGANIZED CASH DRAWER ...................................................... 176

END OF DAY CASH RECONCILIATION .............................................................. 177

GENERAL HOUSEKEEPING: CHECKLISTS ........................................................ 178

OPENING CHECKLIST ..................................................................................... 179

CLOSING CHECKLIST ...................................................................................... 180

RESTROOM CHECKLIST .................................................................................. 181

ADMINISTRATIVE MANAGEMENT CHECKLISTS ............................................... 182

Patient Appointment Log ............................................................................ 183

Catheter Check-In/Check-Out Log ............................................................ 185

Medication & Fluids Log ............................................................................ 186

Medication Refrigerator Temperature Log ................................................ 187

House Call Inventory Check-In/Check-Out Log ........................................ 188

Patient Sign In Log ..................................................................................... 189

Vitamins Log .............................................................................................. 190

New Member Appreciation Follow Up Log ................................................ 191

New Patient Follow Up Log ........................................................................ 192

Alarms, Locks and Keys ............................................................................. 193

Procedures and Protocols ............................................................................. 194

Treatment Offerings ................................................................................... 195

Patient Introduction ................................................................................... 198

©Copyright 2016, Vida-Flo: The Hydration Station, LLC. All Rights Reserved. These materials constitute part of the Confidential Information provided to you under Section 17.4 of the Franchise Agreement and may not be disclosed to any third party without the prior written consent of Vida-Flo: The Hydration Station, LLC.

Franchise Disclosure Document (2021 Multi-State)



*Table of Contents*

Patient Evaluation ................................................................................................ 199

Medication Preparation ........................................................................................ 216

Vitamins Given Intramuscularly ........................................................................... 217

Procedure for Administration of Intramuscular Injections ................................. 217

Treatment Procedure ........................................................................................... 218

Discharge Instructions/Hydration Therapy Plan .................................................. 221

Procedure For Allergic And Anaphylactic Reactions ........................................... 222

Medication and Vitamin/Mineral Information ...................................................... 223

Product Details ..................................................................................................... 223

General Vitamin Information ................................................................................ 232

Procedure For Administration Of Oxygen ........................................................... 240

Safety Precautions And Response Processes ....................................................... 240

Preparation and Cleanup Processes ..................................................................... 241

General Office Rules ............................................................................................. 243

Occupational Safety and Health Standards Toxic And Hazardous Substances
Exposure Control Plan (ECP) ................................................................................ 245

**Employee Handbook** ..........................................................................................**275**

New Employee Acknowledgement Of Documents Receipt .................................. 276

Offer Letter Sample .............................................................................................. 277

Sample Job Ads .................................................................................................... 279

Sample Interview Questions ................................................................................. 282

New Employee Agreement ................................................................................... 284

New Employee Disclosure Authorization ............................................................ 293

Background Check Disclosure and Authorization Form ....................................... 297

New Employee Hepatitis B Decline Form ............................................................ 300

Vida-Flo New Employee Self-Onboarding - Payroll ............................................. 301

Vida-Flo New Employee Self-Onboarding - Scheduling ....................................... 303

Payroll Client Checklist ........................................................................................ 307

HydroCare Provider External Onboarding Checklist ............................................ 308

HydroCare Provider Internal Onboarding Checklist ............................................ 309

Wellness Consultant External Paperwork Checklist ............................................ 310

Progressive Discipline .......................................................................................... 311

**Financial Reporting** .............................................................................................**312**

P&L Submission .................................................................................................... 313

Chart of Accounts ................................................................................................ 314

©Copyright 2016, Vida-Flo: The Hydration Station, LLC. All Rights Reserved. These materials constitute part of the Confidential Information provided to you under Section 17.4 of the Franchise Agreement and may not be disclosed to any third party without the prior written consent of Vida-Flo: The Hydration Station, LLC.

Franchise Disclosure Document (2021 Multi-State)



*Table of Contents*

Daily/Weekly Sales Reporting........................................................................................ 320
    Royalties................................................................................................................ 320
Other Fees.................................................................................................................. 320
    Advertising............................................................................................................ 320
    Transfer................................................................................................................. 320
Renewal..................................................................................................................... 321
    Relocation............................................................................................................. 321
Training ..................................................................................................................... 321
On-site Consultation .................................................................................................. 321
Audits and Inspections .............................................................................................. 322
**Marketing** ................................................................................................................**323**
    Marketing Your Clinic ............................................................................................ 324
    Developing Your Pre-Opening Marketing Plan ....................................................... 325
    Grand Opening Marketing Plan Budget ................................................................ 326
    Marketing Strategies: Additional Grassroots/Non-Traditional Marketing...................... 330
    Social Media Marketing......................................................................................... 332
    Marketing Fund .................................................................................................... 338
    Graphics............................................................................................................... 341
    Brand Integrity ...................................................................................................... 343
    Logo Usage.......................................................................................................... 343
    Fonts.................................................................................................................... 343
    Sponsorships & Partnerships................................................................................ 343
    Trademark Usage.................................................................................................. 344
    Communications Template .................................................................................... 345
    Weekly Marketing Recap Report .......................................................................... 346
**Membership Sales and Pricing** ................................................................................**347**
    Membership Offerings........................................................................................... 348
    Membership Agreement ....................................................................................... 350
    Delinquent Memberships...................................................................................... 354
    Member Referrals.................................................................................................. 355
    Pricing Policies And Fee Structure ....................................................................... 356
**Insurance Requirements and Risk Management** ....................................................**357**
    Minimum Insurance Coverage Requirements........................................................ 358
    Risk Management................................................................................................. 359

©Copyright 2016, Vida-Flo: The Hydration Station, LLC. All Rights Reserved. These materials constitute part of the Confidential Information provided to you under Section 17.4 of the Franchise Agreement and may not be disclosed to any third party without the prior written consent of Vida-Flo: The Hydration Station, LLC.

Franchise Disclosure Document (2021 Multi-State)



*Table of Contents*

House Calls.................................................................................................... 359

What to Do in Case of a Robbery ............................................................. 359

Witness Description Form Sample.............................................................. 361

Preventing Internal Theft ........................................................................... 362

Other Precautions ...................................................................................... 362

Important Names and Phone Numbers ................................................... 363

Reporting Incidents..................................................................................... 364

**Corporate Structure and Financing...............................................................365**

Setting Up Your Entity ................................................................................ 366

   Types of structures ................................................................................... 366

Franchisee As An Entity ............................................................................. 367

Guaranty ..................................................................................................... 367

Corporate Practice of Medicine .............................................................. 367

Obtain an EIN and a Company Bank Account ....................................... 367

Obtain Your Business License And Other.................................................. 368

Financing...................................................................................................... 368

©Copyright 2016, Vida-Flo: The Hydration Station, LLC. All Rights Reserved. These materials constitute part of the Confidential Information provided to you under Section 17.4 of the Franchise Agreement and may not be disclosed to any third party without the prior written consent of Vida-Flo: The Hydration Station, LLC.

