Case 1:19-cv-05192-LMM Document 518 Filed 04/30/23 Page 1 of 262
Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


HYDRATION STATION USA
FRANCHISE SYSTEM, LLC, et al.,

     Plaintiff,                  CIVIL ACTION FILE

     vs.                       NO. 1:19-cv-05192-LMM

JARED CHRISTIAN SEAVERNS,
et al.,

     Defendants.

~~~~~~~~~~~~~~~~~~~~



REMOTE DEPOSITION OF

MICHAEL WINN GAYLE


October 8, 2021

10:00 a.m.


(All parties appeared
remotely via videoconference
and/or teleconference.)



Michelle J. Reeves, CCR, B-1397

Elizabeth Gallo
COURT REPORTING, LLC

Page 2

```
 1              APPEARANCES OF COUNSEL:

 2

 3    On behalf of the Plaintiffs:

 4    CHRISTOPHER W. TIMMONS, Esquire
      Poole Huffman, LLC
 5    3562 Habersham at Northlake
      Building J, Suite 200
 6    Tucker, Georgia  30084
      Email:  timmons@poolehuffman.com
 7    Telephone:  (404) 373-4008

 8    RAMSEY A. KNOWLES, Esquire
      Knowles Gallant Timmons, LLC
 9    6400 Powers Ferry Road
      Suite 350
10    Atlanta, Georgia  30339
      Telephone:  (404) 590-3533
11    Email:  rknowles@knowlesgallant.com

12
      On behalf of the Plaintiff, Keith McDermott,
13    individually:

14    JOHN C. ROGERS, Esquire
      155 Beverly Road
15    Atlanta, Georgia  30309
      Telephone:  (404) 343-1016
16    Email:  johncrogers1776@gmail.com

17
      On behalf of the Defendants, Shawn Fobas; Matt
18    Borah; Jason Trembley; Peter Park; Crimson &
      Red Holdings, LLC; Hydralife Sandy Springs, LLC
19    f/k/a Sandy Springs, LLC; Hydralife Buckhead,
      LLC f/k/a VF Buckhead, LLC; Hydralife
20    Highlands, LLC f/k/a VF Highlands, LLC:

21
      JEFFREY A. POWELL, Esquire
22    Powell Law, LLC
      6075 Barfield Road
23    Suite 227
      Sandy Springs, Georgia  30328
24    Telephone:  (678) 273-3970
      Email:  jeffrey.powell@powelllawga.com
25
```

```
                                                          Page 3
 1                  APPEARANCES OF COUNSEL (continued)

 2          On behalf of the Defendants, Ryan Heavern;
            Brian McCullough; Brett McCullough; Michael
 3          Gayle; Flo West, LLC; Vida-Flo Alabama, LLC;
            Holistic Hydration Organization, LLC; Vida-Flo
 4          Louisiana, LLC; and Geaux Fleaux, LLC:

 5          SHERRI G. BUDA, Esquire
            BRIAN KNIGHT, Esquire
 6          Knight Palmer, LLC
            1360 Peachtree Street, NE
 7          Suite 1201
            Atlanta, Georgia  30309
 8          Telephone:  (404) 228-4822
            Email:  sbuda@knightpalmerlaw.com
 9          Email:  bknight@knightpalmerlaw.com

10

            On behalf of the Defendants, Jared Christian
11          Seaverns; The Whydrate Group, Inc.; Whydrate
            Fulfillment Group, Inc.; and Brett Snellgrove:
12
            JASON S. BELL, Esquire
13          MELANIE WALKER, Esquire
            Smith, Gambrell & Russell, LLP
14          1105 West Peachtree Street, NE
            Suite 1000
15          Atlanta, Georgia  30309
            Telephone:  (404) 815-3619
16          Email:  jbell@sgrlaw.com

17

            On behalf of the Defendant Brendan Joseph
18          Doucette:

19          BRIAN D. TRULOCK, Esquire
            Bendin, Sumrall & Ladner, LLC
20          1360 Peachtree Street, NE
            Suite 800
21          Atlanta, Georgia  30309
            Telephone:  (404) 671-3109
22          Telephone:  (404) 671-3080
            Email:  btrulock@bsllaw.net
23


24
      Also present:  Mr. Brett Snellgrove
25                    Mr. Jared Christian Seaverns
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 4

```
 1                        INDEX TO EXAMINATIONS

 2

 3    WITNESS: MICHAEL WINN GAYLE

 4    EXAMINATION

 5    By Mr. Timmons                        Page 6

 6

 7

 8                         INDEX TO EXHIBITS

 9    EXHIBITS                 IDENTIFICATION        PAGE
```

| | EXHIBITS | IDENTIFICATION | PAGE |
|---|---|---|---|
| 10 | Exhibit 1 | Subpoena | 5 |
| | Exhibit 2 | Responses | 106 |
| 11 | Exhibit 3 | Agreement | 27 |
| | Exhibit 4 | Design manual | 42 |
| 12 | Exhibit 5 | Handbook | 50 |
| | Exhibit 6 | Manual | 53 |
| 13 | Exhibit 7 | Module | 55 |
| | Exhibit 8 | Text messages | 73 |
| 14 | Exhibit 9 | Email chain | 110 |
| | Exhibit 10 | Draft letter | 116 |
| 15 | Exhibit 11 | Text messages | 114 |
| | Exhibit 12 | Text messages | 153 |
| 16 | Exhibit 13 | Email chain | 154 |
| | Exhibit 14 | Text messages | 166 |
| 17 | Exhibit 17 | Text messages | 193 |
| | Exhibit 18 | Letter | 198 |
| 18 | Exhibit 19 | Letters | 206 |
| | Exhibit 22 | Letter | 243 |

```
19

20    (Original exhibits retained by counsel and may be

21    attached later.)

22

23

24

25
```

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 5

```
 1                    Remote Deposition of

 2                    MICHAEL WINN GAYLE,

 3                    MICHAEL WINN GAYLE,

 4   being first duly sworn, was examined and

 5   testified as follows:

 6        MR. TIMMONS:  Mr. Gayle, you probably have

 7   seen me before, but just in case you haven't my

 8   name is Chris Timmons.  I'm an attorney in this

 9   case.  I represent Hydration Station and

10   Vida-Flo Fulfillment.  Both of those entities

11   are plaintiffs in a case pending in Federal

12   Court in which you are a defendant.

13        This deposition is being taken pursuant to

14   notice and agreement of counsel and the Federal

15   Rules of Evidence.  I know the notice says that

16   it's videotaped but that's just for the purpose

17   of notifying everybody.  We don't intend to use

18   a videotape in this deposition later on, just

19   for the transcript.

20        (Exhibit Number 1 was introduced.)

21        MR. TIMMONS:  I will go ahead and mark and

22   present Exhibit 1 which is the third amended

23   notice of videotape deposition of Defendant

24   Michael Gayle.

25        Can we stipulate that we will reserve
```

Page 6

1          objections except as to form of the question,

2          responsiveness of the answer and privilege?

3                  MS. BUDA:  Yes.

4                                  EXAMINATION

5    BY MR. TIMMONS:

6          Q.    Hi, Mr. Gayle.

7                Have you seen any of the depositions in

8    this case before?

9          A.    I saw a little bit of Ryan's and Brett

10   McCullough's.

11         Q.    Okay.

12               Well, I mean, have you ever been deposed

13   before?

14         A.    This is my first rodeo.

15         Q.    Okay.

16               Well, let me go over some of the ground

17   rules that may be tough to remember.  If you need

18   any -- have any questions along the way, I'm sure

19   Ms. Buda or I can help you out.

20               The first and most important thing about a

21   deposition is, as I said earlier, this deposition is

22   not being videotaped.  The only record that we have

23   of this deposition is what Ms. Reeves, our court

24   reporter, writes down.  What that means is we've got

25   to have verbal answers to questions.  I know I can

Page 7

1    see you and you can see me.  But nodding or shaking

2    of the head isn't going to make it into the record.

3    The same thing, uh-huh or huh-uh also won't mean

4    anything when it comes to the transcript.  So if

5    it's a yes or no question, we'll need a yes or no.

6    Does that make sense?

7         A.   Yes, sir.

8         Q.   As far as breaks, if you need a break just

9    let us know.  If it's obviously some sort of

10   bathroom emergency, we'll take it immediately.  If

11   not, we'll go ahead and break when I finish a line

12   of questioning or maybe finish a line of questioning

13   and then take a break.

14            The second most important rule when it

15   comes to depositions is if you don't understand the

16   question please tell me.  And if you could be as

17   specific as possible about what you don't understand

18   that will make it easier for me to reformulate a

19   question.  For example, if you don't understand a

20   certain word that's in a sentence that I might have

21   asked, then please tell me that you don't understand

22   that word or need some sort of definition.

23            As I mentioned previously, this deposition

24   is being taken via zoom.  I think it's been clear

25   that if you've seen any of the depositions before, I



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 8

1    am not the best at zoom.  So we're going to do a lot

2    of screen sharing on zoom.  Please feel free at any

3    time if you need me to zoom in or zoom out on a

4    document that we're looking at.  When we're

5    scrolling, if you need me to speed up the scrolling

6    or slow down, please let me know that, as well.

7    Does that make sense?

8         A.   Yes.

9         Q.   I sent -- and I know it was rather late

10   last night, but I sent copies of the exhibits to

11   your counsel.

12        Did you also receive a copy of -- I'm

13   sorry, I sent the link to the exhibits last night.

14   Did you also receive a copy of that link?

15        A.   I did.

16        Q.   So I'll represent to you that the same

17   documents that are in that link are the same

18   documents that I'm going to be pulling up via screen

19   share.  So if it's easier for you on the zoom to

20   just pull up the documents on your own computer,

21   feel free to do that.  Again, they're going to be

22   the exact same exhibits.  Do you understand that?

23        A.   Yes, I do.

24        Q.   Okay.

25        Are you under the influence of alcohol,



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 9

1    any medication, or any drugs, prescription or

2    otherwise, that may impact your ability to remember

3    things and answer fully or honestly?

4         A.   No.

5         Q.   Do you have any issues with your memory?

6         A.   Not that I'm aware of.

7         Q.   Is there anything today that you know of

8    that would present you from answering fully and

9    honestly the questions that I ask of you?

10        A.   No.

11        Q.   I want to talk about preparation for

12   today's deposition.

13             Did you meet with anyone?

14        A.   Not face-to-face.

15        Q.   Did you meet with anyone otherwise?

16        A.   I had a phone call with Sherri last night.

17        Q.   Sherri Buda, your attorney?

18        A.   That is correct.

19        Q.   Approximately how long did you talk with

20   Ms. Buda?

21        A.   I cannot remember.  Anywhere from 30

22   minutes to an hour.

23        Q.   Did you talk with anyone else about the

24   deposition?

25        A.   I did not.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

Page 10

1        Q.   Did you review any documents in

2    preparation for today's deposition?

3        A.   Just the exhibits that were provided.

4        Q.   Anything other than exhibits that were

5    provided -- or the link to the exhibits -- the

6    documents that were within the link, sorry?

7        A.   The only documents that I reviewed were

8    the ones that were in the exhibit.

9        Q.   What is your current address, sir?

10       A.   4169 Churchill Drive, Birmingham, Alabama,

11   35212.

12       Q.   How long have you lived at the Churchill

13   Drive address?

14       A.   Approximately six years.

15       Q.   Have you ever lived in Georgia?

16       A.   Yes.

17       Q.   When did you live in Georgia?

18       A.   We moved on my third birthday, like the

19   actual day of my birthday, and moved back at the end

20   of third grade.

21       Q.   So from the time that you were roughly

22   three years old until the time that you were roughly

23   eight years old you lived in the State of Georgia.

24       A.   I do not know the age relation, like how

25   old I was in third grade, but it was from three



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

Page 11

```
 1   years old until at the end of third grade.

 2        Q.   Got it.  Thank you.

 3             Where in Georgia did you live?

 4        A.   Alpharetta.

 5        Q.   Other than that time period between the

 6   time that you were three years old and when you

 7   moved in third grade, have you lived in Georgia

 8   other than that?

 9        A.   No.

10        Q.   Do you have any relatives that live in the

11   State of Georgia?

12        A.   I do.

13        Q.   Who are those relatives?

14        A.   My aunt, Beverly Wolfe.  She lives in

15   Alpharetta.  That is the extent of the relatives

16   that I would say I'm aware and that I have

17   communication with.

18        Q.   So just Ms. Wolfe?

19        A.   Correct.

20        Q.   Where did you attend high school?

21        A.   Mountain Brook.

22        Q.   Is that in Alabama?

23        A.   Yes, sir.

24        Q.   What year -- did you graduate from high

25   school?
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 12

 1        A.   I did.

 2        Q.   What year?

 3        A.   2003.

 4        Q.   Did you attend any schooling after high

 5   school?

 6        A.   Ole Miss.  University of Mississippi.

 7        Q.   How long were you at Ole Miss?

 8        A.   2003 until 2008.

 9        Q.   Did you obtain a degree from Ole Miss?

10        A.   Yes.  Managerial finance.

11        Q.   Did you have any further formal education

12   after you graduated from Ole Miss in 2008?

13        A.   Formal education?  Can you elaborate on

14   formal education?

15        Q.   Sure.  Did you pick up a master's degree?

16   Did you go to law school, anything like that,

17   certificate?

18        A.   I did not.  I have a few certifications

19   with -- when I was in finance.  I had my Series 7,

20   my Series 66 license, certified mutual fund

21   counselor, health, life, variable life insurance

22   licensing.  I think that sums that up.

23        Q.   Where did you work after you graduated

24   from Ole Miss in 2008?

25        A.   Waddell & Reed in Memphis, Tennessee.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 13

1        Q.    I'm sorry.  I had trouble hearing you.
2   Could you say that again?
3        A.    Waddell & Reed in Memphis, Tennessee.
4        Q.    How do they spell Waddell?
5        A.    W-A-D-D-E-L-L.  And Reed is with two E's.
6        Q.    Did you work for them in Memphis,
7   Tennessee?
8        A.    I did.
9        Q.    What is Waddell & Reed?
10            I'm sorry.  What did Waddell & Reed do at
11   the time that you worked for them?
12        A.    They're an investment firm, financial
13   planning, asset managers; it was a comprehensive
14   investment firm.
15        Q.    What did you do for them?
16        A.    I was a financial advisor, financial
17   planner.  I managed people's retirement port folios,
18   financial plans, sold annuities and I ran our 401k
19   sales desk in Memphis.  For a time, I was the
20   district manager.  I hired and trained, recruited
21   new advisors.  I ran our training program.  And
22   became an advisor as the stock market was crashing
23   in 2008, so you can imagine.
24        Q.    Are you still with Waddell & Reed?
25        A.    I am not.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 14

1      Q.   When did you leave Waddell & Reed?

2      A.   2011, from what I can remember.

3      Q.   Where did you go after Waddell & Reed for

4   employment?

5      A.   Sterne Agee in Birmingham, Alabama.

6      Q.   How do you spell Sterne?

7      A.   Sterne is S-T-E-R-N-E.  Agee is A-G-E-E.

8      Q.   When did you begin working for Sterne

9   Agee?

10     A.   2011.  I left Waddell & Reed and three

11  days later I was working at Sterne Agee.

12     Q.   What did you do at Sterne Agee?

13     A.   I ran their internal sales desk.  I

14  trained all of their new advisors how to get new

15  business, cold calls, build a book of business.

16  That's what I did.

17     Q.   Is it still in the investment/financial

18  advisor industry?

19     A.   Correct, yes.

20     Q.   Are you still employed by Sterne Agee?

21     A.   I am not.

22     Q.   When did you leave them?

23     A.   I would have to say 2014, I believe, from

24  what I can request.

25     Q.   Employment-wise, where did you go after

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 15

 1    Sterne Agee?

 2        A.   Principal Financial Group.

 3        Q.   **Where did you work for Principal Financial**

 4    **Group?**

 5        A.   Where did I work?

 6        Q.   **Yes.**

 7        A.   In Birmingham.

 8        Q.   **And I think I know how they spell**

 9    **Principal, but if you can just spell it, please,**

10    **that might make it easier.  There are two versions.**

11        A.   It's Principal.  P-R-I-N-C-I-P-A-L.

12        Q.   **Got it.**

13             **What did you do for the Principal**

14    **Financial Group?**

15        A.   Financial advisor, financial planner;

16    essentially the same kind of role as I had been in.

17        Q.   **Are you still employed by Principal**

18    **Financial Group?**

19        A.   I am not.

20        Q.   **When did you leave them?**

21        A.   2016, I believe.  First of 2016 from what

22    I can remember.

23        Q.   **Where did you go from there?**

24        A.   I went from Principal to beginning the

25    Vida-Flo process, and I do not remember the time in

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 16

```
 1    between those two.
 2         Q.    Okay.
 3         A.    It was not long.
 4         Q.    Okay.
 5               From 2016 until the present, other than
 6    Vida-Flo or Holistic Hydration, had you worked for
 7    any other employers?
 8         A.    No.
 9         Q.    Of the employers that we have talked
10    about, have any of them terminated your employment
11    or have you had to resign in lieu of termination at
12    any of those employers that we have spoken about?
13         A.    Sterne Agee was going through a buy-out
14    and they were acquired, from -- I cannot remember
15    the firm that bought them.  But I was part of -- at
16    that time I was in their real estate and investment
17    trust section and that was very short lived because
18    shortly after that it was shuttered during the
19    buy-out.
20         Q.    They terminated your employment?
21         A.    Correct.
22         Q.    Were there any allegations of dishonesty
23    when your employment was terminated?
24         A.    No.
25         Q.    Other than Sterne Agee, did any of the
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

1    other employers terminate your employment or have

2    you resign in lieu of termination?

3         A.   No.

4         Q.   What is your personal phone number?

5         A.   205-529-3584.

6         Q.   Do you have any other personal phone

7    numbers that you use besides that 3584 number?

8         A.   No, sir.

9         Q.   Do you have a work number that's separate

10   from that number?

11        A.   I do.

12        Q.   What is that number?

13        A.   205-705-3288.

14        Q.   Any other numbers, work numbers, besides

15   that number?

16        A.   There is a holding, like a call waiting

17   number, and it's 205-705, and I believe it's 3256,

18   or it's a variation of that, but it's our call

19   waiting number.

20        Q.   How long have you had your personal phone

21   number that's the 3584 number?

22        A.   I believe from when I was 15.

23        Q.   Six years anyway?

24        A.   Correct.

25        Q.   How long have you had the work number

Page 18

1    that's 3288?

2         A.   I cannot remember when we got that.  It's

3    been a couple of years.

4         Q.   **Is there anything meaningful that**

5    **coincides with the time that you got that number?**

6         A.   Not that I can remember.

7              What, the work number?

8         Q.   **Yes.**

9         A.   Not that I can recall.

10        Q.   **Did you have the work number five years**

11   **ago?**

12        A.   Yes.

13        Q.   **What is your personal email address?**

14        A.   M-W-G-A-Y-L-E at gmailcom.

15        Q.   **And I should have done this at the**

16   **beginning of the deposition.**

17             **What is your full name, Mr. Gayle?**

18        A.   Michael Winn Gayle.  W-I-N-N.

19        Q.   **Thank you.**

20             **So other than mwgayle@gmail.com email**

21   **address, do you have any other personal email**

22   **addresses?**

23        A.   No, not that I can recall.  Yes -- no.

24        Q.   **Within the last five years, have you had**

25   **any other personal email addresses that you know of?**

Page 19

```
1       A.   No.

2       Q.   Do you have a work email address?

3       A.   I do.

4       Q.   What is your work email address?

5       A.   Mwgayle -- G-A-Y-L-E -- at

6  myholistichydration.com.

7       Q.   Do you currently have any other work email

8  addresses besides that myholistichydration.com

9  address?

10      A.   There is a email address like for customer

11 service and it is help@myholistichydration.com.

12      Q.   Within the last five years, have you had

13 any other work email addresses?

14      A.   Five years ago?  Yes, I had a Vida-Flo

15 email.  I believe mgayle, M-G-A-Y-L-E, at I believe

16 it was bham.vida/flo.com.

17      Q.   Okay.

18           Other than your Holistic Hydration or a

19 Vida-Flo email address, during the last five years

20 have you had any other work email addresses?

21      A.   Not that I'm aware of, no.

22      Q.   Okay.  So we have personal.  We've covered

23 work.

24           I don't know what other category might be

25 out in there, but I'll go ahead ask it.  Other than
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 20

```
 1   the email addresses that we have talked about,

 2   personal g-mail address, the Holistic Hydration

 3   email address, and any Vida-Flo email addresses that

 4   you might have had, have you used any other email

 5   addresses during the past five years?

 6         A.    No.  No, I have not.

 7         Q.    Okay.

 8         A.    Not that I'm aware of.

 9         Q.    I want to talk about the formation of the

10   Vida-Flo Alabama store.  I'm going to back up a

11   little earlier than that.

12               When and how did you become interested in

13   hydration therapy?

14         A.    My first experience with IV hydration, I

15   was on a trip to Chicago, had a stomach bug, wasn't

16   sure.  But as soon as I landed in Chicago I was

17   sick.  A friend that lived in Chicago took me to an

18   IV clinic and that was really my first experience.

19   And the idea of being able to receive IV fluids

20   instead going to the hospital, that was my first

21   time.

22         Q.    Actually when was that?  What year?

23         A.    I do not know.  I cannot remember.

24         Q.    More than five years ago?

25         A.    Yes.
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 21

1        Q.    After your trip to Chicago where you

2    received IV therapy, what other experiences did you

3    have with IV hydration therapy?

4        A.    None.  None that I can remember.

5        Q.    Before forming Vida-Flo Alabama, did you

6    have a medical background or medical training?

7        A.    No.

8        Q.    How did you become interested in becoming

9    a Vida-Flo franchisee?

10       A.    Being a financial advisor I have always

11   been about your own business, you are your own boss,

12   you're in business and you're responsible for

13   everything, so I knew I wanted to stay in that

14   space.  And the market in Birmingham seemed a good

15   market to kind of explore the idea of opening an IV

16   business there.

17       Q.    How did you learn of the Vida-Flo company?

18       A.    I do not remember.

19       Q.    What was your first contact with the

20   Vida-Flo franchise?

21       A.    From what I can remember, I did a

22   franchisee admission request online.

23       Q.    Tell me about the formation of Vida-Flo

24   Alabama, LLC.  How did that come about?

25       A.    Can you elaborate on that?


Elizabeth Gallo
COURT REPORTING, LLC

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 22

1       Q.    Sure.

2             How did you find partners, how did you

3     decide to do the LLC, et cetera?

4       A.    Partners?  When I reached out to Vida-Flo,

5     Jamey Shirah, from what I can remember, is the one

6     who had passed along my business partner's name,

7     Derrick Purdy.

8             Derrick Purdy and I had known each

9     other -- I think we knew each other on crossed

10    paths.  He and I boxed at the same boxing gym for a

11    brief period and he's, you know, a well-known

12    individual.

13      Q.    So you knew Mr. Purdy prior to the

14    formation of Vida-Flo Alabama, LLC?

15      A.    Yes, sir.

16      Q.    But I guess, lack of a better term, mutual

17    interest in Vida-Flo you learned that through Jamey

18    Shirah and he was the person that put the two of you

19    together?

20      A.    From what I can remember.

21      Q.    Who are the original members of Vida-Flo

22    Alabama, LLC?

23      A.    Derrick Purdy, myself, and the medical

24    director, Dr. Flippo.

25      Q.    Could you spell Dr. Flippo's last name?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 23

```
 1        A.   F-L-I-P-P-O.
 2        Q.   Thank you.
 3             Did you know Dr. Flippo before becoming
 4   interested in becoming a Vida-Flo franchisee?
 5        A.   I cannot remember that.  I do not know.
 6        Q.   How did he become a part of Vida-Flo
 7   Alabama, LLC?
 8        A.   He -- I don't know if I can answer this
 9   without giving personal information.  It has to do
10   with medical and personal physicians.
11        Q.   His medical relationship with you?
12        A.   Not with me, but my partner, Derrick
13   Purdy.
14        Q.   Okay.  I think it's --
15             MS. BUDA:  Is it necessary to go into
16        that, Chris?
17             MR. TIMMONS:  Not really.  But, I mean, I
18        think other than he may have been his doctor.
19        We don't need to know what he was treating for.
20             As far as you know, was Dr. Flippo Mr.
21        Purdy's doctor?
22             THE WITNESS:  I can't speak to that.
23   BY MR. TIMMONS:
24        Q.   You don't know?
25        A.   Correct.  I -- yes.
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

Page 24

1        Q.    Let's back up.

2              Was it Mr. Purdy who brought Dr. Flippo

3     into Vida-Flo Alabama, LLC?

4        A.    I do not remember that process in order.

5        Q.    When you first formed Vida-Flo Alabama,

6     LLC, what were the ownership percentages?

7        A.    Approximately maybe 25, 10 and 65 or 55.

8     I was the majority I believe at 55 percent, I

9     believe.

10       Q.    Yes.  I've seen documents that have said

11    that you were a 65 percent owner.  Does that sound

12    right?

13       A.    Possibly.

14       Q.    Okay.

15             Did the other share percentages change

16    over time, and I mean by over time, from the time

17    that you became Vida-Flo Alabama, LLC to the present

18    now operating under hydration -- Holistic Hydration?

19       A.    Yes.

20       Q.    What are they now?

21       A.    I know I have a lower percentage.  I don't

22    know what it is off the top of my head.  Flippo is

23    the same from what I can recall.  Purdy is either

24    the same or possibly a little lower, I think.  Then

25    we have one other owner.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 25

1      Q.   Who is that?

2      A.   An investor, Garrett Osborne.  He's got a

3   minority percentage.

4      Q.   Was he a member of Vida-Flo Alabama, LLC?

5      A.   No, sir.

6      Q.   So we think you have got roughly

7   65 percent, you said 25 percent and 10 percent.

8           Who had the 25 percent ownership, was it

9   Mr. Purdy or Dr. Flippo?

10     A.   Derrick Purdy.

11     Q.   Okay.

12     A.   From what I can remember, those were the

13  percentages, but that may be off by a couple of

14  points.

15     Q.   I mean, I guess you had the most

16  ownership, Mr. Purdy had the second most, and

17  Dr. Flippo had the least?

18     A.   That is correct.

19     Q.   If you could tell me the process of your

20  interest in Vida-Flo until you became or until you

21  started negotiating the Vida-Flo franchise

22  agreement?

23     A.   I feel like it was -- I feel like it was

24  fairly quick.  Put in the submission, someone

25  reached out and I believe the next step was we

Page 26

```
 1   set-up the meeting, Derrick and I sat down, and I
 2   believe Jamey Shirah was there.  After that, we I
 3   traveled to Atlanta.  I met with Keith McDermott and
 4   Jamey Shirah at their office.  Keith showed me at
 5   least one of the stores and from there it began, I
 6   believe, the paperwork process.
 7        Q.   Let me go back just a little bit.
 8             With regard to the shares, you say roughly
 9   65 percent.  But regardless, you having the most,
10   Mr. Purdy having less and then Dr. Flippo having the
11   least.  How was that assigned?  Was it based on
12   financial contributions, thoughts about maybe doing
13   the work or how did that work?
14        A.   It was financial contributions.  And
15   Dr. Flippo did not -- we compensated Dr. Flippo with
16   his 10 percent ownership versus having a monthly pay
17   to him.
18        Q.   So he didn't make any capital
19   contributions to Vida-Flo Alabama, LLC?
20        A.   Correct.
21        Q.   Did you contribute more of the capital
22   than Derrick Purdy?
23        A.   Yes.
24        Q.   Okay.
25        A.   The percentages, five percent for
```



Page 27

```
1   Dr. Flippo, his ownership came from me.  The other

2   five percent of his ownership came from Derrick.

3   And the remaining, those percentages, were reflected

4   upon our capital contributions.

5        Q.   Getting to the negotiations of the

6   franchise agreement.  Did you hire counsel to assist

7   you?

8        A.   I do not believe so.  I cannot remember

9   during the negotiations, but I don't believe so.

10       Q.   Did you add anything to the franchise

11  agreement after it was presented to you?

12       A.   Can you be more specific?  I'm not sure.

13       Q.   Sure.

14            I mean, did you add terms to the

15  agreement?  Did you add language to the agreement

16  beyond your signature?

17       A.   I believe there was a geographical area

18  when it was just Birmingham that we were allowed to

19  operate in.

20            (Exhibit Number 3 was introduced.)