Franchise Disclosure Document (2021 Multi-State)

# EXHIBIT "F"

## TO DISCLOSURE DOCUMENT

### LIST OF FRANCHISEES

**Part A (Current Franchisees)**

The following table lists our franchisees that were open as of December 31, 2020.

| State | City | Address | Phone | Owner Name(s) |
|---|---|---|---|---|
| FRANCHISEES OPEN AS OF DECEMBER 31, 2020 | | | | |
| Georgia | Johns Creek | 10900 Medlock Bridge Rd., Ste 202 Johns Creek, Georgia 30097 | (770) 674-2798 | Robert Gibbs & Joe Jackson |
| North Carolina | Wilmington | 1930 Eastwood Rd., Suite 160 Wilmington, North Carolina 28403 | (919) 360-3448 | Dustin Gross & Susan Gross |
| South Carolina | Charleston | 138 St. Phillip St. Charleston, South Carolina 29403 | (843) 588-5851 | Jamie Shirah |
| Tennessee | Franklin | 1201 Liberty Pike, Ste. 102-B Franklin, Tennessee 37067 | (615) 840-6747 | Adam Will & Park Turner |
| Tennessee | Nashville | 1516 Demonbreun Street Nashville, Tennessee 37203 | (615) 294-0866 | Adam Will |

The following table lists franchisees with signed franchise agreements that were not open as of December 31, 2020.

| State | City | Address | Phone | Owner Name(s) |
|---|---|---|---|---|
| FRANCHISEES NOT OPEN AS OF DECEMBER 31, 2020 | | | | |
| None | | | | |

**Part B (Former Franchisees Who Left System During Prior Fiscal Year)**

| State | City | Current Business Phone or Last Known Home Phone | Owner Name(s) |
|---|---|---|---|
| FRANCHISEE THAT LEFT SYSTEM IN 2020 | | | |
| Florida | Tampa | (813) 450-1851 | Davin Harris & Minh Ngo |
| New Jersey | Hoboken | (201) 683-3222 | Kelly Blundy |

**If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.**

**EXHIBIT "G"**

**TO DISCLOSURE DOCUMENT**

**FINANCIAL STATEMENTS**

[See Attached]



HYDRATION STATION USA FRANCHISE SYSTEM, LLC

(dba) vida✚flo
THE HYDRATION STATION

Independent Auditor's Report and
Financial Statements

December 31, 2020 and 2019

SCHILD&CO.,INC.
CERTIFIED PUBLIC ACCOUNTANTS

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC

## CONTENTS

|  | Page(s) |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | 1 - 2 |
| FINANCIAL STATEMENTS AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2020 AND 2019 | |
| Balance Sheets | 3 |
| Statements of Income | 4 |
| Statements of Changes in Members' Equity | 5 |
| Statements of Cash Flows | 6 |
| Notes to Financial Statements | 7 - 13 |
| CONSENT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS | 14 |



**INDEPENDENT AUDITOR'S REPORT**

To the Managing Members of
  Hydration Station USA Franchise System, LLC

We have audited the accompanying financial statements of Hydration Station USA Franchise System, LLC (the Company) which comprise the balance sheets as of December 31, 2020 and 2019, and the related statements of income, changes in members' equity, and cash flows for the years then ended and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements.  The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error.  In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Page 1*

Franchise Disclosure Document (2021 Multi-State)

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Hydration Station USA Franchise System, LLC as of December 31, 2020 and 2019 and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

Fountain Valley, California
June 10, 2021

*Page 2*

Franchise Disclosure Document (2021 Multi-State)

## HYDRATION STATION USA FRANCHISE SYSTEM, LLC
**Balance Sheets**
**December 31, 2020 and 2019**

|  | 2020 | 2019 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 34,904 | $ 4,308 |
| Accounts receivable | 12,614 | - |
| Prepaid expenses | - | 3,034 |
| Total current assets | 47,518 | 7,342 |
| **Property and equipment, at cost** | | |
| Furniture, fixtures & equipment | 18,937 | 18,937 |
| Less:  Accumulated depreciation | (18,937) | (18,937) |
| Property and equipment, net | - | - |
| **Other assets** | | |
| Security deposit | - | 4,138 |
| Total other assets | - | 4,138 |
| **TOTAL ASSETS** | $ 47,518 | $ 11,480 |
| **LIABILITIES AND MEMBERS' EQUITY** | | |
| **Current liabilities:** | | |
| Due to affiliates | $ 35,945 | $ 19,608 |
| Accrued expenses | - | 11,562 |
| Deferred revenue, current | 46,300 | 36,900 |
| SBA EIDL Loan payable, current portion | 1,408 | - |
| SBA PPP Loan payable, current portion | 6,564 | - |
| Credit card payable | - | 13,477 |
| Rent payable | - | 4,473 |
| Total current liabilities | 90,217 | 86,020 |
| **Long-term liabilities:** | | |
| SBA PPP Loan payable, net of current portion | 7,836 | - |
| SBA EIDL Loan payable, net of current portion | 98,092 | - |
| Deferred revenue, non-current | 274,525 | 330,225 |
| Total long-term liabilities | 380,453 | 330,225 |
| **TOTAL LIABILITIES** | 470,670 | 416,245 |
| **Members' Equity (Deficit)** | (423,152) | (404,765) |
| **TOTAL LIABILITIES AND MEMBERS' EQUITY** | $ 47,518 | $ 11,480 |

*See accompanying notes to financial statements.*                    *Page 3*

Franchise Disclosure Document (2021 Multi-State)

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC

**Statements of Income**
**For the Years Ended December 31, 2020 and 2019**

|  | 2020 | 2019 |
|---|---|---|
| **REVENUES:** | | |
| Franchise fees | $ 46,300 | $ 36,900 |
| Royalties and other fees | 188,334 | 159,840 |
| Total revenues | 234,634 | 196,740 |
| **Operating expenses:** | | |
| Salaries and employee benefits | 162,966 | 88,280 |
| Travel, meals and entertainment | 34,575 | 54,344 |
| Legal and professional fees | 16,558 | 43,595 |
| Computer supplies and expenses | 20,741 | 42,692 |
| Insurance | 9,296 | 7,835 |
| Rent | 3,563 | - |
| Dues and subscriptions | 3,328 | 10,318 |
| Advertising | 3,082 | 586 |
| Telephone expenses | 2,353 | 4,265 |
| Office supplies and expenses | 1,559 | 1,972 |
| Depreciation | - | 5,788 |
| Contract labor | - | 3,230 |
| Total operating expenses | 258,021 | 262,905 |
| **Other Income (expenses)** | | |
| SBA EIDL advance | 5,000 | - |
| Total other income (expenses) | 5,000 | - |
| **Income/(Loss) before income taxes** | (18,387) | (66,165) |
| Provision for income taxes | - | - |
| **NET  INCOME/(LOSS)** | $ (18,387) | $ (66,165) |

Franchise Disclosure Document (2021 Multi-State)

## HYDRATION STATION USA FRANCHISE SYSTEM, LLC
**Statements of Changes in Members' Equity**
**For the Years Ended December 31, 2020 and 2019**

| | 2020 | 2019 |
|---|---|---|
| **Members' equity (deficit), beginning of year** | $ (404,765) | $ (351,352) |
| Net income/(loss) | (18,387) | (66,165) |
| Contributions | - | 12,752 |
| **Members' equity (deficit), end of year** | **$ (423,152)** | **$ (404,765)** |