21  BY MR. TIMMONS:

22       Q.   Exhibit 3 is a 49-page document that

23  begins with the Bates label VFSUPP-00152.  At the

24  top of the document is the Vida-Flo logo.  The

25  middle says franchise agreement.  This is on the
```

Page 28

1    first page.  And at the bottom left of the first

2    page says franchisee Vida-Flo Alabama, LLC.  Date,

3    May 16, 2016.

4              If we go to page 26 of the pdf.  On page

5    26 of the pdf is VFSUPP-00177.  As far as the number

6    of pages on the franchise agreement, it's numbered

7    page 24.

8              There are some signatures on this page.

9    It appears that Mr. Purdy signed the document.  Do

10   you recognize Mr. Purdy's signature?

11       A.   Are you asking if I know what his

12   signature looks like?

13       Q.   Yes.

14       A.   I would have no reason to believe that's

15   not his signature, but I do not know what Derrick's

16   signature just looks like.

17       Q.   If you were the person with the biggest

18   ownership percentage of Vida-Flo Alabama, LLC, why

19   is Mr. Purdy signing the document and not you?

20       A.   That is a question you would have to ask

21   Jamey because he was the one who had him sign it.

22       Q.   I'll go to page 34 of the pdf.  Page 34 of

23   the pdf 285.  At the bottom of the page there's a

24   signature.  It says underneath it, name Michael

25   Gayle, and its owner.  It appears to be an account,



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 29

1    franchise Vida-Flo Alabama.

2              Were you an owner of Vida-Flo Alabama at

3    this time?

4         A.   Yes, I was.

5         Q.   Is that your signature?

6         A.   Yes, it is.

7         Q.   Talking about the franchise agreement, did

8    you read the document before Derrick Purdy signed

9    it?

10        A.   I have no reason to think I didn't.

11        Q.   Did you understand its terms?

12        A.   To my best ability.

13             MS. BUDA:  Object to form.

14   BY MR. TIMMONS:

15        Q.   Did you reach out to anyone because you

16   thought there might be some ambiguity or something

17   about the agreement that you didn't understand?

18        A.   I do not remember.

19        Q.   I'm going to go to page five of the pdf.

20   Bates label on this page is VFSUPP-00156.  The

21   number on the page is three.  Go to paragraph seven,

22   section 7.1, it says site selection.

23             You agree to locate and obtain our

24   approval of the premises from which you will operate

25   within 90 days of the effective date.  The premises



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 30

1    must be located within the geographic area

2    identified in Attachment B, which is defined as the

3    franchise area, and must conform to our minimum site

4    selection criteria.

5            What was your site for your Vida-Flo

6    franchise?

7       A.    Specifically, we would have to look at the

8    Attachment B, but that would be the geographic range

9    I previously mentioned.

10      Q.    Attachment B, which is on page 30 of the

11   pdf.  That's Bates labeled VFSUPP-00181.  There is a

12   map that appears to be central Alabama.

13           Is that your understanding of your

14   territory, your franchise area?

15      A.    To my understanding at the time, yes.

16      Q.    Does that area include Vestavia Hills?

17      A.    Yes.

18      Q.    If this limited your area to central

19   Alabama, did you want to have rights to all of the

20   state of Alabama?

21      A.    Not that I can recall.

22      Q.    At the time that the franchise agreement

23   was signed, did you intend to open more than one

24   Vida-Flo store?

25      A.    That was the initial idea.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 31

1        Q.   Where else did you want to open stores?

2        A.   Specifically, I do not remember.  But the

3   idea was to grow the Vida-Flo brand and business.

4        Q.   Let me go to page 12 of the pdf.  The

5   Bates label on this page is VFSUPP-00163.  It's page

6   10 of the franchise agreement.  Go to paragraph 14

7   which is titled restrictive covenants.

8             Section 14.1 reads, reasons for covenant.

9   You acknowledge that the intellectual property and

10   training and assistance that we provide would not be

11   acquired except for implementation of this

12   agreement.  You also acknowledge that competition by

13   you, the owners, or persons associated with you or

14   the owners, including family members, could

15   seriously jeopardize the entire franchise system

16   because you and the owners have received an

17   advantage through knowledge of our day-to-day

18   operations and know-how related to the system.

19   Accordingly, you and the owners agree to comply with

20   the covenants described in this section to protect

21   the intellectual property and our franchise system.

22             Did you know how to run a hydration

23   therapy business before entering into this franchise

24   agreement?

25        A.   It's tough to say.  It was my first

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 32

1    hydration business to run.

2         Q.    Why is it tough to say?

3         A.    Well, running a business, I have been

4    managers through college and I have run sales desks

5    and managed people post college.  But this would be

6    my first time running a hydration business.

7         Q.    Did you know about the specifics of the

8    hydration therapy business prior to signing this

9    agreement beyond how to run a business, in general?

10        A.    Can you elaborate on specifics?

11        Q.    What did you know about running a

12   hydration therapy business beyond knowing generally

13   how to run a business?

14        A.    You have to kind of elaborate on what

15   running a hydration business is.

16        Q.    Well, have you run one?

17        A.    No.

18        Q.    You have never run a hydration therapy

19   business?

20        A.    Not before Vida-Flo.

21        Q.    Okay.

22              What I mean is now.  Do you currently run

23   a hydration therapy business?

24        A.    Yes.  Yes, I do.

25        Q.    So you would understand, I imagine, what



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 33

1    beyond generally understanding how to run a business

2    that would be involved in a hydration therapy

3    business, right?  There's more than just knowing how

4    to run a business, correct?

5              MS. BUDA:  Object to form.

6              THE WITNESS:  That could be accurate, yes.

7         That's not one all shoot -- (undiscernible).

8    BY MR. TIMMONS:

9         Q.   Okay.

10             What else in addition to running a general

11   business did you know about the hydration therapy

12   business?

13             MS. BUDA:  Object to form.

14             THE WITNESS:  I do not recall.  I do not

15        know.

16   BY MR. TIMMONS:

17        Q.   I mean now.  What do you know about -- is

18   there anything -- like, I mean, if I understood

19   general business practices, could I just go out and

20   open a hydration therapy business tomorrow?

21             MS. BUDA:  Form.

22             THE WITNESS:  No, but -- yes.  No, you

23        would not, I wouldn't imagine.

24   BY MR. TIMMONS:

25        Q.   Sure.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 34

1              Because, there are differences between

2       running a general business and a hydration therapy

3       business, correct?

4           A.   Well, there are differences between all

5       businesses, correct?  Yes.

6           Q.   Yes.  Okay.

7              So beyond understanding generally how to

8       run a business, did you know anything else about --

9       specifically about the hydration therapy business at

10      the time that you signed this franchise agreement?

11          A.   Not that I can recall.

12          Q.   Okay.

13             Now, go to Paragraph 14.4.  It says unfair

14      competition after term.

15             During the post-term restricted period,

16      you and your owners agree not to engage in any

17      prohibited activities.  Notwithstanding the

18      foregoing, you and your owners may have an interest

19      in a competitive business during the post-term

20      restricted period as long as the competitive

21      business is not located within and does not provide

22      competitive goods for services to customers or

23      located within the restricted territory.

24             If you or an owner engages in a prohibited

25      activity during the post-term restricted period,

Elizabeth Gallo
COURT REPORTING, LLC

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 35

1    other than having an interest in a competitive

2    business that is permitted under this section, then

3    the post-term restricted period applicable to you or

4    the noncompliant owner as applicable, shall be

5    extended by the period of time during which you or

6    the noncompliant owner is applicable and engaged in

7    the prohibited activity.  I'll stick with that

8    section.

9             MS. BUDA:  Chris, I heard you read this.

10        Is there a question pending?

11             MR. TIMMONS:  There will be.

12             MS. BUDA:  Okay.  I'm just making sure I

13        am hearing it all.  Sometimes things cut in and

14        out.

15             MR. TIMMONS:  Sure.  I understand.

16             Did you understand that during the time of

17        the agreement and for two years after that the

18        franchise agreement said you weren't supposed

19        to compete in a hydration therapy business?

20             THE WITNESS:  From what I can recall, yes.

21   BY MR. TIMMONS:

22        Q.   I want to go to page 39 of the pdf.

23   Actually, I'll scroll up a little bit.  I'm on page

24   37 of the pdf.  Bates label VFSUPP-00188.  The top

25   of the document says confidentiality agreement.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                  October 08, 2021

Page 36

1    Going to page three of that attached document which

2    is dot pdf 39.  Bates label VFSUPP-00190.  It's

3    listed as page three.

4            I see a signature at the top of that page.

5    Is that your signature?

6        A.   I believe so, yes.

7        Q.   Going back to page 37 of the document.

8    Paragraph three says, know-how in intellectual

9    property.  You agree, I, which is numeral one, will

10   not use the know-how in any business or capacity

11   other than the Vida-Flo clinic operated by

12   franchisee.  Two, you will maintain the

13   confidentiality of the know-how at all times.

14   Three, you will not make unauthorized copies of

15   documents pertaining to any know-how.  Four, you

16   will take such reasonable steps as we may ask of you

17   from time to time, prevent authorized use or

18   disclosure of the know-how.  Five, you will stop

19   using the know-how immediately if you are no longer

20   an officer, director, employee or independent

21   contractor of franchisee.  You further agree that

22   you will not use the intellectual property for any

23   purpose other than the performance of your duties

24   for franchisee within the scope of your employment

25   or other engagement with franchisee.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

Page 37

1          Did you agree not to use the know-how that

2    you learned from Vida-Flo in any other business or

3    capacity?

4          A.   From what I can remember, yes, that's what

5    that says.

6          Q.   Did you take steps during the terms of the

7    agreement to prevent unauthorized disclosure of the

8    know-how?

9          A.   I did.

10         Q.   I'm sorry.  I couldn't hear.  You cut out.

11   One more time.

12              MS. BUDA:  Object to form.

13              THE WITNESS:  Sherri, did you say

14         something?  To the best of my --

15              MS. BUDA:  I just said object to form.

16         You can still answer.

17   BY MR. TIMMONS:

18         Q.   I'm sorry, Mr. Gayle.  I thought you said

19   I did, but your phone kind of cut out for a second.

20         A.   To the best of my ability.

21              MS. BUDA:  Chris, you are cutting in and

22         out on me.  I don't know what we could do about

23         it.  It might be my connection here and I don't

24         know if this may be -- I don't want to hold

25         things up, but I might need to take a break to

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 38

1      log off and reconnect because I'm missing a

2      lot.

3             THE WITNESS:  It's happens when Chris

4      speaks some.  It's like a statistic.

5             MR. TIMMONS:  I don't have a phone going.

6             MS. BUDA:  I'm missing a lot.  Can we take

7      a short break and see if I can reconnect and

8      get a better connection.  And maybe you, as

9      well, Chris.

10            MR. TIMMONS:  Let's go off the record.

11            (Whereupon, a short break was had.)

12  BY MR. TIMMONS:

13      **Q.   I'm going to go to pdf page 40.  This is a**

14  **non-disclosure, non-solicitation and non-competition**

15  **agreement according to the title.  This is still a**

16  **part of the same Exhibit 3.  First Bates number is**

17  **VFSUPP-00191.**

18            MS. BUDA:  For my benefit, are you

19      currently screen sharing?

20            MR. TIMMONS:  I was not.  Good call.

21            All right.  So I'll go to the page --

22      what's listed as page eight of the same

23      document, VFSUPP-00194, just to make sure we

24      are clear.  I was on page 40 before which is --

25      the title of the document, non-disclosure,

```
 1        non-solicitation and non-competition agreement
 2        which is VFSUPP-00191.  Go to page 43 of the
 3        pdf.  Mr. Gayle, is that your signature?
 4             THE WITNESS:  I believe so.
 5   BY MR. TIMMONS:
 6        Q.   I'm going to go to page 40.  Page 40
 7   defines prohibited activities to mean any or all of
 8   the following.  One, owning and operating or having
 9   any other interests as an owner, partner, director,
10   officer, employee, manager, consultant, shareholder,
11   creditor, representative, agent, or in any similar
12   capacity in a competitive business other than owning
13   an interest of five percent or less in a publicly
14   traded company that is a competitive business.  Two,
15   diverting or attempting to divert any business from
16   us or one of our affiliates or franchisees.  And/or
17   three, inducing, A, any of our employees or
18   managers, or those of our affiliates or franchisees
19   to leave their position or, B, any customer of ours
20   of one of our affiliates or franchisees to transfer
21   their business to you or to any other person that is
22   not then a franchisee of ours.
23             I'm not stating a question yet, but do you
24   understand that -- well, I guess I will ask a
25   question.  Did you understand that definition at the
```

Page 40

1    time that you signed the non-disclosure agreement?

2              MS. BUDA:  Object to form.

3              THE WITNESS:  I agreed with what was, you

4         know, written down, you know, I understood at

5         the time.

6    BY MR. TIMMONS:

7         Q.   Going back to page 16 of the pdf.  Page 17

8    of the document, Bates label VFSUPP-00170.  I want

9    to look at Section 20.

10             Termination.  Section 20.1 by you.  You

11   may terminate this agreement if we materially breach

12   this agreement and fail to cure the breach within 90

13   days after you send us a written notice specifying

14   the nature of the breach.  If you terminate this

15   agreement, you must still comply with your

16   post-termination obligations described in Section 21

17   and all other obligations that survive the

18   expiration or termination of this agreement.

19             Mr. Gayle, did you understand that you had

20   to give 30-days written notice prior to terminating

21   the agreement?

22        A.   30 days?  Where do you see that?

23        Q.   I'm sorry, 90.  Not 30.

24        A.   I see that.  What is the question?

25        Q.   So the question is, the first sentence

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 41

1    says, you may terminate this agreement if we

2    materially breach this agreement and fail to cure

3    the breach within 90 days after you send us a

4    written notice specifying the nature of the breach.

5           Did you understand that prior to

6    terminating the agreement because of some breach by

7    the franchise, that you were required to give

8    90-days written notice prior to termination?

9    A.    I understand that that's what was written

10   down.  I understood at the time, yes.

11   Q.    How did you select the site to open your

12   Vida-Flo Alabama store?

13   A.    When you say how, what do you mean?

14   Q.    What did you do?

15   A.    The process?

16   Q.    Yes, the process.

17   A.    What I can remember we used a real estate

18   company, CBRE, and we provided them the geographic

19   area of what we were looking at.  And from there,

20   they just would show us spots essentially and we

21   picked one that fit our needs the best.

22   Q.    Did you use the existing floor plan or did

23   you do some sort of build-out to that space?

24   A.    We did a build-out.

25   Q.    Did you hire an architect or architects to



Case 1:19-cy-05192-LMM   Document 518   Filed 04/30/23   Page 42 of 262
Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 42

1    assist you with the build-out of the space?

2         A.   We did.

3              (Exhibit Number 4 was introduced.)

4    BY MR. TIMMONS:

5         Q.   I'll pull up Exhibit 4.  Exhibit 4 is a

6    48-page document.  Bates label on it, the first

7    page, VFSUPP-717.  It's got the Vida-Flo logo in the

8    middle of the page and it says real

9    estate-construction-equipment, Hydration Station USA

10   franchise system, franchisee guide.  Version 1.8,

11   November 2015.

12             I'm going to refer, Mr. Gayle, so that we

13   are clear.  I'm going to call this document the

14   design manual.  So when I ask questions about the

15   design manual that's what I'm talking about.

16             So you mentioned there was an architect

17   involved in the design of the store.  Who else was

18   involved besides the architect; in other words,

19   figuring out what the floor plan looks like, et

20   cetera?

21        A.   I know Derrick and I discussed kind of how

22   we wanted the building to be laid out in terms of

23   treatment room size and where we placed the break

24   room and the men's room.

25        Q.   Anybody besides you, the architect and Mr.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

Page 43

1    Purdy?

2        A.   I do not recall, you know, if Jamey or

3    anyone from Vida-Flo, you know, told us to do -- we

4    had to do it one way or another.  I don't recall him

5    doing that.

6        Q.   I want to go to page 26 of the pdf -- the

7    document, sorry.  Page 26, VFSUPP-00742 is the Bates

8    number.  At the top of this page it says example

9    proposed for layout.  And then at the bottom it has

10   a map of a floor plan.

11            Did you use the same floor plan that was

12   on this page?

13       A.   No, sir.

14       Q.   How did your floor plan deviate?

15       A.   You walk in the entrance, lobby was square

16   and walked -- the reception desk was parallel to the

17   rear wall.  There is a treatment room immediately on

18   your left or a med room on your left.  The largest

19   room we have has four chairs.  We do not have single

20   chair rooms, no shared rooms look like.  Med room

21   and office break room are not next to each other.

22   We do not have -- it appears to be like two

23   hallways.  Our bathroom is placed in the rear of the

24   building.  Our med and storage are placed further

25   upfront.  The dimensions of the rooms are different,



Page 44

```
 1    yes.
 2         Q.   So did you have treatment rooms as opposed
 3    to doing treatment out in the open?
 4         A.   Yes.
 5         Q.   Did you have an offices slash break room?
 6         A.   Yes.
 7         Q.   Did you have a med prep and storage room?
 8         A.   Yes.
 9         Q.   How many treatment rooms did you have?
10         A.   Four.
11         Q.   Go to page 34 of the pdf.  Page 34 that is
12    Bates Number VFSUPP-00750.  The top talks about
13    outdoor signage.  It's got pictures of the front of
14    Vida-Flo stores.  And on the bottom part of the page
15    it talks about exterior signage option one.  It has
16    a different type of sign there that has exterior
17    signage option two.  On the next page -- also on
18    that next page, exterior signage option three.
19              Mr. Gayle, did you have, we'll call it for
20    lack of a better word, permanent or fixed signage on
21    the outside of your Vida-Flo store?
22         A.   We did have permanent signage.
23         Q.   Did the signage match one of the options
24    that's listed on these two pages?
25         A.   From what I recall, the bottom one,
```

Page 45

1   Hydration Station was not included, but that's just

2   from what I remember.

3        Q.   Going to page 36 of the pdf talks about

4   exterior banners.

5             Did you have exterior banners on your

6   Vida-Flo store when you were first opened?

7        A.   I do not recall.  I believe we had a

8   banner for our soft opening, but I cannot be for

9   certain.

10        Q.   Did the banner that you had for the soft

11   opening, did it match the banner that's on the top

12   of this page?

13        A.   I do not remember exactly.

14        Q.   If you had a banner, where did it come

15   from?

16        A.   At this period of time?

17        Q.   Yes.  Would it have come from the Vida-Flo

18   Fulfillment web store?

19        A.   Yes.  From what I can remember, yes.

20        Q.   Staying on that same page, which is

21   VFSUPP-00752.  It talks about exterior window

22   decals.

23             Did you have exterior window decals on

24   your Vida-Flo Alabama location when you opened?

25        A.   We had them on one set of windows, yes.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 46

1        Q.   Where did you get those exterior window
2   decals?
3        A.   I believe it was from the web store.
4        Q.   Okay.
5        A.   I believe exterior.
6        Q.   You would have gotten them from corporate
7   anyway?
8        A.   One would assume.
9        Q.   Going to page 837 of the pdf.  Bates
10  VFSUPP-00753.  This page talks about interior
11  signage.
12            Did you have interior signage when you
13  opened as Vida-Flo franchise?
14       A.   Yes, we did.
15       Q.   Where did you get the interior signage
16  from?
17       A.   From what I can remember, the web store.
18       Q.   Page 42 of the pdf.  It's label
19  VFSUPP-00758.  At the top it says paint breakdown
20  and it's got a series of paints with various numbers
21  on them.  The top or letter number combinations,
22  going from left to right, blue or gray, SW6512.  The
23  next is SW6513, the third is SW7063, the fourth is
24  SW7004.
25            Did you use the paints that are listed at

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 47

1    the top of this document as the paint scheme in your

2    Vida-Flo franchise in Alabama?

3         A.   Yes.

4         Q.   Did you change the paint scheme during

5    your existence as a Vida-Flo Alabama franchise?

6         A.   No, we did not.

7         Q.   Go to page 434 of the pdf.  Bates label

8    VFSUPP-00760.  It talks about a treatment chair at

9    the top, Banff two rocker manual recliner in

10   Colorado dark gray.

11              Did you have treatment chairs in your

12   Vida-Flo Alabama store?

13        A.   Yes.

14        Q.   Were they these Banff two rocker manual

15   recliner in Colorado back gray?

16        A.   To my knowledge they were.

17        Q.   Did you buy your treatment chairs from

18   Vida-Flo Fulfillment?

19        A.   Yes.

20        Q.   At the very bottom of the page it talks

21   about treatment room, customer side table.

22              Did you have customer side tables in your

23   treatment rooms at your Vida-Flo Alabama store?

24        A.   Yes.

25        Q.   Did you obtain your side tables from the

Page 48

1    Vida-Flo Fulfillment web store?

2         A.   Yes.

3         Q.   Did you have the chair that we just -- or

4    the chairs, the type of chairs that we just talked

5    about and the types of side tables that we also

6    talked about, did you have those chairs and side

7    tables during the time that you were a Vida-Flo

8    Alabama store?

9         A.   Yes.

10        Q.   Did you ever change the type of treatment

11   chairs that you used while you were a Vida-Flo

12   Alabama store?

13        A.   No.

14        Q.   Did you ever change the customer side

15   tables that you used while you were a Vida-Flo

16   Alabama store, at least the type?

17        A.   No.

18        Q.   You had a medical director.

19             Was Dr. Flippo the medical director when

20   you first opened?

21        A.   Yes.

22        Q.   During your time as a Vida-Flo franchise,

23   did you ever change your medical director?

24        A.   No.

25        Q.   Did you hire staff before opening the

Case 1:19-cv-05192-LMM  Document 518  Filed 04/30/23  Page 49 of 262
Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 49

1  store?

2      A.   Yes.

3      Q.   **What positions did you have when you first**

4  **opened?**

5      A.   We had wellness consultants which would be

6  the front desk and we had our nurses which I believe

7  there were referred to as hydro-care providers, and

8  I was the owner/operator.

9      Q.   **During the time that you were a Vida-Flo**

10 **franchise, did you refer to the nurses as hydro-care**

11 **providers?**

12     A.   From what I can remember.

13     Q.   **While you were a Vida-Flo franchise, did**

14 **you refer to your front desk personnel as wellness**

15 **consultants?**

16     A.   Yes.

17     Q.   **Other than you, were there other managers**

18 **or management staff at your Vida-Flo Alabama store**

19 **during the time that you had the Vida-Flo Alabama**

20 **store?**

21     A.   We had what I would say is an assistant

22 manager.  She helped post schedules and get shifts

23 filled.

24     Q.   **Was there somebody named William that was**

25 **associated with the Vida-Flo Alabama store?**



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                           October 08, 2021

Page 50

1        A.    Yes.   That is my brother-in-law.

2        Q.    **What did he do?**

3        A.    My brother-in-law, you know, he -- to his

4    best abilities, he would try to make sure the store

5    was able to be opened.   He would close people out.

6    He was a wellness consultant.   I believe we were

7    going to send him to Atlanta for training, but I'm

8    not sure if that ever materialized.

9        Q.    **Did he fulfill those roles throughout the**

10   **time that the Vida-Flo Alabama store was open; in**

11   **other words, from the time that it opened until the**

12   **time that it was no longer a Vida-Flo franchise?**

13       A.    William worked briefly for us.

14       Q.    **When did he work for you?**

15       A.    It was -- I cannot remember honestly.   I

16   would have go back and check.

17             (Exhibit Number 5 was introduced.)

18   BY MR. TIMMONS:

19       Q.    **I'll pull up Exhibit 5.   Exhibit 5, we'll**

20   **call it either an employee handbook or an employee**

21   **manual for all employees.   The first page of this**

22   **document is VFSUPP-01124.   The top of the page says**

23   **introduction, welcome message.**

24             **Dear valued employee and new member of the**

25   **Vida-Flo family, welcome to the Vida-Flo team.   We**



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 51

1    are pleased with your decision to join us and look

2    forward to introducing you to our company

3    environment.  First and foremost, please get to know

4    and understand our Vida-Flo corporate care values

5    and mission statement, and then it continues.

6            Did you have an employee handbook while

7    you were a Vida-Flo franchise?

8        A.    I believe they gave us a copy, yes.

9        Q.    Let me scroll through just so we're clear

10   that we're talking about the same document.  There's

11   also a document with employee modules that has to do

12   with training of nurses.

13           Did you provide a version of this document

14   or something similar to employees while you were a

15   Vida-Flo franchise?

16       A.    From what I can remember.

17       Q.    From what you can remember, yes?

18       A.    Yes, yes.

19       Q.    Did you continue to use this document or a

20   similar document throughout your operation as a

21   Vida-Flo store?

22       A.    When you say continue to use, what do you

23   mean?

24       Q.    What I mean by that is, when a new

25   employee starts did you provide them a copy of the



Page 52

1   Vida-Flo employee handbook or manual essentially

2   every time from the time that you were a Vida-Flo

3   franchise until you ceased being a Vida-Flo

4   franchise?

5        A.   From what I can remember, yes.

6        Q.   Did you provide it to all Vida-Flo Alabama

7   employees?

8        A.   I don't know why I wouldn't.

9        Q.   So to what you remember, yes?

10       A.   Yes.

11       Q.   Did you provide a different handbook in

12  addition to this handbook?

13            MS. BUDA:  Object to form.

14            THE WITNESS:  No.

15  BY MR. TIMMONS:

16       Q.   How did you provide it to your employees?

17       A.   Well --

18       Q.   And what I mean by that is --

19       A.   It was print.  And I do not remember if

20  there was a book of them or -- I don't remember, but

21  yes, each of them got a copy from what I can

22  remember.

23       Q.   I started to ask this before but I got an

24  objection so I just want to make sure I have stated

25  it clearly.

Page 53

1            During the Vida-Flo Alabama's existence,

2    did you ever provide your own version of an employee

3    handbook other than this one?

4         A.   Not that I can recall, no, no.

5              (Exhibit Number 6 was introduced.)

6    BY MR. TIMMONS:

7         Q.   I'm going to pull up Exhibit 6.  Exhibit 6

8    is a 356 manual or documents, sorry, that begins

9    VFSUPP-765.  At the top first page on the left-hand

10   side is the Vida-Flo logo.  On the right-hand side

11   it says operations manual.

12            When you first opened, Mr. Gayle, did you

13   have a copy of an operations manual provided to you

14   by Vida-Flo?

15        A.   I do not recall receiving one.  I'm trying

16   to think.  Can you scroll through it?

17        Q.   Tell me to slow down if I'm going too

18   fast, please.

19        A.   I don't believe we ever received this.

20        Q.   Did you receive something similar?

21        A.   Not that I can recall.

22        Q.   Did you have an operations manual that you

23   used, any operations manual, during your existence

24   as a Vida-Flo franchise?

25        A.   We had protocols and procedures in terms

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 54

```
 1    of that Dr. Flippo created to administer medications

 2    and IV.

 3         Q.   Were those written down?

 4         A.   Yes.

 5         Q.   Other than the medical side, did you have

 6    protocols and procedures that were written down with

 7    regard to managing or running the Vida-Flo

 8    business -- your Vida-Flo business?

 9         A.   I believe they had sent us a module, but I

10    do not recall.  They sent us two modules, but I do

11    not recall what all was included in those.

12         Q.   Let's talk about pricing structures.

13              While you were a Vida-Flo franchise, did

14    you use the same pricing structure as corporate?

15         A.   Yes, that I can remember.

16         Q.   Okay.

17         A.   I don't believe I had a choice.  They set

18    the price.

19         Q.   Did you use the same treatment packages

20    that corporate mandated or had during your --

21         A.   When you say treatment packages, what do

22    you mean?

23         Q.   So, for example, Myers cocktails, et

24    cetera.

25         A.   Yes.  Yes, we did.
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 55

1         Q.   Did you offer any -- while you were a

2    Vida-Flo franchisee, did you offer any additional

3    treatment packages beyond those that corporate had?

4         A.   The treatments themselves are customized.

5    And things like the Myers cocktail, there is no

6    actual, you know, set cocktail.  So, theoretically,

7    any time someone comes in and asks for any

8    assortment of vitamins and minerals, that can be

9    considered a cocktail but, you know.

10        Q.   Okay.

11             Did you use vitamins or minerals that were

12   different than the ones corporate suggested or

13   mandated?

14        A.   No.

15             (Exhibit Number 7 was introduced.)

16   BY MR. TIMMONS:

17        Q.   You mentioned a module.  Let me pull up

18   Exhibit 7.

19             Exhibit 7 is 96-page document.  It begins

20   with VFSUPP-01467.  For the record, there are

21   actually four modules.  They are separate documents,

22   but for ease of reference, I've included the four

23   modules into one document, the first page of which

24   is it's got the Vida-Flo logo on it.  It's referred

25   to as Hydro Care Provider and it says module one.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

Page 56

1          Mr. Gayle, are you familiar with the

2    healthcare provider modules?

3          A.   From what I can recall, I have only seen

4    the first two.

5          Q.   Did you use them to train employees during

6    the existence of Vida-Flo Alabama?

7               MS. BUDA:  Object to form.

8    BY MR. TIMMONS:

9          Q.   Did anyone use them to train Vida-Flo

10   employees during the existence of Vida-Flo Alabama?

11              MS. BUDA:  Object to form.

12              MR. TIMMONS:  Sherri, what's the issue?

13              MS. BUDA:  I just want to make sure when

14        you say them, that you're talking two modules

15        or four modules.

16   BY MR. TIMMONS:

17         Q.   Okay.  Any modules.

18              Did you use any modules to train employees

19   during the existence of Vida-Flo Alabama?

20         A.   We -- I would say we would have used the

21   module one and module two.  But from what I recall,

22   we could not use module three and four.

23         Q.   Was that because you didn't have them or

24   because they just didn't work for your training

25   program?