*See accompanying notes to financial statements*                              *Page 5*

Franchise Disclosure Document (2021 Multi-State)

## HYDRATION STATION USA FRANCHISE SYSTEM, LLC
**Statements of Cash Flows**
**For the Years Ended December 31, 2020 and 2019**

|  | 2020 | 2019 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income/(loss) | $ (18,387) | $ (66,165) |
| Adjustments to reconcile net income/(loss) to | | |
| net cash provided by (used for) operations: | | |
| Depreciation and amortization | - | 5,788 |
| (Increase) decrease in: | | |
| Accounts receivable | (12,614) | 15,617 |
| Prepaid expenses | 3,034 | (3,034) |
| Security deposit | 4,138 | - |
| Increase (decrease) in: | | |
| Credit card payable | (13,477) | 13,477 |
| Accrued expenses | (11,562) | 11,562 |
| Deferred revenue | (46,300) | 12,100 |
| Rent payable | (4,473) | (21,629) |
| Net cash provided (used) by operating activities | (99,641) | (32,284) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from SBA EIDL loan | 99,500 | - |
| Proceeds from SBA PPP loan | 14,400 | - |
| Borrowings from affiliate | 16,337 | 11,725 |
| Capital contributions | - | 12,752 |
| Net cash provided (used) by financing activities | 130,237 | 24,477 |
| | | |
| **NET INCREASE (DECREASE) IN CASH** | **30,596** | **(7,807)** |
| | | |
| **CASH AND CASH EQUIVALENTS - beginning of year** | 4,308 | 12,115 |
| | | |
| **CASH AND CASH EQUIVALENTS - end of year** | **$ 34,904** | **$ 4,308** |
| | | |
| | | |
| **SUPPLEMENTAL INFORMATION** | | |
| Cash paid for interest | $ - | $ - |
| Cash paid for income taxes | $ - | $ - |

Franchise Disclosure Document (2021 Multi-State)

## HYDRATION STATION USA FRANCHISE SYSTEM, LLC
### NOTES TO FINANCIAL STATEMENTS
### DECEMBER 31, 2020 AND 2019

### NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The summary of significant accounting policies of Hydration Station USA Franchise System, LLC (the Company) is presented to assist in the understanding of the Company's financial statements. The financial statements and notes are representations of the Company's management, who is responsible for their integrity and objectivity.

**History and organization –** Hydration Station USA Franchise System, LLC ("HSUFSL") was organized as a limited liability company under the laws of the State of Georgia on May 10, 2014. The Company was established to offer franchises for the operation of clinics that provide high quality hydration therapy services and related treatments in a convenient setting utilizing proven medical techniques and treatments.

Hydration Station USA Franchise System, LLC is engaged in the administration, development, operation, and licensing of businesses that operate the franchise clinics and wellness treatments.

As of December 31, 2020, there were 5 operating locations franchised by HSUFSL.

The Company's activities are subject to significant risks and uncertainties, including: (1) the inability to achieve the Company's planned objective and fail in opening and maintaining new franchises and (2) failing to secure additional funding to operationalize the Company's franchise concept.

Franchise operations are regulated by the Federal Trade Commission (FTC) and various state laws regulating the offer and sale of franchises. The FTC's franchise rule and various state laws require that the Company furnish a franchise disclosure document ("FDD") containing certain information to prospective franchisees. The Company must also complete franchise registration, pursuant to state law, in those states where franchises are planned to be sold. The Company is currently going through the registration process.

**Basis of accounting –** The accompanying financial statements have been prepared using the accrual method of accounting in conformity with accounting principles generally accepted in the United States of America (GAAP).

**Cash and cash equivalents –** For purposes of reporting cash flows, cash includes amounts on hand and amounts on deposit at financial institutions. The Company defines cash equivalents as short-term, liquid investments with initial maturity of three months or less. Renewals are generally renewed at the same term. The Company had no cash equivalents as of December 31, 2020 and 2019.

**Use of estimates –** Management uses estimates and assumptions in preparing these financial statements in accordance with generally accepted accounting principles in the United States of America. Those estimates and assumptions affect the reported amounts of assets and liabilities, and the reported revenues and expenses during the reporting period. Actual results could vary from the estimates that were used.

**HYDRATION STATION USA FRANCHISE SYSTEM, LLC**
**N O T E S   T O   F I N A N C I A L   S T A T E M E N T S**
**D E C E M B E R   3 1 ,   2 0 2 0   A N D   2 0 1 9**

**NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

**Accounts receivable –** Accounts receivable consists primarily of accrued royalty fee receivables due from franchisees.  The Company considers accounts receivables to be fully collectible; accordingly, no allowance for doubtful accounts is required.  If amounts become uncollectible, they will be charged to operations when that determination is made. At December 31, 2020 and 2019, accounts receivables totaled $12,614 and $-0, respectively.

**Property and equipment –** Property and equipment is stated at cost, less accumulated depreciation.  Depreciation is provided using the straight-line method over the estimated useful lives of the related assets, which is five or seven years.  Significant additions and betterments are capitalized.  Expenditures for maintenance, repairs and minor renewal are charged to expenses as incurred.  Depreciation expense for the years ended December 31, 2020 and 2019 was $-0 and $5,788, respectively.

**Income taxes –** The Company has elected to be treated as a Partnership for federal and state income tax purposes.  The Company's taxable income or losses, as well as certain other tax attributes, are passed through directly to the Company's members and are reported in each member's individual income tax return.  Consequently, the financial statements do not include any provision for federal or state income tax expense.

The Company's income tax filings are subject to examination by the appropriate tax jurisdictions. As of December 31, 2020, the Company's federal and state tax returns generally remain open for the last three years.

The Company is required to recognize, measure, classify, and disclose in the financial statements uncertain tax positions taken or expected to be taken in the Company's tax returns. Management has determined that the Company does not have any uncertain tax positions associated unrecognized benefits that materially impact the financial statements or related disclosures.  Since tax matters are subject to some degree of uncertainty, there can be no assurance that the Company's tax returns will not be challenged by the taxing authorities and that the Company will not be subject to additional tax, penalties and interest as a result of such challenge.

As of December 31, 2020, the Company had no uncertain tax positions that qualify for either recognition or disclosure in the financial statements.  The Company recognizes interest accrued related to unrecognized tax benefits in interest expense and penalties in operating expenses. During the years ended December 31, 2020 and 2019, no interest or penalties were incurred.

**Advertising costs –** The Company has the policy of expensing advertising costs as incurred. Advertising costs charged to expenses were $3,082 and $586 in 2020 and 2019, respectively.

## HYDRATION STATION USA FRANCHISE SYSTEM, LLC
### NOTES TO FINANCIAL STATEMENTS
### DECEMBER 31, 2020 AND 2019

**NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

**Revenue from Contracts with Customers**

Revenue from contracts with customers consist primarily of royalties, marketing and promotion fee, training fee, and initial franchise fee. The Company's performance obligations under franchise agreements consist of (i) a franchise license, including a license to use our brands (ii) pre-opening services, such as training, and (iii) ongoing services, such as marketing services and operational support. These performance obligations are highly interrelated so are not considered to be individually distinct and therefore are accounted for as a single performance obligation, which is satisfied by providing a right to use intellectual property over the term of each franchise agreement.