Page 57

```
1       A.   From what I can recall, they were -- the

2   process of the edited updated and it fell through

3   the cracks from what I can remember and it just

4   never came.

5       Q.   Did you create your own written training

6   materials when you were a Vida-Flo Alabama

7   franchise?

8       A.   Not that I can recall.

9       Q.   What type of training did you provide to

10  your employees when they were a Vida-Flo Alabama --

11  either before or while they were Vida-Flo Alabama

12  employees?

13          MS. BUDA:  Object to form.

14  BY MR. TIMMONS:

15      Q.   Did you, as a franchise, not separate from

16  corporate, did you provide training to your

17  employees, meaning the nurses and/or receptionist

18  staff?

19      A.   Well, nurses and medical staff, they

20  receive all their training and expertise and

21  experience in the hospitals through nursing school

22  and through their own individual studies.

23          I myself am not a licensed medical

24  professional, so I cannot a train them on how to do

25  things that they know.  The only thing you could say
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 58

1    would be any sort of bedside manner, being able to

2    develop a rapport.  Outside of that, I cannot train

3    nurses to do what med school or nursing school told

4    them to do.

5         Q.   Sure.  I understand that.

6              Did anyone train them with regard to the

7    specific cocktails involved in hydration therapy?

8         A.   Can you elaborate on that?  I'm not sure.

9         Q.   Sure.

10             How did they know what vitamins or

11   minerals to add to a specific IV or a IN before

12   administering it?

13        A.   We had a dosage chart that Dr. Flippo had

14   to review, edit it when necessary and, you know, he

15   signed off on our dosage chart.  In terms of

16   cocktails that corporate had created, those were

17   set.

18        Q.   I assume there was some paperwork that

19   someone had to go over with Vida-Flo customers when

20   they were in your store.  Who went over the

21   paperwork with them?

22        A.   When you say paperwork, what do you mean?

23        Q.   Well, I assume before they went in for

24   treatment there was some sort of documents they

25   filled out or documents that your staff would fill

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 59

1    out.  Am I correct about that?

2         A.   The patient would complete a health

3    questionnaire on a tablet and that went to our

4    nurses.

5         Q.   Okay.

6              Where did you get that health

7    questionnaire that was on the tablet?

8         A.   That was provided through NAC (sic) and

9    corporate had created that.

10        Q.   Okay.

11             With regard to helping patients understand

12   what was on that questionnaire, did any of your

13   employees receive training on that?

14        A.   Not that I recall.  The questionnaire, I

15   feel like, was fairly straightforward.

16        Q.   Okay.

17             So what sort of training did you give

18   employees?  I mean, I assume they didn't show up the

19   first day, you know, and run immediately into a

20   treatment room and jab an IV into somebody's arm.

21   There had to be some sort of training, am I correct

22   about that?

23        A.   Correct.

24        Q.   Go ahead.

25        A.   You were saying something.  What was it?



Page 60

1        Q.   What sort of training did they receive?

2        A.   I would say in terms of noticing, opening

3   and closing duties on bed count, creating, making

4   sure since they carry over from the hospital, med

5   log, expiration date, recording lot numbers, fridge

6   temps at opening and close.  And I would say my

7   sales background, I would help with the nurse on

8   bedside manner, how to develop rapport.  There

9   was -- I mean, that's what I can remember right now.

10       Q.   With regard to opening and closing duties,

11   med counts, the medical, I guess, processes that you

12   talked about for lack of a better word of putting

13   it, who taught them that?

14       A.   Taught them to do med counts?

15       Q.   Well, opening and closing duties, med

16   counts, med logs, recording numbers and stuff like

17   that.

18       A.   Corporate provided just a piece of paper

19   that it would be documented on.

20       Q.   Speaking of corporate.  Before opening or

21   within the first few months of opening your Vida-Flo

22   store, did corporate provide any training to any of

23   the employees?

24       A.   Yes, they did.

25       Q.   What did they do?



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

Page 61

1        A.   I and Justin Reece, I believe is his last

2    name, he and I went to Atlanta to one of the

3    stores -- their IV stores in Atlanta.  I don't

4    remember if it was Brookhaven or Buckhead.  And we

5    worked with Katie Shirah and in short we just ran

6    the store for a day and a half.  And you know,

7    pretty much how to take an order, check someone out

8    and to sell memberships, closing of the register,

9    things of that sort.

10       **Q.   Who is Justin Reece?**

11       A.   He was an employee that was a wellness

12   consultant, I believe, when we first opened.

13       **Q.   Did anyone from corporate either at the**

14   **opening -- prior to the opening or within the first**

15   **few months of opening provide treatment to your**

16   **nurses?**

17            MS. BUDA:  Object to form.

18            THE WITNESS:  Provide treatment?

19   BY MR. TIMMONS:

20       **Q.   Sorry, not treatment.  Training?**

21       A.   Katie Shirah came in, and from what I

22   recall with the nurses, it was again more

23   interactions on how to -- what is the word I'm

24   looking for -- ask questions and to see why that

25   patient was admitted.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                October 08, 2021

Page 62

1      Q.   So other than that, any other training

2   within the first few months of opening or before

3   opening?

4      A.   With the nurses?

5      Q.   With anybody.

6           I understand you and Mr. Reece went to

7   Atlanta to get some training.  Katie Shirah came

8   down and did some training with your nurses.

9           Was there any other training provided by

10  corporate either before opening or within the first

11  few months?

12     A.   Katie, I believe she was there -- I know

13  she was there with me getting a feel for the -- our

14  computer or point of sale.  We had some very long

15  and loud issues with an oxygen compressor and that

16  ended up I believe extending her stay.

17     Q.   Why did the issues with the oxygen

18  compressor extend her stay?

19     A.   From what I can remember, one, it arrived

20  faulty and it was an effort I believe to try and get

21  it fixed and corrected without having to just ship

22  it off and get it repaired, which from what I can

23  recall that's what we ended up having to do.

24     Q.   So was she providing training while she

25  was down there while you were in the process of



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 63

1  trying to fix the oxygen compressor?

2      A.   All these things were happening at the

3  same time.

4      Q.   Why did the issue with the oxygen

5  compressor extend her visit?

6      A.   That would be something you would have to

7  ask her.

8      Q.   Throughout your existence, what I mean by

9  that is, after the first few months of opening,

10  other than what we have already talked about, did

11  corporate provide any additional training to you or

12  any of the Vida-Flo employees of your --

13      A.   Well -- I'm sorry.  Go ahead.

14      Q.   I'm sorry, I meant of your store.  Not all

15  Vida-Flo employees across corporate.

16      A.   I do remember setting William up to go to

17  Atlanta to train, but I honestly do not know if that

18  ever materialized.  His period working with us was

19  not very long and he left and opened up his own like

20  oil change business.

21      Q.   Okay.

22      A.   Different kind of fluids.

23      Q.   I was thinking the same thing.  All right.

24          Anybody other than William go to -- or

25  possibly go to Atlanta other than the folks, you and



Page 64

1    Mr. Reece, et cetera?

2        A.   That would be the three, myself included,

3    from what I remember.

4        Q.   Okay.

5            What about corporate coming down to

6    provide training?  Beyond that trip that we talked

7    about with Katie Shirah, again after you opened or

8    within the first few months -- and after the first

9    few months after you were open?

10       A.   I do not remember them coming back for

11   training.

12       Q.   Did they do any sort of conference calls

13   or anything like that to provide training to your

14   employees?

15       A.   To my employees, no.

16       Q.   Okay.

17           Did they provide training in any other way

18   to your employees -- or other than what we have

19   already talked about, I guess, during your existence

20   as a Vida-Flo franchise and to your employees,

21   meaning Vida-Flo Alabama employees?

22       A.   Not that I can remember, no.

23       Q.   Did you ask them to?

24       A.   I do not recall.

25       Q.   Did Mr. Purdy receive any training at any

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 65

1    time while y'all were a Vida-Flo franchise?

2         A.    No.  Not that I'm aware that I can

3    remember, no.

4         Q.    That you know of?

5         A.    No.

6         Q.    Let's talk about other than training, and

7    what I meant before that, was training on the

8    processes and procedures.

9              And now I want to talk about marketing.

10   Did -- either before opening or within the first few

11   months of openings, other than what we talked about

12   with regard to the signs and the interior posters

13   and the exterior posters, did marketing provide you

14   with any other marketing assistance?

15        A.    During what period?

16        Q.    Before opening or within the first few

17   months of opening.

18        A.    I believe there may have been a drop box

19   that had a handful of select created graphics,

20   social media posts.  From what I can remember, it

21   was a standard picture with a couple of words

22   across.  That is what I remember being available.

23        Q.    Did they provide you any training on how

24   to market hydration therapy business either before

25   opening or within the first few months of opening?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                October 08, 2021

Page 66

1      A.   I do know it was encouraged to give away

2  free treatments, encourage people to come try your

3  business.  That was encouraged, I do remember that.

4      **Q.   What else do you remember?**

5      A.   From what -- I mean, we're a grassroots,

6  you know, type, Birmingham is, and being from

7  Birmingham, you know, just used your existing people

8  that you know, small business owners and executives

9  and market and go door to door.

10     **Q.   Did they teach you -- I imagine it's a**

11 **little different marketing a hydration therapy to**

12 **someone than it is marketing to them the idea that**

13 **you're going to be their financial advisor.  Did**

14 **they --**

15     A.   Not necessarily.

16     **Q.   Well, it's a different product, right?**

17     A.   Sure, but.

18     **Q.   It's also, you know, one time or maybe a**

19 **couple of times or maybe even a membership.  But,**

20 **you know, if you're a financial advisor, you're**

21 **looking for a lifetime, right?**

22     A.   I could sell you one stock on a limb.

23 There is --

24     **Q.   Well, the needs they meet are different or**

25 **the problems that they solve, correct?**



Page 67

1        A.   Well, in terms of emotionally, personally,

2    I don't know.  A lot of people could feel the same

3    benefit of staying hydrated and healthy as they

4    would not knowing they are not, you know, broke.

5             A training -- a sales process is nothing

6    more than identifying objectives, finding ways to

7    overcome those objectives and arrive to a agreement.

8    And if those objectives are I'm worried about the

9    market or I don't know much about IV hydration

10   therapy, both of those objectives have to be

11   overcome.

12       Q.   How did you learn what to say to overcome

13   those objectives or meet those objectives?

14            MS. BUDA:  Object to form.

15            THE WITNESS:  I'm supposed to answer?

16            MS. BUDA:  You can still answer.  If you

17        knew what he was asking, then you can answer

18        the question.

19   BY MR. TIMMONS:

20       Q.   Let me explain how this goes just real

21   quick as far as ground rules.  You may not have seen

22   it before.  If Ms. Buda says object to the form,

23   she's objecting to the way I'm phrasing the

24   question.  That's not objecting to you answering the

25   question.  It's objecting to how I ask the question.

Case 1:19-cv-05192-LMM   Document 518   Filed 04/30/23   Page 68 of 262
Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 68

1    You still should go ahead and answer the question.

2    If she objects to privilege, she'll shut it down and

3    that means not to answer that question.  Those are

4    really the two distinctions.

5          The vast majority of her objections are

6    going to be to the form, at least based on what the

7    questions I have to ask, I assume so.  But your

8    default setting should be go ahead and answer the

9    question unless you hear the word privilege.  Does

10   that make sense?

11        A.   That does.

12             Can you elaborate on your previous

13   question?

14        Q.   Sure.  What I'm getting at is that there's

15   a sale process, meaning do you -- you were talking

16   about meeting an objective as a part of the sales

17   process.

18        A.   Objection, I'm sorry.

19             MS. BUDA:  And Chris, I just want to make

20        sure, obstacles is your word and then Mr.

21        Gayle's was objection, correct?

22             MR. TIMMONS:  No, I think obstacles came

23        from Mr. Gayle.  I want to use his words.  I

24        don't want to use my word.

25             MS. BUDA:  And that's what I was checking



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

1        because I didn't hear that.  I might not have

2        heard it correctly.

3              THE WITNESS:  Yes.  I was saying one of

4        the obs (sic) -- and then someone said

5        objection and then I got confused.

6    BY MR. TIMMONS:

7        Q.   What's the obs (sic) word that you would

8    use?

9        A.   I would say an obstacle.

10       Q.   Yes.  And don't feel like you're limited

11   to an obs (sic) word.  If there's a word that works

12   better, please use that.

13             But what we're getting at is, although

14   very broadly there are similar obstacles.  But the

15   solution being hydration IV therapy is going to be a

16   little different than a solution for financial

17   planning.  One, being buy stocks, buy bonds, invest

18   in this certain thing.  The other one being you need

19   a certain type of vitamin or mineral or solution

20   that will be injected or sent by IV into your body.

21   So there's a difference between the two, right?

22       A.   Well, yes, and I understand like with you

23   not being in sales, it's really understandable.  It

24   is a process.  It's like a methodology to sell

25   someone something.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

Page 70

1              I learned that at Waddle & Reed in Memphis

2     2008 to a sales process that has evolved over time.

3        Q.    The nuances that come along with IV

4     hydration therapy, where did you learn those

5     nuances, the differences?

6              MS. BUDA:  Object to form.

7              THE WITNESS:  The differences in what?

8     BY MR. TIMMONS:

9        Q.    In how you sell IV hydration therapy

10    versus how you sell investments.

11             MS. BUDA:  Same objection.

12             THE WITNESS:  Yes.  Rephrase that again.

13    BY MR. TIMMONS:

14       Q.    Sure.

15             You don't use the exact same sales pitch

16    when you're talking to an investment customer, for

17    lack of a better word or clients.  You're going to

18    use different words when you're talking to them

19    versus when you're talking to somebody who is

20    seeking hydration therapy.

21             Where did you learn to use those hydration

22    therapy type words or classification of words?

23    Where did you learn the differences in how to sell

24    the two?

25             MS. BUDA:  Object to the form.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 71

1          THE WITNESS:  Can you again rephrase it in

2      a better way?

3   BY MR. TIMMONS:

4      Q.   **What do you not understand?**

5      A.   Well, you're asking like where I learned

6   nuances and I don't necessarily understand what that

7   question is.  Like are you asking -- I'm just not

8   entirely sure what you're asking me because I was

9   saying the sales process and I'm just not sure what

10  you're asking.

11     Q.   **The process may be the same.  The**

12  **ingredients of the sale are going to be different,**

13  **right?  In one type of sale you're selling**

14  **investments.  In another type of sale you're selling**

15  **certain mixes of hydration therapy or a whole**

16  **concept of hydration therapy to someone.  So you're**

17  **going to use different words to different customers.**

18          **Where did you learn to make the**

19  **differences between the sales?  Where did you learn**

20  **the different languages?**

21          MS. BUDA:  Object to form.

22          THE WITNESS:  I, as an owner/operator,

23      don't ask them medical questions if that's what

24      you're asking me.

25  BY MR. TIMMONS:

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 72

1       Q.   No, I'm not asking that.

2            I mean, how do you convince somebody to

3    come in for hydration therapy, what do you tell

4    them?

5       A.   That's why we had to give a lot of free

6    treatments out.  You ever tried IV therapy?  No, oh,

7    well, here's a free treatment.  Come check us out,

8    it's on the house.  The concept and idea behind that

9    was it doesn't cost them anything.  We just would

10   pay for the treatment.

11      Q.   When did you open your hydration therapy

12   store?

13      A.   I missed the first part of what you said.

14      Q.   When did you open your Vida-Flo franchise?

15   When did you open your store?

16      A.   I want to say our first day was early

17   December 2016.

18      Q.   So I believe you signed your franchise

19   agreement in May of 2016.  You opened in December,

20   roughly seven months later.  Does that seem about

21   right, was that the amount of time that it took from

22   the time that you signed the franchise agreement

23   before you were up and running?

24      A.   Was that the agreement that I signed in

25   '16?  If that was, then yes, it was from that day to



Page 73

1    December, yes.

2         Q.   Let me back away from the agreement.

3              How long do you think it took from the

4    time that you signed the franchise agreement until

5    you were able to open?

6         A.   Unfortunately for my timeframe, I was in

7    the middle of getting married so, yes, it was

8    months, not years.

9         Q.   About seven; is that right?

10        A.   Possibly, it very well could be.

11        Q.   Could it have been a different timeframe?

12        A.   I don't know.  It could have been.  If

13   that was the date that we signed the franchise

14   agreement, what you showed me, to December, yes,

15   that is that time period.

16             MS. BUDA:  Chris, if you're at a stopping

17        point, we've been going a bit, other than my

18        technical break, can we take a short break?

19             MR. TIMMONS:  Let's take lunch now.  It's

20        12:00 o'clock.

21             (Whereupon, a lunch break was had.)

22             (Exhibit Number 8 was introduced.)

23   BY MR. TIMMONS:

24        Q.   I'm pulling up what is marked as Exhibit

25        8.  It's a set of text messages I believe with Mr.

Page 74

1    Purdy that were produced by you in this litigation.

2    The first page of which 0564 and I'm to going page

3    eight of the pdf.  It's not you and Mr. Purdy.  It's

4    between you and Mr. McDermott.  So the page that I'm

5    on is AL-0646.  It's page 83 of the pdf document.

6              Down at the bottom there's a series of

7    text messages between you and Mr. McDermott.

8    They're from March 6th, 2017 at 10:44 a.m.  You said

9    Brook Nelson -- Nixon, spelling, is coming by to

10   discuss franchisees.  She said you spoke to her.

11   Let me know if it's not true, ha, ha.  Mr. McDermott

12   responds with, hmm, I spoke with someone named

13   Ginger Roundtree last week.  I just tried to call

14   her back but no answer.  They're probably together.

15   That would be super coincidental.  I guess just ask

16   Brook if they are with Ginger.  Then to which you

17   responded.  Make sure they aren't trying to pull a

18   fast one.  I've had people try to get family members

19   hired here so they can learn the business model,

20   long story.  Please tell me about that.

21        A.   I don't necessarily remember the long

22   story, but it would appear that I didn't hire them.

23        Q.   Did you have people who were trying to get

24   hired in your location to learn the business?

25        A.    It would seem that someone at least had



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

 1    attempted on which that I believed and I did not

 2    hire them.

 3        Q.   Did you take any steps with regard to your

 4    employees when you were a Vida-Flo franchise to keep

 5    them from learning the business model and then

 6    opening up another location?

 7        A.   Yes, there was.  From what I can remember,

 8    Katie Shirah sent me an employee agreement but I do

 9    not remember exactly what all that entailed.

10        Q.   Did you have your employees at the

11    Vida-Flo Birmingham location sign the agreement?

12        A.   I wouldn't see a reason why I wouldn't

13    but, yes, I would imagine so.

14        Q.   Did you take any other steps to keep

15    employees from learning your business model and then

16    opening a competing franchise?

17        A.   Not that I'm aware of.  I took every step

18    that I could.

19        Q.   All right.

20             When you were opening your store, so I'm

21    going back in time I guess to the 2016 timeframe,

22    what problems did you encounter, if any, when you

23    were trying to get the store?

24        A.   I do remember there were forms, possibly,

25    software issues.  I mentioned the oxygen compressor



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

Page 76

```
 1   issues.  I do remember before we opened that some
 2   things were already brought up.
 3        Q.   What things?
 4        A.   Can you repeat that?  I didn't hear.
 5        Q.   You said I do remember before we were
 6   opening that some things were brought up.  What
 7   things?
 8        A.   The things that I just previously
 9   mentioned.
10        Q.   Anything other than those?
11        A.   Probably, but I cannot recall at this
12   time.
13        Q.   Who brought them up?
14        A.   I did myself.
15        Q.   Who did you bring them up with?
16        A.   Keith McDermott himself, Katie Shirah and
17   I believe Jamey Shirah, I believe.
18        Q.   How did you do that?  How did you bring
19   them up?  What I mean by that, phone, email, text?
20        A.   Text and phone from what I can remember.
21        Q.   When you opened your Vida-Flo Alabama
22   franchise at the beginning, so within the first few
23   months of being open, what was your role in the
24   business?
25        A.   Owner/operator.
```

Page 77

1        Q.    Did that role change over time?

2        A.    Not necessarily, no.

3        Q.    What was your role with Holistic Hydration

4    when it first opened?

5        A.    Owner/operator.

6        Q.    Is that still your role today?

7        A.    That is.

8        Q.    What was Mr. Purdy's role when you were

9    first opening within the first few months of being

10   open?

11       A.    Investor.

12       Q.    Beyond providing money, did he do anything

13   with regard to the running of the store?

14       A.    With regard to running of the store, no.

15       Q.    What did he do besides providing money?

16       A.    Specifically, any sort of help on

17   promoting.  Outside of that, not anything that I can

18   recall.

19       Q.    What did he do to promote the store during

20   the time?

21       A.    I would say social media posts and that's

22   what I can recall now.

23       Q.    Social media posts on his personal social

24   media or on someone else's social media or both?

25       A.    I do not recall on that.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 78

1      Q.   Does he have -- this is a little vague,

2  but does he have a large social media presence?  And

3  I guess what I mean by that is, does he have a lot

4  of followers or friends on Facebook, Twitter,

5  Instagram?

6      A.   That's relative.  I would say average.  I

7  don't know how to compare that.

8      Q.   I don't know, some people have so many

9  followers I don't know where the line is, but

10  they're referred to as influencers.

11            Is Mr. Purdy regarded as an influencer in

12  the Birmingham, Alabama area?

13      A.   With no disrespect to Derrick, no.

14      Q.   You said earlier that he was somebody that

15  you knew of.  Was he somebody who was well-known in

16  the Birmingham area?

17      A.   I mean, we boxed at the same gym.

18            MS. BUDA:  Object to the form.

19  BY MR. TIMMONS:

20      Q.   What does Mr. Purdy do besides being an

21  investor in Holistic Hydration?

22      A.   He's a small business owner.

23      Q.   What businesses does he own?

24      A.   I do not know the list of every business

25  he owns.  Innisfree (sic) is what he's involved in,



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 79

1   but I don't know the ownership structure.  I don't

2   know the ownership structure of his businesses.

3        Q.   Other than Innisfree, what other

4   businesses is he involved in?

5        A.   None that I can think of off the top of my

6   head.

7        Q.   What is Innisfree?

8        A.   It is an Irish pub/bar/grille.

9        Q.   Does it have more than one location?

10       A.   Yes.

11       Q.   Okay.

12       A.   Yes.

13       Q.   How many locations does it have?

14       A.   I do not know.

15       Q.   Have you been to more than one location

16   personally?

17       A.   No.

18       Q.   Other than Innisfree, what other

19   businesses and -- sorry, other than Innisfree and

20   Holistic Hydration, what other businesses are Mr.

21   Purdy involved in?

22       A.   Those are the only ones that I know.

23   Again, I don't know the complete picture of his

24   business.

25       Q.   Garrett Osborne, did he just come in

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                           October 08, 2021

Page 80

1    when -- under -- at some point during Holistic

2    Hydration or was he ever an investor when it was a

3    Vida-Flo franchise?

4          A.   Holistic Hydration.

5          Q.   What does he do besides investing with

6    Holistic Hydration for a living?

7          A.   He -- I don't know if he's still on the

8    tour, but he was on the web.com tour for a while and

9    the PGA tour for a brief period.

10         Q.   So he's a professional golfer?

11         A.   Correct.

12         Q.   Do you know if he still is?

13         A.   He's been down with injuries, so I don't

14   know if he's back on the tour right now or not.

15         Q.   Do you know if he does anything other than

16   that for work besides being a professional golfer

17   and having involvement with Holistic Hydration?

18         A.   That's it to my knowledge.

19         Q.   You mentioned you were the manager at the

20   beginning.  Did anyone else -- and I think you said

21   no but I want to make sure.  Was anybody else -- did

22   anybody else have a managerial function at the store

23   besides you?

24         A.   At what store?

25         Q.   At, sorry, the Vida-Flo store, not the



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

Page 81

1    Holistic Hydration.  I'm talking about the Vida-Flo

2    store when you were a Vida-Flo franchise.

3         A.   I believe I previously mentioned William.

4    I do remember trying to schedule him going to

5    Atlanta, but honestly I do not know if that ever

6    materialized.  I just don't remember.

7         Q.   I'm sorry.  Then you also said Mr. Reese

8    was the assistant.

9         A.   No.  Reece -- Justin just was a wellness

10   consultant.

11        Q.   I'm sorry.

12             So other than William and you, did anyone

13   else have a managerial function while it was a

14   Vida-Flo Alabama store?

15        A.   Barbara helped with scheduling on the

16   nurses, getting shifts filled.  If you want to say

17   that's a managerial thing, I don't know.  That's up

18   to you.

19        Q.   Who is Barbara?

20        A.   I'm sorry?

21        Q.   What is Barbara's last name?

22        A.   Her maiden name was Cox, but I do not know

23   what her -- she's newly married.  She was married --

24   she was married.  She got married after she left her

25   employment, but.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 82

1        Q.    Was she hired while at you were a Vida-Flo

2    Alabama franchise?

3        A.    From what I remember, yes.

4        Q.    Did she continue to remain with the store

5    after it became a Holistic Hydration store?

6        A.    Yes, but on a more I think limited

7    capacity.

8        Q.    What do you mean by that?

9        A.    I took more of the responsibilities and

10   she was front desk.

11       Q.    Why did that change?

12       A.    Because I felt I would be the best person

13   to take that responsibility.

14       Q.    In terms of timing, did that happen around

15   the time that you switched to being a Holistic

16   Hydration store before that or after that?

17       A.    The timing of what?

18       Q.    Barbara Cox becoming more limited in her

19   role?

20       A.    We were Holistic Hydration.

21       Q.    When you first started opening -- within

22   the first few months of opening your Vida-Flo

23   Alabama store, who handled the marketing?

24       A.    Me, myself.

25       Q.    I think you mentioned Mr. Purdy also did

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

1    some promoting on social media.  Anyone else?

2         A.   I do remember for a brief period of time,

3    her name was Emily, and she would just put the

4    pictures on Instagram for me.  I think she did a

5    total of like eight posts.  No, that wasn't even

6    with Vida-Flo.  No, it was just me.

7         Q.   Okay.

8              When did Emily come onboard?

9         A.   Holistic Hydration.

10        Q.   Was she a direct employee of Holistic

11   Hydration or a consultant or some other

12   relationship?

13        A.   I would say it's like a temp role.  Almost

14   like she was a marketing intern.  She was still in

15   school and a marketing major, and so very temp type

16   role.

17        Q.   During your existence as a Vida-Flo

18   Alabama franchise -- not talking about people from

19   corporate, but folks that would either have been

20   employed by Vida-Flo Alabama or contracted directly

21   with Vida-Flo Alabama, did you bring somebody else

22   in to help with marketing or handle marketing?

23        A.   We did bring in a PR firm for the soft

24   opening.  I don't recall using them for the grand

25   opening, but we did use them.  And I do not

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                             October 08, 2021

Page 84

1    remember -- I cannot remember, but I'm sure I can
2    find that.
3         Q.   What did you have them do?
4         A.   Everything from getting -- like we had it
5    catered, they contacted local news, media.  We got
6    the City of Vestavia Hills Chamber of Commerce.  We
7    did the big ribbon cut.  It really made sure
8    everything ran smoothly.
9         Q.   Who's handing the marketing now?  Is it
10   just you or are there others involved?
11        A.   Just me.
12        Q.   I want to talk about other Vida-Flo
13   franchisees.  What I'll do is ask you about any
14   communications you might have had with these
15   franchisees at any time.  So I'm asking you if
16   you've met them in person, if you've texted with
17   them, if you've had telephone calls with them or if
18   you have emailed with them.
19             Have you had any communications with Brian
20   McCullough?
21        A.   Yes.
22        Q.   Have you ever met with him in person?
23        A.   No.
24        Q.   Have you texted with him?
25        A.   Not that I can recall.  I don't think so.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 85

1        Q.    Have you ever had telephone calls with

2    him?

3        A.    Not one-on-one.

4        Q.    Have you had group telephone calls with

5    him?

6        A.    From what I can recall, yes.  Yes.

7        Q.    Have you emailed with Brian McCullough?

8        A.    Possibly.  Probably.  It'd say it's safe

9    to assume I have.

10        Q.    What about Brett McCullough, have you ever

11    met him in person?

12        A.    Yes.

13        Q.    When was that?

14        A.    2017, 2018; years and years ago.

15        Q.    Have you met with him more than one time

16    in person?

17        A.    No, I have not.

18        Q.    How did you come to meet Brian McCullough?

19        A.    How did I meet Brian?

20        Q.    Yes.

21        A.    I never met him face-to-face, is that what

22    you're asking?

23        Q.    How did you come into contact with him?

24        A.    He's Brett's brother.

25        Q.    How did you come into contact with him

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 86

1    through Brett?

2         A.   I do not remember the exact process of how

3    I was first contacted or I contacted Brian.  I do

4    not remember.

5         Q.   How did you come into contact with Brett

6    McCullough?

7         A.   I want to say it was through one of the

8    corporate conference calls.  They had all the

9    franchisees get on a call together.  I feel like

10   that was the first time.

11        Q.   You've texted with Brett McCullough,

12   correct?

13        A.   Correct.

14        Q.   You've had phone calls with him?

15        A.   Yes.

16        Q.   And I imagine you also emailed with him?

17        A.   Yes.

18        Q.   Did you say yes, I'm sorry?

19        A.   Yes.  I'm sorry.

20        Q.   What about Ryan Heavern?  Have you ever

21   met Ryan Heavern in person?

22        A.   I have not.

23        Q.   Have you texted with him?

24        A.   Yes.

25        Q.   When was the last time you texted with

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 87

1    Ryan Heavern?

2         A.    A couple of days ago.

3         Q.    What about?

4         A.    Asked how he was doing.

5         Q.    Did you ask him about his deposition?

6         A.    No, that I can recall.  I may have asked

7    how he felt, how he was doing.

8         Q.    Just in general?

9         A.    How you doing?  He was at a Braves game or

10   something.

11        Q.    Have you emailed with Ryan Heavern?

12        A.    Yes.

13        Q.    Let's talk about Christian Seaverns.  Have

14   you ever Mr. Seaverns in person?

15        A.    No.

16        Q.    Have you ever texted with Mr. Seaverns?

17        A.    No, sir, not that I can recall.

18        Q.    Have you ever been involved with a

19   telephone conversation with Mr. Seaverns either just

20   you and him or with a group?

21        A.    Not that I can remember, no.

22        Q.    Have you ever emailed with Mr. Seaverns?

23        A.    Not that I can remember, no, I have not.

24        Q.    How about Web Raulston?  You ever met Mr.

25   Raulston in person?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 88

1      A.   Yes.

2      Q.   How many times?

3      A.   The first time was freshman in college

4    when I was moving into my dorm room and he was in

5    the dorm room next to me.

6      Q.   So you have known Mr. Raulston since

7    college?

8      A.   Yes.

9      Q.   How is it that you and Mr. Raulston both

10   came to have Vida-Flo franchises?  Is that a

11   coincidence or was either his or your involvement in

12   Vida-Flo somehow related to the other?

13            MS. BUDA:  Object to form.

14            THE WITNESS:  Can you ask that like --

15   BY MR. TIMMONS:

16     Q.   Sure.  Let me back up.

17            Is that a coincidence that you guys are

18   both next-door neighbors in college and also

19   Vida-Flo franchisees?

20            MS. BUDA:  Object to form.

21            THE WITNESS:  Can you say that like in a

22       different way?  Like a coincidence?

23   BY MR. TIMMONS:

24     Q.   Sure.

25            I mean, I don't know, it just strikes me

Page 89

1   as weird that you guys were next-door neighbors in

2   college and then you both have Vida-Flo franchisees

3   later or involvement in Vida-Flo franchisees later.

4        A.   I do not know which one came first.  I

5   want to say Birmingham came first, so.

6        Q.   Okay.

7        A.   You can say Web learned of Vida-Flo from

8   me.  He saw it on my Facebook.

9        Q.   Yes, that's just what I'm getting at.  I

10  didn't know, you know, if y'all had any

11  conversation.

12            When did y'all start talking about

13  Vida-Flo?

14            MS. BUDA:  Object to form.

15            THE WITNESS:  I don't remember that.  I

16       don't know.

17  BY MR. TIMMONS:

18       Q.   Okay.

19            Obviously, I imagine, is Mr. Raulston

20  somebody you stayed in contact with after college?

21       A.   As good as one can.  We were at each

22  other's weddings.

23       Q.   Do you consider him a friend?

24       A.   Yes.  Now, we haven't -- we just over time

25  we kind of lost contact and haven't been in contact



Page 90

1    as much obviously compared to college.

2         Q.    Sure.

3               Have you texted with Mr. Raulston?

4         A.    Yes.

5               MS. BUDA:  Object to form.

6               MR. TIMMONS:  What was wrong with the

7         question?  I'm just curious.

8               MS. BUDA:  I don't know what timeframe.

9         Is that like ever?

10              MR. TIMMONS:  Ever.

11              THE WITNESS:  Yes, I have texted Web

12        Raulston.

13   BY MR. TIMMONS:

14        Q.    When was the last time you texted

15   Mr. Raulston or he texted you, either way?

16        A.    I feel like a couple of months, maybe

17   longer.  Not recent that I can remember.

18        Q.    Within the last two or three years, have

19   you spoken on the phone with Mr. Raulston?

20        A.    Yes.

21        Q.    Have you emailed with him?

22        A.    Yes.

23        Q.    What about Brett Snellgrove, have you ever

24   met him in person?

25        A.    No.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                           October 08, 2021

Page 91

1        Q.   Do you know who that is, Brett Snellgrove?

2        A.   I know there are like brothers that both

3   have B names and so I don't know.

4        Q.   I mean, have you ever had any contact with

5   either Brett and there's a first name Blake?  We'll

6   just assume that's his brother.  But have you ever

7   had contact with either one of those guys, either

8   met them in person, texted, telephone calls or

9   emails?

10       A.   No, not that I can remember.

11       Q.   Shawn Fobas, have you ever met Mr. Fobas

12  in person?

13       A.   Not that I can recall.

14       Q.   Have you texted with him?

15       A.   Hold on.  There are -- there's a couple of

16  the Atlanta guys and one of them is an Alabama fan

17  and that's the one I talked to.

18       Q.   Okay.

19            But you don't remember which one of the

20  Atlanta franchisees was the Alabama fan?

21       A.   I don't.

22       Q.   But you met whoever the Alabama fan was?

23       A.   Yes.

24       Q.   What were the circumstances of that

25  meeting?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

Page 92

 1        A.   Talking about marketing, best practices,
 2   from what I can remember.  We had been having lots
 3   of success.
 4        Q.   **Did they come to meet you for marketing**
 5   **purposes?  Were they in Alabama for an Alabama game**
 6   **or how did that come about?**
 7        A.   I do not remember the reason they were in
 8   Alabama, or he was.  And from what I recall, it was
 9   maybe 10 minutes of this is what we're doing,
10   grassroots efforts, and that was the most of it from
11   what I can remember.
12        Q.   **Have you texted with Mr. Fobas?**
13        A.   Ever, yes.
14        Q.   **When was the last time that you texted**
15   **with Mr. Fobas?**
16        A.   I can't remember; not recent.
17        Q.   **Did you have telephone calls with Mr.**
18   **Fobas?**
19        A.   Not that I can recall.
20        Q.   **Have you emailed with Mr. Fobas?**
21        A.   I would assume I did just through being
22   another franchise, possibly.
23        Q.   **Let's talk about Jason Trembley.  Have you**
24   **met in person with Mr. Trembley?**
25        A.   No, I have not.

Page 93

1      Q.   Have you texted with Mr. Trembley?

2      A.   Yes.

3      Q.   When was the last time you texted with Mr.

4    Trembley?

5      A.   I cannot remember the last time; not

6    recent.

7      Q.   Within the last few years?

8      A.   Possibly, yes.

9      Q.   Have you had cell phone calls with Mr.

10   Trembley?

11     A.   Yes.

12     Q.   When was the last time you spoke with Mr.

13   Trembley on the phone?

14     A.   I cannot remember; not recently.

15     Q.   Within the last few years, like basically

16   2020 or through now?

17     A.   Possibly, yes.

18     Q.   Peter Park, have you ever met in person

19   with Mr. Park?

20     A.   Not that I can recall, no.

21     Q.   Have you texted with Mr. Park?

22     A.   I do not remember ever texting with him.

23     Q.   Have you ever had a telephone call with

24   Mr. Park either individually or as a part of a

25   group?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 94

1       A.    Possibly.  I can't be for certain.

2       Q.    Why possibly?  What are you thinking of

3    that he might have been involved in?

4       A.    I do remember that he had me call a

5    potential prospect or that had just started, but I'm

6    not entirely sure.  That would be he called.  That's

7    a possibility.  I don't remember if I have or not.

8       Q.    Have you emailed with Mr. Park?

9       A.    I would assume so, yes.

10      Q.    When was the last time you emailed with

11   Mr. Park?

12      A.    No clue.

13      Q.    Since 2020 -- I'm sorry, within 2020 to

14   the present?

15      A.    Nothing likely.  Again, it was we just

16   didn't communicate a lot.

17      Q.    What about Matt Borah?

18      A.    Again, I'm not even sure which one is who.

19   But, no, to my knowledge, I have never met him.

20      Q.    Who are you possibly confusing him with?

21      A.    The Alabama fan, the one I met.

22      Q.    So it could be Borah, it could Mr. Fobas,

23   we're not sure which one?

24      A.    Whoever says Roll Tide.

25      Q.    In addition to being an Ole Miss fan, are

Page 95

1     you a fan of either Alabama or Auburn?

2          A.   I grew up an Auburn fan and married

3     Auburn.

4          Q.   So you may have met with Mr. Borah.  Would

5     you basically give the same answers for Mr. Borah

6     that you gave for Mr. Fobas?

7          A.   Those two I feel are the ones I'm

8     confusing.  I don't know which is which.

9          Q.   Okay.

10              Lauren Kaufman, have you met her in

11    person?

12         A.   No.

13         Q.   Don't know who she is?

14         A.   Not that I can recall, no.

15         Q.   What about, Eva Shibatova (sic) you ever

16    met with her in person?

17         A.   No.

18         Q.   Do you know who that is?

19         A.   I will say Ryan's wife first name is Eva.

20         Q.   Maybe I'm pronouncing it wrong.

21         A.   I don't know, but.

22         Q.   Have you ever met that person?

23         A.   No, I have never contacted, communicated

24    or anything.

25         Q.   I'm going to ask you about some attorneys.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 96

1                    Other than Ms. Buda and Mr. Knight, your

2     counsel, have you ever met with Mr. Powell who's an

3     attorney in this case?

4          A.   No, sir.

5          Q.   Have you ever met with Mr. Trulock?

6          A.   No, sir.

7          Q.   How about Mr. Bell?

8          A.   Mr. who?  The answer is no.

9          Q.   Jason Bell.

10         A.   No, sir.

11         Q.   What about, I guess Mr. Purdy's attorney?

12         A.   No, sir.

13         Q.   What about Mr. Leach?

14         A.   No, sir.

15         Q.   Other than those attorneys I've talked

16    about, asked if you have met them, have you ever

17    communicated with any of them through text,

18    telephones or email?

19         A.   Not that I can recall, no.

20         Q.   Let's talk about any problems you might

21    have had with corporate.

22              I understand there was a big issue with

23    markup on supplies coming from the web store that

24    erupted some time during late summer, early fall

25    2017.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 97

1            What I'm talking about is the time period

2     before that.  So after what we've already talked

3     about, the first few months up until the point where

4     the supply markup issue came about, did you have any

5     other issues with corporate before then or problems?

6          A.   I would say yes.  I'm sure ordering, I

7     believe, just was an issue.  Deliveries.  Software

8     issues in terms of the liability, things of that

9     nature.

10         Q.   Did you have any other issues?  You talked

11    about ordering, problems with delivery and software.

12    Did you have any other issues with corporate?

13         A.   When you say issues, you just mean?

14         Q.   Problems, concerns.

15         A.   Well, I know I'd mentioned them before.

16    That's all I can think of right now.  With

17    marketing, lack of marketing.

18         Q.   Tell me about that, please.

19         A.   The drop box that was made available was

20    just very limited and I would say outdated material

21    for us to use.

22         Q.   Okay.

23         A.   And so getting fresh new commercial

24    products or items was a big importance.

25         Q.   You felt like you were not getting enough



Page 98

1   marketing material in the drop box from corporate?

2       A.   Or in general.

3       Q.   In addition to drop box, what else do you

4   mean?  What sort of support should they have been

5   providing during that timeframe?

6       A.   Well, a little guidance on I would say

7   social media.  There was a brief period where Jamey

8   had best times for us to be post and he was trying

9   to help us out on that, but just nothing ever stayed

10  consistent in terms of how we received our marketing

11  information, who sent it to us.  It was very stop

12  and go and inconsistent.

13      Q.   So we talked at length about how hydration

14  therapy -- selling hydration therapy and selling

15  investments are essentially the same thing.

16           If you knew how to market hydration

17  therapy, why did you need corporate to help you?

18           MS. BUDA:  Object to form.

19           THE WITNESS:  I don't believe I said

20       they're the exact same.  I said sales is sales.

21       And doing grassroots face-to-face, those were

22       things I was apt at doing.  I had never created

23       social media posts like that, and yes.

24  BY MR. TIMMONS:

25      Q.   So there were things you needed from

Page 99

1    corporate?

2         A.   Yes.

3              MS. BUDA:  Object to the form.

4    BY MR. TIMMONS:

5         Q.   All right.

6              Did you address these issues with

7    corporate?  Did you let them know that you were

8    having these issues during that time?

9         A.   From what I can recall, yes.

10        Q.   How did you do that?

11        A.   Email, phone, possibly text; I believe

12   there was a majority.

13        Q.   Did you send them letters?

14        A.   Is email a letter?

15        Q.   I'm sorry.  I mean physically like a piece

16   of paper that would have gone in an envelope and

17   mailed out.  That's what I mean by letter.

18        A.   No.

19        Q.   Do you still have your emails from that

20   timeframe that would have shown you notifying

21   corporate of these issues?

22        A.   No, I lost access to all of my Vida-Flo

23   emails.

24        Q.   So these would have been on your Vida-Flo

25   account?



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 100

```
 1        A.    That or phone calls.
 2        Q.    How did corporate respond when you raised
 3  problems or concerns with them?
 4        A.    From what I recall, we are working on it.
 5  I believe it was a hurry up and wait type.
 6        Q.    Did they solve the issues with ordering?
 7        A.    The issue with ordering grew and changed
 8  over time.
 9        Q.    How so?
10        A.    Obviously the pricing issue.  There were
11  multiple occurrences that -- prescription
12  medication, notably Toradol were shipped to our
13  patients' homes.  That was a great concern of mine.
14  Luckily both patients were respectful, outstanding
15  people, and when they received their box of Toradol
16  at their front door, they brought it to us.
17        Q.    What is Toradol?
18        A.    A non-narcotic Ansaid.
19        Q.    Is it a controlled substance?
20        A.    No, I don't believe so.
21        Q.    Okay.
22              That Toradol that was shipped to these
23  patients, was it shipped directly from corporate or
24  did it come from some sort of other party?
25        A.    I don't know where it originated from.
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

1      Q.   Was it shipped -- I mean, it might have

2   come in from a pharmacy or it might have come in

3   from sort of manufacturer.  But the entity that

4   shipped it from -- that shipped it to the customers

5   or the patients, was that a Vida-Flo entity?  Was

6   that either from fulfillment or the franchise system

7   that shipped the Toradol directly to the patient?