Royalties, including franchisee contributions to the brand and system development fee, are calculated as a percentage of franchisee's monthly gross revenues over the term of the franchise agreement. Initial and renewal franchise fees are payable by the franchisee upon signing and prior to the outlet/clinic opening or at the time of a renewal of an existing franchise agreement. Royalties, inclusive of brand and system development fee contributions, represent sales-based royalties that are related entirely to the Company's performance obligation under the franchise agreement and are recognized as franchised sales occur. Additionally, under ASC 606, initial and renewal franchise fees are recognized as revenue on a straight-line basis over the term of the respective agreement.

Franchise fee payments received by the Company are recorded as deferred revenue on the Balance Sheet, which represents a contract liability. Deferred revenue is reduced as fees are recognized in revenue over the term of the franchise license for the respective outlet/clinic.

**Revenue recognition**

The Company adopted Topic 606 "Revenue from Contracts with Customers" for revenue recognition related to contracts with customers. Under the new guidance, revenue is recognized in accordance with a five step revenue model, as follows: (i) identifying the contract with the customer; (ii) identifying the performance obligations in the contract; (iii) determining the transaction price; (iv) allocating the transaction price to the performance obligations; and (v) recognizing revenue when (or as) the entity satisfies a performance obligation. In applying this five-step model, the Company made significant judgements in identifying the promised goods or services in their contracts with franchisees that are distinct, and which represent separate performance obligations, which is satisfied by providing a right to use our intellectual property over the estimated life of the franchise. The Company recognizes initial franchise fees as revenue on a straight-line basis over the life of the related franchise agreements and any exercised renewal periods.

Franchise Disclosure Document (2021 Multi-State)

**HYDRATION STATION USA FRANCHISE SYSTEM, LLC**
**N O T E S  T O  F I N A N C I A L  S T A T E M E N T S**
**D E C E M B E R  3 1 ,  2 0 2 0  A N D  2 0 1 9**

**NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

**Revenue recognition**

Franchise fee payments received by the Company are recorded as deferred revenue on the Balance Sheet, which represents a contract liability. Deferred revenue is reduced as fees are recognized in revenue over the term of the franchise license for the respective franchised business.

- *Franchise fees* – The Company collects initial franchise fees when franchise agreements are signed. The Company recognizes franchise fee revenue over the estimated life of the franchise, beginning with the opening of the franchise, which is when the Company has performed substantially all initial services required by the franchise agreement and the franchisee benefits from the rights afforded by the franchise agreement. Amounts recognized for franchise fees were $46,300 and $36,900 at December 31, 2020 and 2019, respectively. The Company had deferred franchise fee revenue of $320,825 and $367,125 at December 31, 2020 and 2019, respectively.

- *Royalties* – The Company collects royalties from each retail franchise based upon a percentage of franchisee's gross revenues. The Company recognizes royalties as revenue when earned. The Company recognized $188,334 and $159,840 at December 31, 2020 and 2019, respectively.

**NOTE 2 – SBA PPP LOAN PAYABLE**

On May 5, 2020, the Company was granted a loan from Little Rock Commercial Loan Servicing Center in the aggregate amount of $14,400, pursuant to the Paycheck Protection Program (the "PPP") under Division A, Title I of the CARES Act, which was enacted March 27, 2020. The loan was in the form of a note issued by the Company, matures on November 5, 2022 and bears interest at a rate of 1% per annum. The note may be prepaid by the Borrower at any time prior to maturity with no prepayment penalties. Funds from the Loan may only be used for payroll costs, costs used to continue group health care benefits, mortgage payments, rent, utilities and interest on other debt obligations incurred before February 15, 2020. The Company intends to use the entire Loan amount for qualifying expenses. Under the terms of the PPP, certain amounts of the Loan may be forgiven if they are used for qualifying expenses as described in the CARES Act. The Company plans to apply for the loan forgiveness and expects for forgiveness of most or all of the loan.

At December 31, 2020, the SBA PPP loan balance was $14,400.

Franchise Disclosure Document (2021 Multi-State)

**HYDRATION STATION USA FRANCHISE SYSTEM, LLC**
N O T E S   T O   F I N A N C I A L   S T A T E M E N T S
D E C E M B E R   3 1 ,   2 0 2 0   A N D   2 0 1 9

### NOTE 3 – SBA EIDL LOAN PAYABLE

On May 22, 2020, the Company applied for and received an Economic Injury Disaster Loan through the U.S. Small Business Administration of $99,500.  The term of the note requires 360 monthly payments of $485, including interest at 3.75%.

Maturity requirements on the SBA EIDL loan payable are as follows:

| Year ending December 31, | | Amount |
|---|---|---|
| 2021 | $ | 1,408 |
| 2022 | | 2,179 |
| 2023 | | 2,262 |
| 2024 | | 2,348 |
| 2025 | | 4,968 |
| Thereafter | | 86,335 |
| | $ | 99,500 |

### NOTE 4 – CREDIT CARD PAYABLE

The Company has unsecured bank credit card with an outstanding balance of $-0 and $13,477 at December 31, 2020 and 2019, respectively.

### NOTE 5 – FAIR VALUE OF FINANCIAL INSTRUMENTS

Substantially all of the Company's current assets and liabilities are considered financial instruments.  These assets and liabilities are reflected at fair value, or at carrying value that approximate fair value because of the short term nature of the instrument.  The recorded value of these financial instruments approximated fair value at December 31, 2020 and 2019.

### NOTE 6 – MEMBERS' EQUITY

The Company has two groups of unit owners, Class A and Class B.  The Class A unit owners are members who hold all voting rights and are required to contribute capital, but they are entitled to return of capital if such capital is contributed, as defined in the operating agreement.  The Class B unit owners do not have any voting rights and are not required to contribute capital, but they are not entitled to return of capital if such capital is contributed, as defined in the operating agreement.  All unit owners are allocated their share of profits, losses, and distributions based on their ownership percentages.

Franchise Disclosure Document (2021 Multi-State)

## HYDRATION STATION USA FRANCHISE SYSTEM, LLC
### NOTES TO FINANCIAL STATEMENTS
### DECEMBER 31, 2020 AND 2019

**NOTE 7 – RELATED PARTY TRANSACTIONS**

During the years ended December 31, 2020 and 2019, the Company had transactions with a limited liability company owned by the Company's members.  The following is a summary of transactions with this entity:

- **Due to affiliates** – From time to time, the affiliate advanced funds to the Company to pay operating costs.  The due to affiliates balance was $35,945 and $19,608 at December 31, 2020 and 2019, respectively.  There were no repayment terms for these advances.  The Company and affiliates are related parties due to common ownership.

- **Facility Operating Lease** – The Company shares its office space with affiliates and the office space operating lease is under common control with Hydration Station USA LLC and Hydration Station TWNBRK, LLC.  The existence of this control could result in operating results and financial position significantly different from those that would have been obtained if the companies were independently responsible for their office space.