8      A.   Ordered through fulfillment.  Outside of

9   that, I do not know.

10     Q.   You don't know whose mistake it was that

11  it got sent to the patient?

12          MS. BUDA:  Object to form.

13          THE WITNESS:  I don't know what I don't

14     know.

15  BY MR. TIMMONS:

16     Q.   Sure.

17          Well, who shipped it to -- I mean, who was

18  responsible for the Toradol going to the patient?

19  Who caused that to happen?

20          MS. BUDA:  Object to form.

21          THE WITNESS:  I would have no way of

22     knowing that.

23  BY MR. TIMMONS:

24     Q.   Okay.

25          Do you blame corporate for that happening?

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

1      A.   One would think at least some
2  responsibility would fall on them.
3      Q.   Why?
4      A.   I placed orders through fulfillment and
5  they fulfilled that order.
6      Q.   How would they get an address from one of
7  your patients?
8      A.   I do not know.
9      Q.   Did they maintain a list of your patients
10 and patients' addresses?
11     A.   I do not know.  That's a question you
12 would have to ask them.
13     Q.   When you were sending your orders, did you
14 -- or fulfilling any orders from fulfillment while
15 you were a Vida-Flo franchise, how did you let them
16 know where to ship the vitamins, minerals or
17 non-narcotic, et cetera, the items that you needed
18 to put in the IVs?
19     A.   Everything that we ordered was shipped and
20 supposed to be shipped.  Nothing ever should have
21 been sent to a patient.
22     Q.   Sure.
23          Did you put in the address?  When you're
24 filling out the order form, did you put in the
25 address of where it should ship?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 103

1        A.    My order form for Toradol, I will X

2    amount, enter, I would pay fulfillment and then they

3    would fulfill that order.

4        **Q.    How did they respond when you told them**

5    **about the Toradol error -- corporate, I mean?**

6        A.    The first time I obviously was concerned

7    and upset.  I was assured that it was because there

8    was a requirement that it had to be for that patient

9    name, and I didn't necessarily understand that, and

10   that it was being addressed or something along those

11   lines.

12       **Q.    Beyond the Toradol -- the one Toradol**

13   **shipment, I think you said there was another one.**

14   **What was that?**

15       A.    It was another Toradol shipment.

16       **Q.    Other than those two, were there any other**

17   **shipments errors?**

18       A.    Those were the two that the patients got.

19       **Q.    Approximately how many shipments would you**

20   **receive from fulfillment?**

21       A.    Very highly.

22       **Q.    Okay.**

23             **Well, at the max?**

24       A.    You know, I mean, technically, I could get

25   one every day.  I'm not sure --



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

                                                              Page 104

1        Q.    I'm just trying to figure out, you know,

2    how much Toradol did you have shipped to you on a

3    monthly basis?

4              MS. BUDA:   Object to form.

5    BY MR. TIMMONS:

6        Q.    While you were a Vida-Flo franchise?

7              MS. BUDA:   Same objection.

8    BY MR. TIMMONS:

9        Q.    At the max, what was the maximum amount of

10   Toradol that you had shipped to your franchise?

11       A.    I don't know.

12       Q.    Do you have Toradol shipped to you as a

13   Holistic Hydration franchise?

14       A.    Yes.

15       Q.    How much Toradol do you get a month

16   typically?  How many shipments of Toradol do you get

17   a month?

18       A.    It varies completely.

19       Q.    All right.

20             Last month, how many shipments of Toradol

21   did you receive, September?

22       A.    September?

23       Q.    Yes.

24       A.    I don't have those numbers in front of me.

25       Q.    How about August?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

```
 1        A.   I still don't have -- wouldn't know.  I
 2   don't know.
 3        Q.   Well, I'd assume that would be more than
 4   one since you can't say exact numbers.
 5             Did you get one shipment during September
 6   or more than one?
 7             MS. BUDA:  Objection; asked and answered,
 8        and this is crossing into harassment.
 9             MR. TIMMONS:  That's not what I'm trying
10        to do.  I'm asking how many shipments do you
11        typically get a month of Toradol.  I mean, if
12        you get a --
13             (Whereupon, a short break was had.)
14   BY MR. TIMMONS:
15        Q.   How many shipments a month do you get of
16   Toradol roughly?
17             MS. BUDA:  Object; asked and answered.
18             MR. TIMMONS:  It hadn't been answered.
19             MS. BUDA:  He did.  You didn't like his
20        answer.
21             THE WITNESS:  It varies.
22   BY MR. TIMMONS:
23        Q.   It varies?  Between what numbers?
24        A.   Zero and the max.  I don't know.
25        Q.   What's the max?
```

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Page 106

```
1          A.    I just said I don't know the max.

2          Q.    Okay.

3                So you can't say then, you know, what

4    percentage of Toradol shipments while you were a

5    Vida-Flo franchise was properly delivered versus

6    improperly delivered; you don't know?

7          A.    I just know it's not a 100 percent.

8          Q.    I got that.  But do you know if it's 95

9    percent?

10         A.    (Witness shakes head from side to side),

11   no.

12         Q.    Greater than 50 percent?

13         A.    I do not know because the patients told us

14   that they received -- can you repeat the question?

15         Q.    Yes.

16               I mean, you're saying you don't know the

17   percentage.  I'm asking you was it greater than

18   50 percent of the Toradol shipments that were --

19         A.    I would say it was less than 50 percent.

20         Q.    I want to talk about conversations you

21   were having during September of 2017.  I will pull

22   up Exhibit 2.

23               (Exhibit Number 2 was introduced.)

24   BY MR. TIMMONS:

25         Q.    Exhibit 2 is Michael Gayle, Vida-Flo
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 107

1    Alabama, LLC, and Holistic Hydration Organization,

2    LLC's objections and responses to Hydration Station

3    USA, Franchise System, LLC's first continuing

4    interrogatories.

5            I'm going to go to page six of that

6    document.  I'm going to paragraph 8-C.  The question

7    asked, identify each person who has knowledge of any

8    fact or circumstances regarding the matters set

9    forth in the complaint, answer for defendant's

10   counterclaim, for each person state what facts or

11   knowledge they have regarding these matters.

12           Then C -- and there's an A and a B.  But

13   in C says Ryan Heavern, Ryan McCullough, Brett

14   McCullough and Christian Seaverns.  Mr. Heavern, Mr.

15   Seaverns and Messrs. McCullough have knowledge of

16   September communications among Mr. Heavern,

17   Mr. Gayle, Mr. Seaverns, Ryan McCullough and Brett

18   McCullough.

19           What communications were you having in

20   September of 2017 among those gentlemen?

21       A.   With regards to Mr. Seaverns, I would say

22   it was an error or an overlook by my part to have

23   him listed I guess under Section C because to my

24   knowledge he was not involved with me in any of

25   those communications.  My attorney drafted it and,



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 108

1    you know, just made that error.

2        Q.   I imagine you read over it before it was

3    sent, correct?

4        A.   That is correct.  And I think it seemed

5    like I knew everything.  But upon review and going

6    through everything, that Mr. Seaverns should not

7    have been included in that and I believe we're going

8    to amend my responses.

9        Q.   What about your communications in

10   September of 2017?  We will take Mr. Seaverns out.

11   But with Mr. Heavern, Brian McCullough and Brett

12   McCullough, what communications were you having in

13   September of 2017?

14       A.   I don't recall specifically.  One would

15   assume it was about -- I can't even assume.

16       Q.   Okay.

17            Well, it says you have knowledge.  And if

18   you can't say anything, would you need to amend that

19   entire paragraph to take out that part?

20       A.   Is this about the price issue?  I would

21   assume that's what it is.

22       Q.   Well, it's your answer so I'm trying to

23   figure out what you meant by that.

24            MS. BUDA:  If you have any relevant

25            documents, you might try to refresh his



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

1        recollection.

2    BY MR. TIMMONS:

3        Q.   I mean, what documents did you use to

4    draft C?

5             MS. BUDA:  Object to form.

6    BY MR. TIMMONS:

7        Q.   So you don't know offhand about any

8    knowledge you have about this September 2017

9    communications among you and --

10       A.   2017, again, can you like show me a --

11   something.  But I would assume it's about pricing

12   with issues with corporate and how to fix it.

13       Q.   What were the pricing issues?

14       A.   The price of -- like I said, we were

15   required to buy out of the fulfillment store.

16       Q.   What problems did you have with those

17   prices?

18       A.   They were overpriced.

19       Q.   When did you first learn that -- let me

20   back up.

21            Were all the products overpriced or just

22   some?

23       A.   I don't know.

24       Q.   How did you learn the products were

25   overpriced?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 110

1        A.   I do not recall the exact moment.  I don't

2   recall.

3             (Exhibit Number 9 was introduced.)

4   BY MR. TIMMONS:

5        Q.   I'm going to show you -- I'm going to pull

6   up Exhibit 9.  For the record, Exhibit 9 is a

7   21-page exhibit.  First page of which is LA-0001.

8   Go to page 15.  Pdf LA-0015.

9             There are emails on the page.  Going to

10  the second email which is right here at the bottom

11  in blue.  It says on September 14th, 2017 at

12  2:09 p.m., Seaverns with an email address

13  seaverns@gmail.com wrote.  Gentlemen, it was a

14  pleasure speaking with you all yesterday.  Attached

15  is the pricing comparison on all the medications and

16  vitamin we administer to our customers.  This is

17  just -- (undiscernible) -- a few pricing from my

18  compounding pharmacy.  I know for anyone that has

19  done a build-out in the past eight months, you were

20  definitely overcharged on the items that were

21  required to have in the store; couches, tables,

22  marketing materials, paintings.  Just so everyone

23  knows, I've stopped ordering anything from corporate

24  and have gone straight to the providers for our

25  systems.

Page 111

1              I'm going to go down to the PS part.  It

2      says you all will be getting a link to the shared

3      google doc shortly.  It will come from my store's

4      email account, kennesawvida-flo@gmail.com.  No

5      affiliation with the corporate email system.  I've

6      already added Brett's notes, as well.

7              Now, the first email which is an email

8      from Brian McCullough, you appear as one of the

9      cc's.  I'm talking about the top email first.  Did

10     you receive that email from Mr. McCullough that he

11     sent on or about September 23rd, 2017 at 3:00

12     o'clock p.m.?

13          A.   No.  It went to apparently

14     mgayle@gmail.com.  He left out a W.

15          Q.   Have you ever seen this before?

16              MS. BUDA:  Object to the form.

17     BY MR. TIMMONS:

18          Q.   Have you ever seen this email before?

19              MS. BUDA:  Chris, I'm just trying to get

20          you to narrow it down when.

21              MR. TIMMONS:  Sure.

22              MS. BUDA:  Okay.

23              MR. TIMMONS:  Sometime in the last in --

24          well, all right, around -- in or around 2017.

25          We will say September, October, November of

Page 112

1        2017, did you see this email?

2            THE WITNESS:  This email didn't get sent

3        to me.

4    BY MR. TIMMONS:

5        Q.   Right.  At least it didn't get sent to you

6    on the initial version.

7            Did somebody ever forward or provide it to

8    you in some way within the last -- over the last --

9    over this the couple of months?  I know you got it

10   from me yesterday.

11       A.   Yes.

12       Q.   What about this Seaverns email, September

13   14th, 2017, did you receive that email?

14       A.   Not that I can recall.  I believe he had

15   the wrong email address.  Both Brian and Christian

16   had my wrong email address.

17       Q.   Do you know anything about this google doc

18   that has to do with price issues, the one that's

19   mentioned in the Seaverns email?

20       A.   I believe it was mentioned, but I can't

21   really recall specifics.  I can't.

22       Q.   In the first paragraph it says, gentlemen,

23   it was a pleasure speaking with you all yesterday.

24   Did you have a group conversation with Mr. Seaverns?

25   I guess that would be on September 13th, 2017.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

Page 113

1        A.   Not that I can recall, no.  I don't
2   believe I was involved in that.
3        Q.   **Irrespective of this email chain, so**
4   **pulling that aside, did you learn about the markup**
5   **issue from Mr. Seaverns?**
6        A.   Not that I remember.
7        Q.   **From whom did you learn about the markup**
8   **issue?**
9             MS. BUDA:  Object to form.
10  BY MR. TIMMONS:
11       Q.   **If anyone or maybe you determined it**
12  **yourself, how did you learn it?**
13       A.   As I said earlier, I don't recall exactly.
14       Q.   **Did you ever get a copy of that google**
15  **document that they're talking about?**
16       A.   Possibly.  I can't be sure.
17       Q.   **Why do you say possibly?  I mean, what are**
18  **you thinking about that makes you think possibly?**
19       A.   If they sent it to the right email
20  address.  You know, and this is four years ago.
21       Q.   **Sure.**
22            **You don't have an independent recollection**
23  **of seeing a document that would be a spreadsheet**
24  **possibly created by the group with pricing**
25  **differences or something similar?**

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 114

```
1        A.   Again, possibly.  It was so long ago.
2        Q.   I mean, you don't -- it's possible it
3   happened, but you do not remember?
4        A.   At this time, I do not recall receiving
5   that email.
6        Q.   Do you recall contributing to the -- a
7   document that was put together by more than one
8   franchisee that listed differences in pricing
9   between what was being provided by corporate versus
10  what you could buy from -- directly from the
11  supplier?
12       A.   No, not that I can recall.  I don't
13  recall.
14       Q.   Go back to Exhibit 8.  Sorry, not Exhibit
15  8.
16            (Exhibit Number 11 was introduced.)
17  BY MR. TIMMONS:
18       Q.   Let's go to Exhibit 11.  I know it's out
19  of order, but I'll fill in later.
20            Exhibit 11 is a series of text messages
21  between you and Brent McCullough.  This particular
22  exhibit is 64 pages long.  Begins with the Bates
23  label LA-0653.  Go to pdf page nine.  It's the page
24  with the Bates label LA-0661.  I'm going to
25  October 22nd, 2017.
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

1           It says, what did Ryan say about his

2     meeting with Keith.  That's you.  Brett McCullough

3     Responded not much.  I only spoke with them for a

4     couple of minutes since then.  You respond, 10-4,

5     guessing that's a good thing.  Response from Mr.

6     McCullough back is, yes, we'll get more details

7     tomorrow.  And you respond with gotcha.

8           Did Mr. McCullough fill you in on the

9     details of his conversation with Ryan that would

10    have occurred around October 22nd or 23rd of 2017?

11         A.   Not that I can recall.

12         Q.   I'm going to page 12 of this pdf.  I'm

13    looking at 664 through 665.  It's LA-664 through

14    665.  I'm looking toward the middle of the text that

15    begins on October 31st, 2017 at 5:44 p.m.  You're

16    the gray.  Brett McCullough is the blue.

17          You say, has the letter been mailed.

18    Brett responds back no.  Ryan keeps making changes

19    but should go out tomorrow.  You respond, bro, let's

20    send that.  Brett responds, would have sent it last

21    week if not for Ryan.  You respond 10-4.  And going

22    to the next page and picking up.  Brett says, I told

23    him that if he isn't cool with it by tomorrow, then

24    I'm sending it from just you and me.  Congrats.  And

25    I think it goes on to a different subject about you

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 116

1    having a child.

2              Anyhow, what letter is this text chain

3    talking about?

4         A.   I would assume it's the vote of

5    no-confidence.  I can't be for certain.

6              (Exhibit Number 10 was introduced.)

7    BY MR. TIMMONS:

8         Q.   Let's go to Exhibit 10.

9              Exhibit 10, my understanding now, it's a

10   draft.  But it's a letter that's four pages long.

11   The first page of which being VFSUPP-01437.  It's on

12   stationary at the top, Brian L. McCullough,

13   attorney-at-law.  It's dated November 3, 2017.  And

14   going to the last page, it's got drafts of

15   signatures, Brian L. McCullough, VF Baton Rouge,

16   Brent McCullough, VF Baton Rouge, and Michael Gayle,

17   VF Birmingham.

18             So you just spoke about the no-confidence

19   letter.  Please tell me about the no-confidence

20   letter.

21        A.   The vote of no-confidence was a reflection

22   of our -- Baton Rouge's and Birmingham's I'd say

23   concern about the direction of the franchise

24   overall.  I mean, I invested everything I got and

25   then some to do this, so it was my utmost important



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 117

1    goal to make sure the franchise is healthy and

2    moving in the right direction and that everybody is

3    working together.  It seemed like the most normal

4    and black and white way to make our concerns and

5    voices heard.

6         Q.   Were you hoping for any concrete change?

7         A.   Not that I'm aware of.

8         Q.   What were you hoping to accomplish?  You

9    mentioned these goals sort of broadly.

10             What were you hoping to accomplish by

11   sending this letter?  Were you hoping that Keith

12   McDermott would be fired and you'd be able to leave

13   corporate?  What was your goal?

14        A.   One, it was to shed light.  You know, we

15   wanted to make sure that everyone was aware of

16   really what was going on and that we wanted to stay

17   in and fix it.  And we wanted to do what we could to

18   help the franchise.

19        Q.   How did you want it to be fixed?

20        A.   One, we are a business and it's really

21   hard to operate when we -- our costs are so much

22   higher than they should have been.

23             Communication with corporate.  I'm sure,

24   I'd imagine, it's in the vote of no-confidence

25   letter itself, I feel like it was pretty



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 118

1   straightforward.

2        Q.   Who did you not have confidence in?

3        A.   Keith McDermott.

4        Q.   Were you hoping that Mr. McDermott would

5   get fired as a result of this letter?

6        A.   No.  Not necessarily, no.

7        Q.   Were you hoping that anything would happen

8   to Mr. McDermott as a result of sending this letter?

9        A.   Yes, change his behavior.

10        Q.   Were you hoping that his role within

11   Vida-Flo corporate would change?

12        A.   Not necessarily.  Not -- no, not that I

13   can recall.  No, no.

14        Q.   So the text we looked at just a moment ago

15   in Exhibit 11.  This was sent on October 31st, 2017.

16   It talks about Ryan making changes to a letter that

17   needed to go out.  This letter is dated

18   November 3rd, 2017.  Are the text talking about the

19   same letter, the no-confidence letter?  I mean, you

20   said you thought they were.  Does it help you now

21   having seen the dates on the letter and the text

22   making more sure that it's talking about the letter?

23        A.   That's something that you would need to

24   ask Brian, I guess, or Brett, because I can't be for

25   certain of it.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

1        Q.   Well, you're the one who's saying, has the

2    letter been mailed, bro, let's send it.

3        A.   This is four years ago, so one -- sure,

4    one would assume that the letter in question is,

5    yes, about no-confidence.

6        Q.   Do you remember any other letters you were

7    working on in or around that time with Ryan Heavern

8    and Brett McCullough?

9        A.   I don't -- Brian McCullough and Brett,

10   this letter was not one that I can remember working

11   on.

12       Q.   Do you remember a different one with Ryan

13   Heavern?

14       A.   No, I don't believe Ryan was --

15   (undiscernible) -- with this letter.

16       Q.   Well, that's what I'm asking or getting to

17   eventually, is you say it has -- in the text.  I'm

18   back on Exhibit 11.  Has the letter been mailed.

19   That's what you're asking.  Brett says no.  Ryan

20   keeps making changes, but should go out tomorrow.

21   You respond, bro, let's send that.  He responds,

22   would have sent it last week if not for Ryan.  You

23   say 10-4.  He said, I told him that if he isn't cool

24   with by tomorrow, then I'm sending it from just you

25   and me.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 120

1            So what I'm asking now is, what was Ryan

2    Heavern's involvement in the drafting of the

3    no-confidence letter?

4         A.   That is a question you'd have to ask Ryan.

5    I do not know.  I wasn't even aware of him making

6    any changes.  Brett was the one who told me that, so

7    I would not know.

8         Q.   So you didn't have any discussions with

9    Ryan Heavern directly?

10        A.   I cannot recall.

11             MS. BUDA:  Object.  He's answered.

12   BY MR. TIMMONS:

13        Q.   You can't recall.  Okay.

14             Well, let's go to Exhibit 2 again.  So

15   during the second half of 2017, Vida-Flo Alabama

16   lost confidence in Keith McDermott's leadership of

17   the Vida-Flo franchise system.  The reasons for

18   Vida-Flo Alabama's lack of confidence in

19   Mr. McDermott are set forth in the November 3, 2018

20   vote of no-confidence letter prepared by Brian

21   McCullough and consented to by Michael Gayle.

22             Did you consent to the sending of the

23   no-confidence letter?

24        A.   Yes.

25        Q.   Okay.  I'll walk through it.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 121

1            Looking at page one, which again is

2    VFSUPP-01437.  Going to paragraph three.

3            It says, throughout the nearly 18 months

4    in which the Baton Rouge franchisee has been in

5    operation, increasingly during the most recent

6    several months, we experienced growing concerns

7    regarding Mr. McDermott's leadership and management,

8    specifically, regarding trust/honesty,

9    collaboration, decision-making, lack of respect for

10   employees, customers and franchisees and

11   communication.  We also believe that Mr. McDermott

12   failed to abide by the VF corporate mission's

13   statement by failing to promote a friendly,

14   courteous and relaxing environment.

15           Going to kind of the middle of the first

16   sentence it said, we experienced growing concerns

17   regarding Mr. McDermott's leadership and management.

18           Did you also experience growing concerns

19   regarding Mr. McDermott's leadership and management?

20      A.   Yes.

21      Q.   And you talk about specifically regarding

22   trust/honesty, collaboration, decision-making, lack

23   of respect for employees, customers and franchisees

24   and communication.  Did you share concerns about all

25   of those issues?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 122

```
 1        A.    From what I can remember, Keith does check
 2   all those boxes.
 3        Q.    Okay.
 4              What was untrustworthy or dishonest about
 5   Mr. McDermott on or around November of 2017?
 6        A.    Well, when someone is lying to you, it's
 7   hard to trust them.  Trust is something that's --
 8        Q.    What did he lie to you about?
 9        A.    The pricing discrepancy is one of the
10   biggest and in my opinion that was a very important
11   one.
12        Q.    Were there any others?
13        A.    With?
14        Q.    Trust and honesty, other issues?
15        A.    Well, I mean, once trust and honesty are
16   broken, I'm not really sure.  Not that I can recall,
17   no, I mean.  That's --
18        Q.    Did anything -- I'm sorry.  Go ahead.
19        A.    That was it.
20        Q.    Did anything other than the pricing
21   discrepancy break your trust of Mr. McDermott?
22        A.    Yes.  We were told that Vida-Flo corporate
23   had a agreement with some of our med suppliers and
24   because of the agreement we were guaranteed access
25   to IV fluids.  And as a result, we would be paying a
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 123

1    premium on all their products from what I can

2    recall.  And that agreement, from my understanding,

3    didn't exist.

4        Q.   So you believe -- I'm sorry.

5             Did Mr. McDermott -- was Mr. McDermott the

6    one who told you that there was this agreement?

7        A.   There's an email that kind of outlines it

8    that says that, I believe, but I can't say for

9    certain.

10       Q.   What email are you talking about?

11       A.   An email Keith McDermott sent all the

12   franchisees.  But I could have my dates wrong given

13   it's so long ago.

14       Q.   So you got the pricing discrepancy, an

15   issue where you were told about an agreement that

16   didn't exist.

17            Any other issues affecting your trust of

18   Mr. McDermott's truth or honesty back in November of

19   2017?

20       A.   I can't recall.

21       Q.   All right.

22            It says lack of respect for employees.

23   Please tell me about that.

24       A.   Keith made -- could be harsh to employees

25   and not treat us as all on the same team.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 124

1        Q.   What do you mean by harsh to employees?

2        A.   I would say could be -- how he treats his

3    employees to how his problem-solving approach, that

4    would be -- that would be it.

5        Q.   Do you have specific examples from around

6    that time of Mr. McDermott not treating his

7    employees properly?

8        A.   I can't recall specific incidents right

9    now.

10       Q.   Okay.

11            Other than in that timeframe, during your

12   time as a Vida-Flo franchisee, can you recall any

13   time that Keith McDermott treated one of his

14   employees harshly?

15       A.   When you say employees, can you be more

16   specific?

17       Q.   Sure.  People who worked for either

18   Vida-Flo Fulfillment or Hydration Station Franchise

19   System or any of the corporate stores.

20       A.   There was a very consistent pattern of

21   employees leaving with no notice or reason, and that

22   brought cause for concern.

23       Q.   How do you know they were mistreated, any

24   of them?

25       A.   You would have to speak with those

Page 125

1    employees for specifics.

2        Q.   I'm asking you.  I mean, you're signing

3    off on a letter.  You said you agreed with the part

4    about lack of respect for employees.  And then, when

5    I asked you about it, you said he was harsh.  When I

6    asked you for specific examples, I'm not hearing

7    any.  Do you have any specific examples?

8        A.   Not that I can recall.

9        Q.   What about lack of respect for -- we

10   talked about Vida-Flo direct employees and you kind

11   of hesitated and asked me about what, you know, I

12   meant by that.

13             Any other employees that you know of that

14   were harshly treated by Mr. McDermott at any time

15   during your time as a Vida-Flo franchise?

16       A.   I mean, he was, in terms with me, yes,

17   condescending, I would say threatening at some

18   points.  Yes, that would be included.

19       Q.   Give me an example of the time when he was

20   condescending to you.

21       A.   He would refer to me as "little guy" and

22   -- because I'm short.  And would say things like, I

23   figured you were too afraid to meet me face-to-face.

24       Q.   Is that what you referred to as

25   threatening or were -- in addition to the part where



Page 126

1    he said I figured you were afraid to meet me

2    face-to-face.  Other than that, was there anything

3    else that you considered threatening?

4         A.   Well, a threat to my physical body, no.

5    But a threat to my financial life and my business

6    owner, yes.

7         Q.   How so?

8         A.   Well, when you make comments or threats

9    that to shut my business down or make it a legal

10   process, cost prohibitive for me to resolve our

11   issues.  You know, to make it feel like I just

12   didn't have a chance, any help, that I was all on my

13   own.

14        Q.   Okay.

15             It says lack of respect for customers.

16   Please tell me about that.

17        A.   There were, I believe, a few incidents and

18   there were Facebook reviews that dealt with how

19   Keith treated patients, but I don't have those

20   specific examples right in front of me.

21        Q.   Anything other than Facebook reviews that

22   you know of where he showed lack of respect for

23   customers?

24        A.   I can't think of any that I can recall

25   right now.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 127

1    Q.   With regard to, I guess, lack of respect
2    for you.  We talked about how he threatened you,
3    condescending to you by calling you "little guy" and
4    short -- I'm sorry.  You said you were short.  He
5    called you "little guy."  And you indicated that he
6    threatened the financial viability of your
7    franchise.  You didn't say exactly that but that's
8    kind of what I'm getting at.  Any other threats to
9    you besides those?
10   A.   And the timeframe on that is going to vary
11   just because we're talking about so long ago.  I
12   can't recall at this time.
13   Q.   With regard to lack of respect for
14   customers.  Other than Facebook reviews, is there
15   anything else you knew about him showing lack of
16   respect for customers?
17   A.   Not that I can recall.
18   Q.   Franchisees, you mentioned some conduct
19   that would be disrespectful to you.
20        Do you know of him being disrespectful to
21   other franchisees?
22   A.   Yes.
23   Q.   What do you know?
24   A.   I had heard that he was very aggressive
25   and abrasive.  Brett got it bad and I'm sure that


Elizabeth Gallo
COURT REPORTING, LLC

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

1   was not the only one.

2        Q.   Can you -- other than you and Brett, do

3   you know of any other franchisees in or around this

4   time that was being treated with lack of respect?

5        A.   Not that I can recall.

6        Q.   What about Ryan, was he being treated with

7   a lack of respect around that time?

8        A.   I wouldn't know.  You would have to ask

9   Ryan that.

10       Q.   Not that he said to you anyway?

11       A.   That's a question you have to ask Ryan.

12       Q.   I know.  I'm asking you what you heard.

13  You never heard him say to you around that time that

14  he was being treated with a lack of respect by Mr.

15  McDermott?

16       A.   I can't remember that he specifically said

17  that or not.

18       Q.   Let's go to paragraph four.  The corporate

19  culture espoused through Mr. McDermott's example is,

20  from all apparent, hearsay and a priority,

21  indications, ostensibly that, a toxic environment

22  for both corporate staff and franchisees.  While VF

23  corporate has recruited team members with the best

24  experience in vision and franchising in marketing,

25  the short-lived employments of Mr. Borakov and --

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 129

1    then we're switching from page VFSUPP-01437 and

2    VFSUPP-01438.  The letter continues on page two.

3    Kelly, as well as the recent departure of Mr. Jamey

4    Shirah, evidence such a toxic internal environment.

5    I've heard numerous reports from my co-owners and

6    other franchisees regarding unprofessional and

7    unbecoming executive conduct.

8              With regard or that, I've heard numerous

9    reports from my co-owners and other franchisees

10   regarding unprofessional and unbecoming executive

11   conduct.  Mr. Gayle, do you believe that Keith

12   McDermott was engaged in unprofessional and

13   unbecoming executive conduct around that time?

14   A.   I have no reason to believe that he

15   wasn't.

16   Q.   Do you know what that means?

17   A.   Unbecoming executive conduct?

18   Q.   Yes.

19   A.   I would say it was a behavior that does

20   not reflect a positive executive, unbecoming and a

21   negative light.

22   Q.   Okay.

23              Do you think you, during your time as a

24   Vida-Flo franchise, ever engaged in unprofessional

25   and unbecoming executive conduct?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

1        A.   I wasn't ever intentionally

2   unprofessional.  Now, yes, I was never intentionally

3   unprofessional, but I would be the first to admit

4   I'm not perfect.

5        **Q.   Can you tell me about any unintentional**

6   **unprofessional behavior that you may have engaged**

7   **in?**

8        A.   I can't recall any.

9        **Q.   Were you ever rude to Mr. McDermott while**

10  **you were a Vida-Flo franchisee?**

11       A.   Was I ever -- can you repeat that?

12       **Q.   Were you ever rude to Keith McDermott**

13  **during your time as a Vida-Flo franchisee?**

14       A.   Define -- I mean rude?  Abrupt?

15       **Q.   I don't know.  Have you heard the term**

16  **rude before?**

17            MS. BUDA:  Object to form.

18            THE WITNESS:  Yes.

19  BY MR. TIMMONS:

20       **Q.   What does the term rude mean to you?**

21       A.   Maybe abrupt.  Yes, abrupt, that's what it

22  means to me.

23       **Q.   Have you ever been abrupt with Mr.**

24  **McDermott --**

25            MS. BUDA:  Object to form.

Page 131

```
 1   BY MR. TIMMONS:
 2        Q.   -- during the time you were a Vida-Flo
 3   franchise?
 4             MS. BUDA:  Same objection.
 5             THE WITNESS:  Can you rephrase that?
 6   BY MR. TIMMONS:
 7        Q.   Sure.
 8             You've just defined the term rude as
 9   abrupt.  I guess what I should say, during your time
10   as a Vida-Flo franchisee, were you ever abrupt with
11   Mr. McDermott in a conversation, in an email?
12        A.   It is possible, yes.
13        Q.   Do you remember any specific times that
14   you were abrupt with him?
15        A.   No.
16             MS. BUDA:  Chris, one, we've been going
17        about an hour-and-a-half.  But, I don't know if
18        you saw Mr. Bell sent an email asking for a
19        break at 2:30 to handle an emergency.
20             MR. TIMMONS:  No, I didn't see that.  If I
21        had, I would have broke.  Let's go ahead and
22        break at 2:30.
23             Mr. Bell, how long do you need?
24             MR. BELL:  15 minutes.
25             MR. TIMMONS:  Let's get back at 2:45.
```

Page 132

1          (Whereupon a short break was had.)

2    BY MR. TIMMONS:

3          Q.    Let's go to Exhibit 8.  It's pdf page 109.

4    So I'm on page 109 of the pdf that is Exhibit 8.

5    Bates label AL-0672.  I'm looking at a text from

6    4-14-17 at 10:50 a.m.  I believe the text is from

7    you and it says.  So we got medicine being shipped

8    to clients now.  What happens if meds are tampered

9    with or need to be refrigerated.  Are y'all going to

10   go ahead and send us free meds.  This is Mickie

11   Mouse shit.  What did you mean my Mickie Mouse shit?

12         A.    Mickie Mouse shit, I would say not a

13   organized sort of process, that things were easily

14   falling through the cracks and that was shipping

15   medication to patients.

16         Q.    Do you think that was an appropriate I

17   guess term to use, Mickie Mouse shit?

18         A.    I don't know a better adjective at this

19   point.  I'm sure I could have worded it differently.

20         Q.    Do you think that term was unprofessional?

21         A.    Yes, it's hard to say that is

22   professional.

23         Q.    I'll go to Exhibit 11.  I'll go to pdf 18.

24   Page pdf 18, that series of texts between you Brett

25   McCullough.  It starts on LA-0670.  It begins from

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 133

1    Mr. McCullough.  I'm tempted to reply to Jamey's

2    email about the conference call -- actually, let me

3    give this a date.

4              It's a long conversation text chain,

5    begins LA-0667 and apparently begins November 3rd,

6    2017 around 6:01 p.m.  Go to page 18 of the pdf,

7    again which is LA-0670.  Again, November 3rd, 2017.

8    Mr. McCullough, Brett McCullough says, I am a

9    tempted to reply to Jamey's email about the

10   conference call with something like, didn't realize

11   you were still with the company since I have gotten

12   nothing but crickets from you when trying to reach

13   out to you.  You respond, I have same thoughts but I

14   wanted to put some humor in it, like, damn, Jamey, I

15   figure you'd been deported with the silence.  Then

16   you say, oh, shit, I meant to tell you I fucked with

17   Jamey hard the other day.  Called him in a fake

18   panic asking about if he had heard something about

19   corporate and I said I couldn't tell him what I

20   heard or from whom.  I said -- then said, oh, shit,

21   I gotta go and hung up on him, never called him

22   back.

23        Q.    Okay.

24              Why did you do that to Mr. Shirah?

25        A.    I cannot recollect.  I don't remember.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 134

1       Q.   Do you feel like that was professional?

2       A.   I would say no, it's not very

3   professional.

4       Q.   This is around the time of the

5   no-confidence letter.  I know you didn't have

6   confidence in Mr. McDermott at this point.  Did you

7   also not have confidence in Jamey Shirah?

8       A.   No, I can't -- maybe uncertainty, just --

9   but no.

10      Q.   Did you not like Mr. Shirah at or around

11  that time?

12      A.   No.  I can't say that I didn't like him,

13  no.

14      Q.   Did you ever apologize to him for that

15  phone call?

16      A.   I have no idea what our conversations were

17  following that.

18      Q.   Let's go back to Exhibit 8 which is the --

19  actually, sorry.  Actually, going back to the

20  no-confidence letter which is Exhibit 10 not Exhibit

21  8.  Going to page two, paragraph five, fourth full

22  paragraph.

23           It starts, however, it has recently come

24  to light that nearly every item acquired through

25  VFUF contains a market far beyond anything

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 135

1    subject -- of a subjective reasonable standard.

2    Please find enclosed and attached a spreadsheet

3    comparing the prices charged to franchisees against

4    the price at which a respective franchisee or any of

5    our competitors could purchase the items directly

6    from suppliers.

7              That spreadsheet, what is it talking

8    about?

9         A.   I do not recall.  I do not remember the

10   spreadsheet being attached.  I do not know.

11        Q.   Did you remember reviewing a spreadsheet

12   before this letter was sent?

13        A.   I do not remember.

14        Q.   So, of course, you wouldn't remember

15   checking the spreadsheet for accuracy, I imagine?

16        A.   I cannot remember reviewing it, so I can't

17   say if I did or did not.

18        Q.   That's fair.

19             Let's go to page three.  Page three,

20   paragraph one.  It says without having more facts,

21   it is impossible to determine if there is a

22   violation of this next section pertaining to any

23   transactions between VF corporate and VFUF, or

24   between our VF Brookhaven and VFUF.  However, it is

25   not necessary for an actual fraud, but the mere



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 136

1   appearance of impropriety to foster mistrust among

2   the several franchisees.  Without an extensive

3   document review or substantially increased

4   transparency, we can only guess as to whether or not

5   the VFUF scheme was set-up to shift profits from VF

6   corporate and/or VF Brookhaven and to generate

7   excessive revenues for VFUF at the expense of

8   franchisees.

9           In the third line down, second sentence

10  which begins, however.  It's says, however, it is

11  not necessary for an actual fraud.  The term fraud

12  is used there.  Do you know of any fraud that Mr.

13  McDermott or VF corporate had committed up until

14  that point in November of 2017?

15          MS. BUDA:  Object to form.

16          THE WITNESS:  I can't make a legal

17      conclusion.

18  BY MR. TIMMONS:

19      Q.  Yes, I know.  I'm not asking you.  Sorry,

20  when I say fraud, I'm not talking about -- you guys

21  -- you're well prepared.

22          But anyhow, when say I fraud, I'm not

23  talking about the law.  I'm talking about the

24  colloquial term or the layman's term of fraud, what

25  you would have interpret without going to law



Page 137

```
1    school.  Do you know what fraud is?