   Hydration Station USA LLC is a guarantor of the office space lease.

**NOTE 6 – FRANCHISING**

In general, the Company updates and/or revises franchise agreements on an annual basis, and as a result, the agreements with individual franchisees may vary.  Currently, the franchise agreement provides that franchisees must pay initial franchisee fee, which may be up to $49,000 for a single franchised outlet.

The initial term of franchise agreements are typically 10 years.  Subject to the Company's approval, a franchisee may generally renew the franchise agreement upon its expiration and payment of renewal fee of $2,500.  The Company recognizes renewal fees in income when a renewal agreement becomes effective on a straight-line basis over the life of the franchise agreement.   If approved, a franchisee may transfer a franchise agreement to a new or existing franchisee, at which point a transfer fee of $2,500 is typically paid by the current owner which then terminates the franchise agreement.  A franchise agreement is signed with the new franchisee with no franchise fee required.

Under the current standard franchise agreement, each franchisee is required to pay (i) royalty fees of 7% of gross revenues; (ii) advertising fees an amount equal to the greater of $500 or 2% of gross revenues; and (iii) marketing fund fee not to exceed 2% of gross revenues.

Initial franchise fees are generally recognized over the estimated life of the franchise when substantially all services or conditions relating to the franchise sale have been performed or satisfied by the Company.  Services provided by the Company include assistance to establish and operate the franchised business, training, and implementation of a uniform system which has high standards of services, and quality control system.

Franchise Disclosure Document (2021 Multi-State)

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC
## NOTES TO FINANCIAL STATEMENTS
### DECEMBER 31, 2020 AND 2019

**NOTE 7 – LITIGATIONS, CLAIMS AND ASSESSMENTS**

In the normal course of business, the Company is party to various complaints, legal actions, claims and litigations. These legal actions, claims, and litigations require significant management attention and financial resources and the outcome of any litigation is inherently uncertain. In the opinion of management and the Company's legal counsel, the Company has good defenses and the ultimate outcome of these litigations cannot be determined at this time. Accordingly, no provision for any liability that may result has been made in the accompanying financial statements. Legal fees incurred were $28,120 and $43,595 for the years ended December 31, 2020 and 2019, respectively.

**NOTE 8 – SUBSEQUENT EVENTS**

**Date of management review –** The Company has evaluated subsequent events through June 10, 2021, the date of which the financial statements were available to be issued.

On February 28, 2021, the Company was granted a 2nd PPP loan from Newtek Business Services Corp in the aggregate amount of $18,700, pursuant to the Paycheck Protection Program (the "PPP") under Division A, Title I of the CARES Act, which was enacted March 27, 2020. The loan was in the form of a note issued by the Company, matures on April 28, 2026 and bears interest at a rate of 1% per annum, payable monthly commencing on May 28, 2021. The Note may be prepaid by the Borrower at any time prior to maturity with no prepayment penalties. Funds from the Loan may only be used for payroll costs, costs used to continue group health care benefits, mortgage payments, rent, utilities and interest on other debt obligations incurred before February 15, 2020. The Company intends to use the entire Loan amount for qualifying expenses. Under the terms of the PPP, certain amounts of the Loan may be forgiven if they are used for qualifying expenses as described in the CARES Act.

*Page 13*

Franchise Disclosure Document (2021 Multi-State)





**HYDRATION STATION USA FRANCHISE SYSTEM, LLC**

**(dba)** vida✚flo
THE HYDRATION STATION

Independent Auditor's Report and
Financial Statements

December 31, 2019 and 2018





SCHILD&CO.,INC.
CERTIFIED PUBLIC ACCOUNTANTS

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC

---

## CONTENTS

---

| | Page(s) |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | 1 - 2 |
| FINANCIAL STATEMENTS AS OF AND FOR<br>  THE YEARS ENDED DECEMBER 31, 2019 AND 2018 | |
|   Balance Sheets | 3 |
|   Statements of Income | 4 |
|   Statements of Changes in Members' Equity | 5 |
|   Statements of Cash Flows | 6 |
|   Notes to Financial Statements | 7 - 12 |
| CONSENT OF INDEPENDENT<br>  CERTIFIED PUBLIC ACCOUNTANTS | 13 |



## INDEPENDENT AUDITOR'S REPORT

To the Managing Members of
    Hydration Station USA Franchise System, LLC

We have audited the accompanying financial statements of Hydration Station USA Franchise System, LLC (the Company) which comprise the balance sheets as of December 31, 2019 and 2018, and the related statements of income, changes in members' equity, and cash flows for the years then ended and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements.  The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error.  In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Page 1*

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Hydration Station USA Franchise System, LLC as of December 31, 2019 and 2018 and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

Fountain Valley, California
October 26, 2020

*Page 2*

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC
**Balance Sheets**
**December 31, 2019 and 2018**

|  | 2019 | | 2018 | |
|---|---:|---|---:|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 4,308 | $ | 12,115 |
| Accounts receivable - less allowance for | | | | |
| doubtful accounts of $42,132 | | - | | 15,617 |
| Prepaid expenses | | 3,034 | | - |
| Total current assets | | 7,342 | | 27,732 |
| **Property and equipment, at cost** | | | | |
| Furniture, fixtures & equipment | | 18,937 | | 18,937 |
| Less:  Accumulated depreciation | | (18,937) | | (13,149) |
| Property and equipment, net | | - | | 5,788 |
| **Other assets** | | | | |
| Security deposit | | 4,138 | | 4,138 |
| Total other assets | | 4,138 | | 4,138 |
| **TOTAL ASSETS** | $ | 11,480 | $ | 37,658 |
| **LIABILITIES AND MEMBERS' EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Due to affiliates | $ | 19,608 | $ | 7,883 |
| Accrued expenses | | 11,562 | | - |
| Credit card payable | | 13,477 | | - |
| Rent payable | | 4,473 | | 26,102 |
| Total current liabilities | | 49,120 | | 33,985 |
| **Long-term liabilities:** | | | | |
| Deferred revenue | | 367,125 | | 355,025 |
| Total long-term liabilities | | 367,125 | | 355,025 |
| **TOTAL LIABILITIES** | | 416,245 | | 389,010 |
| **Members' Equity** | | (404,765) | | (351,352) |
| **TOTAL LIABILITIES AND MEMBERS' EQUITY** | $ | 11,480 | $ | 37,658 |

*See accompanying notes to financial statements.*                    *Page 3*

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC
**Statements of Income**
**For the Years Ended December 31, 2019 and 2018**

|  | 2019 | 2018 |
|---|---|---|
| **REVENUES:** |  |  |
| Franchise fees | $ 36,900 | $ 28,100 |
| Royalties and other fees | 159,840 | 264,032 |
| Total revenues | 196,740 | 292,132 |
|  |  |  |
| **Operating expenses:** |  |  |
| Salaries and employee benefits | 88,280 | 146,973 |
| Travel, meals and entertainment | 54,344 | 37,982 |
| Legal and professional fees | 43,595 | 75,690 |
| Computer supplies and expenses | 42,692 | 31,928 |
| Dues and subscriptions | 10,318 | 15,866 |
| Insurance | 7,835 | 7,292 |
| Depreciation | 5,788 | 2,073 |
| Telephone expenses | 4,265 | 6,285 |
| Contract labor | 3,230 | 7,685 |
| Office supplies and expenses | 1,972 | 11,563 |
| Advertising | 586 | 6,943 |
| Rent | - | 53,858 |
| Bad debt expense | - | 42,132 |
| Total operating expenses | 262,905 | 446,270 |
|  |  |  |
| **Income (Loss) before income taxes** | (66,165) | (154,138) |
| Provision for income taxes | - | - |
|  |  |  |
| **NET (LOSS)** | $ (66,165) | $ (154,138) |