2         A.   Can you define it for me, please?

3         Q.   Well, I would prefer to use your

4    definition.  So how would you define the word fraud?

5         A.   In a general sense it would be acquiring

6    something through misleading means or -- what's the

7    adjective I'm looking for.  Mischaracterization of

8    the facts.  Pretty much lying to get something

9    maybe.

10        Q.   All right.

11             We'll go with whatever definition you

12   would like and we can go with all of this.

13        A.   I don't know what my definition of it was

14   four years ago.  This is me coming up with what's

15   out of my head right now.

16        Q.   Have you had an experience that would

17   change your definition of fraud from what it was

18   four years ago until today?

19             MS. BUDA:  Object to form.

20             THE WITNESS:  Can you rephrase that?

21   BY MR. TIMMONS:

22        Q.   Why would fraud mean something different

23   to you now than it would be four years ago?

24             MS. BUDA:  Same objection.

25             THE WITNESS:  Yes.
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 138

```
 1    BY MR. TIMMONS:

 2        Q.   Can you come up with a reason as to why it

 3    would mean something different today than it was --

 4    would have meant to you four years ago?

 5        A.   Well, as I described earlier, when I say

 6    fraud, it's somewhat of a generalized term, so.

 7        Q.   Well, I didn't use the term.

 8             The term's in a letter that you were

 9    eventually a signatory on.  So I guess when you

10    agreed to sign off on that letter, what did you mean

11    by fraud?

12        A.   It means it's not necessary for actual

13    fraud, but the appearance of it.  So it would just

14    even be the appearance of fraud is what Brian's

15    letter says.

16        Q.   Okay.

17             So what appearance of fraud did you know

18    of back in November of 2017?

19        A.   In layman's term, not legal, the pricing

20    would bring, you know, my attention.  If you say

21    something cost X and that is not true, yes, it could

22    be fraud in terms of the general description.

23        Q.   Any other behavior besides the pricing

24    issue that would constitute fraud in your mind?

25        A.   Not that I can recall.
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

1        Q.    Yes.   Let me go to page three, paragraph

2    four.

3              It says there are substantial other

4    instances which alone could support a variety of

5    legal and equitable claims for rescission and

6    damages on behalf of one or more franchisees,

7    including but without limitation, understatement of

8    necessary one-time cost for provision of financial

9    performance representations, including items such as

10   cost of goods sold proforma, indicating much lower

11   price per dosage charges than actual charges to VFUF

12   or substantive changes to a number of pricing

13   structures and offerings.   Coupled with the refutal

14   that grandfather existing members for the duration

15   of their existing commitments in derogation of the

16   law or contract in all 50 states without any import

17   or collaboration from the various markets.

18             And actually, let me go a little bit

19   farther than that.   I want to go to page four.   It

20   talks about the other lack of transparency and

21   collaboration along with instances of clear fraud,

22   self-healing which have come to light, and fostered

23   in other lack of paying -- (undiscernible).   In my

24   opinion, for the members of VF corporate to hesitate

25   any longer to replace senior leadership, become --

Page 140

```
 1   (undiscernible) -- transparent and reduce all VFUF

 2   markups to a reasonable percentage and begin

 3   negotiations for appropriate concessions with each

 4   respective franchisee as well as the franchisee --

 5   (undiscernible).  VF corporate will likely collapse

 6   leaving the respective individual members to

 7   personally answer for unfair trade acts and

 8   practices.  This representations fraud and other

 9   unethical conduct that each allow to infer unchecked

10   by the managing member.

11           Now, it says in there kind of toward the

12   middle, about six sentences down right in the middle

13   of the paragraph, it says VF corporate will likely

14   collapse.

15           Did you agree that if there were not

16   changes made, VF corporate was likely to collapse?

17      A.   I believe there was a worry, yes, that if

18   something didn't happen that corporate Vida-Flo

19   would -- I guess the word is collapse.  And so, we

20   wanted to make sure that Vida-Flo corporate stayed

21   upright, that was healthy, sustainable and moving in

22   the right direction.

23      Q.   What was going to cause it to collapse?

24      A.   I can't speak to that of what could have

25   happened.
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 141

1        Q.   When you were thinking about that

2    collapse, were you thinking about franchisees

3    leaving the franchise system?

4        A.   No.  I was thinking about one day when I

5    go on to log into corporate and I put Vida-Flo

6    Birmingham, that that account was just not going to

7    be there.  That was my worry, you know.

8        Q.   Why did you think corporate was going to

9    go away?  What was going to cause it to go away?

10   Bankruptcy?  Something else?

11       A.   I mean, we continued to mention, you know,

12   Keith's behavior and the consistent revolving door

13   of employees.  That alone would bring cause for

14   concern on how not only would it grow, but just

15   maintain.  And so, yes, it wouldn't necessarily have

16   to extend with financial.  It's just what happens if

17   everyone just quit, what do we do.

18       Q.   Okay.

19            The second sentence says, in my opinion,

20   for the members of VF corporate to hesitate any

21   longer to replace senior leadership, become

22   exceedingly transparent, et cetera.  When he talks

23   about that top part, and I know it says Mr.

24   McCullough's opinion, but it talks about replacing

25   senior leadership.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 142

1          Did you also think that Vida-Flo corporate

2     needed to replace senior leadership?

3          A.   I cannot recall who all actually was

4     senior leadership at this time or if there was

5     senior leadership, so.

6          Q.   Did you think any of senior leadership of

7     corporate needed to be replaced?

8          A.   I obviously thought some things needed to

9     be changed, but I can't necessarily say that.  I

10    don't know what senior leadership was back then or

11    if there was senior leadership.

12         Q.   Did you think that Mr. McDermott needed to

13    be replaced?

14         A.   I thought either that or his behavior.

15         Q.   It doesn't say behavior.  It says replace.

16    That's not what I'm asking.  I'm not asking about

17    him changing his behavior.  I'm asking about do you

18    think that he needed to be replaced.

19         MS. BUDA:  Object to form.  He answered.

20    BY MR. TIMMONS:

21         Q.   I don't know if I got a yes or no to the

22    first part.  I got an explanation.

23              Did you think Mr. McDermott needed to be

24    replaced?

25         A.   I can't say what my mindset was in that



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

Page 143

1   moment right there.

2        Q.   So you don't know whether he needed to be

3   replaced or not?

4        A.   I didn't have a full picture of the entire

5   corporate structure or how that organization was, so

6   I don't know if I can speak to right now on what the

7   best mode would have been.  Obviously, something

8   needed to be changed, whether it be McDermott's

9   position or his behavior.  It was very clear that it

10  stemmed from McDermott.

11       Q.   Okay.  Going to Exhibit 8.  I'm going to

12  page 91 of the pdf.  Bates label AL-0654.

13            This talks about, at the top of the page,

14  you say there are many things that will be

15  addressed.  This conversation has been a long time

16  coming.  Speak to you next Friday.  He says I know,

17  I've tried so many times to speak.  You are so

18  difficult to connect with.  Your response is

19  communication on my part has not led to those

20  problems.  They're coming from the top down.  We'll

21  discuss Friday.  He responds back with I look

22  forward and expect a civilized and productive

23  conversation.  You say likewise.  He says I should

24  be there around 10:30 or 11:00 tomorrow.  I'm

25  waiting until Atlanta traffic dies down and then



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 144

1    head your way.  You say sounds good.  Says running a

2    little late.

3            MS. BUDA:  Chris, I'm sorry.  What was the

4        date?  And you may have showed it but it went

5        by too fast.  The day of the first series of

6        those.

7            MR. TIMMONS:  I'm sorry.  I didn't say it,

8        Sherri, and I should have.  It's 10-24-17.

9        This is all going on late --

10           MS. BUDA:  So 10-24.  It's not like the

11       day before.  Okay.

12           MR. TIMMONS:  No, no, no.  It's like a few

13       days.

14           MS. BUDA:  Because for, one, you kept

15       reading it together.  Okay.  10-24, 11-2.

16           MR. TIMMONS:  Yes.  Then we go to 11-2.

17       And then to 11-3, he says running a little

18       late.  Had to handle something at Brookhaven.

19       I'll update you on the road.  You say 10-4.

20       Same day around 10:30.  He says 11:40.  And you

21       say is that ETA.  You say yup -- or he says

22       yup.  Then you say 10-4.

23           Did you have a meeting with Keith

24       McDermott around November 3rd, 2017?

25           THE WITNESS:  I know we had a meeting

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 145

1        towards the end of 2017, I guess, but that was

2        that.

3   BY MR. TIMMONS:

4        Q.   Now, this is -- I mean, this text is right

5   before the letter of no-confidence went out two days

6   later.

7             Did you have a meeting with Mr. McDermott

8   right around the time just before the no-confidence

9   letter went out?

10       A.   I feel like I wanted to meet with Mr.

11  McDermott face-to-face and speak to him face-to-face

12  before I put my name on that letter of confidence.

13       Q.   Did you tell him that you were in the

14  process of drafting a no-confidence letter?

15       A.   No.

16       Q.   Why not?

17       A.   That would defeat the whole purpose.  The

18  purpose of it was to shed light for everyone else.

19  Keith knows what his behavior was; he's well aware.

20       Q.   Did you tell him that you're going to go

21  to the board with his behavior, tell them about it?

22       A.   I don't believe I said I was going to, no.

23       Q.   Why not?

24            MS. BUDA:  Object to form.

25            THE WITNESS:  Can you rephrase that?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

1    BY MR. TIMMONS:

2        Q.   Why not?  Why didn't you?

3            MS. BUDA:  Same objection.

4    BY MR. TIMMONS:

5        Q.   Why didn't you tell Keith that you were

6    going to the board about his behavior?

7            MS. BUDA:  Same objection.

8            THE WITNESS:  Can you rephrase that?

9    BY MR. TIMMONS:

10       Q.   What are you struggling with?

11       A.   She's objecting and I'm going to say can

12   you rephrase it.

13       Q.   Are you saying every time Ms. Buda

14   objects, I take that you're going to ask me to

15   rephrase the question, is that what you're saying?

16       A.   No.  What I'm saying is I'm having

17   trouble.  You're asking why I did not tell Keith

18   that I was going to tell other people that he had

19   bad behavior?

20       Q.   Yes.  That's exactly what I'm asking.

21       A.   We had already discussed, told Keith

22   personally face-to-face that he had bad behavior, so

23   that did not accomplish anything.  So I don't know

24   why reminding him of that would do anything.

25       Q.   Did you talk about his bad behavior with

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 147

1    him during that conversation in or around

2    November 3, 2017?

3         A.   We discussed behavioral things at that

4    meeting.

5         Q.   What behavioral things did you discuss?

6         A.   We discussed, one, the pricing.  That

7    obviously was one of the larger issues.  Open

8    communication and being truthful and honest.

9    Unfortunately, I feel like I was not told the truth

10   during that meeting.

11        Q.   Why not?  What made you feel that?

12        A.   In terms of pricing, Keith told me that he

13   was not responsible for any of it and that an

14   employee was in charge of all of that and they are

15   no longer with Vida-Flo.  And for Keith to try and

16   blame Katie on what he was doing felt extremely

17   insulting.

18        Q.   How do you know Keith was doing it and not

19   Katie?

20        A.   Because Keith handled the pricing.  Keith

21   was the a head honcho.  Katie said he ordered --

22        Q.   Did he --

23        A.   Go ahead.

24        Q.   Did he personally handle the pricing?

25        A.   From my understanding that it was Keith



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                            October 08, 2021

1    that found the -- picked his suppliers, so he in

2    turn would be the one that would pick the prices

3    that we would have to buy from.

4        Q.   If he picked the suppliers, he would know

5    how much he was paying.

6        A.   I understand that.

7        Q.   But how do you know he was the one that

8    then set the prices at which you purchased?

9        A.   I have no reason to believe.

10       Q.   You have no reason to believe what, I'm

11   sorry?

12       A.   That Keith was not the one in charge of

13   handling the pricing.

14       Q.   Does that mean you don't think anybody

15   else was responsible for that?  I'm just trying to

16   figure out why you think one way and not the other.

17       A.   As I said before, Keith was the head

18   honcho.  Keith chose the pricing across the board

19   from my understanding and so it made no sense to me

20   that he would not handle that pricing.

21       Q.   But you don't know for sure, though?  This

22   is just what you believe?

23       A.   I have no guarantee or knowledge on who

24   exactly was on the other side of the computer

25   screen.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 149

1        Q.   Go to Exhibit 11.  Go to page 12 of the

2   pdf.  We talked about this before.

3             You're talking about Ryan making changes.

4   Why did Ryan come off the letter?

5             MS. BUDA:  Object to form.

6             THE WITNESS:  I am not blue, so.

7   BY MR. TIMMONS:

8        Q.   I'm sorry.  Yes, Brett says it.

9        A.   What was the question?

10       Q.   Why did Brian come off the letter?

11            MS. BUDA:  Object to form.

12            THE WITNESS:  You have to ask him.

13   BY MR. TIMMONS:

14       Q.   You don't know?

15       A.   No.

16       Q.   Around this time, we're talking October,

17   November of 2017, did Vida-Flo Alabama withhold

18   royalties?

19       A.   No.

20       Q.   Did Vida-Flo Alabama withhold tech fees?

21       A.   No.

22       Q.   Going back to Exhibit 2, which are the

23   interrogatory responses.  I'm going to page seven of

24   the responses.  Go to page six and seven because it

25   kind of carries over.  We already talked about the

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

1    September 2017 communications.

2              There is a second sentence that begins on

3    page six.  It begins with Mr. Heavern, Brian

4    McCullough and Brett McCullough have knowledge of

5    November 2017 communications between Michael Gayle,

6    Messrs. McCullough and Mr. Heavern in the

7    November 2017 vote of no-confidence letter.

8         A.   Who is Messrs?

9         Q.   Sorry.  That's plural Mr. -- your counsel

10   wrote that, but what it means is, as opposed to

11   saying Mr. McCullough and Mr. McCullough, it's just

12   a way of using plural mister.

13        A.   Got it.  I understand.

14        Q.   She's right.  It just means the two

15   gentlemen McCulloughs.

16        A.   I understand.

17        Q.   With regard to communications, I

18   understand you were having conversations, according

19   to this, with Mr. Gayle, Mr. McCullough and Mr.

20   Heavern about a November vote of no-confidence

21   letter.

22              Were you talking with anybody else about

23   the no-confidence letter?

24        A.   I cannot remember specifics.

25        Q.   Okay.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 151

1        A.    I do not remember.

2        Q.    Did you enlist support from other

3   franchisees at this time concerning price markups?

4             MS. BUDA:  Object to form.

5             THE WITNESS:  Can you rephrase that?

6   BY MR. TIMMONS:

7        Q.    What didn't you understand?

8        A.    You said did I elicit what?

9        Q.    Did you engage in calls with other -- or

10  other communications with other franchisees

11  concerning the price markups in or around that time?

12       A.    I can't tell you who initiated a call, but

13  it would be safe to assume that franchisees were

14  discussing the pricing issue.

15       Q.    What franchisees?

16       A.    Well, for certain Brian.

17       Q.    You cut out there.  I think you said

18  Brian, am I correct about that?

19       A.    Yes.

20       Q.    Were you having conversations with the

21  Atlanta franchisees in or around that time?

22       A.    I very well could have, but I don't really

23  remember when they got it or when they signed up or

24  joined.

25       Q.    What about the national franchisees, were

Page 152

1    you having conversations with them around this time?

2        A.   I very well could have been having

3    conversations with one of them around that time.  I

4    mean, we were all franchisees, so we would speak.

5        Q.   I'm going to go to Exhibit 11, page 19.

6    This is again a text conversation between you and

7    Brett McCullough.  We already talked about the text

8    up above with interaction with Mr. -- Katie Shirah.

9            Below that, and again this is

10   November 3rd, 2018, says or texts, I'm just getting

11   worn out with all the bullshit from corporate and

12   the fact that they think it is all okay.  Ready for

13   movement in the destruction of corporate, and you

14   say yes, sir.

15           Did you agree with him that you were ready

16   for movement in the destruction of corporate?

17       A.   Not necessarily at all.  I mean, people

18   can say thank you and I say yes, sir, so it could be

19   just an acknowledgement that he sent that.  Yes, sir

20   is not indicative of -- (undiscernible).

21       Q.   At that time, around the time that text

22   was sent which is early November 2017, did you

23   believe that corporate should be destroyed?

24       A.   No.  By all accounts -- (undiscernible) --

25   Vida-Flo to see that we wanted to grow, that we

Page 153

1   wanted everything going in the right direction, same

2   direction.

3        Q.   When you got that text from Mr.

4   McCullough, you didn't correct it, why not?

5             MS. BUDA:  Object to the form of that

6        question.

7             THE WITNESS:  I do not recall that.  I did

8        not know it was my responsibility to correct

9        him.

10            (Exhibit Number 12 was introduced.)

11   BY MR. TIMMONS:

12       Q.   Okay.  I pulled up Exhibit 12 which is a

13   series of text.  You're not on the chain.  It's text

14   we received from Mr. Fobas.  The top of his text

15   says, conversation with Matt Borah, Peter Park,

16   Jason Trembley and Kyle Walling.

17            I'm going to go to page 55 of the pdf.

18   Bates label ATL-DEFENDANTS-002871.  Looking at a

19   text sent by Mr. Trembley on December 2nd, 2017 at

20   8:57 p.m.  Mr. Trembley text, spoke to Baton Rouge

21   today.  BR, BHAM and BREK (sic) are all sending

22   demand letters in two weeks and plan to use

23   excessive up-chargings to get out of the franchise

24   agreement, guys.  They plan to all three rebrand.

25   And it continues, we may need to all think about

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 154

1    what this means to our partnership.  I'm beginning

2    to think we may demand we get paid back $10,000 per

3    store or we plan to also pursue this path.

4              Going back to the top text, the one that I

5    first read.  The second sentence, BR, BHAM and BREK

6    are all sending demand letters in two weeks and plan

7    to use the excessive up-charging to get out of the

8    franchise agreement docs.

9              December 2nd, 2017, in or around that

10   time, were you sending a demand letter with the plan

11   to use the excessive up-charging to get out of the

12   franchise agreement?

13        A.   No.  I do not recall doing that at all,

14   no.

15        Q.   Then the next text down says, they plan to

16   all rebrand.

17              In or around December 2nd, 2017, did you

18   plan to rebrand your Vida-Flo franchise as a

19   different brand?

20        A.   No.  If anything, I was putting more money

21   into growing the brand.

22              (Exhibit Number 13 was introduced.)

23   BY MR. TIMMONS:

24        Q.   Let's go to Exhibit 13.  Exhibit P-13.

25   This is about a month later this was sent from you

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

1   to email and -- Exhibit 13, I'm sorry, is a series

2   of emails that we received.  The page I'm on is

3   AL-0161, which is the 11th page of the pdf.

4             It's an email that you sent on Friday,

5   January 5th, 2018 at 3:00 o'clock p.m. to Keith

6   McDermott.  Subject, re royalty proposal.  Looking

7   at this email, going down to the first bulleted

8   paragraph which is the fifth paragraph, it says 100

9   percent royalty abatement until such time as we have

10  recouped the estimated $30,000 that we were

11  previously overcharged as a result of corporate's

12  fraudulent pricing schemes.

13            What did you mean by corporate's

14  fraudulent pricing schemes?

15       A.   The pricing is inaccurate and we felt that

16  it was intentionally overcharged and that money was

17  going somewhere.

18       Q.   Anything else?

19       A.   And with how they -- (undiscernible) --

20  fraudulent pricing scheme?

21       Q.   Yes.

22       A.   Not that I can recall at this time.

23       Q.   In that sentence it says, the estimated

24  $30,000 that we were previously overcharged.

25            How did you come up with the number



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 156

1  $30,000?

2      A.   From what I recall is I went and found

3  prices that I could get on an individual level as

4  just a franchisee and then compared those to what we

5  were pricing and what we were paying.  From what I

6  can recall, it was a comparison type.

7      Q.   Did you keep track of the differences; in

8  other words -- let me back up.

9          Were you using an Excel spreadsheet to

10  come up with the $30,000 number?

11     A.   The original -- the Excel spreadsheet was

12  done of every product purchase and item that we have

13  purchased from Vida-Flo, and that was just from day

14  one.

15     Q.   Can -- so did you use that -- I'm just --

16  I guess walk me through.

17          You indicated that you figured out what

18  the products should have been, you figured out how

19  much you paid.  How did you then take that data and

20  come up with the $30,000 figure?

21     A.   I subtracted the difference.

22     Q.   But I mean, we're talking about multiple

23  products.

24          Did you sit down and take into account

25  every single transaction that you made from the time



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 157

1    that you opened until that time?

2        A.   To my best knowledge, yes.

3        Q.   **Where did you record that information?**

4        A.   In the Excel spreadsheet that I created

5    from day one.

6        Q.   **Have you provided us a copy of that Excel**

7    **spreadsheet?**

8        A.   I would have to ask Sherri.  I do not

9    know.

10       Q.   **Did you provide it to Ms. Buda?**

11       A.   As -- that's what I'm saying, I will have

12   to ask Sherri.  I do not know if that was in the

13   stuff we had to submit.

14       Q.   **But you did remember creating an Excel**

15   **spreadsheet to come up with this $30,000 number?**

16       A.   From what I can recall, yes.  It was just

17   my purchases.

18       Q.   **I've used Excel a lot and it's unusual for**

19   **me to come up with -- when I'm talking about many**

20   **transactions, an exact round figure, like $30,000.**

21           **So is that what the Excel spreadsheet**

22   **happened to land on or is this a guess based on what**

23   **the Excel spreadsheet told you?**

24           MS. BUDA:  Object to form.

25           THE WITNESS:  It's what --

Elizabeth Gallo
COURT REPORTING, LLC

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 158

```
 1   BY MR. TIMMONS:
 2        Q.   It's what?  I'm sorry.
 3        A.   It says we had recouped the estimated
 4   $30,000.
 5        Q.   Sure.  It says an estimate.
 6        A.   I would say because every purchase, every
 7   time I made a purchase, that number theoretically
 8   could change.
 9        Q.   What would turn that number from an
10   estimated number into a concrete number?
11        A.   Being provided receipts I would imagine
12   from corporate on what they paid for it.
13        Q.   All right.
14             That was in January of 2018.  I want to
15   move onto March of 2018.  I guess I'll stay on
16   Exhibit 13.  Go to page 34 of the pdf.  Page 34 of
17   the pdf is the document labeled AL-0184.
18             At the top of that is an email from Web
19   Raulston, wraulston@jonesraulston.com.  Subject, re
20   conference call.  Date, March 3rd, 2018 at 8:19 a.m
21   sent to Michael Gayle, mwgayle@gmail.com.  Cc'd what
22   we know is Brett McCullough and Ryan Heavern.  It
23   says that works.
24             Underneath it, next email down is from you
25   the day before March 2nd, 2018 at 9:37 p.m.  You
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                October 08, 2021

Page 159

1    wrote, does 9:00 a.m. central, 8:00 a.m. mountain

2    work for everyone.  If it's okay, I'd like to

3    include my father-in-law, Walter Calton, on the

4    call.  Web, you know him.  For Brent and Ryan, he

5    currently serves as the municipal judge for the City

6    of Eufaula, a Court appointed special master for

7    large class action lawsuits in the Circuit Court of

8    Barbour County, an attorney representing the Barbour

9    County Commission and the Assistant District

10   Attorney for the Third Judicial District of the

11   State of Alabama.  He's also served as the Assistant

12   Attorney General for the State of Georgia.  He's

13   ready to help in whatever way he can.  He's about to

14   be a granddad, thinking about granddad mode.  But in

15   an important setting, if timing and everything

16   works, I'll send out the call info.

17            So in or around March 3rd, 2018, you were

18   setting up a call with Mr. Raulston, Mr. McCullough

19   and potentially your father-in-law.  What was the

20   subject of that call?

21       A.   Well, considering my father-in-law is an

22   attorney, I really would assume that it was whatever

23   legal recourse we could proceed with.

24       Q.   For what?

25       A.   I cannot recall.



1          Q.    Looking at Exhibit 11, which is a series

2    of text that are being sent in or around that time,

3    and this is a conversation between you and Mr. Brett

4    McCullough.  And you say, what's y'all's status.  We

5    need to have a conference with you, me, Ryan and

6    Web.  A response back, how does Monday sound.  You

7    respond we're both good Monday at 8:00 a.m.

8              The next day, March 1st, 2018, make sure

9    y'all are checking all y'all's vitamins and their

10   concentration dosage.  I'm going to skip down.  That

11   just has to do with medicine.

12             March 2nd, 2018, 5:19 p.m.  Again you

13   text, father-in-law is an assistant DA in Alabama.

14   I mentioned this.  This could be the biggest

15   leverage.  Like this could just straight up be a

16   game changer.  Brett responds back with, I'm

17   confused, it looks like all of that only applies

18   with the triggering event causing the declaration

19   state of emergency.  You respond, has Louisiana been

20   under a state of emergency in the past 18 months, if

21   so, the price gouging laws come into play.  Brett

22   responds, yes, we have.  You say then it looks like

23   corporate could be beyond fucked, every item, every

24   order.

25             March 4th, 2018.  Did you receive

Page 161

1    conference call invite today.  I can't tell if it

2    went through.  He says, yes, sir.  You say, it's

3    stuck, fuck y'all in the a.m.  He says, yep, yep.

4              Then we go forward three days and it says,

5    dude, we've been under four different states of

6    emergency in the last 20 months.  That's at

7    11:45 a.m.  Then he asks, you ever get anything more

8    from Web on the FTC complaints.  You say no.  I'll

9    send you the reference number or whatever it is.

10   And then there's a complaint submitted to the FTC.

11             Why and about what were you submitting a

12   complaint to the FTC?

13             MS. BUDA:  Object to form.

14             THE WITNESS:  I was not submitting a

15        complaint to the FTC.

16   BY MR. TIMMONS:

17        Q.   Okay.

18             Tell me what you know about this Web

19   Raulston complaint to the FTC.

20        A.   Well, it sounds like Brett asked me if I

21   got any information and I said no.  And the only

22   information I have was the reference number and it

23   appears that I wasn't even sure whatever it is in

24   terms of the reference number.

25        Q.   Did you provide any information to

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

Page 162

1    Mr. Raulston to help him file a complaint to the FTC

2    against corporate in March of 2018?

3         A.   No, not that I can recall.  I believe that

4    was Web individually.

5         Q.   Going back to the text that's March 2nd,

6    2018, or the chain, March 2nd, 2018, at 5:19 p.m.

7    On page LA-0674 you asked, has Louisiana been under

8    a state of emergency in the past 18 months, if so,

9    the price gouging laws come into play.  Brett says,

10   yes, we have.  You say, then it looks like corporate

11   could be beyond fucked, every item, every order.

12             Why, if there had been a state of

13   emergency in the past 18 months, was corporate

14   beyond fucked?

15        A.   Well, because it looked like corporate

16   could be, so I obviously wasn't certain one way or

17   the other.

18        Q.   Okay.

19             Why would you say they'd be beyond fucked?

20        A.   I wasn't certain.  I don't know.

21        Q.   So you just kind of came up with that out

22   of no where?  What were you talking about?

23             MS. BUDA:  Object to form.

24             THE WITNESS:  It looks like we were

25        having -- I was asking if Louisiana was under a



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 163

```
 1        state of emergency.
 2   BY MR. TIMMONS:
 3        Q.   Why would you ask that?
 4        A.   As I say here, if so, then price gouging
 5   laws come into play.
 6        Q.   Why were you talking about price gouging
 7   laws with Brett McCullough?
 8        A.   Obviously, we were concerned about the
 9   pricing that corporate was doing and that was
10   obviously our concern.
11        Q.   Did the FTC complaint from March of 2018
12   mention anything about price gouging?
13        A.   I don't have a clue.  You would have to
14   ask Web that.
15        Q.   Did you ever get involved in a conference
16   call with Web Raulston talking about submitting a
17   complaint to the FTC about corporate?
18        A.   No, not -- no, not that I recall, no.
19        Q.   What were these -- you're talking about a
20   conference call in or around this time.  What was
21   the conference call about?
22        A.   With my father-in-law, so it would have
23   been about a legal process.
24        Q.   Which legal process?
25        A.   I cannot recall just -- I would say what
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 164

1    we were allowed to do, what we could do, I do not

2    know.  Whatever it was, it was regarding what we

3    legally could do.

4        Q.   So it didn't have anything to do with the

5    FTC?

6        A.   Not that I can recall, no.  I don't

7    remember if this conference call was with my

8    father-in-law, but.  I don't know if he ever joined.

9        Q.   In or around March of 2018, did you wish

10   to shutdown corporate?

11       A.   Wish to shutdown corporate?

12       Q.   Yes.  Did you want them to go out of

13   business?

14       A.   When you say out of business, if Vida-Flo

15   goes out of business we, in turn, would go out of

16   business so, no, I didn't want them to go out of

17   business.

18       Q.   Same pdf, page 41.  LA-0693.  This is a

19   text from June 19th, 2018 at 11:35 a.m.

20            You say, y'all work things out with

21   corporate.  Mr. McCullough says, haven't spoken with

22   them in a week and a half other than to bitch out

23   Sean and Ivey on ordering issues and when my Mac

24   went down for three days.  You say I haven't ordered

25   anything from them since February.  Keith and I got

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 165

1    into it yesterday.  Essentially told him I was

2    looking forward to suing him.  Brett asked, how

3    close are y'all getting.  You say, and I got his

4    ass.  Then in all caps, close.