*See accompanying notes to financial statements*  *Page 4*

**HYDRATION STATION USA FRANCHISE SYSTEM, LLC**
**Statements of Changes in Members' Equity**
**For the Years Ended December 31, 2019 and 2018**

|  | 2019 | 2018 |
|---|---|---|
| **Members' equity, beginning of year** | $ (351,352) | $ (45,750) |
| Adjustment for cumulative effect of ASC Topic 606 | - | (151,464) |
| Net loss | (66,165) | (154,138) |
| Contributions | 12,752 | - |
| **Members' equity, end of year** | **$ (404,765)** | **$ (351,352)** |

Franchise Disclosure Document (2021 Multi-State)

## HYDRATION STATION USA FRANCHISE SYSTEM, LLC
**Statements of Cash Flows**
**For the Years Ended December 31, 2019 and 2018**

| | 2019 | 2018 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (66,165) | $ (154,138) |
| Adjustments to reconcile net loss to | | |
| net cash provided by (used for) operations: | | |
| Depreciation and amortization | 5,788 | 2,073 |
| Cumulative adjustment | | (151,464) |
| Bad debts | - | 42,132 |
| (Increase) decrease in: | | |
| Accounts receivable | 15,617 | (9,326) |
| Due from affiliate | - | 8,659 |
| Prepaid expenses | (3,034) | - |
| Increase (decrease) in: | | |
| Credit card payable | 13,477 | - |
| Due to affiliate | 11,725 | 7,883 |
| Accrued expenses | 11,562 | - |
| Deferred revenue | 12,100 | 256,364 |
| Rent payable | (21,629) | 8,858 |
| Net cash provided (used) by operating activities | (20,559) | 11,041 |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Capital contributions | 12,752 | - |
| Net cash provided (used) by financing activities | 12,752 | - |
| | | |
| **NET INCREASE (DECREASE) IN CASH** | **(7,807)** | **11,041** |
| | | |
| **CASH  AND CASH EQUIVALENTS – beginning of year** | 12,115 | 1,074 |
| | | |
| **CASH AND CASH EQUIVALENTS – end of year** | $ **4,308** | $ **12,115** |
| | | |
| | | |
| **SUPPLEMENTAL INFORMATION** | | |
| Cash paid for interest | $ - | $ - |
| Cash paid for taxes | $ - | $ - |

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC
## NOTES TO FINANCIAL STATEMENTS
## DECEMBER 31, 2019 AND 2018

**NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The summary of significant accounting policies of Hydration Station USA Franchise System, LLC (the Company) is presented to assist in the understanding of the Company's financial statements.  The financial statements and notes are representations of the Company's management, who is responsible for their integrity and objectivity.

**History and organization –** Hydration Station USA Franchise System, LLC was organized as a limited liability company under the laws of the State of Georgia on May 10, 2014.  The Company was established to offer franchises for the operation of clinics that provide high quality hydration therapy services and related treatments in a convenient setting utilizing proven medical techniques and treatments.

Hydration Station USA Franchise System, LLC is engaged in the administration, development, operation, and licensing of businesses that operate the franchise clinics and wellness treatments.

As of December 31, 2019, Hydration's had franchised, licensed and operated 1 Company-owned and 6 franchisee-owned clinics in Alabama, Colorado, Georgia, Louisiana, South Carolina and Tennessee.  During 2019, the Company and its franchisees opened 1 new clinic.

Franchise operations are regulated by the Federal Trade Commission (FTC) and various state laws regulating the offer and sale of franchises.  The FTC's franchise rule and various state laws require that the Company furnish a franchise disclosure document ("FDD") containing certain information to prospective franchisees.  The Company must also complete franchise registration, pursuant to state law, in those states where franchises are planned to be sold.  The Company is currently going through the registration process.

**Basis of accounting –** The accompanying financial statements have been prepared using the accrual method of accounting in conformity with accounting principles generally accepted in the United States of America (GAAP).

**Cash and cash equivalents –** For purposes of reporting cash flows, cash includes amounts on hand and amounts on deposit at financial institutions. The Company defines cash equivalents as short-term, liquid investments with initial maturity of three months or less.  Renewals are generally renewed at the same term.  The Company had no cash equivalents as of December 31, 2019 and 2018.

**Use of estimates –** Management uses estimates and assumptions in preparing these financial statements in accordance with generally accepted accounting principles in the United States of America.  Those estimates and assumptions affect the reported amounts of assets and liabilities, and the reported revenues and expenses during the reporting period.  Actual results could vary from the estimates that were used.

*Page 7*

Franchise Disclosure Document (2021 Multi-State)

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC
## N O T E S   T O   F I N A N C I A L   S T A T E M E N T S
## D E C E M B E R   3 1 ,   2 0 1 9   A N D   2 0 1 8

### NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

**Accounts receivable –** Accounts receivable are carried at cost less an allowance for doubtful accounts. At December 31, 2019 and 2018, accounts receivable totaled $-0 and $57,749, respectively. The Company has established an allowance for uncollectible accounts based on management's knowledge and past experiences. Past due accounts are written off by management when deemed appropriate on a case-by-case basis, and payments subsequently received on such receivables are credited back to the allowance account in the period the payment is received. The allowance for doubtful accounts was $-0 and $42,132 as of December 31, 2019 and 2018, respectively.

**Property and equipment –** Property and equipment is stated at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the estimated useful lives of the related assets, which is five or seven years. Significant additions and betterments are capitalized. Expenditures for maintenance, repairs and minor renewal are charged to expenses as incurred. Depreciation expense for the years ended December 31, 2019 and 2018 were $5,788 and $2,073, respectively.

**Income taxes –** The Company has elected to be treated as a Partnership for federal and state income tax purposes. The Company's taxable income or losses, as well as certain other tax attributes, are passed through directly to the Company's members and are reported in each member's individual income tax return. Consequently, the financial statements do not include any provision for federal or state income tax expense.

The Company's income tax filings are subject to examination by the appropriate tax jurisdictions. As of December 31, 2019, the Company's federal and state tax returns generally remain open for the last three years.

The Company is required to recognize, measure, classify, and disclose in the financial statements uncertain tax positions taken or expected to be taken in the Company's tax returns. Management has determined that the Company does not have any uncertain tax positions associated unrecognized benefits that materially impact the financial statements or related disclosures. Since tax matters are subject to some degree of uncertainty, there can be no assurance that the Company's tax returns will not be challenged by the taxing authorities and that the Company will not be subject to additional tax, penalties and interest as a result of such challenge.