5            Why did you have Keith's ass, obviously

6    not literally, but why did you figuratively have

7    Keith's ass back in June of 2018?

8        A.   I think that was a turn of phrase and I

9    cannot recall having Keith's ass.  I would have to

10   look at whatever communication that was referencing

11   to see to say.

12       Q.   I'm going to go to -- this is set on

13   June 10th, 2018 to 5:08 p.m.  Again, between you and

14   Mr. McCullough.  Mr. McCullough sent you a picture

15   of a letter and then says, hope this is something I

16   can use against corporate.

17           What is Mr. McCullough telling you that

18   he's got something he can use against corporate?

19       A.   I do not know, but apparently I called it

20   bullshit.

21       Q.   Did you call what his text was bullshit or

22   what corporate was doing as bullshit?

23       A.   I just read that's bullshit.  It doesn't

24   say.  I obviously don't agree.  I just say that's

25   bullshit.



Page 166

1       Q.   So what Mr. McCullough was saying was

2    bullshit?

3       A.   I would not imagine so, but I can't even

4    read the letter that he's referencing or what he's

5    saying, so whatever it is it was bullshit.

6       Q.   Let's go to Exhibit 8 of the pdf.  This is

7    ALABAMA-0567.

8            These are texts that you're having with

9    Mr. Purdy.  We have a text from June 30th, 2018 at

10   around 11:08 a.m.  On page AL-0567 you say, Keith

11   getting out is the thing.  Either he's gone and we

12   build or he stays and we destroy and build our own.

13   Benjie agrees.

14           What did you mean -- who were you going to

15   destroy?

16      A.   I can't be certain, but Benjie Shogner

17   (sic) agreed with me, so I can't be for certain.

18      Q.   Do you mean destroy corporate?

19      A.   I would not think Benjie would have agreed

20   to destroy corporate, so I would say no.

21      Q.   Do you know what you were intending to

22   destroy?

23      A.   No clue.

24           (Exhibit Number 14 was introduced.)

25   BY MR. TIMMONS:



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                      October 08, 2021

Page 167

1          Q.    I'm pulling up Exhibit 14.

2                Exhibit 14 is a series of text messages

3    that were produced by the Atlanta defendants.  It is

4    a rather large exhibit.  It's 4,882 pages.  The

5    first Bates label is ATL-DEFENDANTS-004920.  I want

6    to go to page 107 of the pdf.  First page is

7    ATL-DEFENDANTS-005026.

8                And it's an email from you dated Michael

9    Gayle -- sorry -- from you, Michael Gayle, dated

10   Tuesday, July 3rd, 2018 at 1:47 p.m.  It's

11   confidential.  It's sent to benjie40@gmail.com and

12   it says dear Benjie and Jamey.

13               Who are Benjie and Jamey?  Who is that?

14        A.    Benjie and Jamey Shirah.

15        Q.    All right.  I'm going to scroll through

16   this a little bit just so you get a chance to

17   understand what this email is.

18               So this is an email that you sent to

19   Benjie and Jamey Shirah back in July of 2018.  The

20   first paragraph says, dear Benjie and Jamey.  What

21   is to follow is not meant to disparage anyone or

22   attempt to persuade any person to pursue potential

23   illegal activities, but to share my side of the

24   events.

25               What illegal activities were you concerned

Page 168

1  that you might be persuading someone to pursue?

2      A.   None, but --

3           MS. BUDA:  Hold on.  Object to form.

4           THE WITNESS:  None.

5  BY MR. TIMMONS:

6      Q.   So you don't know why you said that?

7           MS. BUDA:  Object to form.

8  BY MR. TIMMONS:

9      Q.   Go ahead.

10     A.   I said that so no one would do anything.

11 And you can read the letter and there's no -- I'm

12 not instructing anyone to do that.  But, what is the

13 harm in telling someone not to do something they

14 shouldn't.

15     Q.   Sure.  I guess I'm just trying to figure

16 out why you thought somebody might construe the

17 letter as attempting to persuade a person to pursue

18 potentially illegal activities.

19     A.   I didn't say someone that could take the

20 letter as doing something illegal.  But telling

21 people that I don't want you to do anything illegal.

22 I didn't know that was wrong to tell people that.

23     Q.   That's not what I'm saying.  I'm just

24 saying it's a little weird that that's how you begin

25 a letter.  I mean, you begin the letter with what is

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 169

1    to follow is not meant to disparage anyone or

2    attempt to persuade any person to pursue potential

3    illegal activities, but to share my side of the

4    events.

5              Most letters don't start off with, hey,

6    I'm not trying to convince you to commit a crime.

7    And so what I'm getting at is, why do you use -- why

8    do you put in there perceive potential illegal

9    activities?  Why were you concerned that somebody

10   might construe your letter as persuading them to

11   potentially -- or to pursue illegal activities?

12        A.   I was not concerned.  The reason I wasn't

13   concerned is because I just wrote that and that way

14   it's off the table.

15        Q.   You begin most --

16        A.   I didn't want --

17             MS. BUDA:  Object to form.

18   BY MR. TIMMONS:

19        Q.   You didn't want what?

20        A.   I did not want them to do anything

21   illegal.

22        Q.   You didn't want them to do something

23   illegal?

24        A.   Correct.

25        Q.   Do you know of anyone who made accusations

 1    about pursuing illegal activities?

 2         A.    No, not to my knowledge.

 3         Q.    On page one, paragraph three.  It says

 4    Keith McDermott personally visited my store -- oh,

 5    wait.  Hold on.  I want to go up a little bit more.

 6              I'm starting with the paragraph above

 7    that.  Again I'm on page ATL-DEFENDANTS-005026.

 8    That paragraph begins, I write this letter in good

 9    faith and openness and hopes that my concerns and

10    complaints will not continue to fall on deaf ears.

11    It is somewhat reassuring to hear that the elephant

12    in the room, Keith McDermott's behavior, is finally

13    being discussed openly.  I'm also aware that the

14    same elephant can prevent anyone from doing

15    anything.  I look forward to the potential meeting

16    in Birmingham with the other franchise owners.  If

17    the ship is going to be righted, we must all work

18    together, make things the way they should be.  If we

19    can't or won't, I fully plan on abandoning the ship

20    immediately and holding everyone accountable for

21    what has transpired.  We are all aware that no

22    franchise owner could have signed up with Vida-Flo

23    if we knew this would be the relationship with

24    corporate.  Below is a summary of events happening

25    after November 2nd, 2017.  We all know what happened

Page 171

1   prior to that.

2            There's a lot to unpack there.  I want to

3   go back and I want to go to the middle of the

4   paragraph with the sentence that starts, I look

5   forward to.  The sentence says, I look forward to

6   the potential meeting in Birmingham with the other

7   franchise owners.  Who were you planning on meeting

8   with?

9        A.   If I remember correctly, I was not -- I

10  feel like Jamey was the one that wanted to get all

11  the owners to meet.  I say I look forward to the

12  potential meeting in Birmingham, so it would appear

13  that it's -- it has not been set, just a potential.

14       Q.   What were you looking forward to?

15       A.   To the potential meeting.

16       Q.   Who was going to be at that potential

17  meeting?

18       A.   I do not recall.  It says with the other

19  franchisees owners.

20       Q.   Skipping down it says, if we can't or

21  won't, I fully plan on abandoning the ship

22  immediately and holding everyone accountable for

23  what has transpired.

24            What ship were you planning on to abandon?

25       A.   Abandon the Vida-Flo ship.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 172

1      Q.   Did you think at that time you were going
2   to be able to get out of your contract?
3      A.   I think at this time I'm sending a Hail
4   Mary to Benjie and Jamey Shirah to say we need help.
5   Like, you know, I am just trying to get some help,
6   have someone help the franchise owners.
7      Q.   So the threat says I fully plan on
8   abandoning the ship.  Was that an empty threat?
9           MS. BUDA:  Object to form.
10          THE WITNESS:  I can't say that's a threat.
11  BY MR. TIMMONS:
12     Q.   Okay.
13          Well, did you think you were going to be
14  contractually able to abandon the ship, the ship
15  being Vida-Flo?
16          MS. BUDA:  Object to form.
17          THE WITNESS:  Yes, I can't speak to that.
18  BY MR. TIMMONS:
19     Q.   You don't know whether it would violate
20  your contract or not?
21     A.   I'm saying at this moment in time I am not
22  for sure what abandoning the ship means, in what
23  context, but it sounds like abandoning.
24     Q.   Okay.
25          It says holding everyone accountable for

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 173

1    what has transpired.  Who's everyone?

2         A.   I do not have a list.  I did not have a

3    list of who is responsible for what, but I do know

4    Keith would be included.

5         Q.   Who would you be -- what would you be

6    holding them accountable for?  You say accountable

7    for what has transpired.  What had transpired?

8         A.   The letter doesn't go into great detail

9    about everything.

10        Q.   Okay.  We'll come back.

11             The next paragraph says, Keith McDermott

12   personally visited my store on November 3, 2017 in a

13   feeble attempt to assuage my concerns about

14   corporate and himself.  He proceeded to tell me to

15   my face that the items in the store were overpriced

16   and that he dropped the ball regarding ordering and

17   pricing.  Unfortunately, he ultimately laid the

18   blame entirely on Katie Shirah's shoulders.  Our

19   conversation ended with him telling me that because

20   there were some items underpriced, corporate would

21   not be paying anyone back.  In short, he admitted

22   that he was overcharging the stores in violation of

23   our franchise agreement, but it wasn't his fault and

24   he was refusing to reimburse anyone.  This was a

25   tipping point.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 174

```
1              What do you mean by this was a tipping

2    point?

3         A.   I would say beginning to believe that

4    Keith had no intention on rectifying or correcting

5    any of the problems.

6         Q.   What problems?  Because your letter says,

7    below is a summary of events happening after

8    November 22nd, 2017.  This happened on November 3rd.

9              So what were the problems that occurred

10   prior to November 3rd, 2017?  They're apparently not

11   going to be listed in the letter.  So what were

12   they?

13        A.   I mentioned the marketing due to the

14   revolving door, corporate employees, lack of

15   communication, the pricing discrepancies, all the

16   things we talked about.

17        Q.   So Keith comes to your store visiting you,

18   you didn't interpret that as him attempting to make

19   it right?

20        A.   Well, kind of one of those -- and say,

21   yes, he drove to my clinic, that is true.

22             Yes, Keith did come to my store, that is

23   true.  But he came with no intention on admitting

24   what happened, giving me the full story and

25   accepting at least some of the responsibility and/or
```

Page 175

```
 1   showing that how it would actually stop -- this
 2   problem would stop.
 3        Q.   How has he dropped the ball not admitting
 4   responsibility?
 5        A.   That he, quote, unquote, he said it, he
 6   dropped the ball.  Keith said those words.
 7        Q.   Right.
 8        A.   That he dropped the ball.
 9        Q.   Yes.  That sounds to me like somebody's
10   admitting responsibility.
11        A.   No.  Dropping the ball, you know, I feel
12   like that's kind of a cop-out because he then laid
13   the blame on Katie Shirah.  So no, he was not
14   accepting responsibility; he was diverting.
15        Q.   Go to the next page.  It's a rather long
16   paragraph.
17             It says on November 5th, 2017, Vida-Flo
18   Birmingham and Vida-Flo Baton Rouge send a vote of
19   no-confidence to Keith McDermott, John McDermott,
20   Ryan Redding, Shawn Campbell and to the both of you.
21   It outlines some of the more serious concerns we had
22   regarding Keith, corporate employee turnover and
23   pricing.  Apropos, the legal liability each
24   corporate officer has, I incorrectly assume action
25   would be taken.
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 176

1            What legal liability did each corporate

2    officer have?

3         A.   I can't speak to what their legal

4    liabilities are.

5         Q.   What did you mean when you said legal

6    liability of each corporate officer?

7         A.   I cannot recall whether or not they had

8    legal responsibility or not, or what each corporate

9    officers' actions were.

10        Q.   Okay.

11             You said we sent our SOS and no one

12   answered.  The following day, Keith held a

13   conference call, proceeded to explain to everyone

14   that he was not failing anywhere and there was

15   nothing we could do about it.  Our attempt at

16   rectifying the problems had backfired as it only

17   emboldened Keith.  On November 21st, Keith emailed

18   me a proposal to make amends.  Jamey Shirah and Ivey

19   Robinson were both cc'd, in summary, of outlined

20   goals and communication, transparency, 10 percent

21   royalty abatement would approximate $3,000 and the

22   opportunity to purchase another franchise for only

23   $20,000.  The inability for refusal to comprehend

24   the severity of the situation was obvious.

25             Why did offering you communication,

Page 177

```
 1    transparency and a 10 percent royalty abatement
 2    constitute a refusal to comprehend the severity of
 3    the situation?
 4         A.   Well, I will answer those.
 5              The goals of communication, I can say,
 6    yes, we're going to communicate, but when the person
 7    that you're communicating with is lying, you believe
 8    they're lying, it's difficult.
 9              Transparency.  From what I can recall, I
10    never did receive any sort of cost report or showing
11    what corporate had paid previously for their
12    products, which are then resold to us.
13              The 10 percent royalty abatement, that
14    seems just like a really convenient number that's
15    not based on any sort of anything.
16         Q.   Why did it seem like a convenient number?
17         A.   Because he was going to either pay me back
18    for the money that was owed to me.  That was going
19    to be paid back on decreased royalties of 10
20    percent.  That does not make sense.  How would you
21    accurately pay someone back money when you put a
22    flat 10 percent royalty abatement that is tied not
23    to what our purchases are, but what our sales were.
24    Again, those two don't mix and it just seemed like
25    trying to do the least amount possible.
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 178

1    Q.    Okay.

2          You say after that, I've not accepted the

3    offer.  My relationship with Keith quickly

4    deteriorated as did my relationship with corporate

5    and its continuing revolving door of executives.  I

6    responded on January 5th, 2018 with a

7    counter-proposal.  I propose 100 percent royalty

8    abatement until we recoup the estimated $30,000 that

9    we were previously overcharged.

10         Is that -- how did you get that $30,000

11   number?  Did you just go back to your January 5th

12   letter?

13   A.    Possibly, yes, that I was using that

14   information.

15   Q.    Skipping down just a little bit.  You say,

16   I ended it with re-affirming that my goal was to

17   make my business and his corporate successful.  Less

18   than three hours later that same day, Keith emails

19   me a formal notice that corporate intended to

20   immediately sell another franchise in the Homewood

21   area.  The prospective owner in question is a

22   current member and did not intend on actually

23   opening the location.

24         How did you know that that potential

25   franchisee was not intent on actually opening a

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

Page 179

1    location?

2         A.   He was a current member of ours and I had

3    spoke to him from what I can recall.

4         Q.   And he told you he wasn't actually

5    intending on opening a location?

6         A.   From what I can recall, yes.

7         Q.   It was portrayed to us in such a manner.

8    This appeared to be an attempt to coerce us to

9    purchase another location and waive any prior legal

10   plans.

11            What were your prior legal plans?

12        A.   The pricing issues.

13        Q.   January 10th I have my legal counsel email

14   Sean Curtis and Keith McDermott regarding a

15   face-to-face meeting versus emails.  My attorney

16   gave available dates.  Keith responded with one of

17   the most degrading emails I have ever read.  The

18   opening paragraph was nothing more than a threat in

19   posturing.  Instead of attempting to work through

20   this together, he elaborated on having attorneys on

21   retainer and his E&O insurance covering his expenses

22   through any disputes.  In an effort to discourage me

23   from continuing to use legal counsel, Keith

24   referenced exorbitant legal bills for myself and

25   this will all end in negotiation.



Page 180

1          What was degrading about any of that?  Why

2     did you feel degraded?

3          A.   I would have to read Keith's response for

4     me to answer that.

5          Q.   Okay.

6               I mean, I would think if it was one of the

7     most degrading emails you would -- you've ever read,

8     it would have stuck with you.

9               MS. BUDA:  That's not a question.  There

10         is no question there.

11              THE WITNESS:  Yes.

12     BY MR. TIMMONS:

13          Q.   Why don't you remember if it's one of the

14     most degrading emails you've ever read?

15              MS. BUDA:  Object to form.

16              THE WITNESS:  My memory is not tied to --

17         I'm -- can you repeat the question?  I don't

18         get it.

19     BY MR. TIMMONS:

20          Q.   I was asking you what about the email made

21     it one of the most degrading emails you have ever

22     read?  You said that you can't remember, you would

23     have to see the email.  I asked you essentially if

24     it's one of the most degrading emails you've ever

25     read, why don't you remember it without looking at

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle

October 08, 2021

Page 181

1   the email?

2          MS. BUDA:  Object to form.

3          THE WITNESS:  I can't answer that.  I

4      can't answer that.  I don't know.

5   BY MR. TIMMONS:

6       Q.   Then you say, he outright refused every

7   request except the sourcing as we had Ivey grant us

8   permission already.

9          Did Ivey already -- what did -- did Ivey

10  already allow you at that point to source from other

11  suppliers?

12      A.   At least what the letter says.

13      Q.   Okay.

14          Skip to the next paragraph.  Go to the

15  paragraph after that.

16          It says, at the beginning of May, Keith

17  reach out via email regarding a speaking (sic).  He

18  said that Michael Hayley in Nashville gave him the

19  impression that I was interested in talking with me

20  and learning about all the great things we are doing

21  at corporate to support you and the entire franchise

22  system.  He told me that he was helpful, that I

23  would just let bygones be bygones, save money on

24  legal fees.  He had the audacity to tell me that

25  I've not even told him what my issue is other than

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 182

1    some overcharging plans as if the vote of

2    no-confidence even happened.  When board members do

3    not hold their executives accountable, this is what

4    happens.  Keith also included the tidbit that almost

5    every other franchise had been able to work through

6    their issues by communicating directly with them,

7    both Keith and corporate, unquote, and he would be

8    so gracious as to forget about the past and focus on

9    the future for me.

10           It sounds like you were angry at Mr.

11   McDermott, is that accurate?

12        A.   I was obviously not pleased with him.  But

13   I'm very clear, direct and non-emotional at all, so

14   I can't say I was angry.

15        Q.   But you referred to a -- you say he had

16   the audacity to tell me.  Audacity seems like a

17   pretty stern word.  Why did you say audacity if you

18   weren't mad?

19        A.   I did not know if I used the word audacity

20   that that would mean that I was mad.

21        Q.   And then down below where we talk about

22   Keith.  Keith in corporate, he would be so gracious

23   as to forget about the past and focus on the future

24   for me.

25           That's seems like sarcasm, was it, the



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 183

1    whole would be so gracious part?

2         A.   I can't tell my tone of voice with Keith

3    and corporate and he would be so gracious.  That

4    very well could be words that he used.  I do not

5    know.

6         Q.   And you say, one of the most egregious

7    issues I have with Keith is his negligence.  You

8    used the term egregious.  Again, that would seem to

9    indicate you were mad.  You were not mad?

10        A.   I was unaware if I used egregious and that

11   would mean I was mad.

12        Q.   Okay.

13             Skipping down to the bottom.  You talk

14   about the Toradol issue.  And then in the last

15   sentence you say, on two separate occasions

16   medication was sent to a patient's house including

17   Toradol.  On one occasion, under Keith's oversight

18   and guidance, our only black box medication was

19   mailed directly to a patient's house.

20             What is a black box medication?

21        A.   I would have to look that up.

22        Q.   Well, you used it at the time.  Did

23   somebody else help you write this letter?

24        A.   No.

25        Q.   You just don't remember now what you meant



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

Page 184

1    by black box medication?

2        A.    I can't remember exactly what black box is

3    in reference to, like medically.

4        Q.    Okay.

5              The first sentence says, it would appear

6    that some franchisees have recently succeeded in

7    legal battles versus corporate.  This brings me to a

8    crucial point, prior and pending litigation.  I was

9    made aware of the lawsuit with the previous

10   Charleston, South Carolina location.  I'm sure

11   there's a gag order in effect, but why was I not

12   made aware of this lawsuit prior to signing the

13   franchise agreement.  The Kennesaw location is no

14   longer a Vida-Flo and neither is Tennessee.  I would

15   be naive to think they or corporate just went

16   quietly.  On June 18th, Keith texted me that I was

17   the only store not to move past bad blood and that

18   Kennesaw paid a settlement to corporate.  There's a

19   contradiction in every turn.  The contradiction

20   ended with him texting, I'm beginning to really feel

21   sorry for you, Michael.  Either Birmingham is the

22   only store not invited to the party or Keith is

23   waiting in line.  This would be funny if my

24   livelihood didn't depend on it.  What assurances

25   that -- can you give me that corporate will not be

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 185

1    bankrupted and I am stuck with a business with no

2    name or support.

3          Why did you think corporate was going to

4    be, quote, bankrupted?

5    A.    I didn't think that they were going to be

6    bankrupted.  It appears I was worried and I didn't

7    want them to go bankrupt.

8    Q.    Sure.

9          Why did you think they might possibly

10   become bankrupt?

11   A.    I do not know the inner workings of

12   corporate finances or I can't speak to what could

13   cause them to go bankrupt.  But I will say that I

14   actually did not want them to go bankrupt.

15   Q.    I understand.  But I mean, you know, if I

16   said to you I hope you won't get hit by a car, that

17   would imply some sort of -- you know, I'm actually

18   concerned that you might get hit by a car.  I

19   wouldn't say that randomly.

20         So why did you -- what made you think that

21   there was a possibility that corporate would be

22   bankrupt?

23         MR. TIMMONS:  Object to form.

24         THE WITNESS:  Yes.  You're going to have

25      to rephrase it a different way.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

```
 1    BY MR. TIMMONS:

 2        Q.   It's not a bad question.  What did you not

 3    understand?

 4        A.   I'm confused how you don't -- aren't

 5    taking my answer as that I wanted to make sure that

 6    corporate was not going to be bankrupt.  I wanted

 7    corporate to be successful.  I don't know what I

 8    don't know and that would appear why I said what

 9    assurances.

10        Q.   Well, I mean, you could have written in

11    there what assurances can you give me that corporate

12    will not be struck by a jet airplane that falls out

13    of the sky or hit by a meteor or attacked by

14    dinosaurs.

15             But, what you actually said is, what

16    assurances can you give me that corporate will not

17    be bankrupted.  That would indicate that you had a

18    concern that corporate would be bankrupted.  I

19    understand you're saying you were hoping they would

20    not be bankrupted.  But I'm asking why did you have

21    a concern that corporate would be bankrupted?

22        A.   The direction that Keith McDermott was

23    taking the Vida-Flo franchise.

24        Q.   How so?

25        A.   Everything that we've discussed for like
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

Page 187

1    the past six hours.

2        Q.   So the pricing issue, the transparency and

3    the lack of marketing, that all made you think that

4    Vida-Flo would be bankrupted?

5        A.   Well, if the head of any company does as

6    poor of a job, in my opinion, as Keith, then, yes,

7    you should worry about the longevity of the company.

8    And if you're involved in that company, you want to

9    do everything you can to make sure it continues and

10   is healthy.

11       Q.   Did you ever talk with other franchisees

12   about attempting to bankrupt Vida-Flo?

13       A.   No.

14       Q.   You ever heard anyone say that they'd like

15   to bankrupt Vida-Flo?

16       A.   No.  If I was a franchisee, that would be

17   trying to bankrupt me I feel like.

18       Q.   So going down, you say I'm trying to see

19   what options there really are.  Our vote of

20   no-confidence letter was delivered almost eight

21   months ago.  Why has it taken this long for either

22   of you to appear, Benjie, or reappear, Jamey.  You

23   must understand my concern that just because you

24   both are visible doesn't mean that anything will

25   change.  Jamey you left us, straight up, dropped us



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 188

 1    like a bad habit.  Went down to Florida and left us

 2    to fend for ourselves knowing full well who was in

 3    charge.  Why should we trust you to not do that

 4    again.  We all trusted you and it feels like you

 5    abandoned us.  I worry that if we don't do something

 6    soon, we'll get passed by our competitors in the

 7    market and left with an empty facility.  One of the

 8    only reasons I am still within the system is that I

 9    think that this can be fixed.  I was happy.  I just

10    don't think we'll ever get there with the current

11    leadership.  If something does happen and Keith is

12    no longer the CEO, who will take over.  What would

13    happen with the current executives, board seats, et

14    cetera, if/when Keith stepped down.  Could y'all

15    describe your ideal candidate for those positions,

16    what you're looking for.  I truly believe that there

17    must be a franchisee board as well as franchises

18    having voting rights on certain issues.  Having a

19    few franchise owners on the board would help

20    alleviate many of the concerns we have, as well.

21    Please consider any possible arrangement.  Something

22    is definitely missing within the corporate

23    structure.

24              Up top it says one of the only reasons I'm

25    still within the system is that I believe things can

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 189

1    be fixed, I always have.  I just don't think we'll

2    ever get there with the current leadership.  What

3    did you mean, what part of the leadership did you

4    wish to have replaced at that time?

5         A.   One would assume that it is Keith

6    McDermott.

7         Q.   Anyone else?

8         A.   I am unaware of any other executives.

9         Q.   The next paragraph.  In regards to the

10   structure within the franchise system, there must be

11   a more concise and heartfelt effort to help the

12   franchises learn and grow their business.  Talking

13   about a concrete system and a staff position that's

14   dedicated in helping the market find their niche,

15   identify and secure partnerships, sponsorships and

16   events, et cetera.  Each and every location is

17   different and must be treated as such.  I have so

18   many ideas that I'd like to share.  While I do enjoy

19   our current line of vitamins and medication, I think

20   there could be a few additions that would have a

21   huge impact and definitely drive patients to us.

22             Do you think if all that had been done

23   that your relationship with Vida-Flo still would

24   have failed?

25        A.   If all of those had happened?



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 190

1      Q.   Yes.

2      A.   Yes, if Keith McDermott was gone and all

3  that happened, I'd still be with Vida-Flo.

4      Q.   You end your letter with the following

5  quote.  Victorious warriors win first and then go to

6  war, while defeated warriors go to war first and

7  then seek to win.  It's a quote from Sun Tzu.

8           Was that quote something that was

9  automatically added like a signature to most or all

10 of your emails, or was that something that you added

11 to this particular email?

12     A.   It was something that I added and I can't

13 remember what exactly about the quote, only that it

14 talks about being victorious.

15     Q.   So I think that comes from a book called

16 The Art of War, am I correct?

17     A.   Correct.

18     Q.   Were you threatening war --

19          MS. BUDA:  Object to form.

20 BY MR. TIMMONS:

21     Q.   -- by using that quote?

22     A.   No.  It is obviously not a threat of we're

23 going to war at all.

24     Q.   It literally says victorious warriors win

25 first and then go --

Page 191

```
 1        A.   Win first, correct.  So no, I'm not saying
 2   go to war.  I'm not saying anything.  It's a quote
 3   from Sun Tzu.
 4        Q.   What's interesting is that you -- and I'm
 5   going to -- I want to go down -- sorry, not from
 6   where I was.  I'm going to page
 7   ATL-DEFENDANTS-005026.  You get to paragraph two,
 8   kind of toward the bottom where you said, if the
 9   ship is going to be righted, we must all work
10   together to make things the way they should be.  If
11   we can't or won't, I fully plan on abandoning the
12   ship immediately and holding everyone accountable
13   for what has transpired.
14             Is there anything in the letter -- or
15   anything outside of the letter that transpired that
16   made you want to abandon the ship?
17        A.   I'm not intending that I want to abandon
18   the ship.
19        Q.   Are there any other problems that have
20   transpired that you didn't mention in this letter?
21        A.   It is likely that I did not get
22   everything.  I tried to.  It's like a term paper of
23   what.  It was not a joy to write, I will say that.
24        Q.   How long did it take you to write the
25   email?
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 192

```
 1        A.   I don't know.

 2        Q.   Like more than a day?

 3        A.   I have no idea.

 4        Q.   Did it have more than one draft?

 5        A.   No clue.

 6        Q.   You wrote this thing in July of 2018.  You

 7   forwarded it to Jason Trembley on November 28th of

 8   2018.  And where I have seen the forward is

 9   ATL-DEFENDANTS-005025.

10             Why did you send this to Michael Gayle on

11   -- you are Michael Gayle.

12             Why did you send this to Jason Trembley on

13   November 28th, 2018?

14        A.   I do not know.  I can't recall.

15             (Whereupon, a short break was had.)

16   BY MR. TIMMONS:

17        Q.   We're on Exhibit 8.  We're on page

18   AL-0579.  And again, these are text from August 3rd,

19   2018.  Up at the top you say royalties are --

20   actually Purdy says, and how much did it cost us for

21   all that bullshit.  You say, royalties are

22   seven percent plus $1,000 in tech fees.  Haven't

23   updated the numbers, but approximately 35 to 45

24   without interest.

25             Where did you come up with the number 35
```

Elizabeth Gallo
COURT REPORTING, LLC

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                            October 08, 2021

Page 193

1    to 45?

2         A.   That is an updated number.  That's an

3    approximation.

4         Q.   **Where did it come from?  What did you use**

5    **to approximate the figure?**

6         A.   I do not have -- it says updated numbers.

7    I would say on existing -- I would say it appears

8    that it's on, you know, a file sheet or something

9    that has not been updated.

10        Q.   **Okay.  Moving down to text.  You say, she**

11   **tries to act like a victim.  Purdy says she**

12   **apparently didn't understand not to talk to you.**

13   **You then say, well, I put a stop on banks so they**

14   **aren't getting royalties this month.**

15             **Who is the she that's trying to act like a**

16   **victim?**

17        A.   I don't have a clue.

18        Q.   **Did you stop paying royalties on or around**

19   **August 3rd, 2018?**

20        A.   I believe we stopped paying royalties in

21   August, yes.

22             (Exhibit Number 17 was introduced.)

23   BY MR. TIMMONS:

24        Q.   **Let's go to Exhibit 17.**

25             **Exhibit 17 is a series of texts between**



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 194

1      Shawn Fobas and Jason Trembley.  Go to page 402, the

2      pdf.  On Bates label ATL-DEFENDANTS-001678.

3              At the top is a text received from Jason

4      Trembley on March 19th, 2019 at 1:10 p.m.  It's a

5      screenshot of a WhatsApp conversation titled fuck

6      Keith.  It says Brett, Michael, Ryan and you.

7              What do you know about a WhatsApp

8      conversation that was called fuck Keith?

9          A.   Very little, from what I can remember.

10     From what I can remember, I didn't really use it

11     much and that's really it.  I don't know.  I didn't

12     use it that much so I can't really tell you what I

13     don't know.

14         Q.   Did you participate in the fuck Keith

15     conversation?

16              MS. BUDA:  Object to form.

17              THE WITNESS:  When you say participate,

18     what do you mean?

19     BY MR. TIMMONS:

20         Q.   Did you text things or write things into

21     the WhatsApp that was the fuck Keith WhatsApp group?

22         A.   Possibly, but I don't really remember

23     exactly that WhatsApp.  I believe it was a long time

24     ago, so I don't know.

25         Q.   Let's talk about Ivey Robinson.  What do

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 195

 1    you think of Ivey Robinson?

 2         A.   Right now?

 3         Q.   Yes.

 4         A.   She's a hard worker and did the best that

 5    she could given what her resources and what she was

 6    able to do.

 7         Q.   What was your relationship like with Ms.

 8    Robinson while you were a Vida-Flo franchisee?

 9         A.   Hot and cold.  I would say there were

10    periods where Ivey and I were clicking on all

11    cylinders.  And then, there was periods where we

12    weren't meshing as well.

13         Q.   Did you ever call the police when she

14    visited your store?

15         A.   No, I did not.

16              Now, there was an issue where Ivey came in

17    and I was not at the clinic.  She came into the

18    clinic unannounced and just walked into our med

19    room.  What I can recall, she was not wearing or did

20    not have the Vida-Flo ID card, name tag or anything

21    like that.  And the nurse, I don't remember who it

22    was, obviously became very concerned that a stranger

23    was just looking through all of the supplies in the

24    med room.  From what I can recall, Ivey was asked to

25    leave.  Outside of that, I don't know how the

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 196

1    individual conversation went when she was there.

2    But, no, I did not call the police.

3         Q.   Did you straighten out that

4    misunderstanding?

5         A.   I can't say.  I know her sister canceled

6    her membership.  Whether or not that was related, I

7    do not know, but that seemed like coincidence.

8         Q.   Did you ever talk with Ivey about the time

9    that the police were called when she was in your

10   store?

11        A.   I didn't know the police were called, so

12   no.

13        Q.   How did you find out about it?

14        A.   You just told me.

15        Q.   Well, you gave this detailed description

16   of a nurse calling the police because she was back

17   in the med room and she was asked to leave.

18        A.   I didn't say she was calling the police,

19   and if I did, I misspoke.

20             My nurse went into the med room and saw

21   that she was there and she was asked to leave, but I

22   do not know of any police being involved at all.

23        Q.   Go back to Exhibit 11, which is text

24   between you and Mr. McCullough.  Go to pdf --

25   actually, AL-705.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 197

1        A.   Can you screen share, please?

2        Q.   Yes.  Sorry.  I keep taking it down when
3   we go on break.

4             I'm looking LA-0705 through AL-0707.

5             705 is a text screen between you and
6   Mr. McCullough, begins on August 5th, 2018 at 7:25
7   a.m.  It looks like there is an issue with getting
8   Vida-Flo emails.  And then, going up a little bit.
9   I sent Benjie -- you say, I sent Benjie an email.
10  Then from Ivey, we're in discussion with the
11  developer now.  I think she should be able to get it
12  going within the hour.  That is her usual time for
13  things of this nature.  Then you screen shot,
14  already progress report.  The problem lies within
15  the G Suite.  We are addressing now right.  We'll
16  revert.  Emails should populate within the hour
17  based on my understanding.  If the franchises have
18  any issues from this point, they know where to find
19  me.  You write -- from Benjie.  McCullough responds,
20  wow, that seems to be combative.  You respond with
21  fuck jet, then you correct.  Probably that was an
22  auto text issue, but you respond with F her.  So
23  essentially if you put those two together, fuck her.