As of December 31, 2019, the Company had no uncertain tax positions that qualify for either recognition or disclosure in the financial statements. The Company recognizes interest accrued related to unrecognized tax benefits in interest expense and penalties in operating expenses. During the years ended December 31, 2019 and 2018, no interest or penalties were incurred.

**Advertising costs –** The Company has the policy of expensing advertising costs as incurred. Advertising costs charged to expenses were $586 and $6,943 in 2019 and 2018, respectively.

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC
## NOTES TO FINANCIAL STATEMENTS
## DECEMBER 31, 2019 AND 2018

### NOTE 1 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Revenue from Contracts with Customers

Revenue from contracts with customers consist primarily of royalties, marketing and promotion fee, training fee, and initial franchise fee. The Company's performance obligations under franchise agreements consist of (i) a franchise license, including a license to use our brands (ii) pre-opening services, such as training, and (iii) ongoing services, such as marketing services and operational support. These performance obligations are highly interrelated so are not considered to be individually distinct and therefore are accounted for as a single performance obligation, which is satisfied by providing a right to use intellectual property over the term of each franchise agreement.

Royalties, including franchisee contributions to the brand and system development fee, are calculated as a percentage of franchisee's monthly gross revenues over the term of the franchise agreement.  Initial and renewal franchise fees are payable by the franchisee upon signing and prior to the outlet/clinic opening or at the time of a renewal of an existing franchise agreement. Royalties, inclusive of brand and system development fee contributions, represent sales-based royalties that are related entirely to the Company's performance obligation under the franchise agreement and are recognized as franchised sales occur.  Additionally, under ASC 606, initial and renewal franchise fees are recognized as revenue on a straight-line basis over the term of the respective agreement.

Franchise fee payments received by the Company are recorded as deferred revenue on the Balance Sheet, which represents a contract liability.  Deferred revenue is reduced as fees are recognized in revenue over the term of the franchise license for the respective outlet/clinic.

### Revenue recognition

The Company adopted Topic 606 "Revenue from Contracts with Customers" for revenue recognition related to contracts with customers.  Under the new guidance, revenue is recognized in accordance with a five step revenue model, as follows: (i) identifying the contract with the customer; (ii) identifying the performance obligations in the contract; (iii) determining the transaction price; (iv) allocating the transaction price to the performance obligations; and (v) recognizing revenue when (or as) the entity satisfies a performance obligation.  In applying this five-step model, the Company made significant judgements in identifying the promised goods or services in their contracts with franchisees that are distinct, and which represent separate performance obligations, which is satisfied by providing a right to use our intellectual property over the estimated life of the franchise.  The Company recognizes initial franchise fees as revenue on a straight-line basis over the life of the related franchise agreements and any exercised renewal periods.

Franchise Disclosure Document (2021 Multi-State)

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC
## N O T E S   T O   F I N A N C I A L   S T A T E M E N T S
## D E C E M B E R   3 1 ,   2 0 1 9   A N D   2 0 1 8

### NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

#### Revenue recognition

Franchise fee payments received by the Company are recorded as deferred revenue on the Balance Sheet, which represents a contract liability.  Deferred revenue is reduced as fees are recognized in revenue over the term of the franchise license for the respective franchised business.

- *Franchise fees* – The Company collects initial franchise fees when franchise agreements are signed.  The Company recognizes franchise fee revenue over the estimated life of the franchise, beginning with the opening of the franchise, which is when the Company has performed substantially all initial services required by the franchise agreement and the franchisee benefits from the rights afforded by the franchise agreement.  The Company had deferred franchise fee revenue of $367,125 and $355,025 at December 31, 2019 and 2018, respectively.

- *Royalties* – The Company collects royalties from each retail franchise based upon a percentage of franchisee's gross revenues.  The Company recognizes royalties as revenue when earned.  The Company recognized $159,840 and $264,032 at December 31, 2019 and 2018, respectively.

### NOTE 2 – FAIR VALUE OF FINANCIAL INSTRUMENTS

Substantially all of the Company's current assets and liabilities are considered financial instruments.  These assets and liabilities are reflected at fair value, or at carrying value that approximate fair value because of the short term nature of the instrument.  The recorded value of these financial instruments approximated fair value at December 31, 2019 and 2018.

### NOTE 3 – CREDIT CARD PAYABLE

The Company has unsecured bank credit card with an outstanding balance of $13,477 at December 31, 2019.

### NOTE 4 – MEMBERS' EQUITY

The Company has two groups of unit owners, Class A and Class B.  The Class A unit owners are members who hold all voting rights and are required to contribute capital, but they are entitled to return of capital if such capital is contributed, as defined in the operating agreement.  The Class B unit owners do not have any voting rights and are not required to contribute capital, but they are not entitled to return of capital if such capital is contributed, as defined in the operating agreement.  All unit owners are allocated their share of profits, losses, and distributions based on their ownership percentages.

Franchise Disclosure Document (2021 Multi-State)

# HYDRATION STATION USA FRANCHISE SYSTEM, LLC
## NOTES TO FINANCIAL STATEMENTS
## DECEMBER 31, 2019 AND 2018

### NOTE 5 – RELATED PARTY TRANSACTIONS

During the years ended December 31, 2019 and 2018, the Company had transactions with a limited liability company owned by the Company's members.  The following is a summary of transactions with this entity:

- **Due to affiliates** – From time to time, the affiliate advanced funds to the Company to pay operating costs.  The due to affiliates balance was $19,608 and $7,883 at December 31, 2019 and 2018, respectively.  There were no repayment terms for these advances. The Company and affiliates are related parties due to common ownership.

- **Facility Operating Lease** – The Company shares its office space with affiliates and the office space operating lease is under common control with Hydration Station USA LLC and Hydration Station TWNBRK, LLC.  The existence of this control could result in operating results and financial position significantly different from those that would have been obtained if the companies were independently responsible for their office space.

  Hydration Station USA LLC is a guarantor of the office space lease.

### NOTE 6 – FRANCHISING

In general, the Company updates and/or revises franchise agreements on an annual basis, and as a result, the agreements with individual franchisees may vary.  Currently, the franchise agreement provides that franchisees must pay initial franchisee fee, which may be up to $49,000 for a single franchised outlet.

The initial term of franchise agreements are typically 10 years.  Subject to the Company's approval, a franchisee may generally renew the franchise agreement upon its expiration and payment of renewal fee of $2,500.  The Company recognizes renewal fees in income when a renewal agreement becomes effective on a straight-line basis over the life of the franchise agreement.  If approved, a franchisee may transfer a franchise agreement to a new or existing franchisee, at which point a transfer fee of $2,500 is typically paid by the current owner which then terminates the franchise agreement.  A franchise agreement is signed with the new franchisee with no franchise fee required.

Under the current standard franchise agreement, each franchisee is required to pay (i) royalty fees of 7% of gross revenues; (ii) advertising fees an amount equal to the greater of $500 or 2% of gross revenues; and (iii) marketing fund fee not to exceed 2% of gross revenues.