24             The fuck her that you're responding to or
25  talking about, is that Ivey Robinson?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 198

```
 1      A.   I do not -- one would assume, but I don't
 2   know.  It looks like from Benjie, so I don't
 3   necessarily understand the attachment from Benjie.
 4   Can you scroll up?  Because above that I said she
 5   should be able to get it going within the hour.
 6   That is her usual timeline for things of this
 7   nature.  So, I mean, that doesn't seem to be
 8   negative by any means.  I don't understand.  I'm not
 9   following the from Benjie, how I replied, so I don't
10   necessarily know where that fits in.  I could have
11   said F-U-C-K him, but I do not know.
12             (Exhibit Number 18 was introduced.)
13   BY MR. TIMMONS:
14      Q.   Okay.
15           I'm going to pull up Exhibit 18.
16           Exhibit 18 is a letter from Warshawsky &
17   Seltzer dated November 8th, 2018.  It's sent from
18   Aaron Gagnon to Vida-Flo Alabama, LLC, attention
19   Michael Gayle and Derrick Purdy.  Re, notice of
20   default of your franchise agreement.  At the bottom
21   of the first page it talks about Section 13.2,
22   royalty fee of your franchise agreement states.  On
23   the day of each week that we specified, you agreed
24   to pay us a royalty fee equal to seven percent of
25   your gross revenues from the prior week of
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                           October 08, 2021

1    operations.  Then it says Section 13.3, other fees

2    and payments.  If your franchise agreement states

3    you agree to pay all other fees and expense

4    reimbursements and other amounts specified in this

5    agreement in a timely manner as fully set forth in

6    this Section 13.  You also agree to promptly pay us

7    an amount equal to all taxes levied or assessed

8    against us based upon goods or services that you

9    sell based upon goods that we furnish to you under

10   the income taxes that we pay based on amount that

11   you pay us under this agreement.

12           Beginning of the second page it says, as

13   of the day of this notice you owe to the franchisor

14   the following amounts in royalty and technology

15   fees.  Royalty fees $11,598.36, fluids and medical

16   supplies, $2,498.06, and technology fees $4,000 for

17   a total of $18,096.42.

18           As of the date of this letter, which is

19   November 9th, 2018, had you failed to pay royalty

20   fees to corporate in the amount of $11,598.36?

21        A.   I would not know the exact amount of the

22   royalties, no.

23        Q.   Have you failed to pay royalty fees from

24   the time that we talked about in August until at

25   least September of 2018?



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 200

```
 1        A.    Yes.
 2        Q.    With regard to fluids and medical
 3   supplies, were there some fluids and/or medical
 4   supplies that you received from corporate in or
 5   around this time that you did not pay for?
 6        A.    I will have to disagree on that.  I'm not
 7   entirely sure how they could come up with any number
 8   that says that I owe them money for supplies.  But,
 9   you know, these are their numbers, so I don't know
10   how they came up with that.
11        Q.    With regard to technology fees, had you
12   stopped paying technology fees or failed to pay
13   technology fees during the timeframe between August
14   of 2018 and this letter in November of 2018?
15        A.    Yes.
16        Q.    Going back to Exhibit 8.  Going to pdf
17   page 96.  The Bates label on this page is AL-0659.
18              This is a series of text between you and
19   Keith McDermott.  The date on the exchanges that
20   we're going to look at is November 26th, 2018 at
21   9:55 a.m.  You text, blocking us on Booker hurts you
22   more than it does me.  Rick will be in contact with
23   your legal counsel today.  Mr. McDermott responds,
24   you have access to Booker so you can take payment,
25   et cetera.  Because you have not paid us for it for
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 201

1    120 days, but continue to use it free of charge some

2    of your privileges have been revoked.  Additionally,

3    all the Vida-Flo memberships, EFT transfers from

4    Birmingham will be frozen until we work this

5    situation out.  The sooner your counsel communicates

6    your needs, the sooner the membership revenue will

7    be unfrozen.

8              With regard to Booker, had you not paid

9    for -- well, let me back up.  The technology fee

10   that you pay, was that in part to pay for the Booker

11   system?

12        A.   Yes, I believe Booker point of sale was

13   included in the tech fee.  Now, at this time, I do

14   believe, yes, it was included in the tech fee.

15        Q.   You ever had a member stop paying their

16   membership fee?

17        A.   Yes.

18        Q.   Do you give them 120 days of additional

19   service before your stop their membership?

20             MS. BUDA:  Object to the form of the

21        question.

22             THE WITNESS:  That's -- I don't think

23        those two are relatable.

24   BY MR. TIMMONS:

25        Q.   That's not what I'm getting at.

Page 202

```
 1      A.   Okay.
 2      Q.   Do you allow members to continue using
 3  their membership without paying for it?
 4      A.   We have members that have accrued IV
 5  benefits and they are allowed to put their
 6  membership dues on pause and they can continue to
 7  redeem their accrued benefits and not have to pay
 8  anything as they already have.
 9      Q.   What about somebody who has not paid, are
10  you going to continue giving them services if they
11  stop paying?
12           MS. BUDA:  Object to form.
13           THE WITNESS:  Again, I don't see how these
14      two are related.
15  BY MR. TIMMONS:
16      Q.   Related or not, please answer the
17  question.
18           MS. BUDA:  If you don't know, then don't
19      answer.
20           THE WITNESS:  Yes, I don't know what I
21      would do.
22  BY MR. TIMMONS:
23      Q.   Well, I mean, have folks stopped paying in
24  the past?
25      A.   I really can't speak to my patients'
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

Page 203

```
 1   financial state.  You know, I am not able to go

 2   through and crosscheck that.

 3        Q.   You don't keep track of whether your

 4   patients are paying you?

 5        A.   No.

 6             MS. BUDA:  Object to form.

 7             THE WITNESS:  You said -- yes, I do not

 8        keep track of my patients' financial status in

 9        terms of if they are able to pay.  I don't

10        know.

11   BY MR. TIMMONS:

12        Q.   That's not what I'm asking.  I'm asking if

13   they -- do you keep track of whether they pay?

14        A.   Yes, our point of sale does report sales.

15        Q.   And if somebody doesn't pay a membership

16   fee, you continue to provide them with services?

17             MS. BUDA:  Object to form.

18             THE WITNESS:  I feel like I have already

19        answered that question.

20   BY MR. TIMMONS:

21        Q.   Not even close.

22        A.   I said they could put their membership on

23   pause, not pay membership dues and continue to

24   redeem their benefits.

25        Q.   So they can continue -- this is that they
```

Page 204

1    have already paid or these are folks that have not

2    paid?

3         A.    These are benefits that they paid for.

4         Q.    What happens if they stop paying and they

5    haven't paid previously?

6              MS. BUDA:  Object to form.

7              THE WITNESS:  I would have to take that on

8         a case-by-case basis.

9    BY MR. TIMMONS:

10        Q.    Have you ever suspended somebody's

11   membership because they failed to pay you?  I'm not

12   asking for specific names.

13        A.    I do not recall.  You know, I will say

14   COVID has taught us a lot about trying to give

15   people grace and be patient with people and work

16   with people however we can.

17        Q.    What about prior to COVID?

18        A.    I would say I would -- people have the

19   same I guess compassion or empathy when people might

20   need help.  I do not know.

21        Q.    Okay.

22              Did you ever suspend or terminate

23   somebody's membership for failure to pay prior to

24   COVID?

25              MS. BUDA:  Object to form.  That's been

Page 205

```
 1         answered.  He's answered that.
 2              MR. TIMMONS:  Not in connection to COVID.
 3         He hasn't talked about before COVID.
 4              MS. BUDA:  He answered --
 5              THE WITNESS:  I did.
 6              MS. BUDA:  In general before.
 7    BY MR. TIMMONS:
 8         Q.   He can answer it again.
 9         A.   I already did.  It's the same answer.
10         Q.   What is that answer?
11              MS. BUDA:  Same objection.
12              THE WITNESS:  I mean, come on.  I already
13         answered the question.
14    BY MR. TIMMONS:
15         Q.   Sure, let me ask it again.
16              Prior to COVID -- it's not a hard
17    question.  Prior to COVID --
18         A.   Yes, I know.  I answered to the best of
19    my ability.  I do not know any specific incident to
20    where I had a conversation with a patient and I said
21    I am canceling your membership because you refuse to
22    pay.  I do not remember a conversation -- having
23    that with a patient.
24         Q.   Other than conversation, do you remember
25    just doing it, I mean, just canceling a membership?
```

Page 206

1         A.   We've canceled memberships, yes, that's

2    correct.

3         **Q.   Have you canceled any memberships for**

4    **people not paying?**

5         A.   There's always a conversation with that,

6    so I can't say one size fits all.

7         **Q.   Anybody?  I'm asking at all.  Have you**

8    **ever --**

9         A.   I don't know.  No, I never would.  I do

10   not remember every incident I've had with a member

11   and their membership dues or how they started and

12   how they ended their membership.

13             (Exhibit Number 19 was introduced.)

14   BY MR. TIMMONS:

15        **Q.   Okay.  Let's look at Exhibit 19.**

16             **Exhibit 19 is a letter dated January 21st,**

17   **2019.  Bates labeled VFSUPP-01610.  It's on JFL,**

18   **Johnson Franchise Law's stationary.  It's a letter**

19   **dated January 1st, 2019.  It's sent to Hydration**

20   **Station, USA Franchise System, LLC, and by email to**

21   **Daniel Warshawsky.  Re, Vida-Flo franchise agreement**

22   **dated May 16, 2016 between Hydration Station USA**

23   **Franchise System, LLC and Vida-Flo Alabama, LLC.**

24   **Notice of franchisor's violation of federal law,**

25   **notice of rescission of franchise agreement,**

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 207

1     collectively the notice.

2              All right.  So it talks about A, violation

3     of 16 CFR, Part 436.2A, deceptive acts and

4     practices.  It says the Federal Franchise Rule

5     provides it is a violation of federal law for a

6     franchisor to fail to publish a respective

7     franchisee with a copy of the franchisor's current

8     franchise disclosure document, the FTD, at least 14

9     calendar days before the prospective franchisee

10    signs a binding agreement with or makes any payment

11    to the franchisor in connection with the proposed

12    franchise sale.  And it quotes the statute.

13             It says you provided franchisee with a

14    copy of your FTD on May 13th, 2016.  See Exhibit 1

15    attached to this notice.  Day one in the 14-day

16    countdown was the next day, February 14th, and it

17    lays out the countdown.  It says there must be 14

18    full days in the 14-day countdown as shown on the

19    table above.  The last day in the 14-day countdown

20    was May 27th, 2016.  As a result, the first date

21    that you have could entered into the binding

22    agreement with and taken any payments from

23    franchisee was the next day, May 28th, 2016.  You

24    entered into the agreement with the franchisee and

25    you took the franchisee's payment of the initial



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                      October 08, 2021

Page 208

1    franchise fee on May 16th, 2016.  Only two days of

2    the mandatory 14-day period prescribed by law.  In

3    other words, you violated federal law by failing to

4    satisfy the mandatory 14-day waiting period

5    prescribed by 16 CFR Part 436.2.

6              Essentially, what your lawyer is saying is

7    that you signed your franchise agreement on May 16th

8    and they should have waited until May 28th, 2016.

9    What difference would it have made to you if you had

10   waited until May 28th, 2016 to sign your franchise

11   agreement as opposed to signing it on May 16th,

12   2016?

13             MS. BUDA:  Objection to form.

14             THE WITNESS:  I can't answer that question

15        because that didn't happen.

16   BY MR. TIMMONS:

17        Q.   I'm sorry?

18        A.   I would have no -- I would have no way of

19   knowing how -- what would happen in a different

20   occurrence or a different situation, so I don't

21   know.  That didn't happen.

22        Q.   Okay.  So did you suffer any harm?

23             MS. BUDA:  Object to form.

24             THE WITNESS:  Harm?  Harm in what way?

25   BY MR. TIMMONS:

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

Page 209

1        Q.   By not having the additional 12 days to

2   consider the franchise disclosure document before

3   signing the agreement, how did that hurt you?

4              MS. BUDA:  Object to form.

5              THE WITNESS:  Hurt me?  I'm not entirely

6        sure how to answer that.

7   BY MR. TIMMONS:

8        Q.   Did you get hurt in some way by not having

9   those additional 12 days to consider the franchise

10  disclosure document?

11             MS. BUDA:  Same objection.

12             THE WITNESS:  Given that it's, you know,

13       over five years ago, I can't answer that.

14  BY MR. TIMMONS:

15       Q.   So you don't know whether you were damaged

16  or not?

17       A.   You know, ask me five years ago, but I --

18       Q.   You don't know now?

19       A.   Not that I can recall.  I'm not entirely

20  sure of the question.

21       Q.   The second part says, violation of 16 CFR

22  Part 436.5S3, deceptive acts and practices.  It says

23  the federal franchise law provides it is a violation

24  of federal law for a franchisor to provide a

25  prospective franchisee with the financial

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 210

```
 1   performance representation unless the financial

 2   performance representation is contained in the

 3   franchisor's FTD.  And then it talks about

 4   disclosure items.

 5            Then it says -- I'm skipping over a few

 6   paragraphs -- you violated 16 CFR Part 436.9 in that

 7   you, one, stated in item 19 of your financial

 8   disclosure document that we do not make any

 9   representations about a franchisee's future

10   financial performance but, two, you made an oral

11   financial performance representations to franchisee

12   when franchisee was a prospective franchisee.  This

13   is a contradiction within the meaning of 16 CFR Part

14   436.9A and you violated 16 CFR Part 436.9C in that

15   you disseminated financial performance

16   representations to franchisee when franchisee was a

17   prospective franchisee that were not included in

18   item 19 of your financial disclosure documents.

19            What financial performance representations

20   did any member of Vida-Flo corporate make to you

21   prior to you signing your franchise agreement?

22        A.   I cannot recall the conversations that we

23   had five years ago.  It's just not a possibility.

24        Q.   Well, you are rescinding your franchise

25   agreement, you're walking away from Vida-Flo, the
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 211

1    franchise, based on these two issues.  One, that

2    they didn't give you an additional 12 days to look

3    at your financial disclosure document and, two, they

4    made some sort of financial representation to you.

5    Are you saying you don't remember those?

6         A.    I'm saying that it would be a question

7    that Rick could shed some light on.  But just

8    because I don't remember something doesn't mean that

9    it didn't happen.

10        Q.    Rick wasn't there, right?

11        A.    Rick wrote this.

12        Q.    Right.  But Rick wasn't there when they

13   supposedly made oral financial representations to

14   the franchisee when you were a prospective

15   franchisee?

16        A.    Correct, but we obviously had

17   conversations revolving that or regarding that.  I

18   do know I was sent an email with projections on

19   franchises.  I don't recall what location.  I

20   believe I shared it with Sherri.  I still have it.

21        Q.    This says oral financial representations.

22   What oral financial representations did they make to

23   you?

24        A.    I don't remember exactly what was said.

25        Q.    This doesn't say anything about an email



Page 212

1   representation.  It just says oral.  You don't

2   remember what the oral representations were?

3        A.   No, I do not remember what all that

4   entailed.

5        Q.   Okay.

6             This letter doesn't -- you listed a bunch

7   of issues that you had with Mr. McDermott and

8   Vida-Flo in that long email you sent on July 3rd,

9   2018.

10            Why aren't any of those grievances listed

11  in this letter as your reason for rescinding your

12  franchise agreement?

13            MS. BUDA:  Object to form.

14            THE WITNESS:  That --

15            MS. BUDA:  And I don't want to -- excuse

16       me -- to discuss anything that you discussed

17       with your lawyer, like something may or may not

18       have happened.

19            THE WITNESS:  Yes, that's all with Rick.

20  BY MR. TIMMONS:

21       Q.   These were things that would have happened

22  in 2016.  Why did you wait until 2019, roughly two

23  and a half years later, to rescind your contract

24  agreement for conduct that occurred two-and-a-half

25  years before?

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 213

1        A.   You know, Rick and I discussed this and

2    this was the route he chose, I would say.  He was

3    the professional and I --

4             MS. BUDA:  Go ahead.  You can say that you

5        talked to your lawyer.  Just, again, I caution

6        you about saying anything that your lawyer

7        said.

8             THE WITNESS:  Got it.  That was discussion

9        and conversation Rick and I had.

10   BY MR. TIMMONS:

11       Q.   Let's talk about other franchisees.

12            After you became a Holistic Hydration

13   store, or even before that, did you attempt to

14   recruit other franchisees to become part of the

15   Holistic Hydration franchise?

16       A.   No.

17       Q.   You did or did not?

18       A.   No, I did not.

19       Q.   What about Brett McCullough, did you ever

20   try to add Brett or Brian McCullough and their Baton

21   Rouge franchise into the Holistic Hydration

22   franchise system?

23            MR. TIMMONS:  Object to form.

24            THE WITNESS:  We don't have a Holistic

25        Hydration franchise listing.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

Page 214

 1   BY MR. TIMMONS:

 2        Q.   Sure.

 3             Did you ever try to recruit Birmingham to

 4   become a part of Holistic Hydration?

 5        A.   Birmingham is a part of Holistic

 6   Hydration.

 7        Q.   Sorry.

 8             Did you ever try to recruit Baton Rouge?

 9        A.   No, not that I can recall.  I don't -- not

10   that I recall.

11        Q.   Well, this is Exhibit 11 and it's LA-0680.

12   It's a series of texts between you and Brett

13   McCullough on April 4th, 2018 at 9:23 a.m.

14             You say, need to talk soon about branding

15   and more details about that.  I've pulled docs and

16   have been changing shit around with different ideas

17   with pricing.  Got to talk about corporate

18   structure, board, execs, et cetera.  And then Mr.

19   McDermott says, tomorrow sometime.  You say, works

20   for me.  Name the time and we can talk.  He says

21   9:45.  You said perfect.

22             What are you talking to Mr. McCullough

23   about as far as branding and then corporate

24   structure, board, execs, et cetera?

25        A.   From what I can recall, it was the


Elizabeth Gallo
COURT REPORTING, LLC

Page 215

1  corporate structure on who was I guess in charge,

2  responsibilities, pricing.  I do remember there was

3  a issue with membership price increase, so that

4  could be what that was about, yes.

5      Q.    So this wasn't about them becoming a part

6  or investors or some part of Holistic Hydration?

7      A.    No.

8      Q.    I mean, did you ever talk with them about

9  the corporate structure, the board, et cetera, of

10 Holistic Hydration?

11     A.    Well, no, Holistic Hydration wasn't in

12 existence right here.  We're talking about how to

13 help the Vida-Flo board and how we can help that

14 structure.

15     Q.    It looks like at page 30.  This is on

16 April 5th, 2018 at 10:30 a.m.  It looks like a day

17 after.  Mr. McCullough says, about to check someone

18 out.  Will holler after that.  And then, you send

19 him a logo of the Holistic Hydration organization.

20          Why did you send a logo of the Holistic

21 Hydration organization to Mr. McCullough if you were

22 not interested in having him become a part of the

23 Holistic Hydration organization?

24     A.    Just because I sent him a mock-up of a

25 logo does not mean I was inviting him to be part of



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 216

```
 1    it.
 2         Q.    Did you ever invite him to become a part
 3    of it?
 4              MS. BUDA:  Object to form; asked and
 5         answered.
 6              MR. TIMMONS:  I just want to see if this
 7         refreshes his recollection.
 8              MS. BUDA:  Yes, but it's getting too late
 9         in the day.  He's answered.
10              MR. TIMMONS:  I got another hour and a
11         half.  We are good.
12              Does this refresh your recollection that
13         you invited either Brett McCullough or Brian
14         McCullough to join the Holistic Hydration
15         organization?
16              MS. BUDA:  Object to form.
17              THE WITNESS:  I have stated everything
18         that I can recall.
19    BY MR. TIMMONS:
20         Q.    Let's go to page 45.  Going to Exhibit 8,
21    page 45.  I'm on page AL-0608.
22              This in a text, January 12th, 2019.  Mr.
23    Purdy's sending you an imagine.  Says confused.  You
24    say what, you are or is Brian.  You then say, our
25    attorney is drafting our response right now.  I'm
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

                                                              Page 217

1   having to deal with them individually right now

2   which is painstakingly difficult.  You also say it's

3   slowly getting better as I work through them

4   individually until I have letter from attorney.  He

5   says is Brian upset with us.  You respond, no, he

6   was more confused.  He said it was unprofessional on

7   VF part and he'll still come to HH.

8           Who is Brian?

9       A.   Will you scroll up, please?  I cannot

10  recall.

11      Q.   Okay.

12      A.   But I know Derrick and Brian McCullough

13  were not talking, so.

14      Q.   Well, who else other than Brian McCullough

15  did you know that would have said was unprofessional

16  on Vida-Flo's part and he will still come to HH?

17      A.   A patient.

18      Q.   Who was the patient?

19      A.   It would assume Brian.

20      Q.   Brian who?

21      A.   I do not know.

22      Q.   Why would Brian be getting a letter from

23  an attorney?

24      A.   I did not state that Brian is going to be

25  getting a letter.  I just said our attorney is

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

```
 1   drafting our response right now.
 2        Q.   Why would Brian a patient know that?
 3             MR. TIMMONS:  Object to the form.
 4             THE WITNESS:  No where does it say Brian
 5        knows anything.
 6   BY MR. TIMMONS:
 7        Q.   Okay.
 8        A.   Just other than it was unprofessional on
 9   the Vida-Flo's part.
10        Q.   You're sure that's a patient named Brian?
11             MS. BUDA:  Object to form.
12             THE WITNESS:  From what I can recall.
13   BY MR. TIMMONS:
14        Q.   So it's a coincidence --
15             MS. BUDA:  Can you scroll up and show me
16        the date on this.
17             MR. TIMMONS:  It's January 12, 2019.
18             THE WITNESS:  I think I just did connect
19        the dots on what he's referring to on
20        unprofessional.  That would be the email Keith
21        sent out in the first week of January 2019.
22        That makes sense.  And our attorney's drafting
23        our response would be I guess a response to
24        that.  I don't know if anything ever came to
25        that draft.
```

Page 219

```
 1    BY MR. TIMMONS:

 2        Q.   Let me go to pdf, the next page 46.  This

 3    is AL-609.  It's dated January 18th, 2019 at

 4    5:58 p.m.

 5             It says something is off with Jason T. and

 6    their group.  He tried to copy all of our intake

 7    forms and protocols and procedures and I told him he

 8    couldn't.  He hung up on me.  Trem always said they

 9    wanted to litigate day one, just be weary what you

10    say/text.  Purdy responds back, okay, thanks for the

11    heads up.  Haven't heard from them.

12             So Jason T, is that Jason Trembley who was

13    trying to get your intake forms and protocols?

14        A.   I can't be for certain.  I would assume

15    that would be Jason T.

16        Q.   Did Atlanta have any interest -- and by

17    Atlanta, I mean the Atlanta Vida-Flo franchisees,

18    did they any have interest in becoming a part of the

19    Holistic Hydration organization?

20             MS. BUDA:  Object to form.

21             THE WITNESS:  What I say, used or copied

22          intake forms and not be associated with

23          Holistic Hydration, so, no, I can't say that.

24    BY MR. TIMMONS:

25        Q.   Did you ask them to become a part of the
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

1   Holistic Hydration company?

2        A.   No, I did not.  I can't recall.

3        Q.   **When did you start preparing to leave**

4   **Vida-Flo?**

5        A.   By prepare?

6        Q.   **Taking steps to become Holistic Hydration?**

7        A.   Actual concrete steps in terms of opening

8   up accounts and like a Booker point of sale, I

9   believe it was December of 2019.

10       Q.   **Did you do anything else before that?**

11       A.   Created a graphic that I could use, so.

12       Q.   **When did you come up with the graphic?**

13       A.   I do not remember.

14       Q.   **Could it have been in April of 2019?**

15       A.   It could have been -- of 2019?

16       Q.   **Sorry, of 2018?**

17       A.   I don't remember when that was created.

18       Q.   **Who came up with the name Holistic**

19   **Hydration?**

20       A.   I want to say it was me.

21       Q.   **When did you come up with it?**

22       A.   I don't have a clue honestly.  I liked the

23   idea of two Hs and an O, H2O.  But, no, I don't

24   remember.

25       Q.   **You mentioned you took additional steps**

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                           October 08, 2021

                                                              Page 221

1    beyond creating a logo, getting bank accounts, et

2    cetera.  When did you do that?

3        A.   If memory serves me correctly, it was

4    December of 2018, if I'm remembering correctly.

5        Q.   When did you decide that you were going to

6    leave Vida-Flo?

7             MS. BUDA:  Object to form.

8             THE WITNESS:  You say when I decided to

9        leave.  I don't know the exact moment when I

10       made that decision.

11   BY MR. TIMMONS:

12       Q.   Okay.

13            You were obviously having thoughts about

14   it in 2018, correct?

15       A.   Well, the last day as Vida-Flo was in

16   2018, yes, yes.

17       Q.   And in April of 2018 you were having those

18   thoughts?

19       A.   Not of leaving, but you can have a

20   thought.

21       Q.   Did you buy that Holistic Hydration logo

22   or did somebody else do it, the graphic we saw?

23       A.   It was pretty crudely drawn, so I did

24   that.

25       Q.   You didn't hire somebody else to create



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 222

1    the Holistic Hydration logo?

2         A.   That Holistic Hydration logo I'm almost

3    certain that I just attempted that in like a paint

4    or photo shop or whatever the app is.

5         **Q.   Was there any time between when you closed**

6    **as a Vida-Flo store and became a Holistic Hydration**

7    **store; in other words, did you close on one day and**

8    **open the next, or was there some days in between**

9    **when you were completely shut down?**

10        A.   Last day as Vida-Flo, if I can remember,

11   was either New Year's Eve or the day before.  And I

12   want to say January 4th was our first day open as

13   Holistic Hydration.

14        **Q.   Were you soft opening during that time or**

15   **completely closed?**

16        A.   From what I can remember we were

17   completely closed.

18        **Q.   What did you do during the time that you**

19   **were completely closed and opening on January 4,**

20   **2019?**

21        A.   We moved and tossed all signage, like

22   paper signs, posters.  We removed our window decals

23   and until we could have a contractor physically

24   remove the outdoor signage, it was covered.

25   Anything with the name Vida-Flo was removed.  Yes,



Page 223

1    that's it.

2         Q.   Okay.  Look at Exhibit 8 again.  I'm going

3    to pdf page 41.  Actually, I'm going to page AL-605,

4    pdf page 42.

5              It's a text that you sent to Mr. Purdy on

6    December 27, 2018 at 8:23.  You say got to talk

7    soon.  We're rescinding on 12-31 and opening up as

8    Holistic Hydration on 1-1-2019.  He says, okay, man.

9    I'm out of town until the 2nd.  This text you

10   indicate that you were going to be opening on

11   January 1st, 2019.

12             Why did you not open on that date?  Why

13   did you wait until January 4th?

14        A.   Obviously, we needed to make sure we took

15   care of what needed to be removed from our clinic,

16   from what I can remember, and make sure we had a

17   nice deep clean of anything Vida-Flo.

18        Q.   Holistic Hydration, does it receive more

19   than 50 percent of its revenue from hydration

20   therapy?

21        A.   Yes.

22        Q.   And has that been the case since you

23   opened Holistic Hydration?

24        A.   Yes.

25        Q.   Did you change employees when you went



Case 1:19-cv-05192-LMM   Document 518   Filed 04/30/23   Page 224 of 262
Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 224

1    from becoming Vida-Flo to Holistic Hydration?

2         A.   Some were carried over and some didn't.

3         Q.   Any how did you decide who to carry over
4    and who to let go?

5         A.   It wasn't necessarily a letting go.  It
6    was we had normal turnover.  And just from what I
7    can remember, I don't remember exactly.  Everyone
8    that was with Vida-Flo joined over.  Some might have
9    started new jobs.  I just don't remember.

10        Q.   Who left around that time?

11        A.   I do not remember.

12        Q.   Who did you hire?

13        A.   New people?

14        Q.   Yes.  In between the time that you closed
15   as Vida-Flo and became Holistic Hydration?

16        A.   I do not recall.  I don't know.

17        Q.   In between the time that you stopped being
18   a Vida-Flo franchise and opened as a Holistic
19   Hydration store, did you change nurses?

20        A.   No, not all.  There could have been some
21   that didn't come over that I have mentioned normal
22   turnover.

23        Q.   You didn't fire everybody that was there
24   and then hire a completely new staff, correct?

25        A.   No, that is correct.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

1      Q.   What training did you do during the time

2   period that you were shutdown and reopened as a

3   Holistic Hydration store?

4      A.   Our processes on all of our intake forms,

5   software, that all changed.  That was a, I would

6   say, the biggest training, because it was started

7   from scratch.  We had to teach all of our nurses

8   functionality of the software, our new intake

9   process, and that -- I'll say our first day open did

10  not go as smoothly as I would like.  We needed more

11  training.

12     Q.   When did you buy the software that you

13  were using?

14     A.   I don't remember.

15     Q.   Did you buy it before or after you were a

16  Vida-Flo franchise?

17     A.   I would imagine I would have had to get it

18  before we opened as Holistic Hydration.

19     Q.   Did you do it before or after you were a

20  Vida-Flo franchise?

21     A.   I'm -- not before I was a Vida-Flo.

22     Q.   How did you do the retraining?

23     A.   Well, our head nurse, she and I Dr. Flippo

24  are the ones that created the intake forms, the

25  questionnaires and then it's just the process kind

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

Page 226

 1   of walking them through it.  The functionality, what

 2   to check, what to record.

 3       **Q.   How did that differ from what the intake**

 4   **form was that you used when you were a Vida-Flo**

 5   **franchise?**

 6       A.   Pretty much night and day in terms of what

 7   it looks like, the customization of it.  Intake, you

 8   can you customize it how you like it and how your,

 9   you know, facility needs.  I can't speak to any of

10   the functionality on what the software was before.

11           Some of the things that we did focus on

12   with intake is having -- making sure all health

13   protected information was not viewed by anyone other

14   than a nurse.  And so all of our front desk had --

15   they had separate, I guess, profile to where they

16   could only see what the patient's name, like date of

17   birth, address, profiles, and just what treatments

18   they received that day.  It is HIPAA compliant.  It

19   is encrypted, secured.  You have to be on our IP

20   address at our clinic to be able to access our

21   client forms.

22       **Q.   Did you issue a new employee manual or**

23   **handbook?**

24       A.   We have a new training manual.  It's not

25   been used in a long time.  You know, you can teach



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

1   people how to check people in.  It's not really that

2   complicated so, yes, we had a manual.

3        Q.   When did you create the manual?

4        A.   It was the -- I want to say the first

5   couple of months of 2019 from what I remember, maybe

6   March, but I cannot be positive.

7        Q.   Who wrote it?

8        A.   Our head nurse and myself.

9        Q.   What did you do in between the time that

10  you ceased being a Vida-Flo franchise and when you

11  had the new manual prepared in I guess around March

12  of 2019?

13       A.   Had one-on-one training.  And, again, the

14  nurses know how to be nurses.  So it is more just

15  making sure that they know how to use our software,

16  all of our checks, things of that nature.

17       Q.   After you ceased being a Vida-Flo

18  franchise, what happened to the printed employee

19  handbook?

20       A.   I'm pretty sure I tossed them in the

21  shredder.

22       Q.   I want to go Exhibit 8 which we're on.

23  Pdf page 50.  This is Bates labeled AF-0613.

24            It's a text chain beginning on March 2nd,

25  2019 at 12:36 p.m.  At the top of the page AL-0613



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 228

1    it says, Garrett is good with the valuation of HH at

2    $350,000.

3            Was Holistic Hydration worth $350,000?

4        A.   I accidentally hit the hidden button and I

5    had to call back in.  I missed a majority of that.

6        Q.   I'm on Exhibit 8.  I'm on page AL-6013.

7    It's text chain that begins on March 2nd, 2019 at

8    12:36 p.m.  Up top it says Garrett is good with the

9    valuation of HH at $350,000.

10           Is that what Holistic Hydration was worth

11   back in March of 2019?

12       A.   It would appear that's what the value of

13   it was.

14       Q.   Did you have --

15           MR. TIMMONS:  Do y'all hear the background

16       noise or is it just on me?

17           MS. BUDA:  I hear it, as well.

18           THE WITNESS:  I have a wining dog that's

19       been locked in my room for awhile.  Can I just

20       run upstairs and let him out and come back?

21           MR. TIMMONS:  Yes.  Let's take a five

22       minute break.

23           (Whereupon, a short break was had.)

24   BY MR. TIMMONS:

25       Q.   Mr. Gayle, we were talking about the

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 229

1    valuation of Holistic Hydration with Garrett back in

2    March of 2019.

3              How did that valuation of $350,000 come

4    about?

5       A.   That was a conversation with Michael

6    Clark, my attorney, registered agent of Holistic

7    Hydration, he and I discussed all that.

8       Q.   Did you hire somebody to do a formal

9    valuation of Holistic Hydration?

10      A.   I do not recall.

11      Q.   Did you have an accountant assist you with

12   the valuation?

13      A.   I do not know who Michael Clark consulted

14   with on that.

15      Q.   Do you think that $350,000 valuation was

16   accurate?

17      A.   I have no reason to think -- I said I have

18   no reason to think, you know, otherwise.