Initial franchise fees are generally recognized over the estimated life of the franchise when substantially all services or conditions relating to the franchise sale have been performed or satisfied by the Company.  Services provided by the Company include assistance to establish and operate the franchised business, training, and implementation of a uniform system which has high standards of services, and quality control system.

*Page 11*

Franchise Disclosure Document (2021 Multi-State)

## HYDRATION STATION USA FRANCHISE SYSTEM, LLC
**N O T E S   T O   F I N A N C I A L   S T A T E M E N T S**
**D E C E M B E R   3 1 ,   2 0 1 9   A N D   2 0 1 8**

### NOTE 7 – LITIGATIONS, CLAIMS AND ASSESSMENTS

In the normal course of business, the Company is party to various complaints, legal actions, claims and litigations.  These legal actions, claims, and litigations require significant management attention and financial resources and the outcome of any litigation is inherently uncertain.  In the opinion of management and the Company's legal counsel, the Company has good defenses and the ultimate outcome of these litigations cannot be determined at this time.  Accordingly, no provision for any liability that may result has been made in the accompanying financial statements.  Legal fees incurred were $43,595 and $75,690 for the years ended December 31, 2019 and 2018, respectively.

### NOTE 8 – SUBSEQUENT EVENTS

**Date of management review** – The Company has evaluated subsequent events through October 26, 2020, the date of which the financial statements were available to be issued.

On May 5, 2020, the Company was granted a loan from Newtek Business Services Corp in the aggregate amount of $14,400, pursuant to the Paycheck Protection Program (the "PPP") under Division A, Title I of the CARES Act, which was enacted March 27, 2020.  The Loan was in the form of a Note issued by the Company, matures on November 5, 2022 and bears interest at a rate of 1% per annum, payable monthly commencing on November 5, 2020.  The Note may be prepaid by the Borrower at any time prior to maturity with no repayment penalties.  Funds from the Loan may only be used for payroll costs, costs used to continue group health care benefits, mortgage payments, rent, utilities and interest on other debt obligations incurred before February 15, 2020.  The Company intends to use the entire Loan amount for qualifying expenses.  Under the terms of the PPP, certain amounts of the Loan may be forgiven if they are used for qualifying expenses as described in the CARES Act.

Franchise Disclosure Document (2021 Multi-State)

# EXHIBIT "H"

## TO DISCLOSURE DOCUMENT

### <u>AREA REPRESENTATIVES</u>

None

**EXHIBIT "I"**

**TO DISCLOSURE DOCUMENT**

<u>STATE EFFECTIVE DATES</u>

**State Effective Dates**

The following states have franchise laws that require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered or exempt from registration, as of the Effective Date stated below:

| State | Effective Date |
|---|---|
| California | |
| Hawaii | |
| Illinois | |
| Indiana | |
| Maryland | |
| Michigan | |
| Minnesota | |
| New York | |
| North Dakota | |
| Rhode Island | |
| South Dakota | |
| Virginia | |
| Washington | |
| Wisconsin | |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

Franchise Disclosure Document (2021 Multi-State)

# EXHIBIT "J"

## TO DISCLOSURE DOCUMENT

### <u>RECEIPTS</u>

[See Attached]

RECEIPT

This Disclosure Document summarizes certain provisions of the franchise agreement and other information in plain language. Read this Disclosure Document and all agreements carefully.

If Hydration Station USA Franchise System, LLC offers you a franchise, it must provide this Disclosure Document to you 14 days before you sign a binding agreement or make a payment with the franchisor or an affiliate in connection with the proposed franchise sale.

If Hydration Station USA Franchise System, LLC does not deliver this Disclosure Document on time, or if it contains a false or misleading statement or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580, and the appropriate state agency listed in EXHIBIT "A" to this Disclosure Document.

The franchise seller(s) involved with the sale of this franchise is/are:

Keith McDermott; 2964 Peachtree Road, Suite 420, Atlanta, Georgia 30305; (404) 307-3004

Shaun Curtis; 2964 Peachtree Road, Suite 420, Atlanta, Georgia 30305; (770) 843-0585

_____; _____; _____

Issuance Date: June 10, 2021

Hydration Station USA Franchise System, LLC's agent to receive service of process is listed in EXHIBIT "A" to this Disclosure Document.

I received a Franchise Disclosure Document that included the following Exhibits:

| | |
|---|---|
| EXHIBIT "A" | State Agencies and Administrators |
| EXHIBIT "A" | Agent for Service of Process |
| EXHIBIT "C" | Franchise Agreement |
| EXHIBIT "D" | Other Agreements |
| EXHIBIT "E" | Table of Contents of the confidential Brand Standards Manual |
| EXHIBIT "F" | List of Franchisees |
| EXHIBIT "G" | Financial Statements of Hydration Station USA Franchise System, LLC |
| EXHIBIT "H" | Area Representatives |
| EXHIBIT "I" | State Effective Dates |
| EXHIBIT "J" | Receipts |

_____
Print Name

_____
Date

_____
(Signature) Prospective Franchise Owner

(This Receipt should be executed in duplicate. One Receipt must be signed and remains in the Franchise Disclosure Document as the prospective franchise owner's copy. The other Receipt must be signed and returned to Hydration Station USA Franchise System, LLC.)

RECEIPT

This Disclosure Document summarizes certain provisions of the franchise agreement and other information in plain language.

Read this Disclosure Document and all agreements carefully. If Hydration Station USA Franchise System, LLC offers you a franchise, it must provide this Disclosure Document to you 14 days before you sign a binding agreement or make a payment with the franchisor or an affiliate in connection with the proposed franchise sale.

If Hydration Station USA Franchise System, LLC does not deliver this Disclosure Document on time, or if it contains a false or misleading statement or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580, and the appropriate state agency listed in EXHIBIT "A" to this Disclosure Document.

The franchise seller(s) involved with the sale of this franchise is/are:

Keith McDermott; 2964 Peachtree Road, Suite 420, Atlanta, Georgia 30305; (404) 307-3004

Shaun Curtis; 2964 Peachtree Road, Suite 420, Atlanta, Georgia 30305; (770) 843-0585

_____; _____; _____

Issuance Date: June 10, 2021

Hydration Station USA Franchise System, LLC's agent to receive service of process is listed in EXHIBIT "A" to this Disclosure Document.

I received a Franchise Disclosure Document that included the following Exhibits:

| | |
|---|---|
| EXHIBIT "A" | State Agencies and Administrators |
| EXHIBIT "A" | Agent for Service of Process |
| EXHIBIT "C" | Franchise Agreement |
| EXHIBIT "D" | Other Agreements |
| EXHIBIT "E" | Table of Contents of the confidential Brand Standards Manual |
| EXHIBIT "F" | List of Franchisees |
| EXHIBIT "G" | Financial Statements of Hydration Station USA Franchise System, LLC |
| EXHIBIT "H" | Area Representatives |
| EXHIBIT "I" | State Effective Dates |
| EXHIBIT "J" | Receipts |

_____

Print Name

_____

Date

_____

(Signature) Prospective Franchise Owner

(This Receipt should be executed in duplicate. One Receipt must be signed and remains in the Franchise Disclosure Document as the prospective franchise owner's copy. The other Receipt must be signed and returned to Hydration Station USA Franchise System, LLC.)