19      Q.   Okay.

20              The treatments that Holistic Hydration

21   provided when you switched over from becoming a

22   Vida-Flo franchise, what was different about that?

23      A.   We added some and removed some.  We

24   stopped doing the Vitamine D by IV.  We started

25   administering NAD Plus.  We did blood work.  So

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 230

1    patients could come in, get blood drawn and we would

2    send them off for vitamin levels on ascorbic acid,

3    folate, zinc, Vitamin C, Vitamin D and I'm missing

4    maybe one or two.  Those were, I would say, the main

5    ones.

6         Q.   Okay.

7              Other than stopping to do the Vitamin D by

8    IV, were there any other treatments that you stopped

9    doing?

10        A.   I don't believe we did B7 -- administered

11   B7.

12        Q.   Anything else?

13        A.   I'm -- not that I can recall at this time.

14        Q.   So you added NAD Plus, you did blood work.

15   What other things did you add?

16        A.   That's the majority of it.  The blood work

17   was a big part and the NAD was something that we

18   worked on for a while.

19        Q.   Can you think of anything else other than

20   those two?

21        A.   Not at this time.  I mean, we stopped

22   using all of Vida-Flo's, like their cocktails and

23   Vida whatever their cocktails that you had mentioned

24   previously.

25        Q.   What did you replace them with?


Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 231

1              MS. BUDA:  Object to the form.

2              THE WITNESS:  Replacing, we didn't

3         necessarily replace them.  We changed how the

4         patients really are treated.  So instead of

5         having, you know, a cocktail that they would --

6         that has a set list of ingredients, all of our

7         patients come in and they have what I'll call

8         it a credit that they can allocate on any

9         vitamins, minerals, medication that, you know,

10        are suitable for them, what they need, et

11        cetera.  That was a big thing is a full menu,

12        so to speak.  We didn't have tiers.  And no one

13        was going to have a pay a premium to get a

14        specific type of vitamin.

15   BY MR. TIMMONS:

16        Q.   Did you still have memberships available?

17        A.   We started with zero.

18        Q.   So I'm asking that wrong.

19             Did you still have the ability for

20   patients to become members as opposed to just

21   seeking out individual treatments?

22        A.   We created a new membership, new

23   membership model and everything.

24        Q.   What was that membership model?

25        A.   The price structure was different, the

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

Page 232

1    benefits, what you could redeem was different.  We

2    changed -- we added new memberships.  We have family

3    plans, fluid only plans, student/teacher plans,

4    special discounts on injections.  Certain

5    memberships get what we call a member gift where

6    they can give an IV treatment to a friend or family

7    or whomever.  Different pricing.  Across the board

8    different.

9         Q.   Did you change suppliers when you changed

10   from a Vida-Flo franchise to a Holistic Hydration?

11        A.   We began using McKesson as our main med

12   supplier.

13        Q.   When did you start using McKesson as your

14   main med supplier?

15        A.   I do not recall.

16        Q.   Did you change in between the time that

17   you stopped being a Vida-Flo franchise and then

18   became a Holistic Hydration store?

19        A.   I cannot recall how soon that happened.  I

20   really don't.

21        Q.   Did you use the same medical equipment

22   when you moved from Vida-Flo Alabama to Holistic

23   Hydration?

24             MS. BUDA:  Object to form.

25             THE WITNESS:  When you say medical



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

1         equipment, what do you mean?

2    BY MR. TIMMONS:

3         Q.   Medical equipment like things that you

4    used to administer treatments?

5         A.   We changed catheters.

6         Q.   I mean type.  You're not going to use the

7    same needle or IV bag on the same person, at least

8    not without getting sued.

9              Did you change the type of medical

10   equipment that you used when you changed over?

11        A.   Yes, from what I can remember we did.  We

12   use different catheters, admin sets.  We added an

13   additional gauge IV catheter, additional catheter IM

14   needle, Vitamin D drip sets.  We started using flow

15   regulators, dial flows on some patients.  We didn't

16   use any pressure bags.

17        Q.   How did you let Vida-Flo Alabama members

18   know that you were becoming Holistic Hydration?

19        A.   With what I can remember, it was a social

20   media post just saying that something in terms of we

21   are no longer Vida-Flo, that we are Holistic

22   Hydration.

23        Q.   Did you email your former members?

24        A.   I didn't have any of their emails

25   addresses.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 234

1      Q.   Okay.

2      A.   They contacted me.

3      Q.   **Where did you get your customers from when**

4   **you first started?**

5      A.   Started where?

6      Q.   **Sorry, Holistic Hydration.**

7      A.   We have a good amount that are just

8   walk-ins.  We are -- sorry, my cat has got out.

9   Word of mouth.  I'm from Birmingham, so it's pretty

10  easy to market yourself.

11     Q.   **Before leaving Vida-Flo, did you make a**

12  **list of all of your customers that saw your Alabama**

13  **franchise before you became Holistic Hydration?**

14          MS. BUDA:  Object to form.  And I'll be

15      honest, I didn't hear or didn't understand.

16      Would you mind just re-asking that?  I may have

17      just got lost in the feed.  I don't know.

18  BY MR. TIMMONS:

19     Q.   **Did you make a list of customers that were**

20  **customers at your Vida-Flo Alabama store prior to**

21  **becoming your Holistic Hydration store?**

22     A.   I don't remember making a list, but I do

23  remember trying to get an idea on memberships.  I do

24  remember that.

25     Q.   **What do you mean by that?**

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 235

1        A.    Paused them to make sure they didn't

2   continue to get reoccurring charges.

3        Q.    I know we talked about email and you

4   mentioned social media.

5              Did you do anything else to contact

6   Vida-Flo Alabama customers either before or shortly

7   after it changed to Holistic Hydration that you were

8   becoming Holistic Hydration?

9        A.    Can you repeat the first part?

10       Q.    Sure.  We already talked about email.  We

11  already talked about social media.  So I'm talking

12  about any other means of communication.

13             Did you do anything besides what we've

14  already talked about to let existing Vida-Flo

15  Alabama customers know that you were ceasing to be a

16  Vida-Flo Alabama store and becoming a Holistic

17  Hydration store?

18       A.    So media posts.  I cannot recall.  Well, I

19  will say after like a week it became -- the work was

20  all done for us, so we didn't really have to do

21  anything.

22       Q.    What do you mean by that?

23       A.    Keith emailed all of our patients and told

24  them that we are no longer Vida-Flo.  He gave them

25  my phone number so they started calling me a lot.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 236

1        Q.   How did you treat a patient who had been a

2   Vida-Flo Alabama member with regard to Holistic

3   Hydration?  In other words, did you honor in some

4   way Vida-Flo Alabama's contract?  Did you give them

5   a discount because they'd been a Vida-Flo Alabama

6   member?  How did you do that?

7        A.   From what I remember, after the email was

8   sent out and I started getting some of the worst

9   calls and messages I ever received in my life, we,

10  or I, made the decision that we would honor anything

11  that -- wait, somebody just -- somebody asked me to

12  stop sharing my screen.  Sorry.  Where was I?

13       Q.   After you got some of the worst emails and

14  calls you'd ever received, you made the decision

15  that we would --

16       A.   Yes, to honor anything that they paid

17  Vida-Flo Alabama.  And that was just because I had

18  so many people threatening to sue me, saying that I

19  was a crook, a criminal.  I mean, it was tough, man.

20  Like I'm from Birmingham and I have got people that

21  I grew up with, family, friends, that get this

22  violent, lying, false email, and gives my name,

23  personal phone number, and instructs people to

24  contact me and tell them that I owe them money and

25  that I have done wrong.  Man, I didn't deserve that.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                              October 08, 2021

Page 237

1        Q.    What was false about that email?

2        A.    Saying that they cut ties with us because

3   of bad business practices.  And from what I can

4   remember, it was something about us not having their

5   membership charges for -- that we couldn't -- or

6   that corporate could not control that and that they

7   had to contact us again.

8        Q.    You mentioned that you had memberships

9   when -- sorry.  After you became Holistic Hydration

10  and it was possible to become a member, did they

11  have agreements to do that?

12       A.    To become Holistic Hydration members?

13       Q.    Yes, sign some sort of agreement or enter

14  into some sort of contract?

15       A.    Yes, we used the same software, IntakeQ,

16  as we do for our intakes just so it'd be another

17  secured way, so we had to draft up and create the

18  membership agreements.

19       Q.    Who drafted the membership agreement?

20       A.    I did.  From what I can remember, it was

21  using one of those google template types and it's,

22  you know, pretty simple.  All you want to do is get

23  their basic information, what they are, membership

24  type they're signing up for, the term and the price.

25       Q.    Do you currently use the same furniture at

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 238

1    Holistic Hydration as you did when you were a

2    Vida-Flo Alabama franchise?

3         A.   We have the same couch and I guess it's

4    called a club chair.  And then, in the treatment

5    rooms, those chairs, those recliners that we had to

6    buy.  We had all the tables resurfaced, so they have

7    like a wrap that's on them, that covers the secure

8    so it just looks like a new style table.

9         Q.   Are you using the same chairs that you

10   used when you were a Vida-Flo franchise?

11        A.   Yes, yes.

12        Q.   Any changes to those chairs?

13        A.   We didn't change the chair.

14        Q.   You didn't put like cover on it or a wrap

15   like you did with the table anyway?

16        A.   No.  I mean, it's a leather chair so

17   you're limited on what you can do with it.

18        Q.   I imagine you changed the exterior of the

19   business.  And you mentioned that having to change

20   the exterior of the business when you first became a

21   Holistic Hydration franchise?

22        A.   All of the windows decals were removed.

23   We covered up the outdoor signage until we could get

24   a contractor to like actually un-install it.  Yes,

25   when you drove by, you wouldn't know that a Vida-Flo

Page 239

1    was there.  Or until we got our own personal sign,

2    you wouldn't know anything was there.

3         Q.    Did you put up your own window decals when

4    you made the change?

5         A.    No.  We don't use window decals.

6         Q.    What did -- you got the Vida-Flo sign

7    there and you covered it up.  Did you have like a

8    banner or anything to let folks know that this is

9    now Holistic Hydration when you changed over?

10        A.    We got a banner, but I do not know if it

11   was like attached on the building or what.  I don't

12   believe we had anything from what I can remember

13   until the big metal Vida-Flow sign was removed.

14        Q.    But you had that covered up?

15        A.    Yes.

16        Q.    Did you cover it up before becoming a

17   Holistic Hydration store?

18        A.    Yes, sir.

19        Q.    What about the interior, did you change

20   the interior signage, like posters?

21        A.    Well, yes.  One we don't use, like the

22   marketing posters, we don't have any of that.  All

23   of our interior, the treatment rooms, it's like

24   night and day.

25              And to give you an example.  In one room,

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 240

1    obviously, we removed all marketing material from

2    the walls.  We installed LED lighting around the

3    rear bays, like behind the treatment chairs.  There

4    is the fake greenery grass type stuff that is along

5    the back wall and down the sides.  We have like

6    butterflies and dragon fly stickers that are like 3D

7    that are by the ivy.  We have mantra quotes,

8    whatever, like every day is a good day or you will

9    succeed.  I don't remember what they say but we have

10   those in the treatment rooms.  When you walk into

11   the front lobby, the entire back wall is the fake

12   ivy and that is surrounding our Holistic Hydration

13   sign.  We have blue roses that are around that sign,

14   but that is more to do with one of our nurse's

15   daughter that was murdered so that's like a tribute

16   to her.  Let's see, more of the LED lighting

17   accents, I don't know what you call that, trim.

18   That's what I can remember.

19        **Q.   Did you add all of those things or make**

20   **all of those changes during the days that you were**

21   **closed as a Vida-Flo franchise before you opened as**

22   **a Holistic Hydration store?**

23        A.   We removed all of the Vida-Flo material

24   information, whatever, before we opened the Holistic

25   Hydration.  And, you know, our interior decor has



Georgia Reporting.com/Schedule
404.389.1155

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                        October 08, 2021

Page 241

```
 1  grown over time.
 2      Q.   Sure.  I mean, you talked about a lot of
 3  stuff.  You installed LED, you got butterfly,
 4  dragonfly stickers, you got mantra quotes, got more
 5  fake ivy up front, you got the blue roses.
 6           What of that did you do in between the
 7  time that you closed the Vida-Flo store and opened
 8  as Holistic Hydration?
 9      A.   From what I remember, it was -- obviously
10  we removed signage.  I put up like paintings, kind
11  of the acrylic type abstract, from what I can
12  remember.  Let's see, I feel like the LED lights was
13  pretty, pretty soon, but it was not during the four
14  days that we were closed.  That would be a whole lot
15  to do in four days.
16      Q.   Did you change the interior paint?
17      A.   It was faded to where I tried to figure
18  out what color it was and I couldn't use one of the
19  little aps, so I mean right now some rooms are like
20  gray.
21      Q.   Did you change the paint?  Did you paint
22  over the paint when you -- I'm sorry.
23           Is it the same paint that was on the walls
24  when you were operating as a Vida-Flo franchise
25  today?
```



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 242

1        A.   Not the trim.  I feel like I changed and

2   the painted of the trim and like switched the whites

3   or made the trim whiter from what I can remember.

4        Q.   When did you do that?

5        A.   I don't know.

6        Q.   Was it during the three or four days you

7   were closed?

8        A.   No.

9        Q.   What did you do with your Vida-Flo

10  Facebook account, did you keep it and change it to

11  Holistic Hydration Facebook account or did you just

12  change the page over from Vida-Flo to Holistic

13  Hydration?

14       A.   Like if I kept the page and changed the

15  name?

16       Q.   Yes.

17       A.   That's what I did.

18       Q.   Did you have a Twitter account when you

19  were with Vida-Flo?

20       A.   I don't think I did.  I don't believe I

21  did.

22       Q.   What about Instagram, did you have a

23  Instagram account when you were a Vida-Flo

24  franchise?

25       A.   Yes.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 243

1        Q.   What did you do with that Instagram

2    account, did you shut it down completely and start a

3    new one or did you just change the information over

4    to Holistic Hydration?

5        A.   It's the same.  I believe I removed all

6    Vida-Flo posts and anything that was Vida-Flo.

7        Q.   So leaving anything that we've already

8    talked about, did you create any new manuals?  You

9    said you had an employment manual.  You might have

10   done some training protocols.

11            Other than those two, did you create any

12   manuals or handbooks other than what we have already

13   talked about?

14       A.   Not that I can recall.

15            (Exhibit Number 22 was introduced.)

16   BY MR. TIMMONS:

17       Q.   I'm pulling up Exhibit 22.

18            Exhibit 22 is a series of letters that are

19   all combined into one exhibit.  I'm on the seventh

20   page of that pdf, VFSUPP-0409.  And it is a letter

21   that was written on October 15th, 2019.  It's on

22   Knowles Gallant stationary.  It was sent via Federal

23   Express to Vida-Flo Alabama, LLC and Holistic

24   Hydration Organization, LLC and it's a demand for

25   preservation of evidence.  It was sent to a Mr.

Page 244

1   Clark and you.  Did you receive this letter?

2        A.   Yes.  I feel like he delivered it to me, I

3   feel like.

4             MS. BUDA:  Michael, do you need to see

5        more of the letter to know if you did?  You

6        sounded very hesitant.

7             THE WITNESS:  Yes.  I mean, I do remember

8        getting something telling me that I had to keep

9        all my stuff.

10  BY MR. TIMMONS:

11       Q.   Okay.  Did you take steps to preserve --

12  I'll read the second paragraph.  It says,

13  specifically, Hydration demands that VF Birmingham

14  preserve all physical and electronic documents,

15  data, related to the VF franchise documents from

16  January 1st, 2016 to the present.  Hydration also

17  demands that VF Birmingham preserve all

18  communications, including but not limited to all

19  emails, text messages, and other communications from

20  personal and company devices with hydration and any

21  Vida-Flo franchisee; Crimson & Red Holdings, LLC,

22  Reva Investments, LCC and Keith McDermott, Boras

23  Kaufman, Shawn Fobas, Matt Borah, Jason Trembley,

24  Peter Park, Michael Gayle, Derrick Purdy, Brian

25  McCullough, Brett McCullough, Jonathan Frost,

Case 1:19-cv-05192-LMM   Document 518   Filed 04/30/23   Page 245 of 262
Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 245

1   Matthew Web Raulston, Jared Christian Seaverns,

2   Brett Snellgrove, Ryan Heavern, Eva Heavern and

3   their agents.  Are you now familiar with the letter?

4        A.   Yes.

5        Q.   Did you take steps to preserve all of the

6   communications, documents and data that was related

7   to this case that were created from January 1st,

8   2016 until October of 2019?

9             MS. BUDA:  Object to form.

10            THE WITNESS:  Yes.  If I received it in

11       October of '19.

12   BY MR. TIMMONS:

13       Q.   Yes.

14       A.   I can't say that before I received that

15   letter that I didn't, you know, destroy the Vida-Flo

16   manual that I was supposed to do, you know.

17       Q.   After you received the letter, did you

18   take steps to preserve what might be evidence in

19   this case?

20            MR. TIMMONS:  Object to form.

21            THE WITNESS:  To my knowledge.

22   BY MR. TIMMONS:

23       Q.   What did do you?

24       A.   Not delete stuff intentionally.  I tried

25   to take care of my phone.  I don't know what all --



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

Page 246

1    I could do.

2        Q.   Mr. McCullough provided us with a lot of

3    text he had between you and him.  We didn't get your

4    text.  What happened to your text between you and

5    Mr. McCullough?

6        A.   It very well could be from my new phone,

7    didn't transfer over.  I'm on like the third phone

8    right now.

9        Q.   Did you save your other two phones?

10       A.   No.  One got wet and was destroyed and the

11   other one was kind of like run over, I guess would

12   be the word, and just eventually died.

13       Q.   What type of phone do you have now?

14       A.   I-Phone.

15       Q.   What type of phone was the phone before

16   that?

17       A.   I-Phone.

18       Q.   What was the phone before that one?

19       A.   I-Phone.

20       Q.   Did you have an iCloud account?

21       A.   I do.

22       Q.   Did you search your iCloud account for any

23   text messages that might have been communications

24   from the folks that I read just now on the letter?

25       A.   Yes.  To my best ability, yes.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                            October 08, 2021

Page 247

1       Q.   Did you enlist somebody to help you with

2    that; in other words, a professional, a computer, I

3    don't know, technician for lack of a better word?

4    Did you bring it to somebody that knows something

5    about data to help you recover text messages or

6    email?

7       A.   No, I didn't know I was supposed to.

8       Q.   Let's go back to Exhibit 9.  Going to the

9    first page of this exhibit which is Bates labeled

10   LA-0001.  It's an email from seaverns@gmail.com.

11   Subject canceled event.  General Vida-Flo

12   discussion.  Tuesday, December 3rd, 2019, 5:06 p.m.

13   And among the individuals that are listed on this --

14   it's got your wrong email address.  It doesn't have

15   the M. W. Gayle on it.

16           So you don't -- obviously this email

17   didn't go to you.  Did you know anything about this

18   December 3rd, 2019 event that was supposed to happen

19   that was then canceled?

20      A.   Not that I can recall, no.

21      Q.   Do you know of any crimes of Mr. McDermott

22   has committed?

23      A.   I'm not completely aware if he has or if

24   he has not, no.

25      Q.   Have you heard anyone say that Mr.



Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 248

1   McDermott committed a crime?

2        A.   That's a possibility.  I would not know

3   who said or if it was said.

4        Q.   **What did you hear?**

5        A.   As I just said, I would not know who said

6   or what was said.

7        Q.   **Okay.**

8             **So just generally somebody might have been**

9   **talking about Mr. McDermott committing a crime but**

10  **you don't know what crime or who said it?**

11       A.   Oh, I'm sorry, I must have misspoke.

12            No, I do not personally remember an exact

13  time when someone specifically told me that.  I do

14  not recall.

15       Q.   **Who told you anything about Mr. McDermott**

16  **committing a crime or possibly committing a crime?**

17       A.   I can't remember.  I do not know.  I

18  generally don't know.

19       Q.   **What crime did they accuse him of**

20  **committing?**

21       A.   Well, we're assuming that the

22  conversations happened and I'm saying that it is a

23  possibility, but that is not a guaranty, but.

24       Q.   **It's not something you remember?**

25       A.   If it did or it didn't or what.  This is

1   2019, I wouldn't know.

2        Q.   I'm saying in general.

3             Regardless, forget about the 2019.  I'll

4   ask these questions again because I think you might

5   have been putting them in context with the 2019.

6             So, at all, in general, ever, are you

7   aware of any crimes that Mr. McDermott has

8   committed?

9        A.   I am not aware of anything for the record,

10  no.

11       Q.   Do you know if he has committed any

12  crimes?

13       A.   Isn't that a question for the police.

14       Q.   What do you know about potential criminal

15  activity?  Do you know if he's committed -- you

16  know, you might see somebody walk in and pull out a

17  gun and rob a liquor store and he's committing a

18  crime.

19            So do you know if Mr. McDermott has done

20  something that you would categorize as a crime?

21            MR. POWELL:  Object to the form.

22            THE WITNESS:  I have never witnessed Keith

23       rob a liquor store if that's what you're asking

24       me.

25  BY MR. TIMMONS:

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 250

1        Q.    I'm asking any crime.  Are you aware of

2  him committing any crimes?

3            MR. POWELL:  Objection.

4            THE WITNESS:  You know, I don't think I'm

5       in a position to say.  I'm not the police.

6  BY MR. TIMMONS:

7        Q.    Okay.

8            Well, do you know what it means to commit

9  a crime?

10           MS. BUDA:  Object to form.

11  BY MR. TIMMONS:.

12       Q.    What does it mean to you?

13       A.    There is a law and you do not break the

14  law.

15       Q.    Do you know of any situations where Mr.

16  McDermott violated the law?

17           MR. BELL:  Are we talking criminal law or

18       civil law?

19           MR. TIMMONS:  Criminal law.

20           MR. BELL:  Object to the form.

21           THE WITNESS:  I can't speak if he did or

22       did not.  Yes, I don't know if he committed

23       crimes.

24  BY MR. TIMMONS:

25       Q.    Have you ever heard anyone say that Mr.

```
 1    McDermott has committed a crime?
 2              MS. BUDA:  Object to form.
 3              THE WITNESS:  Possibility.
 4    BY MR. TIMMONS:
 5         Q.   Who?
 6         A.   I said it was a possibility.  I don't know
 7    who or whom could have or put that -- shared that
 8    with me.
 9         Q.   What -- if you don't know the identity,
10    what crime?
11              MR. POWELL:  Object to the form.
12              THE WITNESS:  I don't know if he has done
13         something illegal.
14    BY MR. TIMMONS:
15         Q.   Have you heard anyone say that Keith has
16    done something illegal?
17         A.   I do not remember that, but it's not to
18    say that it didn't happen.  I don't know.  I don't
19    know if he committed crimes.
20         Q.   Have you ever said that he committed a
21    crime?
22         A.   It's quite a possibility, yes.
23         Q.   What crime did you say he committed.
24              MS. BUDA:  Object to form.
25              THE WITNESS:  I wouldn't know what that
```

1      was.

2    BY MR. TIMMONS:

3        Q.   What behavior did he engage in that you

4    think might have been criminal?

5            MS. BUDA:  Object to form.

6            THE WITNESS:  Like I am not -- I don't

7        know how to view someone's behavior and see if

8        they're committing crimes.

9    BY MR. TIMMONS:

10       Q.   I mean, I could run through a list of

11   them, you know, DUI, murderer, arm robber, drug

12   dealer, drug possession, during user.

13       A.   Yes.  And I do not remember a specific

14   time someone told me that, but it is pure

15   possibility.

16       Q.   Have you ever said -- at any time, have

17   you ever said that Keith committed a crime?

18           MS. BUDA:  Object to form.

19           THE WITNESS:  No, I -- when you say crime,

20       what do you mean?

21   BY MR. TIMMONS:

22       Q.   What does that mean to you?

23           MS. BUDA:  Object to form.

24           THE WITNESS:  I don't know if someone

25       has -- anyone has committed a crime or not.

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                October 08, 2021

1        That is a -- for a judge, jury, I guess, police

2        to decide.  My opinion on it, I guess, really

3        doesn't matter.

4    BY MR. TIMMONS:

5        **Q.  I'm just asking if you said, you know, Mr.**

6    **McDermott stole, Mr. McDermott used drugs?  Have you**

7    **ever said he's stolen?**

8        A.  I do not -- it's quite a possibility

9    because, you know, when you say that, the whole

10   pricing thing, that kind of feels like theft, so

11   that's a possibility.  It's a possibility that.  You

12   know, yes.  I mean, it's 2019.  I have no idea what

13   could have been shared with me or what I shared or

14   whatever because if it's true it's true.

15        MS. BUDA:  Chris, hang on a second.  We've

16        been going like I guess an hour-and-a-half.  I

17        can tell the witness is tired.  I'm going to

18        call for like a five minute comfort break.  We

19        have got like I guess 20 minutes left, but I

20        think we need a break.

21        (Whereupon, a short break was had.)

22   BY MR. TIMMONS:

23        **Q.  So before we broke I was asking you about**

24   **whether you had accused Mr. McDermott of committing**

25   **a crime.  I'll ask it a different way.**

Page 254

1              Have you ever said that Mr. McDermott is

2     bipolar?

3         A.   I don't remember saying that, no.

4         Q.   **Do you remember anyone else saying it?**

5         A.   Not necessarily.  I mean, the shoe fits,

6     but I don't know.

7         Q.   **Okay.**

8              **You don't know.  I mean, you think he is,**

9     **but you haven't heard anybody say that?**

10        A.   I didn't say that I thought he was.

11        Q.   **You said if the shoe fits, so I was**

12    **curious.**

13        A.   I'm just saying if the shoe fits, then

14    that could work.  I don't know if the shoe fits.

15        Q.   **Okay.**

16             **Have you ever said that Mr. McDermott is a**

17    **drug addict?**

18        A.   I do not remember.  I don't remember.

19        Q.   **Have you ever heard somebody say that Mr.**

20    **McDermott is a drug addict?**

21        A.   Not that I recall off the top of my head.

22        Q.   **Do you believe he's a drug at drug addict?**

23             MS. BUDA:  Object to form.

24             THE WITNESS:  I wouldn't know.  I wouldn't

25        know.  I don't know.  I don't know if he is or

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                    October 08, 2021

1      not.  You would have to ask him.

2  BY MR. TIMMONS:

3      **Q.   On the subject of crimes, have you ever**

4  **been arrested before?**

5      A.   I have not.

6      **Q.   Have you ever been a party to a lawsuit**

7  **other than this one?**

8      A.   No, sir.

9      **Q.   Is that yes, I'm sorry?**

10     A.   No, sir.

11          MS. BUDA:  Was that a no?

12          THE WITNESS:  That was a no.  No, I have

13      never been a party to a lawsuit before this

14      one.

15          MR. TIMMONS:  That is all I have.

16          MS. BUDA:  Off the record.

17          (Whereupon, a short break was had.)

18          MS. BUDA:  Back on the record.  We will

19      state for the record that during recess counsel

20      had a discussion and reached an agreement that

21      the remaining attorneys can reserve one hour

22      for questioning on another date that will be

23      agreeable to counsel and the witness.

24          MR. TIMMONS:  Plaintiff agrees.  I'm fine

25      with that.

Case 1:19-cv-05192-LMM   Document 518   Filed 04/30/23   Page 256 of 262
Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 256

1        MS. BUDA:  Okay.  Any objection to that on

2   the record?  Does anyone object?

3        THE WITNESS:  No, ma'am.

4        MS. BUDA:  Okay.  Hearing no objection, we

5   will conclude other than the one hour reserved

6   for a later date.  Thank you everyone.  We are

7   adjourning for today.

8        (Whereupon, the deposition was

9   adjourned at 6:43 p.m.)

10        (Pursuant to Rule 30(e) of the Federal

11   Rules of Civil Procedure and/or O.C.G.A.

12   9-11-30(e), signature of the witness has been

13   reserved.)

14

15

16

17

18

19

20

21

22

23

24

25

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 257

1    STATE OF GEORGIA:

2    COUNTY OF HALL:

3            I hereby certify that the foregoing

4       transcript was reported, as stated in the

5       caption, and the questions and answers thereto

6       were reduced to typewriting under my direction;

7       that the foregoing pages represent a true,

8       complete and correct transcript of the evidence

9       given upon said hearing, and I further certify

10      that I am not of kin or counsel to the parties

11      in the case; am not in the employ of counsel

12      for any of said parties; nor am I in any way

13      interested in the result of said case.

14

15      _____

16      Michelle J. Reeves, CCR-B-1397

17

18

19

20

21

22

23

24

25

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                          October 08, 2021

Page 258

DISCLOSURE OF NO CONTRACT

1

2      I, Michelle J. Reeves, do hereby disclose
pursuant to Article 10.B of the Rules and
3  Regulations of the Board of Court Reporting of
the Judicial Council of Georgia that Elizabeth
4  Gallo Court Reporting, LLC was contacted by the
party taking the deposition to provide court
5  reporting services for this deposition and
there is no contract that is prohibited by
6  O.C.G.A. 15-14-37(a) and (b) or Article 7.C of
the Rules and Regulations of the Board for the
7  taking of this deposition.

8      There is no contract to provide reporting
services between Elizabeth Gallo Court
9  Reporting, LLC or any person with whom
Elizabeth Gallo Court Reporting, LLC has a
10  principal and agency relationship nor any
attorney at law in this action, party to this
11  action, party having a financial interest in
this action, or agent for an attorney at law in
12  this action, party to this action, or party
having a financial interest in this action.
13  Any and all financial arrangements beyond my
usual and customary rates have been disclosed
14  and offered to all parties.

15      This, the 27th day of January, 2023.

16

17  _____
                    Michelle J. Reeves, B-1397
18      Elizabeth Gallo Court Reporting, LLC

19

20

21

22

23

24

25

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 259

1    CASE:  Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.

2    NAME OF WITNESS:    Michael Winn Gayle

3        The preceding deposition was taken

4    in the matter, on the date and at the time and

5    place set out on the title page hereof.

6        It was requested that the deposition

7    be taken by the reporter and that same be

8    reduced to typewritten form.

9        It was agreed by and between counsel

10   and the parties that the deponent will read and

11   sign the transcript of said deposition. Said jurat

12   is to be returned, within 30 days after the transcript

13   is made available, to the following address:

14            Elizabeth Gallo Court Reporting, LLC

15            2900 Chamblee Tucker Road

16            Building 13, First Floor

17            Atlanta, Georgia 30341

18   If an errata is executed and returned

19   to EGCR within the 30 days allocated by law,

20   the executed errata will be sent to the taking

21   attorney for filing with the original transcript.

22   Should an executed errata not be forwarded from

23   EGCR to the taking attorney for filing, the

24   deposition was not reviewed and signed by the

25   deponent within 30 days.

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 260

1    NAME OF CASE:      Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
     DATE OF DEPOSITION: 10/08/2021
2    NAME OF WITNESS:   Michael Winn Gayle

3    EGCR JOB NO.:      81412

4                 CERTIFICATE

5           Before me this day personally
     appeared MICHAEL WINN GAYLE, who, being duly
6    sworn, states that the foregoing transcript of
     his/her deposition, taken in the matter, on
7    the date and at the time and place set out on
     the title page hereof, constitutes a true and
8    accurate transcript of said deposition.

9                 _____

10                  MICHAEL WINN GAYLE

11          SUBSCRIBED and SWORN to before me

12   this _____ day of _____ 20____.

13   in the jurisdiction aforesaid.

14   _____   _____
15   My Commission Expires      Notary Public

16      STATE OF _____

17      COUNTY/CITY OF _____

18

19      []   No changes made to the Errata Sheet;

20   therefore, I am returning only this signed,

21   notarized certificate.

22      []   I am returning this signed,

23   notarized certificate and Errata Sheet with

24   changes noted.

25

Case 1:19-cv-05192-LMM   Document 518   Filed 04/30/23   Page 261 of 262
Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                    October 08, 2021

Page 261

```
1              Errata Sheet

2   NAME OF CASE:      Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.

3   DATE OF DEPOSITION: 10/08/2021

4   NAME OF WITNESS:   Michael Winn Gayle

5   Reason Codes:  1. To clarify the record

6                  2. To correct transcription errors

7                  3. Other
    _____
8   _____

9   Page _____ Line _____ Reason _____

10  From _____ to _____

11  Page _____ Line _____ Reason _____

12  From _____ to _____

13  Page _____ Line _____ Reason _____

14  From _____ to _____

15  Page _____ Line _____ Reason _____

16  From _____ to _____

17  Page _____ Line _____ Reason _____

18  From _____ to _____

19  Page _____ Line _____ Reason _____

20  From _____ to _____

21  Page _____ Line _____ Reason _____

22  From _____ to _____

23

24   SIGNATURE:_____DATE:_____

25              Michael Winn Gayle
```

Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.
Michael Winn Gayle                                                          October 08, 2021

Page 262

1             Errata Sheet

2  NAME OF CASE:      Hydration Station USA Franchise, et al. vs Jared Christian Seaverns, et al.

3  DATE OF DEPOSITION: 10/08/2021

4  NAME OF WITNESS:   Michael Winn Gayle

5  Reason Codes:  1. To clarify the record

6                 2. To correct transcription errors

7                 3. Other

   _____
8  _____

9   Page _____ Line _____ Reason _____

10  From _____ to _____

11  Page _____ Line _____ Reason _____

12  From _____ to _____

13  Page _____ Line _____ Reason _____

14  From _____ to _____

15  Page _____ Line _____ Reason _____

16  From _____ to _____

17  Page _____ Line _____ Reason _____

18  From _____ to _____

19  Page _____ Line _____ Reason _____

20  From _____ to _____

21  Page _____ Line _____ Reason _____

22  From _____ to _____

23

24   SIGNATURE:_____DATE:_____

25          Michael Winn Gayle